# EXHIBIT D

**ORIGINAL**

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------X
LAWRENCE I. FRIEDMANN,

                    Plaintiff,

          -against-

RAYMOUR FURNITURE CO., INC., and
LUCY GOLDSTEIN, individually,

                    Defendants.
------------------------------------------------X

               50 Jericho Quadrangle
               Jericho, New York

               January 4, 2013
               9:52 A.M.

      EXAMINATION BEFORE TRIAL OF LAWRENCE I.

FRIEDMANN, the Plaintiff herein, taken pursuant to

Order, and held at the above time and place before

Terri Fudens, a Stenotype Reporter and Notary

Public of the State of New York.

**GEMINI REPORTING**
**By EMERALD-ASSOCIATED REPORTERS, INC.**

3375 Park Avenue, #4006
Wantagh, New York 11793

Ph.  516-783-4311
Fx.  516-783-5279

```
 1                    LAWRENCE I. FRIEDMANN

 2        A      Correct.

 3        Q      When did you first apply for a job

 4   with Raymour & Flanigan?

 5        A      2005.   Towards the end of 2005.

 6        Q      What position were you applying for?

 7        A      Sales associate.

 8        Q      How did you learn about the opening?

 9        A      Some Seaman's -- former Seaman's

10   employees had already joined Raymour and, you

11   know, me being disenchanted with Levitz, I decided

12   to pursue that.

13        Q      Was there a particular location?

14        A      I interviewed in Yonkers with Larry

15   Gallagher, who was the regional manager at the

16   time.

17        Q      Okay.

18        A      I mean the personnel person was

19   Clayton -- I forgot his last name.  I don't think

20   he's with Raymour any longer.  Clayton Marcus.

21   No, it can't be Clayton Marcus.  That's a

22   furniture company.

23        Q      You interviewed with Mr. Gallagher

24   before you were offered the position?

25        A      Yes, and then he hired me on the
```

```
1                    LAWRENCE I. FRIEDMANN

2    spot.

3         Q      Where was your interview?

4         A      In the Yonkers location.

5         Q      What was discussed during this

6    interview?

7         A      My background and -- you know,

8    basically my background and that I wanted to join

9    their company.  He hired me to start in the

10   Yonkers location with the understanding that I

11   lived in -- you know, on the Queens/Nassau border

12   and wanted to eventually transfer to, you know, a

13   Long Island location.

14        Q      Did you complete an employment

15   application when you applied for Raymour &

16   Flanigan?

17        A      I'm sure, yeah.  Yes.

18               MS. CHICLACOS:  Mark this as 4,

19               please.

20               (Defendant's Exhibit 4,

21               Application for Employment marked for

22               Identification as of this date.)

23        Q      I would like to show you what's been

24   marked as Defendant's Exhibit 4.  Do you recognize

25   this document?
```

27

1           LAWRENCE I. FRIEDMANN

2      A      Yes.

3      Q      What is it?

4      A      It's an employment application from

5  Raymour & Flanigan.

6      Q      Is this the application that you

7  filled out?

8      A      Yes.

9      Q      If you turn to the second page of the

10  document, is that your signature at the bottom?

11      A      Yes.

12      Q      On the application, if you look on

13  the first page, sort of towards the middle, it

14  says names of friends or relatives employed in

15  this location, and you said Stacey Ross, Bill

16  Camaris.   Who are those individuals?

17      A      Stacey Ross is a sales associate in

18  Garden City, and Bill Camaris is a sales associate

19  in Farmingdale.

20      Q      Those were friends of yours?

21      A      Yes.   I worked with Stacey and Bill

22  at Seaman's furniture.

23      Q      You testified that after you

24  interviewed with Mr. Gallagher, he offered you a

25  position?

1                    LAWRENCE I. FRIEDMANN

2          A      Yes.

3          Q      Do you recall when you started with

4    Raymour & Flanigan?

5          A      In October of 2005.

6          Q      Was there an orientation process when

7    you started with the company?

8          A      There is a training program, yes.   At

9    the time there was a two-week training program.

10         Q      What did that training consist of?

11         A      Well, you went to a location in

12   Jersey and you basically trained for a five-day

13   period and then came back home for the weekend,

14   and then trained for a second week again, and then

15   went to the Yonkers store.

16         Q      When you say trained, what do you

17   mean by that?

18         A      Well, their computer systems, their

19   product philosophy, their product mix, went out on

20   the sales floor.  You know, just got a feel for

21   the store.

22         Q      Was there any training related to

23   Human Resources policies and procedures?

24         A      Yes.

25         Q      What did that training consist of?

```
 1                  LAWRENCE I. FRIEDMANN

 2        A       General Human Resource information of

 3   what to do, what not to do.

 4        Q       Do you recall receiving any handbooks

 5   or policies relating to Human Resources

 6   procedures?

 7        A       Yes.

 8        Q       What do you recall receiving?

 9        A       A handbook, which is no longer --

10   everything is on their computer now.

11        Q       Anything else?

12        A       That's really it.

13                  MS. CHICLACOS:  Defendant's

14                  Exhibit 5, please.

15                  (Defendant's Exhibit 5, Raymour

16                  & Flanigan New Hire Form marked for

17                  Identification as of this date.)

18        Q       Mr. Friedmann, I would like to show

19   you what's been marked as Defendant's Exhibit 5.

20                  Do you recognize this document?

21        A       Not really.

22        Q       If you look towards the bottom of the

23   document, is that your signature?

24        A       Yes.

25        Q       Does this refresh your recollection
```

1              LAWRENCE I. FRIEDMANN

2      as to any other documents you might have received

3      during this training process?

4              A       No.

5              Q       You testified you were hired as a

6      sales associate?

7              A       Correct.

8              Q       When you were hired, did Raymour &

9      Flanigan have any policy with respect to sales

10     that needed to be generated by a sales associate

11     at a particular showroom?

12             A       Yes.

13             Q       If you could please describe that

14     policy to me.

15             A       Minimum sales volume was $750,000 per

16     year.

17             Q       Meaning that as a sales associate,

18     you needed to have sales of a minimum --

19             A       A minimum of --

20             Q       -- of $750,000 per year?

21             A       Correct, yes.

22             Q       Then how did your compensation work

23     with respect to that?

24             A       Commission against a draw.

25             Q       What does delivered sales mean?

31

```
1                    LAWRENCE I. FRIEDMANN
2         A     That's what you're paid on.
3                    MR. ANDREWS:  Objection.
4         A     That's what you're paid on.
5         Q     Meaning what?
6         A     That's the merchandise that you have
7   to deliver.
8         Q     Delivered meaning has to be delivered
9   to the customer?
10        A     Correct.
11        Q     Not just writing up an invoice for
12  the merchandise?
13        A     No.  It has to be delivered.
14        Q     So the $750,000 was based on --
15        A     Is delivered sales.
16        Q     Let me finish my question -- is based
17  on delivered sales?
18        A     Correct.
19        Q     When you started working in the
20  Yonkers location, who did you report to?
21        A     Richard Petransky was the showroom
22  manager at the time.  He since went on to become
23  the regional manager of the -- you know, the
24  Garden City, Long Island store, and to my
25  knowledge after that became store manager at
```

32

```
 1                    LAWRENCE I. FRIEDMANN
 2     Farmingdale.  I don't know if he's still with the
 3     firm.
 4          Q     During the time you were in the
 5     Yonkers location, did you report -- was he the
 6     showroom manager during the entire time you were
 7     there?
 8          A     The store manager, yes.
 9          Q     Anyone else that you reported to; an
10     assistant store manager?
11          A     No.  He's deceased.  He was a young
12     guy.  I forgot his name.
13                    MR. ANDREWS:  Is that someone
14                    you would have reported to?
15          A     Well, he was assistant manager there,
16     and he was also in Garden City.  But he passed
17     away while I was still with the company.
18          Q     As a sales associate, what were your
19     duties and responsibilities?
20          A     To sell the customer, to maintain the
21     store.  Basically sales and, you know, follow up
22     on paperwork and general sales responsibilities.
23          Q     So you had interaction with the
24     public?
25          A     Yes.
```

33

1                      LAWRENCE I. FRIEDMANN

2          Q       And you say maintain the store.  What

3     did you mean by that?

4          A       Each morning you would go around and

5     fix up the store before the store opening if you

6     were on the morning shift, and -- you know, just

7     for presentation purposes.

8          Q       Did there come a point in time when

9     you requested a transfer to a different location?

10         A       Well, I did.  I requested a transfer

11    to the Carle Place location.

12         Q       Why was that?

13         A       Because I lived 10 minutes away from

14    that store.

15         Q       Do you recall when you requested that

16    transfer?

17         A       Well, from the beginning actually,

18    because that was the underlying agreement, that I

19    would eventually be transferred to Carle Place.

20                 Eventually Mr. Petransky gave into my

21    requests and I was transferred.  I think if I

22    joined in October, I was probably transferred to

23    Carle Place either by April or May.

24         Q       Of 2006?

25         A       Correct.

1                    LAWRENCE I. FRIEDMANN

2          Q      In connection with your request for a

3     transfer, did you interview with anyone at the

4     Carle Place showroom?

5          A      Not really interview.  I mean I was

6     introduced to the store manager at the time.

7          Q      Who was that?

8          A      Lucy Goldstein.

9          Q      Did you meet with her before your

10    transfer?

11         A      I would meet her -- actually, I met

12    her once when I was still in training.  There

13    really was no formal interview with her to come to

14    that location.

15         Q      Do you know if Miss Goldstein had to

16    approve your transfer request?

17         A      I'm sure she did, but my performance

18    was deserving.

19         Q      You said you met her while you were

20    in training?

21         A      I met her briefly in the Fairfield

22    store.  She was probably out there for a meeting.

23         Q      So before starting at the Carle Place

24    showroom, did you have any other interaction with

25    her besides meeting her during the training

35

1                     LAWRENCE I. FRIEDMANN

2     process?

3            A     No.  No.

4            Q     At the Carle Place location, she was

5     the store manager when you transferred there?

6            A     Yes.

7            Q     Did you report to her?

8            A     Yes.

9            Q     You remained a sales associate?

10           A     Correct, yes.

11           Q     Did your duties and responsibilities

12    stay the same?

13           A     Yes.

14           Q     Did the requirement that you have

15    $750,000 in delivered sales annually remain the

16    same in the Carle Place location?

17           A     Yes.

18           Q     Did your compensation structure

19    remain the same in how you described, it was a

20    commission against a draw?

21           A     Yes.

22           Q     Was there an assistant manager that

23    you reported to in the Carle Place location?

24           A     Well, there were a few different

25    assistant managers.  There was a Chris Bonaventura

36

```
 1              LAWRENCE I. FRIEDMANN

 2   at one time.  I really forget who else was the

 3   assistant manager.  There were others, but I don't

 4   recall who they were.

 5        Q    Did there come a point in time when

 6   you requested another transfer to a different

 7   location?

 8        A    When they opened the Garden City

 9   store.

10        Q    When was that?

11        A    Probably two years after.  Maybe

12   2008.  I'm not sure.  When the store opened.  But

13   I was in Carle Place for a couple -- at least a

14   couple of years.

15        Q    Why did you want to transfer to the

16   Garden City showroom?

17        A    Well, it was a new location.  It was

18   a much larger store, much more potential.

19        Q    Potential for what?

20        A    Sales volume.  Income, sales volume.

21        Q    Did you interview with anyone in your

22   request for a transfer to the new showroom?

23        A    Lucy Goldstein was the manager of the

24   Garden City store, so she chose who she wanted to

25   come to the store.
```

1              LAWRENCE I. FRIEDMANN

2        Q      Miss Goldstein chose you to join her,

3    as well as others, in the Garden City showroom?

4        A      Mm-hmm.  She asked who wanted to come

5    there, and I said I wanted to, and she said okay.

6        Q      At the Garden City showroom, you

7    remained a sales associate?

8        A      Mm-hmm.  Yes.

9        Q      Did your duties and responsibilities

10   remain the same?

11       A      Yes.

12       Q      Did the requirement that you have

13   $750,000 in delivered sales annually remain when

14   you started working at the Garden City showroom?

15       A      Yes.

16       Q      You reported to Lucy Goldstein at

17   this location?

18       A      Yes.

19       Q      Were there assistant managers at this

20   location?

21       A      There were.

22       Q      When you started there in 2008, who

23   were the assistant managers?

24       A      Mitchell Medonic (phonetic) was one

25   of them for a time.  The person who is deceased,

```
 1                  LAWRENCE I. FRIEDMANN
 2   his first name was John.  He was also a showroom
 3   manager there at one point.  Iman Kasmi was later
 4   on.
 5           Q      Anyone else, assistant managers?
 6           A      Anthony Baines was there for a while.
 7           Q      Anyone else?
 8           A      There were a couple of others, but I
 9   really have forgotten their names.
10           Q      During your time at the Garden City
11   showroom, did Miss Goldstein remain the manager of
12   that showroom?
13           A      Yes.
14           Q      Besides Yonkers, Carle Place and
15   Garden City, did you work at any other locations?
16           A      I was asked to interview for another
17   location just prior to me being dismissed.
18           Q      Tell me about that.
19           A      I was asked to interview at the Carle
20   Place location again.
21           Q      Who asked you to interview?
22           A      Lucy Goldstein and Tony Bender, who
23   was the regional at the time.
24           Q      Do you know why they asked you to
25   interview for a position at Carle Place?
```

39

1                    LAWRENCE I. FRIEDMANN

2          A     They felt I would be more comfortable

3     in a smaller location.  I didn't request it.

4          Q     Did they say that to you?

5          A     Yes.

6          Q     Did they explain what they meant by

7     that?

8          A     Well, I was already on a coaching

9     plan.

10         Q     Did you interview?

11         A     I did.

12         Q     Who did you meet with there?

13         A     The first name was Laura.  I don't

14    remember her last name.

15         Q     Do you recall when you met with

16    Laura?

17         A     Probably six weeks before I was let

18    go.

19         Q     You're referring to your termination

20    from Raymour & Flanigan?

21         A     Yes.

22         Q     Where did you meet with Laura?

23         A     In the Carle Place location.

24         Q     Was it just you and her, or was

25    anyone else present?

1                      LAWRENCE I. FRIEDMANN

2       Flanigan, did any of your supervisors ever discuss

3       your performance with you?

4              A       Only when I wound up on the coaching

5       plan.

6              Q       During your employment with Raymour &

7       Flanigan, did you ever receive any performance

8       evaluations?

9              A       Yes.

10             Q       Do you recall when you received

11      evaluations?

12             A       Well, the first four years of my

13      employment -- the first year my sales volume was a

14      million 19.  The second year it was 856,000.  The

15      third year it was 846.  The fourth year it was

16      792, and the fifth year was the sciatica issue,

17      which I was, you know, under doctor's care for

18      about seven months.  That's when my volume started

19      to drop.

20                      MR. ANDREWS:  I think Jessica's

21                      question was did you receive

22                      performance evaluations.

23                      MS. CHICLACOS:  That's fine.

24                      And I will clarify with him, if

25                      necessary.

53

```
 1                    LAWRENCE I. FRIEDMANN

 2          Q      Is this the coaching plan you were

 3   just testifying about?

 4          A      Yes.

 5          Q      Do you see that the document on the

 6   second page is dated May 7, 2011?

 7          A      Yes.

 8          Q      Is that your signature --

 9          A      Yes, it is.

10          Q      -- on the second page?

11                 Did Miss Goldstein provide you with

12   this document?

13          A      Yes.

14          Q      Did she meet with you to give it to

15   you?

16          A      Yes.

17          Q      What did she say?

18          A      Along with Anthony Baines.

19          Q      He was the assistant store manager at

20   that time?

21          A      Yes.

22          Q      Where did you meet with

23   Miss Goldstein and Mr. Baines?

24          A      At a dining room table in the main

25   showroom.
```

54

```
 1                  LAWRENCE I. FRIEDMANN

 2        Q     Was anyone else present?

 3        A     No.

 4        Q     What did Miss Goldstein say to you

 5   when she provided you with this document?

 6        A     That this was the requirements, you

 7   know, the expectations.

 8        Q     Are you referring to --

 9        A     Well, I'm looking at the goal

10   figures.  These are expected -- you know,

11   expectations of goals.  I don't know what the

12   actual is.  Is it listed here?  No, I don't see

13   any.

14        Q     If you look at the top of the

15   document --

16        A     Yes.

17        Q     -- it refers to a 750,000 business

18   planner for 2011.

19        A     Yes.

20        Q     Does that refer to the $750,000

21   requirement --

22        A     Yes, it does.

23        Q     Let me finish my question.

24        A     Sorry.

25        Q     -- of delivered sales for the year?
```

55

1                    LAWRENCE I. FRIEDMANN

2          A      Yes.

3          Q      If you see there as well, does it say

4     that your delivered sales to date thus far were

5     $252,750?

6          A      And projected out to 617,435.

7          Q      For the year?

8          A      Yes.

9          Q      Do you recall anything that

10    Miss Goldstein said to you when she gave this to

11    you?

12         A      Honestly, at this point I started to

13    sense that they had an agenda, because the 617,435

14    on May 7th projected out could change rapidly.

15    It's only five months into the year.

16         Q      What was your sense of an agenda?

17         A      Well, just things were happening.  I

18    didn't like the interview in Carle Place to begin

19    with.  I had a sense there.  I had a sense

20    afterwards too, but I just looked aside and said

21    maybe things will change.  But I just started to

22    feel something was changing.

23         Q      What do you mean by that?

24         A      That it was the beginning of what

25    happened.

56

1              LAWRENCE I. FRIEDMANN

2        Q     What do you mean by what happened?

3        A     That I was let go.

4        Q     If you look at this document, like

5   you said, it's dated May 7, 2011.

6        A     Mm-hmm.

7        Q     Do you recall if you met with Laura

8   in Carle Place before or after this date?

9        A     Probably before, maybe a day or two.

10  It's right around this date, because this is when

11  the coaching plan started.

12       Q     Going back to the meeting with

13  Miss Goldstein and Mr. Baines when she provided

14  you this document --

15       A     Right.

16       Q     -- can you recall what Miss Goldstein

17  said to you during this meeting?

18       A     Not really.

19       Q     Do you recall what Mr. Baines said

20  during this meeting?

21       A     Not really.

22       Q     Do you recall what, if anything, you

23  said during this meeting?

24       A     Not really.

25       Q     If you see in the document it says:

1                    LAWRENCE I. FRIEDMANN

2    Below will be your goals for the next two weeks.

3           A    Right.

4           Q    And that there would be follow-up?

5           A    Correct.

6           Q    Was there follow-up?

7           A    Not really.  I mean there's follow-up

8    where you're signing another piece of paper every

9    two weeks, but there was no coaching to speak of.

10   There was no initiation of coaching or intent to

11   coach.

12          Q    Did you ask Miss Goldstein for any

13   assistance to help raise your sales volume at this

14   point?

15          A    I was starting to feel it was

16   pointless.

17          Q    Please answer the question.  Did you

18   at this point ask her for any assistance to help

19   raise your sales volume?

20          A    No.

21          Q    Did you ask Mr. Baines?

22          A    No.

23          Q    Did you ask anyone at the Garden City

24   showroom at this point for any assistance to help

25   raise your sales volume?

```
 1                  LAWRENCE I. FRIEDMANN

 2        A    No.

 3        Q    Did you ask anyone at Raymour &

 4   Flanigan for assistance in help raising your sales

 5   volume?

 6        A    No.

 7                  MS. CHICLACOS:  10, please.

 8                  (Defendant's Exhibit 10, Raymour

 9                  & Flanigan Coaching for Success

10                  document dated May 23, 2011 marked

11                  for Identification as of this date.)

12        Q    Mr. Friedmann, I show you what's been

13   marked as Defendant's Exhibit 10.  Do you

14   recognize this document?

15        A    Same coaching plan.

16        Q    If you look at the second page of the

17   document, it's dated May 23, 2011; is that

18   correct?

19        A    Yes.

20        Q    Is that your signature?

21        A    Yes.

22        Q    Is that Miss Goldstein's signature on

23   the document?

24        A    Yes.

25        Q    So this is different than Defendant's
```

1             LAWRENCE I. FRIEDMANN

2    Exhibit 9, the previous Coaching for Success plan

3    we looked at?

4         A     It's the second review date.

5         Q     Is it the follow-up that was

6    discussed when you were initially provided with

7    the plan?

8         A     Well, it's dated 5/23, so it is the

9    follow-up.

10        Q     It was approximately two weeks later?

11        A     Correct.

12        Q     Did Miss Goldstein provide you with

13   this document?

14        A     Yes, she did.

15        Q     When did she do so?

16        A     Actually, you know, she did not

17   provide me with documents.  She did not provide me

18   with copies of these.

19        Q     Did you sign this document?

20        A     I signed it, but she didn't provide

21   me with a copy of the document.

22        Q     Did you have an opportunity to review

23   it before signing it?

24        A     Yes.

25        Q     You met with her and she showed you

60

1                     LAWRENCE I. FRIEDMANN

2       this document, and you reviewed it for you to

3       sign?

4            A     I signed it because that's what you

5       have to do, sign it.

6            Q     Where did she do that?

7            A     At the same dining room table.

8            Q     Was anyone else present?

9            A     I don't remember who else was

10      present.  There's two or three different showroom

11      managers, so I really don't recall who was there.

12           Q     At this point in time in May of 2008,

13      there was Anthony Baines; correct?

14           A     Yes.  Iman Kasmi was also there as a

15      showroom manager.  I don't recall if there was a

16      third manager at this point.

17           Q     Do you recall what Miss Goldstein

18      said to you when she met with you to provide you

19      with this document?

20           A     Not really.

21           Q     Do you remember what you said to

22      Miss Goldstein when you met with her when she gave

23      you this document?

24           A     Not really.

25           Q     If you look at the column on the

1                    LAWRENCE I. FRIEDMANN

2       bottom of the page --

3              A      Okay.

4              Q      -- showing that for one week the

5       expectation for delivered sales is $20,000; do you

6       see that?

7              A      Yes.

8              Q      Then are there numbers written in

9       showing what your actual delivered sales were?

10             A      Yes.

11             Q      And then at the bottom there's a

12      notation as of 5/23, year to date, minus 63,799.

13      Is that your handwriting?

14             A      Yes.  No.  No, that's not my

15      handwriting.

16             Q      Do you know whose handwriting that

17      is?

18             A      I have no idea.

19             Q      Do you know what that's referring to?

20             A      Not really.  I mean maybe this is a

21      make-up figure for the -- I really don't.

22             Q      At this point in time, did you ask

23      Miss Goldstein for any assistance in helping raise

24      your sales goals?

25             A      No.

1              LAWRENCE I. FRIEDMANN

2        Q     Did you ask anyone else at Raymour &

3   Flanigan for assistance?

4        A     No, nor was any offered.

5        Q     Did Miss Goldstein discuss with you

6   any follow-up that would be taken following this

7   with respect to your sales goals?

8        A     I don't recall.

9        Q     While you were working at the Garden

10  City showroom, did you ever receive an action plan

11  and performance agreement?

12       A     Prior to this?

13       Q     Following this.

14       A     The final -- well, there might have

15  been one other -- I mean I was let go on June 18,

16  so there had to be another.

17             MS. CHICLACOS:  Defendant's

18             Exhibit 11, please.

19             (Defendant's Exhibit 11, Raymour

20             & Flanigan Coaching for Success

21             document dated June 13, 2011 marked

22             for Identification as of this date.)

23       Q     Mr. Friedmann, this is what's been

24  marked as Defendant's Exhibit 11.

25       A     Okay.

63

1                    LAWRENCE I. FRIEDMANN

2        Q      Do you recognize this document?

3        A      Yes.

4        Q      What is it?

5        A      It's the -- it's an action plan.

6        Q      What is an action plan?

7        A      Which an action plan would ultimately

8    lead to termination.

9        Q      Who provided you with this action

10   plan?

11       A      I see Lucy Goldstein signed it, so it

12   would be here.

13       Q      On the second page, that's your

14   signature?

15       A      Yes.

16       Q      The document is dated June 13, 2011?

17       A      Yes, it is.

18       Q      Do you recall meeting with

19   Miss Goldstein when she provided you with this

20   action plan?

21       A      At the same dining room table.

22       Q      Do you recall if anyone else was

23   present?

24       A      No, I do not.

25       Q      Do you recall what Miss Goldstein

64

1                    LAWRENCE I. FRIEDMANN

2     said during this meeting?

3          A      No.

4          Q      Do you recall what you said during

5     this meeting?

6          A      No.

7          Q      Were you meeting your sales goals at

8     this point in time?

9          A      I'm not sure.  I mean I'm not sure if

10    I met my sales goals to come up to the level of

11    750 or the action plan.  No, I don't know.

12         Q      If you look to the top square of the

13    document, it shows that the date range that they

14    were analyzing your sales goals was January 1,

15    2011 through June 10, 2011; correct?

16         A      Correct.

17         Q      That would be for the first half of

18    the year?

19         A      Right.

20         Q      Do you see where it says that your

21    delivered sales are $322,875?

22         A      Yes.

23         Q      So based on the $750,000 requirement

24    in delivered sales, at this point in time were you

25    meeting your goals to have met that number?

65

1          LAWRENCE I. FRIEDMANN

2          A     No, I was not, but I believe the

3    projection would be higher than the 617,435 that

4    was dated 5/7.  So I was making progress at that

5    point, because 322,875, if you project it out to

6    the end of the year, would probably be 660, 670.

7    So it was climbing, because this is only through

8    June 13th.

9          Q     I understand that.  But the number at

10   this point in time for the year was $750,000;

11   correct?

12         A     That was the goal figure.

13         Q     In delivered sales?

14         A     The goal figure, but it was climbing.

15   The figure -- if you look at it from May 7th where

16   they projected 617,435, the 322,875 would probably

17   project out to 660, 675, so it was climbing.

18         Q     You're referring to the document

19   Defendant's Exhibit 10 where the previous month, a

20   month before --

21         A     No.  I'm looking at the action plan

22   on June -- dated June 13th.  It shows that my

23   annual expectation was 322,875 in delivered sales.

24                    MR. ANDREWS:  Is that year to

25              date?

66

1          LAWRENCE I. FRIEDMANN

2               THE WITNESS:  Year to date.

3               MS. DAUB:  Off the record for a

4          second.

5               (Discussion held off the

6          record.)

7    CONTINUED EXAMINATION

8    BY MS. CHICLACOS:

9          Q     Mr. Friedmann, if you could look at

10   Exhibit 9, which is the May 7, 2011 Coaching for

11   Success plan, if you could take that out, please.

12   They're tagged at the bottom.

13         A     I see that.

14         Q     If you could focus on that one,

15   please.

16         A     Yes.

17         Q     At the top of the document it states

18   that you underperformed for this year to date to

19   the minimum expectation of $252,750 in delivered

20   sales by $53,537.

21         A     Okay.

22         Q     Is it correct that this document is

23   saying that at this point the minimum expectation

24   of delivered sales was $252,750?

25         A     Right.

1               LAWRENCE I. FRIEDMANN

2       Q       And what does the document reflect

3   with respect to your performance?

4               MR. ANDREWS:   Objection.   I

5               think that's a compound question.

6       A       The 53,000?

7       Q       Does that reflect that you were under

8   the minimum expectation by $53,537?

9       A       Yes, to get to 750.

10      Q       Okay.   Do you have any reason to

11  believe that this number is inaccurate?

12      A       I have no reason to believe it's

13  accurate or inaccurate.   I don't.   I mean no, I

14  have no reason to believe it's inaccurate.

15      Q       The minimum expectation at this point

16  was $252,750, still looking at Defendant's

17  Exhibit 9.

18      A       Okay.

19      Q       So you underperformed by $53,537?

20      A       Correct.

21      Q       Does that mean that your actual

22  delivered sales up to that point in time were less

23  than $200,000?

24      A       By $53,000.   I don't know at this

25  point.   I'm assuming that's yes.

68

1                    LAWRENCE I. FRIEDMANN

2          Q     You testified that you had no reason

3     to believe that these numbers aren't accurate.

4          A     Okay.

5          Q     So if the minimum expectation was

6     $252,750 --

7          A     Correct.

8          Q     -- you underperformed by $53,537;

9     correct?

10         A     Correct.

11         Q     So that would mean that your actual

12    delivered sales to that point were less than

13    $200,000; correct?

14         A     I'm assuming so.  I mean I don't

15    know.

16         Q     Based on this document.

17         A     Well, that it was under it by a

18    thousand dollars.  I mean is that what you're --

19    it would be the difference between the two

20    numbers.

21         Q     The difference between the two

22    numbers, correct, which is less than $200,000?

23         A     Correct.  Yes.

24         Q     If you could, please look at

25    Defendant's Exhibit 10 now, please.

74

1                    LAWRENCE I. FRIEDMANN

2                    MR. ANDREWS:   Okay.

3          Q     So your actual for all of these five

4    categories in which you were evaluated was less

5    than the expected?

6          A     Yes.

7          Q     Then if we can take a look at

8    Defendant's Exhibit 11 one more time, please, the

9    last one I've given you.

10         A     Yes.

11         Q     This is the action plan and

12   performance agreement dated June 13, 2011;

13   correct?

14         A     Yes.

15         Q     If you look at the square box at the

16   top --

17         A     Yes.

18         Q     -- it says you underperformed for

19   this year-to-date period to the minium expectation

20   of $322,875 in delivered sales by $48,190;

21   correct?

22         A     Yes.  So that went down.

23         Q     So this document says that at this

24   point in time as of June 13th, the minimum

25   expectation of sales was approximately $322,000?

1                    LAWRENCE I. FRIEDMANN

2         A     Correct.

3         Q     And it shows that your delivered

4    sales were almost $50,000 less than the minimum

5    expectation; correct?

6                    MR. ANDREWS:   Objection.

7         A     But it also improved by $5,000 over

8    the previous.

9         Q     It shows it's approximately $50,000

10   less than the expected sales?

11        A     Yes.

12        Q     So based on this, you were less than

13   $300,000 for the minimum expectation for the year

14   at this point?

15        A     Yes.

16        Q     Do you have any reason to believe

17   that those numbers aren't accurate?

18        A     No.

19        Q     I would like to turn your attention

20   to the second page of Defendant's Exhibit 11,

21   please, at the top the box marked actions for the

22   associate.

23        A     Yes.

24        Q     It says:  Larry needs to consistently

25   turn any of his ups over to a manager if he could

1                    LAWRENCE I. FRIEDMANN

2          A     There was also a woman there, I've

3    forgotten her name, that was an assistant manager

4    that I also got involved with sales.  I really

5    have forgotten her name.

6          Q     Does Raymour & Flanigan have any

7    special promotions during the month of May?

8          A     Yes.  Friends and family.

9          Q     What is friends and family?

10         A     That's where you contact customers

11   twice a year.  They offer 20 percent discounts,

12   you know, on merchandise, and they do quite well

13   with that.  End of sentence.

14         Q     I would like to turn your attention

15   to June 18, 2011.

16         A     Mm-hmm.

17         Q     What happened that day?

18         A     Well, I was off on the 17th, had a

19   very nice birthday party, and then came in on the

20   18th, and I was not able to get on to the

21   computer.  I wasn't even suspicious at the time.

22   I just thought something happened with my -- you

23   know, just to get on.

24               And then about 12, 1 o'clock Lucy

25   called me to -- you know, to ask me to come to the

84

```
 1                  LAWRENCE I. FRIEDMANN
 2    asked me prior to that when I planned to retire,
 3    and I said maybe in another five years.
 4        Q      During this conversation with
 5    Mr. Kasmi after your employment was terminated,
 6    did you mention that you were going to retire?
 7        A      No.
 8        Q      So why would Mr. Kasmi mention his
 9    father's retirement?
10                   MR. ANDREWS:   Objection.
11        A      Because he was, in his way, trying to
12    be a nice guy.  I don't know what he was trying to
13    say, but it was irritating.
14        Q      Why was it irritating?
15        A      Why was it irritating?  Because it
16    was referring to age.
17        Q      How is that referring to age?
18        A      Well, Mr. Kasmi is in his mid 40s,
19    the same age as my sons, so I'm assuming his
20    father is around my age.  End of sentence.
21        Q      In your Complaint you state that when
22    Miss Goldstein terminated you on June 18, 2011,
23    she stated:  Enjoy your summer in the Hamptons.
24        A      Yes, she did.
25        Q      When did she make that statement?
```

85

1               LAWRENCE I. FRIEDMANN

2          A    As she was walking me out the door.

3          Q    The door to the back office or the

4     door to the showroom?

5          A    No.  The door to the showroom.

6          Q    Did you have a Hamptons home?

7          A    I don't own a Hamptons home.

8          Q    Did you rent in the Hamptons?

9          A    No, I didn't rent in the Hamptons.

10         Q    You never rented in the Hamptons?

11         A    I rented in the Hamptons when I was

12    27 years old or 19 years old.

13         Q    Did you vacation in the Hamptons?

14         A    I did.

15         Q    What years did you vacation in the

16    Hamptons?

17         A    From 19 on.  I mean -- no.  My

18    ex-wife has a home in the Hamptons.

19         Q    Do you visit her in that home every

20    summer?

21              MR. ANDREWS:  Objection.

22         A    She lives in California.  My son --

23    my older son uses the home regularly.  I use the

24    home regularly.

25         Q    Do you use the home every summer?

86

                    LAWRENCE I. FRIEDMANN

1

2       A       As much as I can, yes.

3       Q       Did you use the home in 2008?

4       A       In 2008?

5       Q       Yes.  During the summer.

6       A       Probably on my days off.

7       Q       Did you use the home --

8       A       Or vacation time.

9       Q       Did you use the home in 2009?

10      A       Probably.

11      Q       Did you use the home in 2010?

12      A       Probably.

13      Q       Did you have plans to use the home

14  during the summer of 2011?

15      A       No.  I had plans to figure out what I

16  was going to do after my termination.

17      Q       Before your termination.

18      A       Did I have plans to use it?  Again,

19  on my days off or vacation time.

20      Q       Did you discuss the fact that your

21  ex-wife owned a home in the Hamptons with people

22  from work?

23      A       I mean people were aware that there

24  was a home in the Hamptons.

25      Q       Did you tell Miss Goldstein that your

1                    LAWRENCE I. FRIEDMANN

2    ex-wife owned a home in the Hamptons?

3         A    She was aware that there was a home

4    in the Hamptons.  I didn't discuss who owned the

5    home.

6         Q    That's fine.  Just that you had use

7    of a home in the Hamptons for the summer?

8         A    Yes.  She was wishing me well.

9         Q    What do you mean, when she said that

10   to you?

11        A    Yes.

12        Q    Do you know who made the decision to

13   terminate your employment?

14        A    No.

15        Q    Did you ask Miss Goldstein why you

16   were being terminated?

17        A    It was pointless.

18        Q    Did you ask her why you were being

19   terminated?

20        A    No.

21        Q    Did she provide you with a reason why

22   you were being terminated?

23        A    Well, she would go back to sales

24   figures.

25        Q    Did she provide you with a reason

89

1                    LAWRENCE I. FRIEDMANN

2        A     Sometimes they would leave an "N"

3   off, and I would not dispute it, you know, but

4   that's it.  F-R-I-E-D-M-A-N-N is the way it's

5   supposed to be spelled.

6        Q     You've never used a different

7   spelling.

8        A     No.

9              MS. CHICLACOS:  Let's take

10             lunch.

11             (After a luncheon recess was

12             taken, the following was had:)

13

14        A F T E R N O O N   S E S S I O N

15   CONTINUED EXAMINATION

16   BY MS. CHICLACOS:

17        Q     Mr. Friedmann, in this case you

18   allege that you have a disability?

19        A     Yes.

20        Q     What is this disability?

21        A     Well, I had back surgery in 2002,

22   herniated disks, L4 and L5.  That occurred when I

23   was still with Seaman's.  And I was out of work

24   for four months.  I had attempted to avoid surgery

25   by taking epidural injections, and after two

1                LAWRENCE I. FRIEDMANN

2    shots, they didn't work.  So then I went for the

3    surgery, and the rehab was about eight weeks.

4                Along with the disk problem, it was

5    severe sciatica pain.  So I would try -- you

6    really don't know how -- what triggers the

7    sciatica pain, so I would do different things to

8    try and avoid it.  I had a minor episode in 2008.

9    I always start by going to my orthopedist, and

10   then he would refer me to, you know, a specialist

11   if necessary.  That probably lasted a month or so.

12               But I believe in 2009 or 10, you

13   know, I don't have the exact dates, I had a severe

14   occurrence.  That was early in the year.  It was

15   probably like January or the beginning of

16   February.  It was already bothering me.  And then

17   by the time I went to the orthopedist, it was

18   another three weeks.  At this point it was

19   serious.  I was not able to stand up.  The pain

20   was severe again, and he referred me to a pain

21   management doctor, Dr. Britestein.

22               So, you know, I went for the initial

23   consultation, and then he sent me for an MRI.  And

24   the MRI said that the sciatica condition exists

25   and that there's an increasing -- not severe, but

1                LAWRENCE I. FRIEDMANN

2  arthritis increases.  So to basically sum up, this

3  took about seven months until I was back to normal

4  again.  I went for the epidural -- I was cynical

5  about the epidural injections because they didn't

6  work the first time prior to the surgery.  But,

7  you know, he said why are we being negative.  So

8  we went forward with it, and it did help.

9            By the time the injections -- it's

10 like two or three injections spaced out two or

11 three weeks apart, you know, took hold, it then --

12 then the pain subsided.  I went for physical

13 therapy.  But I was not able to really stay on my

14 feet at work for too long a period, because with

15 their up system at Raymour, which is a good

16 system, you have to stand at the door on the 10

17 spot.  And you could be standing there for 15, 20,

18 25 minutes until a customer walks through the

19 door.

20            I just couldn't stand like that for

21 that period of time.  I would try to lean on a

22 dining room table.  I would try different things

23 to just relieve the pain.  And it just -- the

24 sciatica is just excruciating when it occurs.

25 Finally after seven months it got, you know, under

1                    LAWRENCE I. FRIEDMANN

2       control again, but that destroyed that year.  I

3       mean up until then, the prior year I had done

4       $792,000 in volume, and I think I wound up the

5       year, that particular year, with 646, something

6       like that, in volume.

7               Q       What is a 10 spot?

8               A       This is Raymour & Flanigan's up

9       system.  They have a 10, which is you're in

10      position to greet the customer.  The 20 spot, the

11      customer -- when the 10 man greets the customer,

12      the 20 man moves up to the 10 spot to be in

13      position to greet a customer.  And then there is a

14      30 spot, which is by the entrance of the office,

15      you know, and you have to be ready to assume the

16      20 spot.

17                      But I could not -- I constantly had

18      to sit down to relieve the pain.  I just

19      couldn't -- no matter what I did during that

20      period, I just couldn't make the pain disappear.

21              Q       So let's backtrack for a second.  So

22      you first experienced an issue in 2002?

23              A       That was when I had gone for surgery,

24      yes.

25              Q       What had happened that you had a

93

1            LAWRENCE I. FRIEDMANN

2    herniated disk?

3         A    I had herniated disks, L4 and L5.  I

4    initially went to the same orthopedist, but he

5    doesn't do surgery on a herniated disk, so he

6    referred me to a surgeon.  And along with the

7    surgeon, he also referred me to a pain management

8    doctor, and he believes in pain management.

9              So the surgeon really told me that I

10   should go for the surgery immediately instead of

11   going to the -- but I had the orthopedist telling

12   me to try the pain management first.  So that

13   wasted probably another six, eight weeks until I

14   finally said I'm going for the surgery.  Then I

15   had an 8-week rehab.

16        Q    That was in 2002?

17        A    That was 2002.

18        Q    So the next time that you have issues

19   relating to your back is in 2008?

20        A    I had before that too, minor things,

21   and then it would disappear.  I've had three or

22   four MRIs for the same incident.  Each incident,

23   you know, it gets progressively worse.  So I did

24   whatever I could do physically.

25              I no longer lift weights which -- you

94

```
 1              LAWRENCE I. FRIEDMANN

 2   know, I do a lot of bike riding, and, you know,

 3   this type of exercise is healthy for this.  I'm

 4   just very careful though because it -- once it

 5   flares up, it's impossible for it to -- it just

 6   doesn't go away on its own.

 7        Q      You testified earlier you started

 8   working for Raymour & Flanigan --

 9        A      In 2005.

10        Q      -- in October of 2005; correct?

11        A      Right.

12        Q      When was the first time that you had

13   a flare-up with your sciatica while working at

14   Raymour & Flanigan?

15        A      I might have had one in 2007.  I

16   mean -- but that was not -- you know, that went

17   away relatively quickly.  Then I had another

18   flare-up I think in 2008, and I went for an MRI

19   again.  You know, again the dates I'm really --

20   but the major one was, I believe, in 2009 when my

21   volume dipped.  The year before I did 792,000.

22   The year that I had this, you know, issue for

23   seven months, my volume dropped to 636, 646.

24        Q      You believe that was 2009?

25        A      2010.  I'm not sure.  I would have to
```

95

1                    LAWRENCE I. FRIEDMANN

2    refer back to my medical records.

3         Q     Well, if we take a look at your

4    Complaint --

5         A     Right.

6         Q     -- which was the first exhibit.

7         A     This one.

8         Q     It's probably at the bottom of the

9    pile.  It was the first one.

10        A     Okay.

11        Q     If you look at page 3 of that

12   document.

13        A     Okay.

14        Q     It states there that you did not have

15   any significant flare-ups in your sciatica from

16   May 1, 2008 until March of 2010.  Does that help

17   refresh your recollection as to when you had this

18   significant flare-up?

19        A     Probably.  Yeah, it would be -- I

20   mean it flared up before that until I -- you know,

21   until I went to the -- until it didn't go away on

22   its own.  I probably took three weeks until I went

23   to the orthopedist.

24        Q     If you look at the next page, there

25   is detailed medical treatment ranging from

96

1                    LAWRENCE I. FRIEDMANN

2       March 3rd, 2010 through August 9, 2010.

3              A       Right.

4              Q       Does that help refresh your

5       recollection as to what year you had the flare-up?

6              A       Yes.

7              Q       When did you have this significant

8       flare-up?

9              A       Well, the first time I went to the

10      orthopedist was on March 3rd.

11             Q       So it was in 2010?

12             A       Correct.

13             Q       You testified you believe that the

14      flare-up lasted approximately seven months?

15             A       Six months, seven.

16             Q       That was in 2010?

17             A       Correct.

18             Q       So after this flare-up ended and you

19      went through various treatments, did you have

20      another flare-up during the course of your

21      employment with Raymour & Flanigan?

22             A       Minor.  Not -- not anything that

23      would inhibit my health at this point.  But again,

24      I was always careful after that incident, because

25      that was seven months, and I was ready to go for

97

1                    LAWRENCE I. FRIEDMANN

2    surgery again.  The pain management guy said why

3    are we talking about surgery.  So I'm constantly

4    cautious about it, because I try to avoid any

5    flare-ups.

6          Q     Are you currently receiving any

7    treatment --

8          A     No.

9          Q     -- for your sciatica?

10         A     No.

11         Q     Are you currently taking any

12   medications for your condition?

13         A     No.  Once in a while Aleve, but not

14   often.

15         Q     Are you currently using any medical

16   devices to help with your condition?

17         A     Just exercise.

18         Q     What, if any, limitations does your

19   condition currently impose upon you?

20         A     At this point, nothing.  But any time

21   I get a little pain in that area, I'm cautious.  I

22   mean I -- I mean I've always challenged myself

23   physically, but now I restrict it to an indoor

24   life cycle, which I do five hours a week, and then

25   long distance bike riding in the summertime, which

```
 1                LAWRENCE I. FRIEDMANN

 2   sums it up.  I mean everybody was aware of it, but

 3   these are people that I interacted with on a daily

 4   basis.

 5        Q    Let's start with Miss Goldstein.

 6   When did you first discuss your condition with

 7   her?

 8        A    When I was going for medical

 9   treatment.

10        Q    When was that?

11        A    Prior to 2010, because I had to, you

12   know, either take off for appointments or -- I

13   mean prior to March 3rd, prior to the --

14        Q    Of 2010?

15        A    Yeah, because it already was

16   bothering me.  But before I made a decision to go

17   to the doctor, I wanted to see if it was going to

18   go away on its own.  But after two or three weeks,

19   I knew I had to seek medical attention.

20        Q    So you asked Miss Goldstein for time

21   off for doctor's appointments?

22             MR. ANDREWS:  Objection.

23        A    If it wasn't my regular day off, I

24   would have asked her to switch my day off so I can

25   make an appointment.  It's possible it was my day
```

1                    LAWRENCE I. FRIEDMANN

2    off, but I made her aware of my --

3          Q      What do you recall telling her

4    specifically?

5          A      That I had a flare-up of sciatica,

6    and this one seems to be serious.

7          Q      Anything else?

8          A      That's it.

9          Q      Do you recall what she said in

10   response?

11         A      Well, I could tell you that later on

12   any time I discussed something with her, she would

13   say oh, that sciatica issue again, which didn't

14   seem too sympathetic to me.

15         Q      When you say discuss things with her,

16   what were you discussing with her?

17         A      The fact that I couldn't stand for

18   extended periods of time without being in

19   excruciating pain.  So if I was on the 10 spot --

20   there's a dining room table that's right adjacent

21   to the 10 spot.  So to relieve a little pressure,

22   I would lean on the dining room, and she would

23   tell me to get back on the 10 spot.  So I got back

24   on the 10 spot.  And then as it flared up again, I

25   would move back to the table again, just to lean

```
 1                    LAWRENCE I. FRIEDMANN
 2          A      Any names that I mentioned before
 3     were all aware of the problem.  Jim Powers -- as
 4     an example, I sat down on this large ottoman for
 5     like two, three minutes, and I happened to be
 6     sitting like this.  And he passed by and he says
 7     to me:  You look like the thinker.  I mean we
 8     laughed, but I knew it didn't look great to him.
 9          Q      Did he say anything else?
10          A      No.  He just kept, you know, on his
11     way.
12          Q      Do you know what he was referring to
13     when he said the thinker?
14          A      Yes.  First of all, he was referring
15     to me sitting down, period.
16          Q      Do you know what the thinker is?
17          A      I know what the thinker is.
18          Q      What is it?
19          A      Isn't that a classical -- I know who
20     the thinker is.
21          Q      A statue?
22          A      Yes.
23          Q      So he was comparing you to that?
24          A      Yes.
25          Q      Let's get back.  You said you asked
```

1                    LAWRENCE I. FRIEDMANN

2    people if you would be allowed to sit down.  Who

3    specifically did you ask?

4         A    I would ask Lucy.  Really Lucy,

5    because -- or I would sit down.  I mean if I had

6    to sit down, I had to sit down.

7         Q    When you asked Lucy, what would she

8    say?

9         A    She wouldn't let me sit down.  She

10   would say go in the office, get off the floor.

11        Q    She allowed you to leave the floor to

12   go sit down?

13        A    Well, you're not supposed to leave

14   the floor.

15        Q    She allowed you to leave the floor so

16   you could sit down?

17        A    No.  She was being sarcastic.  That's

18   what she was being.

19        Q    She said go to the office?

20        A    Yeah.  But if I'm with a customer, I

21   can't go to the office.

22        Q    So there were situations while you

23   were helping a customer where you asked

24   Miss Goldstein if you could sit down?

25        A    No.  I sat down.  I sat down for two

1                    LAWRENCE I. FRIEDMANN

2    minutes.  You don't understand the intensity of

3    this pain, so you have to do something to relieve

4    it.

5         Q       Okay.  But you just testified that

6    you asked Miss Goldstein if you could sit down?

7         A       Well, I would.

8         Q       What would she say to you?

9         A       She would not really approve me

10   sitting down on the sales floor.

11        Q       What would she say?

12        A       Go in the office.

13        Q       Did you go into the office?

14        A       No, I didn't go in the office,

15   because I was with a customer.  I was always in

16   earshot of the customer.  But if I had to do

17   something to relieve the pain during that period,

18   I had to do it.

19        Q       When you asked Miss Goldstein to sit

20   down, her response was to go into the office?

21        A       To go into the office or you can't

22   sit down.

23        Q       When did she tell you you couldn't

24   sit down?

25        A       I don't remember the dates.

1              LAWRENCE I. FRIEDMANN

2        A    Well, any managers.  If I had to sit

3   down, I sat down.  Just the general -- the general

4   feeling was that -- not to sit down regardless.

5        Q    Did anyone else catch you sitting

6   down?

7        A    No.

8        Q    Did anyone see you sitting down and

9   tell you to stand up?

10       A    Yes.

11       Q    Who?

12       A    Lucy Goldstein.

13       Q    Who else?

14       A    Anthony Baines, Iman.  And, you know,

15  without being told to stand up, Jim Powers.  Just

16  his comment, I knew I should stand up.  But he

17  didn't say it harshly, but I knew I should stand

18  up.

19       Q    Did Mr. Powers tell you to stand up?

20       A    No.

21       Q    You testified that this flare-up in

22  2010 lasted about six or seven months.

23       A    About six, yeah.

24       Q    Looking at the Complaint, your

25  treatment began on March 3rd.

110

LAWRENCE I. FRIEDMANN

2      A      Page 3 and 4?

3      Q      Yes.  The Complaint says that the

4    flare-up started in March; correct?

5      A      Yes.

6      Q      And that your treatment began --

7      A      It began on -- March 3rd was the

8    first time I went to the orthopedist, and it went

9    through it looks like August, but there was not

10   full recovery for another 30 days or so because

11   these -- the physical therapy and the epidural

12   injections really take time before they restore

13   you to complete normalcy.

14     Q      So by the end of September of 2010,

15   you had had a full recovery from this flare-up?

16     A      Pretty much.

17     Q      After September of 2010, did you

18   still need to sit down?

19     A      Not as much.

20     Q      Using September, 2010, after this

21   point, did you ask anyone if you could sit down?

22     A      No, not at that point, because it

23   really wasn't anything that was going to be

24   lengthy.

25     Q      Did you ask anyone at Raymour &

111

                    LAWRENCE I. FRIEDMANN

1

2    Flanigan for any kind of assistance after the

3    flare-up ended?

4           A    No.

5           Q    So during the flare-up, you said you

6    needed to sit down?

7           A    Yes.

8           Q    Anything else that you asked Raymour

9    & Flanigan for?

10          A    No.

11          Q    Did you ask them for a leave of

12   absence?

13          A    No.

14          Q    When you say that you asked them if

15   you could sit down, were these requests made

16   orally?

17          A    Yes.

18          Q    Did you ever put this request in

19   writing?

20          A    No.

21          Q    You made these requests to the

22   individuals at the Garden City showroom?

23          A    Correct.

24          Q    You testified earlier that you were

25   in receipt of Raymour & Flanigan's employee

```
 1              LAWRENCE I. FRIEDMANN

 2    qualified to discuss this with you.

 3         A    Yes.

 4         Q    Do you see that?

 5         A    Yes.

 6         Q    Did you ever speak with anyone at

 7    Human Resources about your need to sit down?

 8         A    No.

 9         Q    Did you ever speak to anyone from

10    Human Resources regarding your medical condition?

11         A    No.

12         Q    Did you apply for short-term

13    disability while employed by Raymour & Flanigan?

14         A    No.

15         Q    Did you apply for a long-term

16    disability while employed by Raymour & Flanigan?

17         A    No.

18         Q    Have you applied for short-term

19    disability since leaving Raymour & Flanigan?

20         A    No.

21         Q    Have you applied for long-term

22    disability since leaving Raymour & Flanigan?

23         A    No.

24         Q    Have you ever applied for Social

25    Security Disability payments?
```

1                    LAWRENCE I. FRIEDMANN

2    stories where she's referred to me as old man when

3    I'm not even around.

4          Q    You told her your age?

5          A    I did.

6          Q    You said that she called you old man?

7          A    Right.

8          Q    To you personally?

9          A    To me personally.

10         Q    When did she do that?

11         A    I don't have dates.

12         Q    What year?

13         A    2011.

14         Q    What about 2010?

15         A    She would say it, but it wasn't -- it

16   was a different tone.

17         Q    How was the tone different?

18         A    It was just different.  It wasn't --

19   it was nothing that I became conscious of at that

20   point.  In 2011 I started to realize that my age

21   might possibly be an issue for whatever reasons.

22         Q    Why, if she had made those comments

23   before?

24         A    Because the tone changed, the purpose

25   changed.

150

1                   LAWRENCE I. FRIEDMANN

2    discrimination because of your disability in your

3    Complaint; correct?

4         A    I believe that whether I was placed

5    on a coaching plan or not in 2010, that it was

6    still -- whether it's on paper or not, it was

7    taken into account with the final decision.

8         Q    So in 2010 when you were suffering

9    from this flare-up, you testified earlier that you

10   wanted to be able to sit down; correct?

11        A    Yes.

12        Q    Please explain how your ability to

13   sit down should have affected your sales numbers.

14        A    The showroom is 85,000 square feet.

15   Now, if I'm with a customer and I have a flare-up,

16   the only way to relieve it is to sit down.  So

17   once you lose track of a customer in that store,

18   you could be wandering around forever, and each

19   person is circling and circling.  You don't see

20   them again.

21             It had an effect on my overall

22   volume.  My ability to stay in earshot of my

23   customer because of this disability affected my

24   performance in 2010.

25        Q    So you did sit down when you were

1              LAWRENCE I. FRIEDMANN

2    disability?

3                   MR. ANDREWS:  Objection.

4         A    I don't know how to answer that.

5         Q    Can you point to any specific factual

6    circumstances that occurred that you believe were

7    the result of disability discrimination?

8         A    I was fired.

9                   MR. ANDREWS:  Objection.

10        Q    Besides being terminated.

11        A    That was enough for me.

12        Q    Did anyone at Raymour & Flanigan ever

13   make any comments about your medical condition?

14        A    Yes.

15                  MR. ANDREWS:  Objection.

16        Q    What was that?

17        A    Just silly jokes.

18        Q    What kind of silly jokes?

19        A    I really don't recall the specifics.

20        Q    Who made the jokes?

21        A    Many people.

22        Q    Please, to the best of your

23   recollection, tell me who.

24        A    I don't recall.

25        Q    Did you ever request that your sales

1                    LAWRENCE I. FRIEDMANN

2    quotas be adjusted?

3          A    No.

4          Q    When you were presented with the

5    coaching plan in May, 2011, did you request that?

6          A    No.

7          Q    You also claim in this lawsuit that

8    you were subject to retaliation in connection with

9    your employment; is that correct?

10         A    Retaliation?

11         Q    Yes.  Are you familiar with that

12   term?

13         A    No.

14         Q    If you look at paragraph 31 of the

15   Complaint, it should be right in front of you, it

16   says that:  Upon plaintiff complaining to his

17   supervisors about age and disability

18   discrimination, nothing changed.  Moreover,

19   plaintiff Friedmann was terminated because of his

20   age and disability in retaliation for his

21   complaints of discrimination.

22               Do you see that?

23         A    Yes.

24         Q    Reading that, does that help you

25   understand what I'm asking about, that you were

```
 1                    LAWRENCE I. FRIEDMANN

 2    subject to retaliation in connection with a

 3    complaint that you made?

 4                    MR. ANDREWS:  Objection.

 5         A    I don't know how to answer that.

 6         Q    Did you ever complain to anyone at

 7    Raymour & Flanigan about age discrimination?

 8                    MR. ANDREWS:  Objection.

 9         A    I don't know how to answer it.

10         Q    Did you ever discuss with anyone at

11    Raymour & Flanigan your belief that you were being

12    discriminated against because of your age?

13         A    No.

14         Q    Did you ever discuss with anyone at

15    Raymour & Flanigan your belief that you were being

16    discriminated against because of your disability?

17         A    No.

18         Q    So in the Complaint where it says

19    that you complained to your supervisors about age

20    and disability discrimination, what are you

21    referring to there?

22                    MR. ANDREWS:  Objection.

23         A    Being fired.

24         Q    Anything else?

25         A    That's it.  That's enough.  I was
```