# EXHIBIT E

1

1

2     UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF NEW YORK
3     ----------------------------------------X
      LAWRENCE I. FRIEDMANN,
4
                                    PLAINTIFF,
5

6              -against-          Case No:
                                  12 CV 1307
7                                 (LDW)(AKT)

8
      RAYMOUR FURNITURE CO., INC., and
9     LUCY GOLDSTEIN, individually,

10                                DEFENDANTS.
      ----------------------------------------X
11

12                    DATE: February 13, 2013

13                    TIME: 10:52 A.M.

14

15

16             DEPOSITION of the Defendant,

17     RAYMOUR FURNITURE CO., INC., by a Witness,

18     PATRICIA DELGENIO, taken by the Plaintiff,

19     pursuant to a 30(b)(6) and to the Federal

20     Rules of Civil Procedure, held at the

21     offices of The Harman Firm, PC, 200 West

22     57th Street, New York, New York 10019,

23     before Deborah Garzaniti, a Notary Public

24     of the State of New York.

25

<pre>
 1                    P. DELGENIO
 2    report to you?
 3           A.     Currently?
 4           Q.     Currently?
 5           A.     Five.
 6           Q.     At the time that this report
 7    from Mr. Roland to you was made, how many
 8    HR field specialists reported to you?
 9           A.     I am going to say two.
10           Q.     What was reported to you?
11           A.     Everyone who was put on a
12    Performance Plan in that location, actually
13    I would say in any of Chris' locations.
14    She just made me aware, hey, the following
15    people have been put on Performance Plan.
16           Q.     Just so I am clear, you did not
17    participate in placing anyone on a
18    Performance Plan?
19           A.     No.
20           Q.     Did, to your knowledge,
21    Ms. Roland participate in placing any
22    people on a Performance Plan?
23           A.     No.
24           Q.     Do you have an understanding of
25    how people would get placed on Performance
</pre>

1                    P. DELGENIO

2    Plans?

3         A.    Yes.

4         Q.    Can you describe that process?

5         A.    Generally in the sales

6    organization, which is very heavily metric

7    driven, there is a weekly commission review

8    where a leader in the store will sit down

9    with an associate and measure their success

10   or their performance, metrics against the

11   standard expectation or the minimum

12   expectation, and discuss whether their

13   performance is either better than the

14   expectation, not on par with the

15   expectation.

16          If over a period of time an

17   associate performs below expectation, the

18   store leader will generally summarize the

19   amount of time that the person has been

20   performing below expectation and

21   specifically to what extent, in what areas

22   of their business and offer them assistance

23   if they need it to hit the goals and a time

24   frame in which they are expected to hit set

25   goals.

```
 1                    P. DELGENIO
 2   associate and of the store and if I have
 3   any questions related, I will ask them, so
 4   it would be accurate to say that I don't
 5   concern myself.
 6        Q.    But you don't actually read the
 7   Performance Plans?
 8        A.    I have.  I can't say that I
 9   read every single one, but I have read
10   Performance Improvement Plans.
11        Q.    Do you recall reading any of
12   Mr. Friedmann's Performance Improvement
13   Plans?
14        A.    I don't recall reviewing them
15   at that time.
16        Q.    Once you became aware that Mr.
17   Friedmann had been placed on a Performance
18   Improvement Plan, did you take any action
19   at that time?
20        A.    No.
21        Q.    Did you investigate the Plan or
22   why he had been put on the Plan?
23        A.    It is my recollection that I
24   worked with Christine Roland and my
25   recollection is that it was her assertion
```

```
 1                    P. DELGENIO
 2    that the Plan seemed standard.
 3         Q.    Could you elaborate on what you
 4    mean by that, when you say that the Plan
 5    seemed standard?
 6         A.    Yes.  As I previously
 7    described, Plans generally say this is your
 8    performance, measure it against the
 9    expectation, here is the difference between
10    the two, here is where you need to go and
11    how to get there.  It is my recollection
12    that Mr. Friedmann's Performance Plan was
13    very much in the line of that standard type
14    Performance Plan.
15         Q.    Do you know if Ms. Roland would
16    have participated in the decision to place
17    Mr. Friedmann on a Performance Plan?
18         A.    She would not have.
19         Q.    She would not have?
20         A.    She would not have, unless the
21    leadership team had questions about it.
22         Q.    When you say "the leadership
23    team," who are you referring to?
24         A.    Any store leaders, store
25    manager, showroom managers.
```

1                     P. DELGENIO

2        Q.    Can you describe the nature of

3  those updates?

4        A.    My updates would of come

5  through Chris Roland and my recollection is

6  that Mr. Friedmann was given the

7  opportunity to interview at another

8  location and that there wasn't a tremendous

9  interest on either side at that location,

10  so Mr. Friedmann remained in the Garden

11  City location.

12        Q.    When you say "there wasn't a

13  tremendous interest on either side," what

14  do you mean?

15        A.    My recollection is that, and

16  this is my recollection through Chris

17  Roland, however many years ago, but my

18  recollection is that when Mr. Friedmann was

19  offered the opportunity to interview at

20  Carle Place, he was not excited about it.

21  That's the best way that I can capture it.

22        Q.    Do you know why Mr. Friedmann

23  was asked to interview at the Carle Place

24  store?

25        A.    I wasn't told specifically by

```
 1                    P. DELGENIO
 2    store leadership, but very often we will
 3    look to find a location that can help make
 4    an associate successful and my
 5    understanding is that Mr. Friedmann started
 6    in the Carle Place location and the hope
 7    was in returning to the Carle Place
 8    location he would be better able to be
 9    successful.
10         Q.    Just to recap, all of this was
11    relayed to you by Ms. Roland?
12         A.    Correct.
13         Q.    You had no discussions with
14    store leadership about this situation?
15         A.    Not that I recall, no.
16         Q.    Do you recall who the store
17    leadership at his location would have been
18    at the time?
19         A.    Other than Lucy Goldstein?
20         Q.    Other than Lucy Goldstein?
21         A.    Oh, gosh.  It would be a best
22    guess who the showroom managers were.  I
23    would guess Kevin Sagendorf (phonetic), and
24    I can't recall who the other one was at
25    that period of time.
```

```
 1                    P. DELGENIO
 2    location?
 3         A.    Yes.
 4         Q.    Under Ms. Lucy Goldstein's
 5    supervision?
 6         A.    Yes.
 7         Q.    Did you hear about Mr.
 8    Friedmann's employment again after that
 9    point?
10         A.    When his employment was
11    terminated is my next recollection of
12    anything related to his status.
13         Q.    How were you advised that he
14    had been terminated?
15         A.    It would have been by Chris
16    Roland.
17         Q.    Would it be fair to say -- I am
18    sorry.
19         A.    Go ahead.
20         Q.    I didn't mean to interrupt you.
21         A.    That's okay.
22         Q.    You testified it would have
23    been by Chris Roland?
24         A.    Yes.
25         Q.    Do you recall what Chris Roland
```

```
 1                    P. DELGENIO
 2    told you?
 3           A.    Do I recall?
 4           Q.    What Chris Roland told you?
 5           A.    Yes, my -- again, this is a
 6    guess, not a recollection.  My guess is
 7    that Chris Roland said Larry Friedmann
 8    didn't make his Performance Improvement
 9    Plan and they released him from service or
10    they are going to release him from service.
11    I am not sure if it was precisely before or
12    after.
13           Q.    Correct me if I am wrong, you
14    did not play a role in that decision?
15           A.    No.
16           Q.    Is that standard practice in
17    your position, to not play a role in that
18    decision?
19           A.    No.  If I believe there is
20    reason to insert myself into a
21    decision-making process related to an
22    associate, I will.
23           Q.    Can you give me some examples
24    of when you might consider inserting
25    yourself into the process?
```

```
 1                    P. DELGENIO
 2   Friedmann on several occasions just in the
 3   course of visiting stores?
 4        A.    Yes.
 5        Q.    At any point in those
 6   interactions with Mr. Friedmann, do you
 7   recall discussing any HR concerns with him?
 8        A.    No.
 9        Q.    Do you recall him raising any
10   HR concerns with you?
11        A.    No.
12        Q.    Do you recall Ms. Roland ever
13   discussing with you that Mr. Friedmann had
14   raised any HR concerns?
15        A.    I don't recall that, no.
16        Q.    Prior to being made aware of
17   the fact that Mr. Friedmann had been placed
18   on a Performance Plan approximately six to
19   eight weeks prior to his termination, were
20   you aware of any performance issues with
21   Mr. Friedmann's employment?
22        A.    No.
23        Q.    Did you, at any point, review
24   Mr. Friedmann's history of performance with
25   the company?
```

```
 1                    P. DELGENIO
 2   myself in, ask more questions and try to
 3   gather information.
 4        Q.    Is it fair to say that you were
 5   not aware of the existence of any of those
 6   issues with respect to Mr. Friedmann's
 7   employment?
 8        A.    That's correct.
 9        Q.    Is it also fair to say that Mr.
10   Friedmann was never offered the opportunity
11   to meet with an HR representative during
12   the last eight weeks of his employment?
13        A.    No.
14             MS. CHICLACOS:   Objection to
15        the form.   Go ahead.
16        A.    We have an open door policy at
17   Raymour & Flanigan.   It is posted on our
18   walls and an HR field person is in every
19   location once a week, having the kinds of
20   conversations that I spoke about before,
21   hi, how are you?   How is everything going?
22   How is your day?   You know, did you have a
23   good weekend?   Things of that nature.   So
24   there is at least a weekly opportunity for
25   any associate to speak to their HR person
```

1                   P. DELGENIO

2      face-to-face.  So whether an opportunity

3      was offered, I don't know, but the

4      opportunity is very apparent.

5           Q.    Would it have been Ms. Roland

6      who would have been the HR representative

7      visiting Mr. Friedmann's location?

8           A.    Yes.  I may have visited also

9      during that time, it was part of my region,

10     but I can't specifically tell you what

11     weeks I was there.

12          Q.    How are sales associates made

13     aware of the open door policy that you just

14     described?

15          A.    Well, in the orientation

16     process, it is discussed by their HR

17     person, it is listed out in our Associate

18     Handbook, there is a Workers 1 poster.

19     Workers 1 is a 1-800 hotline number that

20     they can call if they are not comfortable

21     speaking to someone in the field.  That

22     goes to an anonymous service that is

23     checked by our central services team in

24     Syracuse.  There is a sheet in the break

25     room and in the sales office that has the

```
 1                    P. DELGENIO
 2     contact information for every HR person in
 3     the market with their cell phone numbers,
 4     fax number, e-mail address and things like
 5     that.  That is standard in every location
 6     that we have.
 7          Q.    Do you know when Mr. Friedmann
 8     first began working with Raymour &
 9     Flanigan?
10          A.    Well, I know it was before my
11     time.  I guess it is 2005.
12          Q.    Why do you believe it was 2005?
13          A.    Because he was there before me
14     and I started in 2006.
15          Q.    Do you know anything about Mr.
16     Friedmann's performance in 2005?
17          A.    No.
18          Q.    Do you know anything about Mr.
19     Friedmann's performance in 2006?
20          A.    No.
21          Q.    Do you know anything about his
22     performance in 2007?
23          A.    No, not specifically to him,
24     no.  I didn't have any specific information
25     presented to me about Mr. Friedmann's
```

1                    P. DELGENIO

2          A.    No.  I mean training, anything

3     in the HR, the trainings that HR provides.

4          Q.    What types of trainings does HR

5     provide?

6          A.    HR provides new hire

7     orientation.  HR provides professional

8     conduct and harassment awareness training.

9     HR provides management training,

10    communication, effective listening, on the

11    role of the supervisor assertive influence,

12    diversity and coaching.  There are two or

13    three coaching workshops that the HR team

14    facilitates as part of the HR service that

15    we provide to our leaders.

16         Q.    Have you ever trained Ms. Lucy

17    Goldstein?

18         A.    Yes.

19         Q.    Can you recall what training

20    you provided Ms. Lucy Goldstein?

21         A.    Yes.  I recall at least one

22    time where I facilitated a professional

23    conduct and harassment awareness refresher

24    training.

25         Q.    Can you describe in summary

1                    P. DELGENIO

2      form what that type of session would have

3      consisted of?

4           A.     Sure.   Each year we refresh

5      professional conduct and harassment

6      awareness training for our managers and the

7      training that I am thinking of now, Lucy

8      was present, it was either her second or

9      third time attending, and we talk about the

10     laws related to discrimination on the basis

11     of protected categories, age, race,

12     disability, family, marital status, now

13     sexual orientation, things of that matter.

14     We talk about third-party harassment, we

15     talk about quid pro quo, peer harassment,

16     we talk about hostile working environment.

17     Anything that would, I assume, customarily

18     would be included in sexual conduct and

19     sexual harassment workshop.

20          Q.     Are store managers advised to

21     reach out to Human Resources if they have

22     questions?

23          A.     Yes.

24          Q.     How are they advised to do

25     that?

```
1                    P. DELGENIO
2         A.    At the end of any HR workshop,
3    if you have questions, if you have
4    concerns, if there is anything that you are
5    unsure about, feel freely to reach out to
6    any member of our team.  Are numbers are
7    posted on the wall, as I stated previously.
8    You know, when we are in your location,
9    feel free to pull us aside, that is what we
10   are here for.
11        Q.    If a store manager received a
12   complaint from an employee alleging some
13   form of prohibited discrimination and
14   didn't reach out to Human Resources, would
15   that be a violation of company policy?
16        A.    Yes.
17        Q.    To your knowledge, did Mr.
18   Friedmann ever complain to Ms. Goldstein
19   regarding any issues concerning his
20   employment during the time that he was
21   employed there?
22        A.    Not to my knowledge, no.
23        Q.    To your knowledge, did
24   Ms. Goldstein ever reach out to you or to
25   any one of your colleagues in HR regarding
```

```
 1                    P. DELGENIO
 2         question and do you stand by that
 3         instruction to not answer?
 4                 MS. CHICLACOS:  Yes.
 5                 MR. ANDREWS:  I would like to
 6         go off the record.
 7                 (Whereupon, an off-the-record
 8         discussion was held.)
 9         Q.    Are you generally familiar with
10    the company's policies regarding employee
11    disability?
12         A.    Yes.
13         Q.    Do you participate in
14    formulating those policies?
15         A.    I participate in the
16    administration of those policies.  The
17    formulation I would say no.
18         Q.    Do you know who formulates
19    those policies?
20         A.    I would assume that it is in
21    conjunction with counsel as those policies
22    are saved in the Associate Handbook, so the
23    same process would apply.
24         Q.    You used the word before, I
25    don't want to misstate what you said, you
```

```
 1                    P. DELGENIO
 2    stated before that you participate in the
 3    administration of those policies?
 4         A.    The administration of the
 5    disability policies?
 6         Q.    Yes.
 7         A.    Yes, or the oversight of the,
 8    you know, how they are carried out.
 9         Q.    I will use the word
10    administration for now.  That's okay.  How
11    are you trained in how to administer those
12    policies?
13         A.    How am I personally trained in
14    how to administer those policies?  Frankly,
15    my years of experience in the HR field and
16    all of the training and experience that I
17    have had to date, conferring with counsel
18    if I have questions or clarifications that
19    need to be made to the policy, that I
20    oversee and administer the following of the
21    policy.  So specific training, I can't tell
22    you.
23         Q.    And your supervisor, the
24    overall head of human resources is Mr.?
25         A.    McPeak.
```

                    P. DELGENIO

1

2      Q.     McPeak.  Does he provide you

3    with input on the administration of those

4    policies?

5      A.     Yes.

6      Q.     How does he do that?

7      A.     If I was to confer with him

8    that I needed additional support or

9    resources to help me determine how to

10   administer a policy or situation that I was

11   specifically working with, I might reach

12   out to Steve or to counsel to make sure

13   that we are following through in the

14   appropriate fashion.

15     Q.     When you become aware one way

16   or the other that an employee, such as a

17   sales associate, is temporarily disabled,

18   what is the process for dealing with that?

19     A.     Temporarily disabled, meaning

20   that they are out of work?

21     Q.     Let's start with that.

22     A.     An associate is out of work, I

23   would determine the reason why, the amount

24   of time that they need to be out of work,

25   if they were eligible for any -- entitled

1                    P. DELGENIO

2    leaves, family medical leaves and the

3    paperwork associated, health care

4    certifications associated with those leaves

5    to determine the amount of leave that they

6    are entitled to.

7         Q.    If it is a situation where the

8    employee is able to report to work, but is

9    requesting some modification in his

10   schedule, how is that handled?

11        A.    They would let their manager

12   know that they need an accommodation or a

13   schedule adjustment based on whatever

14   condition they are managing at the time.

15   If the store manager has questions about

16   being able to make those adjustments or

17   accommodations, they reach out to the Human

18   Resource team and we would help them

19   determine what accommodations can and

20   should be made.

21        Q.    If a manager did not reach out

22   to your team, would that be a violation of

23   company policy?

24        A.    Yes, they should reach out.

25   They should reach out if they feel they are

```
 1                    P. DELGENIO
 2    not able to make the accommodation or the
 3    adjustment.  If they are able to make the
 4    accommodation or adjustment, then they do
 5    it.
 6         Q.    Is any type of documentation
 7    required of managers in those situations?
 8         A.    No, no specific documentation.
 9         Q.    If a manager feels that he or
10    she is unable to make the adjustment or
11    accommodation, is any documentation
12    required of that?
13         A.    No.
14         Q.    So if a manager refused to
15    accommodate an employee and didn't reach
16    out to Human Resources, you would have no
17    way to know that that request had been
18    made?
19         A.    Unless the associate themselves
20    reached out to Human Resources.  If the
21    manager didn't tell us, we wouldn't know.
22    If the associate didn't tell us, we
23    wouldn't know.
24         Q.    Is it fair to say that if Mr.
25    Friedmann was having an issue with Ms.
```