# EXHIBIT F

1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK


12 CV 1307 (LDW)(AKT)


LAWRENCE FRIEDMANN,

        Plaintiff,

vs.

RAYMOUR FURNITURE CO., INC.,

and LUCY GOLDSTEIN, individually,


        Defendants.

_____/




1606 Aboco Drive,

Coconut Creek, Florida

Friday, February 22, 2013

10:00 a.m. - 1:42 p.m.


D E P O S I T I O N

Of

LUCY GOLDSTEIN

Taken on behalf of the Plaintiff

pursuant to a notice of taking deposition

- - -

1      of a store is in charge of the sales associates.

2            Q.   And did you, in fact, get 34 sales

3      associates for the store?

4            A.   Yes.

5            Q.   And Larry was one of those associates?

6            A.   Yes.

7            Q.   Do you have any idea how old Larry is?

8            A.   I'm not sure.  I'm not sure.

9            Q.   Would you say --

10           A.   I figure he's about my age.

11           Q.   How old are you?

12           A.   66.

13           Q.   Did you ever discuss his age with him?

14           A.   No.

15           Q.   Did you ever hear him tell anyone how old he

16     is?

17           A.   No.

18           Q.   Did you ever hear discussions with Larry and

19     anyone else regarding his age?

20           A.   No.

21           Q.   Of the 34 that were hired, other than Larry,

22     were any of the other 34 in their sixties?

23           A.   Charlie Bruno, I believe.  God, I'm going

24     back, it's so hard to remember.  If I can have a -- I

25     don't have a -- I don't really know everybody's age.

1         A.    I don't know.

2         Q.    Do you recall whether that review was

3    positive or not?

4         A.    I would say -- you know what, I'm saying it

5    because Larry was a good sales associate, so I'm

6    thinking back, it should have been a good review.  I

7    don't know because I don't have the paperwork from so

8    many years ago, but I don't remember having any

9    problems with Larry.

10        Q.    Okay.  What about in 2006, how was Larry's

11   performance as a sales associate at the Glen --

12        A.    Cove.

13        Q.    -- Cove store?

14        A.    Fine, same.

15        Q.    When you say excellent performance and

16   numbers were good, can you describe to me more

17   specifically what you mean by that?

18        A.    Sure.  The sales associates are given a

19   projection of what their numbers are supposed to be

20   when they come on board.  Before they sign up with us

21   they are given a sales associate's projection stating

22   that -- and it's broken down into months.  Sales

23   associates are supposed to do approximately -- at that

24   time I think it was 650,000 for the year.  I don't

25   think it was yet 750,000.  That was their minimum.

1      And then it was broken down into months, because in

2      sales, in furniture you have good months and you have

3      bad months.  And then it was broken down like in

4      January they are supposed to write 11,000 and deliver

5      15,000 or -- so it's broken down across the board like

6      that.  So when we do reviews, we go back and that's

7      what we would look at.  Okay, Larry, you were supposed

8      to do -- you were supposed to get 15,000 delivered

9      this month, and you got 18,000 delivered this month.

10     Great, you are doing great.  You know what I mean?

11     That's how you did a review.

12          Q.   And how frequently would those reviews

13     occur?

14          A.   Once a month.

15          Q.   And those would be done verbally?

16          A.   You could do it verbally and then -- but

17     then by at least once every three months you had a

18     written where you sat and, you know, went over the

19     numbers, you know, like within those numbers it was

20     broken down into platinum, which was your protection

21     plan and how good they were doing on that, and how

22     much bedding they were selling, if they needed help in

23     certain areas, it was kind of broken down like that.

24     So you are doing really good here, but let's see if we

25     can get this up and, you know, things like that.

1        Q.    And how about in 2007?

2        A.    Larry was still good.  I had no problem with

3    Larry in Glen Cove at all, to the point that when we

4    opened Garden City, which was the huge box that

5    everybody was waiting for, I was allowed to handpick

6    my staff that would go over there.  I handpicked Larry

7    to come with us.

8        Q.    So you were responsible for opening a new

9    store?

10       A.    Yes.

11       Q.    Okay.

12       A.    A big one, that's their biggest and largest

13   store today.

14       Q.    And that's Garden City?

15       A.    Garden City.

16       Q.    When was that store opened?

17       A.    2000 -- what's today, the 12th -- 2008.  I

18   think it was 2008.

19       Q.    And how many sales associates did you need

20   for Garden City?

21       A.    They started higher with like, I don't know,

22   I think it was 38, and then we went down again to 34.

23   I think we were at a minimum -- they were at minimum

24   of 34 over the years.

25       Q.    Of your sales associates at Glen Cove, how

1    many of your sales associates from Glen Cove did you

2    take to Garden City?

3         A.   I'd have to say about 50 percent.

4         Q.   And Larry was included in that?

5         A.   Yes.

6         Q.   Why did you select Larry?

7         A.   Because he was a good sales associate.

8    Again, he was dedicated, he was performing well, his

9    momentum was good, his attitude was good.  And, you

10   know, when you are opening a new store, when you are

11   given a store, just like the sales associates have a

12   performance record given to them to do, a manager is

13   also given budgets for the year that they need to hit.

14   So you would take your best sales associates with you

15   that, you know, would be good enough to perform in

16   that store.  The store was a lot larger, huge.

17        Q.   But it didn't have more sales associates

18   than the Glen Cove store; is that correct?

19        A.   No.

20        Q.   Okay.  It was just a physically larger

21   store; is that correct?

22        A.   Correct.

23        Q.   How was Larry's performance in 2008?

24        A.   Good.  I think Larry was one of the ones

25   that did huge on a friends and family event.  He

31

1    focused, he brought people in, he was doing very well.

2         Q.    So would you say the same as the previous

3    years or --

4         A.    Yes.

5         Q.    -- better or worse?  The same?

6         A.    The same.

7         Q.    You specifically recall a contribution to

8    the friends and family event?

9         A.    Yes.

10        Q.    That was positive?

11        A.    Yes.

12        Q.    Okay.  Anything else you recall about his

13   performance in 2008?

14        A.    No, not anything outstanding.  And, you

15   know, the reason is -- unfortunately what happens is,

16   you say good job, you know, good job, good job, good

17   job, and I'm the type of a manager that always manages

18   with -- very positive, I'm a very positive human

19   being.  I always look at a glass half full.  So if

20   Larry would come in the office and he did a sale, I

21   would just immediately say great job, give me five,

22   you know, and build him that way.  The ones struggling

23   at the bottom were the ones that were more -- I was

24   more focused on to try and build them up and bring

25   them back.

1     A.    Were very close.  I mean, yes, it was very

2     close.  I had Linder and Stacey and Michele and Karen

3     and Nardy -- there was a lot of women in the store

4     also, a lot of women.

5     Q.    Okay.  I'm really not asking you for the

6     names, I just want to know -- I just want your

7     testimony to be clear.  You think that half of the --

8     A.    Listen, if I'm saying half, you know, it

9     could be maybe 17 men and, you know, a little less --

10    but there were a lot of women there.  There were more

11    men -- I believe there were more men, but there were a

12    lot of women there also.

13    Q.    Do you recall -- what else do you recall

14    about Larry's health issues?

15    A.    I remember him coming and saying that he

16    needed an operation.  I remember him -- me having a

17    conversation with him telling him not to worry.  When

18    I hire anybody -- from the day I hire somebody, the

19    very first words out of my mouth when we are

20    discussing ... is sit down with them immediately, if,

21    if anything happens with your health or with your

22    family, understand, do not hesitate to come to me,

23    that comes before anything.  And I've lived by that

24    with every one of them.

25    Q.    Okay.  I'm just asking about what you recall

35

1        about Larry's health issues.

2              A.    I remember he had a -- he needed an

3        operation and I told him not to worry about it.

4              Q.    Do you recall what operation he had?

5              A.    Something with his back, I believe.

6              Q.    Okay.  And did he have the operation?

7              A.    Yes.

8              Q.    And did he take time off from work?

9              A.    Yes.

10             Q.    Okay.  And did he need to fill out paperwork

11       to take time off of work?

12             A.    I believe he did.

13             Q.    Okay.  As a manager, what is the procedure

14       for a sales associate to request time off of work for

15       an operation?

16             A.    That goes through human resources.

17             Q.    And then did you refer Larry to HR?

18             A.    Yes.

19             Q.    And to whom did you refer him?

20             A.    It was either Patty Delgenio or Chris

21       Rowland.  And I don't know if Chris was on board yet,

22       she might have been on board.

23             Q.    And how would you have done that?

24             A.    Well, basically, I would call them and let

25       them know that Larry has requested a leave of absence.

1    And a lot of times they would come down to speak with

2    him or to fill out paperwork, and, you know, let him

3    leave or when is it going to be.  And I don't think

4    Larry left right away, I think he told me the

5    operation was going to be ... so he had time to speak

6    with them.

7        Q.   Do you recall how much time he took off?

8        A.   I'm thinking 12 weeks.

9        Q.   Do you know if that was paid time?

10       A.   I don't know how they do that.  I've

11   never -- I really have never been involved in that end

12   of the business.

13       Q.   And do you recall when he took 12 weeks of

14   leave for his back surgery?

15            MRS. CHICLACOS:  Objection to the form.

16            MR. HARMAN, JR.:  You can answer.

17            THE WITNESS:  No, I don't remember the

18   date.

19   BY MR. HARMAN, JR.:

20       Q.   I'm talking about the year, was it in the

21   first year of the opening of the new store?

22       A.   I don't remember.  I don't think so.  I

23   don't -- I think that Larry was with me the first year

24   of the store and we did very well.  I don't remember.

25       Q.   Okay.  Did you terminate Larry?

1          THE WITNESS:   Correct.

2    BY MR. HARMAN, JR.:

3          Q.   Okay.  And do you know whether it was closer

4    to the opening of the store, whether it was closer to

5    you terminating him?

6          A.   It was in -- I would have to say it was

7    maybe a year, a year and a half, a year and three

8    quarters before I terminated him.

9          Q.   Okay.  So that's going back to sometime in

10   2010 or 2009, correct?

11         A.   Correct.

12         Q.   Okay.  So he was out, as far as you recall,

13   for 12 weeks; is that correct?

14         A.   Correct.

15         Q.   And was he out for any other time period

16   related to his back?

17         A.   I don't believe so.

18         Q.   Okay.  So it was just that 12 weeks?

19         A.   Correct.

20         Q.   Okay.  And you said his performance overall

21   in 2008 was good or the same as it had been in the

22   prior years; is that correct?

23         A.   Correct.

24         Q.   Do you know what his performance was like in

25   2009?

1          A.    This was when he came back?

2          Q.    Prior to his surgery, okay, what was his

3     performance like?  So let's -- we talked about 2008,

4     there would have been some period in 2009.  What was

5     his performance like leading up to Larry informing you

6     that he needed to have back surgery?

7               MRS. CHICLACOS:  Objection to form.

8               THE WITNESS:  I believe for -- I think I

9     didn't have any problem with Larry in any way until

10    after he came back from surgery.

11    BY MR. HARMAN, JR.:

12         Q.    And when Larry was away for the 12 weeks,

13    was he replaced with anyone?

14         A.    No.

15         Q.    Okay.  And can you describe Larry's job

16    responsibilities as a sales associate?

17         A.    Sure.  He greeted people, customers coming

18    through the door, he worked with them on the floor, he

19    either made the sale, didn't take the sale.

20    Afterwards, sales associates, once they start to get a

21    log of people, they could make a sale and it's not

22    delivered, so it goes into different reports such as

23    10/10's, 12/12's, 6/6's, which all mean different

24    things.  And the sales associates, when they are not

25    on the floor, have the option to sit in the office on

1     the computer and go through their customers and see --

2     make phone calls, see if they can get something

3     delivered that's already been sold, work on people

4     that were supposed to leave deposits and didn't leave

5     deposits, certain things like that.  That's what the

6     sales associates do.

7          Q.    Do you recall how many hours Larry worked

8     per week?

9          A.    I would say at least 40.

10          Q.    Was he required to work a certain amount of

11    hours?

12         A.    I think it was 40, yes, 40, 42 they worked.

13         Q.    So he was required to actually be in the

14    store for a certain period of time during a week?

15         A.    Yes.

16         Q.    Was he compensated for that time?

17         A.    Compensated?

18         Q.    Meaning was he paid for that time?

19         A.    I believe they were paid their salaries,

20    yes.

21         Q.    But he was also paid commission; is that

22    correct?

23         A.    Yes.

24         Q.    And were employees allowed to take breaks?

25         A.    Yes.

1       Q.   Okay.  What about bathroom breaks, did they

2  count toward the 15?

3       A.   No, of course not.

4       Q.   And what about getting something to drink,

5  would that count toward the 15-minute break?

6       A.   No.

7       Q.   Any other job responsibilities that Larry

8  had as a sales associate?

9       A.   Well, during the sales time of friends and

10  family they were asked to bring in a certain amount of

11  customers into the store, given a budget of how much

12  they were supposed to do.  And, you know, sale days

13  were always exciting in the stores because you always

14  had the advertising going on and customers coming in

15  and it was their chance to make big money that would

16  cover them now for another month or two.

17       Q.   When you say "big money," what do you mean

18  by that?

19       A.   Well, friends and family, now it's three

20  days a week, when we started it was only two days a

21  week.  Friends and family is twice a year and the

22  Goldbergs give -- the owners of the company give

23  20 percent off if, let's say, somebody is buying 2,900

24  -- 29 -- I think it's 2,999 worth of delivered goods,

25  they are entitled to 20 percent discount.  They are

1    entitled to 15 percent discount if it's over, I think,

2    2,499, and 10 percent below that or 12 percent below

3    that.

4            So this happened twice a year and,

5    basically, what happened was you got the best -- your

6    best customers would kind of know and you would

7    contact them and you would tell them, okay, I have

8    another friends and family coming in.  You know that

9    sofa sectional you were looking for, that you said you

10   were going to do next friends and family, blah, blah,

11   blah, and they would come into the store at that time

12   and purchase it.  So you could build a clientele of a

13   lot of people.

14           We also let them handwrite sales in advance

15   so that the morning of they can input it into the

16   computer.  Those customers would come in, not have to

17   ask for any of the sales associates, but we as

18   managers would take them up to the desk, let them get

19   finished so the sales associates could be taking

20   somebody else, so there was more of a chance of them

21   making more sales on those two days and building up

22   their finances.

23       Q.   So prior to Larry going on this 12-week

24   leave, did you ever write him up for his performance?

25       A.   I do not believe so.

FRIEDMAN, LOMBARDI & OLSON
COURT REPORTERS

1       going forward; is that correct?

2           A.   Well, actually 2004.  I was hired

3       October 2004 and I did my training up in Connecticut

4       in Jersey because the store wasn't open yet.

5           Q.   What did that training entail?

6           A.   Their ways of doing things.

7           Q.   Okay.  What do you mean by, "their ways of

8       doing things"?

9           A.   Well, I've been a manager for 32 years.  I

10      had three positions in those 32 years and every

11      company does things a little bit different, so I had

12      to learn their reports, you know, how they opened

13      their books in the morning, how they closed, just

14      normal stuff like that.  Their vendors on the floor,

15      you know, simple -- you know, nothing major-major, but

16      it does take a while.  You know, you have to do

17      repetition.

18          Q.   Did you have any training with respect to

19      discrimination in the work place?

20          A.   Yes.

21          Q.   And what did that entail?

22          A.   It was quite intense and it was done at

23      least once a year.  All the managers had to go through

24      it and all the assistant managers had to go through

25      it.  The showroom managers had to go through it and it

1    was done by human resources.  We were brought into a

2    room and we went over everything.

3         Q.    What is everything?

4         A.    Discrimination, how to speak with

5    associates, how you speak with customers, what's --

6    you know, we used to do examples of what is

7    appropriate and what's not appropriate and wording

8    that you should use with associates and customers, and

9    wording that's not permitted to do.  We went over, you

10   know, just all of that kind of -- all those kinds of

11   things.

12        Q.    With respect to age, what would be an

13   example?  Did you ever discuss some what types of

14   statements would be inappropriate with respect to age?

15        A.    Age?  You never ask anybody their age.

16   Basically, you know, age was not an issue, ever, ever

17   in Raymour and Flanigan.

18        Q.    When you say, "age was not an issue at

19   Raymour" -- strike that.

20             The questions I'm asking you today are based

21   on your personal knowledge only.

22        A.    Correct.

23        Q.    So did Raymour and Flanigan have a policy

24   against age discrimination?

25        A.    Yes.

1       Q.   Okay.  And then the next question I would

2  have is, just based on your own personal observation,

3  your own personal knowledge, did you ever observe

4  anybody being discriminated against based on their

5  age?

6       A.   No.

7       Q.   Did you ever overhear an inappropriate

8  comment with respect to someone's age?

9       A.   No.

10      Q.   Did you ever observe an inappropriate

11  comment in the workplace with respect to someone's

12  race?

13      A.   No.

14      Q.   Did you ever observe an inappropriate

15  conduct with respect to someone's gender?

16      A.   No.

17      Q.   You said that everything was discussed at

18  the discrimination training which was intense and took

19  place once a year.  Was disability discussed during

20  the discrimination training?

21         MRS. CHICLACOS:  Objection to form.

22         THE WITNESS:  I'm not understanding the

23  question.

24  BY MR. HARMAN, JR.:

25      Q.   If someone has a physical -- do you

1    understand what I mean by disability, by physical

2    disability?

3            A.    Of course, some kind of a physical --

4            Q.    For now, for the sake of the deposition,

5    unless I clarify it further, I mean any physical or

6    mental impairment.

7            A.    Okay.

8            Q.    Okay.

9            A.    Yes, it was discussed where anybody, anybody

10    that had any kind of a problem with any kind of a

11    disability, you were to be lenient with and help them

12    in any way that you could.

13            Q.    And are you referring to customers?

14            A.    I'm referring to sales associates,

15    customers, whomever.

16            Q.    And did you ever have -- did you ever manage

17    a sales associate with a disability?

18            A.    Well, it depends what you call disability.

19            Q.    Okay.  Well --

20            A.    You know, somebody that's pregnant is

21    considered a disability, yes.  Somebody that's hurt or

22    back on leave from an operation, I guess you can say

23    that's a disability, I would say yes.  So I would have

24    to say overall, yes, I have, you know, managed people

25    with disabilities.

1    Q.    And so when Larry took leave for his

2    surgery, would he still have been required to hit the

3    $750,000 mark?

4    A.    No.

5    Q.    And can you explain to me how that -- would,

6    for instance, a different sales target be set for an

7    individual that took a leave for medical reasons?

8    A.    It's not a different -- it's not a different

9    sales target.  I explained to you before, if somebody

10   comes back and they are given a number of 15,000 for

11   that month and they pull 17, 18,000, they are going in

12   the right direction and you can get extended as long

13   as you need, as long as they are continuously climbing

14   the ladder, okay.  So Larry was on a coaching plan for

15   a long, long time when he came back.  We made it a

16   point, because of his past record of how good he was

17   and because he was out on disability, we gave him the

18   benefit of going on and on and on.  Even when he

19   wasn't performing we tried to do everything we could

20   to get him back to where he was.

21   Q.    When was Larry first put on a coaching plan?

22   A.    May.  Was it May?  I'm not sure.  I don't

23   have his paper in front of me.

24   Q.    Okay.  But you reviewed some papers

25   yesterday?

1      A.   Yes, but I didn't -- I really didn't look at

2  everything.

3      Q.   Okay.  Well, you just testified that Larry

4  was on a coaching plan for a long, long time?

5      A.   He was.

6      Q.   What do you mean by, "a long, long time"?

7      A.   Okay.  And maybe -- well, let me say it a

8  different way, maybe I said it wrong.  When Larry came

9  back, and I'm not sure the date he came back, I think

10  we gave him the benefit of the doubt and we didn't put

11  him on a coaching plan hoping to get him, his numbers

12  back up.  So Larry could have been going down and --

13     Q.   Mrs. Goldstein, I am not asking you to

14  speculate here today.

15     A.   I'm not speculating.

16     Q.   I'm asking you to tell me what you remember

17  specifically from your recollection, okay.  How long,

18  if you recall, was Larry on a coaching plan?

19     A.   I don't know.

20     Q.   Okay.  You testified earlier that he was on

21  a coaching plan for a long, long time, that was your

22  testimony.  Do you want to change your testimony?

23          MRS. CHICLACOS:  Objection to form.

24          MR. HARMAN, JR.:  Okay.

25          THE WITNESS:  Yes.

1    BY MR. HARMAN, JR.:

2         Q.    How long was Larry on a coaching plan?

3         A.    I don't know.

4         Q.    Okay.  And then you testified that you

5    had -- well, strike that.

6              Do you recall when Larry returned from his

7    medical leave?

8         A.    I don't remember.  Dates, I don't remember.

9         Q.    Okay.  Do you recall how long a period of

10   time it was between when he returned from his medical

11   leave and when you terminated him?

12        A.    No.

13        Q.    Okay.  Was it longer than a year?

14        A.    I don't know.

15        Q.    Did Larry ever tell you that he needed an

16   accommodation with respect to his medical condition?

17        A.    No.

18        Q.    Okay.  Do you know what his medical

19   condition was at the time?

20        A.    No.  I think he had something with his back.

21        Q.    Did you ever ask him?

22        A.    I'm sure I did.  I'm sure Larry told me.

23   I'm sure we had this discussion, and quite honestly I

24   don't remember.

25        Q.    You don't remember -- do you remember if --

1            MRS. CHICLACOS:  Objection to form.

2            THE WITNESS:  Yes.

3  BY MR. HARMAN, JR.:

4      Q.   When was that?

5      A.   I felt he gave up.  He wasn't giving it his

6  all.

7      Q.   You felt he gave up, when did he give up?

8      A.   After he came back from his surgery and we

9  were trying to get him back up and running, it wasn't

10  the same Larry.

11      Q.   What do you mean by that?

12      A.   His motivation wasn't there, he wasn't

13  trying to produce the way he used to.  He became, I

14  don't know, I guess, you know, lazy.

15      Q.   You felt he was lazy?

16      A.   Yes.

17      Q.   What do you mean by that?

18      A.   He wasn't trying to -- I didn't believe he

19  was trying to bring his numbers up.  He wasn't -- I

20  remember before his friends and family where he was so

21  good at prior, in all the years prior, he didn't work

22  his.  He didn't work his friends and family that May.

23      Q.   You are positive he didn't work his friends

24  and family that May?

25      A.   Yes.

1        Q.    What do you mean by that?

2        A.    Friends and family you are supposed to bring

3   a certain amount of people in, you are supposed to

4   bring certain amount of numbers in, and I'm pretty

5   sure, I'm not going to put, you know -- I'm more than

6   pretty sure that that was one of the reasons.  I think

7   Larry only did $9,000 for the two days and I can't be

8   a hundred percent accurate, but I am almost certain

9   about this in my mind.

10       Q.    Were you having problems with anybody else's

11  performance during the same period?

12       A.    I think we went through this before.  I

13  think it was Rafael that was on a coaching plan.  I

14  think it was Karen that was on a coaching plan.

15       Q.    Anybody else?

16       A.    Not that I can recall right now.

17            MR. HARMAN, JR.:  Okay.  Again, I'm calling

18  for the production of the coaching plans for Rafael

19  and the coaching plans for Karen that were referred

20  to by Mrs. Goldstein.

21  BY MR. HARMAN, JR.:

22       Q.    Were there monthly reports generated of

23  people's sales performance?

24       A.    Yeah, but we didn't do written ones every

25  month.  We sat -- you know, their team captains, their

FRIEDMAN, LOMBARDI & OLSON
C O U R T   R E P O R T E R S

1           MRS. CHICLACOS:  Objection to form.

2           MR. HARMAN, JR.:  What is wrong with, "were

3    his numbers low?"  What is wrong with the form of that

4    question?

5           MRS. CHICLACOS:  It was the previous

6    colloquy before you asked that question.

7           MR. HARMAN, JR.:  Were his numbers low was

8    not an objectionable question.

9    BY MR. HARMAN, JR.:

10          Q.    Were his numbers low?

11          A.    Yes.

12          Q.    Okay.  When did they start?  When did you

13   perceive that his numbers were low for the first time?

14          A.    After Larry came back his numbers were low.

15   He needed to get them up.

16          Q.    And during that time, did anyone else have

17   low numbers?

18          MRS. CHICLACOS:  Objection to form.

19          THE WITNESS:  Yes.

20   BY MR. HARMAN, JR.:

21          Q.    Who else had low numbers?

22          A.    Again, Rafael and Karen I know.  I don't

23   remember who else.

24          Q.    But there were others?

25          MRS. CHICLACOS:  Objection to form.

FRIEDMAN, LOMBARDI & OLSON
C O U R T   R E P O R T E R S

1          THE WITNESS: I'm not sure.

2   BY MR. HARMAN, JR.:

3      Q. You say you remember writing up others?

4      A. I remember writing up others, I'm not a

5 hundred percent sure. I mean, I can't remember from

6 so many years ago.

7      Q. Okay. But we are talking, it's 2013, we are

8 talking about the spring of 2011?

9      A. I'm 66 years old.

10      Q. Yeah, but you seem pretty sharp to me.

11      A. I'm not stupid but I'm not -- listen, I ran

12 with 34 sales associates, 34, okay? You do on a daily

13 basis talk to a lot of sales associates, motivate, do

14 this, do that, do other things. I don't want to

15 give -- I am under oath. I don't want to give you

16 answers that I'm not a hundred percent about.

17      Q. Okay. And I don't want you to speculate,

18 and I also don't want to engage in any kind of

19 argument with you. But I do want to get to the core

20 of the matter, and the core of the matter is -- well,

21 strike that.

22      Were Larry's numbers the lowest of the 34?

23      A. I don't remember.

24      Q. Why did you terminate him?

25      A. I terminated Larry because he was way past

1    where he could come back.  I think he was trending to

2    do something like 600,000.  Garden City is one of the

3    highest producing stores.  I am a manager that's

4    running a business.  I gave him numerous

5    opportunities, numerous opportunities to help him.  I

6    gave him numerous opportunities to relocate to bring

7    his numbers up in another store and then come back.  I

8    did everything in my power.  The last thing in the

9    world that I wanted to do is fire another human being.

10        Q.   Okay.  Did anyone force you to fire him?

11        A.   No, it was a joint, joint decision.

12        Q.   Who was it a joint decision with?

13        A.   Me, Jim Powers, my VP, and my regional.

14        Q.   Who's your regional?

15        A.   Tony Bender.

16        Q.   Did you terminate anyone else in 2011?

17        A.   I don't believe so.

18        Q.   Did you terminate anyone else in 2010?

19        A.   I think that's the year I terminated that

20    young fellow, I can't remember his name.

21        Q.   Okay.  So is it fair to say in the last two

22    years of your employment with Raymour and Flanigan

23    you've only terminated two people, is that correct,

24    that you recall?

25        A.   That I recall, yes.

1        Q.   And that would have been at least 34 sales

2   associates; is that correct?

3        A.   Uh-huh.

4        Q.   Okay.

5        A.   Okay.

6        Q.   And who was present when you terminated

7   Larry?

8        A.   I terminated him alone, with just me and

9   Larry.

10        Q.   What did you say to him?

11        A.   I told him that we couldn't keep him any

12   further, his numbers were below performance.  Here is

13   one, in all the years, in all the companies I've

14   worked for that I've terminated people, Larry made it

15   the easiest for me out of everybody.  He was prepared.

16   He said to me, "I was waiting for it to happen."  He

17   knew it was coming.  Normally when you terminate

18   somebody you walk them to the door and let them leave.

19   Larry was fine with this.  He asked me if -- "Do you

20   think they are going to hold back my unemployment?"  I

21   said, "No, why would they do that, we are terminating

22   you?"  And, you know, I said, "There's no way that's

23   ever going to happen."  When he left he asked me if he

24   could say good-bye to everybody in the office, I did

25   not stop him.  We left on good terms.  He made my life

93

1    BY MR. HARMAN, JR.:

2         Q.   So you only encountered problems with

3    multiple individuals meeting their numbers in 2011; is

4    that correct?

5              MRS. CHICLACOS:   Objection to form.

6              THE WITNESS:   Yes.

7    BY MR. HARMAN, JR.:

8         Q.   Did Larry ever ask to take a break to sit

9    down?

10        A.   No.

11        Q.   Did he ever tell you his back hurt?

12        A.   No.

13        Q.   Do you understand that he claims as part of

14   this lawsuit that he had sciatica?

15        A.   No.

16        Q.   So you have no understanding that he had a

17   flare up of sciatica?

18        A.   No.

19        Q.   That was never mentioned to you?

20        A.   No.

21        Q.   Do you understand that he claims he had

22   problems with his back?

23        A.   I know he went out for an operation on his

24   back.

25        Q.   When he returned from the operation, do you

1    being referred to as old man?

2         A.   No.

3         Q.   And can you tell me -- you said you

4    testified that you tried to get him another position

5    at another store, why would you do that?

6         A.   Because he was floundering with his numbers.

7    And instead of firing him -- he was a superstar in

8    call place and sometimes when somebody is floundering

9    they can windup going back to where they were or to

10   another store.  And instead being on the bottom of so

11   many superstars in Garden City, you go to a store with

12   people that do not perform as well.  And somebody

13   that's in Garden City can come up the ranks in Glen

14   Cove and windup back on the top.  And then if he got

15   to that point, we could have transferred him back

16   over.

17        Q.   But he didn't transfer to the other store?

18        A.   No, he didn't.  When I -- okay.

19        Q.   Yes or no?

20        A.   No.

21        Q.   Okay.  Well, you testified you never read

22   the complaint, so I'm going to tell you that the

23   complaint says that Mr. Larry alleges that eight

24   employees were on a coaching plan and that he was the

25   only one of the eight employees that was terminated.

1        A.    Could be.

2        Q.    Could be.  So you don't have any reason to

3    believe that that's false?

4        A.    No.  But again --

5        Q.    Just answer my questions, please.

6              Okay.  So you have no reason to believe that

7    that's a false statement?

8        A.    Right.

9        Q.    And as you said here today, you believe

10   Larry's numbers were the lowest of the 34?

11       A.    As far -- I'm not sure.

12       Q.    Okay.  So when you terminated him, was it

13   based on his numbers?

14       A.    It was based on his number performance, yes.

15       Q.    Was it based on anything else?

16       A.    No.

17       Q.    Just on his numbers?

18       A.    Personally it was all done on performance.

19       Q.    And by performance you mean solely based on

20   his numbers?

21       A.    Yes.

22       Q.    On his sales numbers?

23       A.    Correct.

24       Q.    Okay.  And do you recall whether or not

25   Larry had been out for any period of time during 2011?

1    bathroom break, please?

2            MR. HARMAN, JR.:  Sure.

3        [Short recess taken.]

4        [The Documents were marked for identification as

5    Plaintiff Goldstein's Exhibits 1, 2 and 3.]

6    BY MR. HARMAN, JR.:

7        Q.   I'm sorry, in the midst of my traveling I

8    arrived without a stapler and paperclips, you'll have

9    to forgive me, we'll have to work without them.

10           Mrs. Goldstein, I'm handing you what has

11   been marked for identification as P, for plaintiff,

12   Goldstein 1.  Can you please take a look at this

13   document?

14       A.   I see, yes.

15       Q.   Do you recognize this document?

16       A.   Yes.

17       Q.   What is it?

18       A.   Coaching plan.

19       Q.   Okay.  For the record, it's a document

20   entitled Coaching for Success and it has the

21   associate's name, Larry Friedmann, date of review,

22   5-7-11.

23           Did you prepare this document?

24       A.   Yes.

25       Q.   Okay.  This is a two-page document, it's

FRIEDMAN, LOMBARDI & OLSON
C O U R T   R E P O R T E R S

1      Bates stamped D 000039 and D 000040.

2              When you say "coaching plan," is this what

3      you are referring to?

4          A.    Uh-huh, yes.

5          Q.    Okay.  And did you provide a coaching -- so

6      Coaching for Success is a coaching plan?

7          A.    Correct.

8          Q.    Okay.  And did you provide a coaching plan

9      to Larry Friedmann on May 7th of 2011?

10         A.    Yes.

11         Q.    Okay.  Did you draft this document?

12         A.    I did.

13         Q.    And had you provided a coaching plan

14     prior -- to Larry Friedmann prior to this date?

15         A.    I don't remember.

16         Q.    Okay.  Can you please read what's in the

17     box?  Can you please read it out loud?

18         A.    "I want to review with you your

19     underperformance for delivered sales.  The date range

20     is from January 1st, 2011 to May 5th, 2011.  You

21     underperformed for this year to date to the minimum

22     expectation of 252,750 in delivered sales by 53,537.

23     This dollar amount is based on your 750 business

24     planner for 2011 that we will review.  You are also

25     underperforming to the minimum expectation for

1    delivered sales for the year and are currently

2    projected to finish the year at 617,435.

3              Below will be your specific goals by

4    category for the next two weeks and will include an

5    additional dollar in written and delivered

6    expectations per week to help catch up to the amount

7    you are short."

8         Q.   Okay.  Is there anything in what you just

9    read that you believe is inaccurate?

10        A.   No.

11        Q.   Okay.  And you have no recollection as to

12   whether you gave Mr. Friedmann or Larry a coaching

13   plan prior to this date?

14             MRS. CHICLACOS:  Objection to form.

15             THE WITNESS:  Don't remember.

16   BY MR. HARMAN, JR.:

17        Q.   Okay.  And you have no reason to believe

18   that these numbers --

19             MS. CHICLACOS:  Do you have to answer the

20   phone?

21             THE WITNESS:  It's not my phone, it's just

22   letting me know I have to take a certain medicine.

23             MR. HARMAN, JR.:  You want to just take the

24   medicine?  We'll take a break.

25             THE WITNESS:  But let me finish the

1    question.

2    BY MR. HARMAN, JR.:

3        Q.    Okay.  And you have no reason to believe

4    that these numbers in this box that you just read are

5    inaccurate?

6        A.    No reason.

7        Q.    Please take your medicine and do what it is

8    you need to do.

9        [Short recess taken.]

10   BY MR. HARMAN, JR.:

11       Q.    Back to Goldstein 1.  So you were indicating

12   or you were explaining, you've explained to Larry -- I

13   take it you met with him on May 7; is that correct?

14           MRS. CHICLACOS:  Objection to form.

15           THE WITNESS:  Correct.

16   BY MR. HARMAN, JR.:

17       Q.    And that you told him that he was targeted

18   as of May 7th to hit 617,000 in sales.  And what would

19   have been his expectation?

20       A.    750.

21       Q.    Okay.  And do you have any recollection as

22   to whether he had taken any time off during the

23   calendar year 2011?

24       A.    I can't -- I don't remember.

25       Q.    Okay.  Going down to the goals for Coaching

1    production of all performance plans for Rafael during

2    the 2011 period.  I believe I've already done so, but

3    to the extent that I haven't, I'm going to call for

4    the production of those plans.

5    BY MR. HARMAN, JR.:

6        Q.    With respect to Karen, she would have also

7    been given written expectations; is that correct?

8        A.    Yes.

9        Q.    And if She didn't meet those written

10   expectations, she would have been terminated; is that

11   correct?

12       A.    I have to say no.

13       Q.    Okay.  I'm going to hand you what has been

14   marked as P-Goldstein 2.  If you can please take a

15   look at it.

16       A.    Okay.

17       Q.    Do you recognize this document?

18       A.    Yes.

19       Q.    What is it?

20       A.    It's an action plan.

21       Q.    Okay.  Is there a difference between an

22   action plan and a coaching for success?

23       A.    Yes.  An action plan is when -- it's the

24   step before being fired.

25       Q.    And when did you terminate Larry?

FRIEDMAN, LOMBARDI & OLSON
C O U R T   R E P O R T E R S