1

```
1              "ROUGH DRAFT, NOT PROOFREAD"
2              THE WITNESS:  I do.
3                    DIRECT EXAMINATION
4    BY MR. HARMAN, JR.:
5        Q.   Could you please state your name for the
6    record?
7        A.   Lucy Goldstein.
8        Q.   And have you ever gone by any other name?
9        A.   I was born Lucille Spampinato.
10       Q.   Is Goldstein a married name?
11       A.   Yes.
12       Q.   Okay.  And while working, have you gone by
13   any other name but Lucy Goldstein?
14       A.   No.
15       Q.   Mrs. Goldstein, have you ever been deposed
16   before?
17       A.   No.
18       Q.   I don't know if I properly introduced
19   myself, but my name is Walker Harman.  I'm an attorney
20   and I represent Mr. Friedmann in a lawsuit that he
21   brought against Raymour and Flanigan.  Do you
22   understand that?
23       A.   Yes.
24       Q.   We are here today to take your deposition as
25   part of that lawsuit, and we've agreed, due to your
```

```
1    health condition, to conduct the deposition in your
2    home.  Do you understand that?
3         A.   Yes.  Thank you.
4         Q.   Have you ever been a party to a lawsuit
5    before?
6         A.   No.
7         Q.   Okay.  That means you've never been a
8    plaintiff or a defendant in any lawsuit?
9         A.   No.  Not that I recollect.
10        Q.   Since you've never been deposed before, let
11   me just go over a few of the ground rules.  I've
12   explained to you who I am and who I represent.  I'm
13   going to ask you a series of questions today
14   concerning Mr. Friedman's lawsuit.  If you don't
15   understand a question that I ask, please let me know
16   and I will endeavor to rephrase the question.
17        A.   Okay.
18        Q.   If you answer the question, however, the
19   record will read as though you understood the
20   question.  Do you understand that?
21        A.   I understand, yes.
22        Q.   If you want to take a break, you can take a
23   break at any time, I just ask that you would finish
24   any pending questions.  So if I ask you a question,
25   provide an answer and then take a break.  Obviously,
```

1    if you have health issues we'll stop the deposition at

2    any point that you need to stop the deposition.  But

3    in general I would ask that you answer a question

4    before you take a break.

5         A.   I understand.

6         Q.   And that you not confer with counsel before

7    you answer a question.  Do you understand that?

8         A.   You are saying if I don't answer a question

9    to let you know I don't answer it, correct?  And if

10   I'm confused whether to answer or not, to look toward

11   Jessica.

12        Q.   What I'm saying is that you need to provide

13   your best answer to any question before you either

14   take a break or before you confer with counsel.  You

15   understand that?

16        A.   Absolutely, yes.

17        Q.   Are you represented today by an attorney?

18        A.   Jessica.

19        Q.   Okay.  And when did Jessica become your

20   attorney?

21        A.   Yesterday.

22        Q.   Okay.  So had you conferred with Jessica

23   before yesterday?

24        A.   No.

25        Q.   Had you conferred with any other attorney

1    before yesterday regarding this matter?

2        A.   Ed Groh called to tell me that I may be

3    doing a deposition and he wanted to know if I could

4    fly up to New York.

5        Q.   Who is Ed Groh?

6        A.   That is his last name, isn't it?

7             MRS. CHICLACOS:  I can't help you while you

8    are answering.  So, you just have to answer to best

9    of you recollection.

10            THE WITNESS:  Okay.  I believe he is

11   Raymour Flanigan's, part of Raymour Flanigan's legal

12   team.

13   BY MR. HARMAN, JR.:

14       Q.   And he asked you if you could fly up for a

15   deposition, and what was your response?

16       A.   I couldn't.

17       Q.   Okay.  What was the reason for that?

18       A.   It's hard for me to breath.  I have

19   emphysema.  There are days that I get up and I can't

20   even get down to the car.  There are days that I get

21   up and I feel better.  So I'm never sure how I'm going

22   to, you know, react.  It's one of the reasons that I

23   left Raymour, because I was ill.

24       Q.   Okay.  I'm going to ask you a few more

25   questions about your health condition, and I'm not

1   trying to pry into your health condition, I don't want

2   to upset you.

3        A.   Right.

4        Q.   The sole purpose for my inquiry is to

5   determine the extent of which you would be available

6   where we'd have a trial in this matter or where we'd

7   need to continue your deposition on a later date.   Do

8   you understand that?

9        A.   I do.

10        Q.   When is last time you got on a plane?

11        A.   Two years ago.

12        Q.   And when is the last time you travelled more

13   than five miles from your home?

14        A.   Well, I came down here in November and I

15   drove with my husband and we had a nebulizer in the

16   car.

17        Q.   So you drove here from the New York area in

18   November?

19        A.   Yes.

20        Q.   And are you required to have a nebulizer

21   with you at all times?

22        A.   Yes.

23        Q.   Is it not possible for you to get on a

24   plane?

25        A.   The stress makes my breathing worse.   It

1    triggers it.  It's one of the worse things that I can

2    have is stress in my life.  So, you know, even this is

3    extremely stressful for me, but, you know, I'm

4    doing -- I'm doing it.  And between that and the

5    nebulizer, you know, and trying to breath and not

6    going into a panic attack and stuff like that, you

7    know, I just -- I'm very uncomfortable getting on a

8    plane.

9         Q.   Other than the drive from New York in

10   November, have you taken any other long drives in the

11   last year?

12        A.   No.

13        Q.   Do you plan to stay in the Florida area

14   permanently?

15        A.   It's debatable.  Actually, I'm going home in

16   April 1st, we are leaving to go back to New York.  My

17   husband recently went through cancer and we have to

18   have taxes done and we need to see doctors for me and

19   him.  Unfortunately, my mother-in-law is next door at

20   96 years old down here and her husband just passed

21   away.  She's with two aides that I see are not

22   treating her well, so the plan right now is to go

23   home, take care of things we need to do there, and

24   then fly back to be hear her.

25        Q.   When you say "home," where is that?

7

1       A.   It's Lindenhurst, Long Island.  Now, here is

2   the kicker, when I go home, I won't be at home because

3   my daughter -- my daughter's home was destroyed in

4   Sandy, so she -- I gave her my place which is a condo,

5   a one-bedroom condo, with four children and her

6   husband, so there's not enough room for us to go home.

7   The reason I want her to stay there is because all

8   four of her children go to school in Lindenhurst, so

9   I'm either going to go stay with my son who lives in

10  Deer Park or my sister-in-law in Roslyn.  I'm not sure

11  where I'm going to go yet, but you can always reach me

12  by cell phone.

13      Q.   Okay.  Do you intend to have Jessica

14  continue to represent you throughout this process?

15      A.   I would assume that would be Raymour's

16  decision.

17      Q.   Well, actually, that's something you have to

18  discuss with Raymour.  You are entitled to an attorney

19  of your choosing or to not have any attorney at all.

20      A.   Well, I assume if this goes further I would

21  stay with Jessica.

22      Q.   Okay.  If anything changes with respect to

23  your representation, I would ask that you let my

24  office know.

25      A.   Sure.

8

```
1        Q.   And I'm going to hand you one of my business
2    cards.  Now, right now Jessica is your attorney?
3        A.   Right.
4        Q.   And it is inappropriate for me to speak with
5    you without Jessica being present.
6        A.   Correct.
7        Q.   But were that to change, for any reason,
8    you'll let my office know that we can contact you
9    directly, okay?
10       A.   You are saying if I go with a different
11   attorney?
12       Q.   You go with a different attorney or if you
13   elect not to have an attorney at all, if you would
14   please let my office know.
15       A.   Okay.
16       Q.   What is the best number to reach you at?
17       A.   516-297-4220.
18       Q.   Now, I am taking that number down
19   understanding you have now represented to me that you
20   have an attorney and your attorney is Jessica and we
21   are only going to contact you through Jessica.  But if
22   something changes and we can't locate you or Jessica
23   informs me that she no longer represents you, then
24   we'll reach out to you directly by your cell phone.
25       A.   Okay.
```

1        Q.   I'm sorry, by the way, to hear about all of

2   your health issues, and I'm sympathetic to them.  I've

3   gone through many situations with my relatives and my

4   grandparents, and I do understand.  This is my job and

5   I have to do it and I'm under a court order to

6   complete certain aspects of discovery, so I'm not here

7   to exacerbate your health condition or to make your

8   life more difficult.  I'm just doing my job and I hope

9   you understand this.

10       A.   I do.  We just all want to get to the truth.

11       Q.   I see that you've already been doing this,

12   but you'll need to verbalize your answer to any

13   questions today.  So if I ask you a question, you need

14   to provide a yes or a no or some other form of verbal

15   answer so that the court reporter can take that down.

16   The court reporter can't always take down a nod of the

17   head or some other type of gesture.

18            Along those lines I'd ask that you and I

19   both, and it's difficult for me, as it is for many

20   people, to not try to interrupt one another.  So let

21   me finish my question and you can provide an answer.

22   If your attorney interjects an objects, you still have

23   to answer the question.  If she directs you not to

24   answer the question, she and I will engage in dialogue

25   and determine where to go from there.  Do you

1   understand that?

2       A.   Yes.

3       Q.   Are you aware that you are under oath today?

4       A.   Yes.

5       Q.   And that failing to tell the truth at a

6   deposition is a crime called perjury.  Do you

7   understand that?

8       A.   Yes.

9       Q.   The questions I'm about to ask you are

10  routine question that I would ask anybody at any

11  deposition.

12           Are you under the influence of alcohol?

13      A.   No.

14      Q.   Have you had anything to drink in the last

15  24 hours?

16      A.   No.

17      Q.   Are you under the influence of any

18  narcotics?

19      A.   When you say "narcotics" ...

20      Q.   Are you taking any medications?

21      A.   Yes.

22      Q.   What medications?

23      A.   Xanax.

24      Q.   Have you taken Xanax today?

25      A.   Yes.

1          Q.   Have you taken Xanax as prescribed by your

2     doctor?

3          A.   Yes.

4          Q.   Okay.  And are you taking any other

5     medications?

6          A.   High blood pressure medicine.

7          Q.   Okay.  Anything else?

8          A.   I'm taking Proventil steroid to help me

9     breath.

10         Q.   So medication --

11         A.   I took this today.  I took Symbicort today.

12    I took Spariva this morning.  These are all inhalers

13    to help with my breathing.  I did not do any nebulizer

14    yet, you know, but, you know, I'm hoping that I don't

15    have to take it until after this is over.

16         Q.   Okay.  You testified, Mrs. Goldstein, that

17    you took Xanax.  Is that something you take every day?

18         A.   Yes.

19         Q.   Okay.  And other than the medications that

20    you take for your breathing and for your emphysema,

21    are you taking any other medications?

22         A.   No.

23         Q.   Are you taking any medications today that

24    you believe would impede your ability to testify

25    accurately and truthfully?

1       A.   No.

2       Q.   Have you been prescribed any medications

3  that you are not taking?

4       A.   No.  But you know what, I forgot to put down

5  on that, I want to go back, I'm taking an

6  antidepressant also, Lexapro.

7       Q.   Did you take that today?

8       A.   I did.

9       Q.   Is that something you take every day?

10      A.   It is.

11      Q.   Can you think of any reason why you could

12  not provide your best and most truthful answers here

13  today?

14      A.   No.

15      Q.   Did anyone tell you not to provide truthful

16  answers here?

17      A.   No.

18      Q.   Have you ever been arrested?

19      A.   No.

20      Q.   Have you ever been terminated from a job?

21      A.   Never.

22      Q.   Have you ever been accused of a crime?

23      A.   No.

24      Q.   What, if anything, did do you to prepare for

25  today's deposition?

1        A.   Well, we spoke, Jessica and I spoke

2   yesterday.

3        Q.   Let me just caution you, I'm not asking you

4   for the content of the conversation that you had with

5   Jessica or any other attorney because that is

6   privileged information.  What I'm going to ask you

7   about is with whom you met, how long you met, what you

8   looked at.

9        A.   Okay.

10       Q.   Do you see the difference?

11       A.   Yes.

12       Q.   So tell me, did you meet with Jessica?

13       A.   Yes.

14       Q.   Okay.  When did you meet with Jessica?

15       A.   Yesterday.

16       Q.   Okay.  How long did that meeting take place?

17       A.   About an hour, an hour and 15 minutes.

18       Q.   And did you look at any documents?

19       A.   I did.

20       Q.   What documents did you look at?

21       A.   I looked at some of the documentation that I

22   sent up to human resources, you know, just legal

23   papers that you usually sent up when you are doing

24   coaching plans and action plans and things like that.

25       Q.   Do you have copies of those documents with

1    you today?

2         A.   No, I don't remember what I looked at.

3              MR. HARMAN, JR:   I'm going to call for the

4    production to the extent, and this is really more

5    Jessica than it is for you, call for the production

6    of any documents that were reviewed that

7    Mrs. Goldstein testified that were sent to HR.

8    BY MR. HARMAN, JR.:

9         Q.   Did you look at any other documents?

10        A.   A payroll slip that is sent up through the

11   computer once somebody is fired with the reasoning why

12   they were fired, and the background saying that there

13   was coaching plans done on this date and this date and

14   termination was done.  That's the only other paper.

15        Q.   When you say "paper," can you tell me -- can

16   we try to get a little bit more specific in terms of

17   the documents that you recall looking at.  Can you

18   tell me the first document that you recall looking at?

19        A.   A coaching plan.

20        Q.   Okay.  So there's a coaching plan.

21             What was the second document you recall

22   looking at?

23        A.   A second coaching plan.

24        Q.   Okay, a second coaching plan.

25             And the third document, if there was?

1      A.   Those two coaching plans were not done by

2   me, those were done by somebody else and I'm not sure

3   who.  I don't recognize the signatures on them.  And

4   then there was another coaching plan by me, signed by

5   me.  There was another coaching plan signed by me.

6   There was the payroll termination done online by me.

7      Q.   Okay.  So you've testified to five documents

8   that you reviewed with Jessica; is that correct?

9      A.   Yes.

10      Q.   And I take it that the payroll termination

11   online was a printout of what would have been done on

12   a computer; is that correct?

13      A.   That's correct.

14      Q.   Okay.  You didn't look at any other

15   documents to prepare for today's deposition?

16      A.   No.

17      Q.   Have you ever seen any other documents

18   related to this matter?

19      A.   There was -- I'm not even sure what it was,

20   it was -- I think -- I think it was Larry's complaint,

21   but I never read it yesterday.  I never picked it up

22   and I never went over it at all.

23      Q.   Who gave you Larry's complaint?

24      A.   Well, Jessica had it.  She said, do you want

25   to read this?

```
 1          MRS. CHICLACOS:  Don't discuss the content
 2   of our conversation.
 3          THE WITNESS:  Jessica.
 4   BY MR. HARMAN, JR.:
 5      Q.   Jessica gave it to you?
 6      A.   Yes.
 7      Q.   And you did not read it?
 8      A.   No.
 9      Q.   What did you do with it?
10      A.   Gave it back to her.
11      Q.   Do you have any documents in your possession
12   related to this matter?
13      A.   None.
14      Q.   Okay.  And you decided not to read it?
15      A.   Correct.
16      Q.   Why?
17      A.   I don't feel, and I don't know if I need to
18   say this, I don't feel like I need to read what he
19   wrote.  I'm sitting here today with you to tell the
20   truth and I just wanted to go in cold and do the
21   right -- to me this is the right thing, not to read
22   something that he said about me or this or that.  I'm
23   trying to recollect from two years ago the best of my
24   knowledge of what went on and I didn't want to read
25   his statement.
```

1        Q.   But you do understand that, and I guess

2   since we are using first names I'll go with Larry too,

3   if that's okay, since you are calling --

4        A.   That's fine.

5        Q.   -- Mr. Friedmann, Larry.

6             You know that Larry has sued Raymour and

7   Flanigan?

8        A.   Correct.

9        Q.   And that although you are not a legal

10  defendant at this point, that he named you originally

11  in the lawsuit.  You understand that?

12       A.   I do.

13       Q.   Okay.  And do you have any understanding of

14  why he sued Raymour and Flanigan?

15       A.   He's going -- I think he's suing for -- he's

16  claiming that he was terminated for old age and for

17  disability, something to that effect, like ...

18       Q.   Anything else?

19       A.   No.

20       Q.   Just bear with me for one second.

21            MR. HARMAN, JR.:  Again, I'm going to call

22  for the production of all five of the documents that

23  Mrs. Goldstein reviewed to prepare for her deposition

24  and I'll follow up with a writing.

25            MRS. CHICLACOS:  They've all been produced.

```
 1              MR. HARMAN, JR.:  Okay.
 2    BY MR. HARMAN, JR.:
 3         Q.   What was your relationship like with Larry?
 4         A.   It was good, very good.
 5         Q.   Were you friendly with him?
 6         A.   I would say yes.  I mean, you know,
 7    friendly, we didn't go out together, you know, we
 8    never had any kind of personal outside of work, but,
 9    you know, we got along well.
10         Q.   And how long did you know Larry?
11         A.   I'm thinking.  I'm not quite sure when Larry
12    came to work for me, but Larry was hired when I was in
13    the first store, in the Glen Cove store.  And I'm
14    trying to remember if I interviewed him and I hired
15    him or he was hired by somebody else.  It goes back so
16    far, I can't remember.  I interviewed so many people.
17    But he came on board when Raymour was new to the area.
18    He was with Seaman's prior to.  And Huffman Koos had
19    closed and that's when Raymour took over Huffman Koos.
20    And I think it was a year later that Seaman's went out
21    of business and Larry came down for an interview and I
22    was able to take the best sales associates from
23    Huffman Koos and the best sales associates from
24    Seaman's and I found Larry to be in that category.
25         Q.   Did you hire Larry?
```

1      A.   I'm not sure.  I think that's the best way

2  to say it because I don't remember.

3      Q.   You don't remember whether you hired him or

4  not?

5      A.   Don't remember.  You know, I understand that

6  I was hiring everybody for that store because it was a

7  brand new store.  So, you know, we needed 34 people

8  and, you know, I had helped with the hiring and I

9  don't know which one of us -- we used to go trade off

10  and I interviewed and then the regional would

11  interview, and we'd go back and forth until we got

12  everybody hired.

13          There was a gentleman by the name of Clayton

14  at that time who used to be a, I forgot what you call

15  it, a recruiter, and the store wasn't even ours, we

16  were hiring in a mall.  We were meeting people in a

17  mall, actually.  But I don't think that was Larry.

18  Larry came to the store because those were the Huffman

19  Koos people that we hired in the mall.

20      Q.   And I don't want to mischaracterize your

21  testimony, but is it fair to say that Mr. Frid -- or

22  Larry came with a group of people, that he was hired

23  with a group, brought on as part of a group?

24      A.   No.

25      Q.   Okay.

1       A.   Everybody was individual.

2       Q.   Everybody was individual?

3       A.   Everybody was individually.

4       Q.   This was the new store in Glen Cove?

5       A.   Yes.

6       Q.   And were you the manager at that store?

7       A.   Yes.

8       Q.   And you needed 34 people?

9       A.   Correct.

10      Q.   And of those 34, how many were salespeople?

11      A.   That would be my --

12      Q.   34 sales associates?

13      A.   As a manager -- as a manager, a store

14   manager, you are in charge of the sales associates.

15   Raymour works in just three different ways, a manager

16   of a store is in charge of the sales associates.

17      Q.   And did you, in fact, get 34 sales

18   associates for the store?

19      A.   Yes.

20      Q.   And Larry was one of those associates?

21      A.   Yes.

22      Q.   Do you have any idea how old Larry is?

23      A.   I'm not sure.  I'm not sure.

24      Q.   Would you say --

25      A.   I figure he's about my age.

1          Q.    How old are you?

2          A.    66.

3          Q.    Did you ever discuss his age with him?

4          A.    No.

5          Q.    Do you ever hear him tell anyone how old he

6    is?

7          A.    No.

8          Q.    Did you ever hear discussions with Larry and

9    anyone else regarding his age?

10          A.    No.

11          Q.    Of the 34 that were hired, other than Larry,

12    were any of the other 34 in their sixties?

13          A.    Charlie Bruno I believe.  God, I'm going to

14    back, it's so hard to remember.  If I can have a -- I

15    don't have a -- I don't really know everybody's age.

16    You know, it was not -- I'm not sure.

17          Q.    I'm not trying to put pressure on you to

18    give me exact ages.

19          A.    But you are talking about going back --

20          Q.    Based on your --

21          A.    Sorry.

22          Q.    That's all right.

23                Based on your best recollection and what

24    people said and how they appeared, can you tell me of

25    the 34 if anybody else was in their sixties?  You

1    mentioned Charlie Bruno?

2              MRS. CHICLACOS:  Objection to form.

3              THE WITNESS:  Arlene, Arlene Cohn, I know

4    she was older.  And understand, now we are going back

5    to 2005 at this point, so it's a lot of years ago,

6    you know.  It's a lot of years ago for me to go back

7    because things have changed, people have changed,

8    some left, some went on, some came with me, but it's

9    so many years ago that it's hard to remember who my

10   original staff was, and that's what I'm trying to do.

11   But I know there was Arlene, I know that there was

12   Charlie.

13             There were a few older people and, you know

14   what, age was never ever involved in hiring or not

15   hiring, it was based on their performance.  They came

16   with documents from Seaman's showing me their -- what

17   they had done prior, Huffman Koos people, too.  You

18   know, there's always lists of the best writers and,

19   you know, if you bring that, that's what I was

20   looking for, the best of the best to bring the store

21   together.

22   BY MR. HARMAN, JR.:

23        Q.   Other than Mr. Bruno and Ms. Cohn, can you

24   think of anyone else who was older, as you say, as

25   part of the 34?

1      A.   I think Victor -- well, Victor wasn't -- he

2   was a manager, I can't say that.  I can't remember.  I

3   really can remember.

4      Q.   That's all right.  I'm only asking you for

5   what you can remember based on your personal

6   knowledge.  So if you think of any other names, you

7   can certainly let me know later on in the deposition.

8      A.   Okay.

9      Q.   So can you tell me what your -- so you began

10  to manage, is it fair to say that you began to manage

11  Larry in approximately 2005?

12     A.   Yes.

13     Q.   And what was Larry like as an employee in

14  2005?

15     A.   Larry was excellent.  His numbers were good,

16  he was focused, he was part of a great team.  The

17  excitement of the store growing, he was part of that.

18     Q.   And did you give Larry any feedback during

19  2005 regarding his performance?

20     A.   Oh, I'm sure.  We had -- always did reviews

21  with the sales associates, so I'm sure there were

22  reviews that were sent up on all the sales associates.

23     Q.   Okay.  Would you personally complete their

24  reviews?

25     A.   Some of them, some of them what happens is

1    I'm the store manager, and then there were three

2    managers, for Glen Cove it might have been two

3    managers, it wasn't -- the store wasn't that big yet.

4    And the sales force was divided into groups under

5    certain manager who helped them, the ones that were

6    struggling.  They would write up their reviews.  I

7    would sit with them while they were doing the reviews

8    one on one and heard the information going back and

9    forth.  I might have put input in at that point, but

10    I'm not saying that I wrote every one of them.

11        Q.  Okay.  But is it fair to say then that you

12    participated in completing every review?

13        A.  Absolutely.

14        Q.  Do you recall whether you completed Larry's

15    review in 2005?

16        A.  I don't know.

17        Q.  Do you recall whether that review was

18    positive or not?

19        A.  I would say -- you know what, I'm saying it

20    because Larry was a good sales associate, so I'm

21    thinking back, it should have been a good review.  I

22    don't know because I don't have the paperwork from so

23    many years ago, but I don't remember having any

24    problems with Larry.

25        Q.  Okay.  What about in 2006, how was Larry's

1    performance as a sales associate at the Glen --

2         A.   Cove.

3         Q.   -- Cove store?

4         A.   Fine, same.

5         Q.   When you say excellent performance and

6    numbers were good, can you describe to me more

7    specifically what you mean by that?

8         A.   Sure.  The sales associates are given a

9    projection of what their numbers are supposed to be

10   when they come on board.  Before they sign up with us

11   they are given a sales associates projection stating

12   that -- and it's broken down into months.  Sales

13   associates are supposed to do approximately -- at that

14   time I think it was 650,000 for the year.  I don't

15   think it was yet 750,000.  That was their minimum and

16   then it was broken down into months, because in sales,

17   in furniture you have good months and you have bad

18   months, and then it was broken down like in January

19   they ae supposed to write 11,000 and deliver 15,000

20   or -- so it's broken down across the board like that.

21   So when we do reviews, we go back and that's what we

22   would look at.  Okay, Larry, you were supposed to

23   do -- you were supposed to get 15,000 delivered this

24   month, and you got 18,000 delivered this month.

25   Great, you are doing great.  You know what I mean?

1    That's how you did a review.

2        Q.    And how frequently would those reviews

3    occur?

4        A.    Once a month.

5        Q.    And those would be done verbally?

6        A.    You could do it verbally and then -- but

7    then by at least once every three months you had a

8    written where you sat and, you know, went over the

9    numbers, you know, like within those numbers it was

10   broken down into platinum, which was your protection

11   plan and how good they were doing on that, and how

12   much bedding they were selling, if they needed help in

13   certain areas, it was kind of broken down like that.

14   So you are doing really good here, but let's see if we

15   can get this up and, you know, things like that.

16       Q.    And how about in 2007?

17       A.    Larry was still good.  I had no problem with

18   Larry in Glen Cove at all, to the point that when we

19   opened Garden City, which was the huge box that

20   everybody was waiting for, I was allowed to handpick

21   my staff that would go over there.  I handpicked Larry

22   to come with us.

23       Q.    So you were responsible for opening a new

24   store?

25       A.    Yes.

1       Q.   Okay.

2       A.   A big one, that's their biggest and largest

3  store today.

4       Q.   And that Garden City?

5       A.   Garden City.

6       Q.   When was that store opened?

7       A.   2000 -- what's today the 12th -- 2008.  I

8  think it was 2008.

9       Q.   And how many sales associates did you need

10  for Garden City?

11       A.   They started higher with like, I don't know,

12  I think it was 38, and then we went down again to 34.

13  I think we were at a minimum -- they were at minimum

14  of 34 over the years.

15       Q.   Of your sales associates at Glen Cove, how

16  many of your sales associates from Glen Cove did you

17  take to Garden City?

18       A.   I'd have to say about 50 percent.

19       Q.   And Larry was included in that?

20       A.   Yes.

21       Q.   Why did you select Larry?

22       A.   Because he was a good sales associate.

23  Again, he was dedicated, he was performing well, his

24  momentum was good, his attitude was good, and, you

25  know, when you are opening a new store, when you are

1    given a store, just like the sales associates have a

2    performance record given to them to do, a manager is

3    also given budgets for the year that they need to hit.

4    So you would take your best sales associates with you

5    that, you know, would be good enough to perform in

6    that store.  The store was a lot larger, huge.

7         Q.   But it didn't have more sales associates

8    than the Glen Cove store; is that correct?

9         A.   No.

10        Q.   Okay.  It was just a physically larger

11   store; is that correct?

12        A.   Correct.

13        Q.   How was Larry's performance in 2008?

14        A.   Good.  I think Larry was one of the ones

15   that did huge on a friends and family event.  He

16   focused, he brought people in, he was doing very well.

17        Q.   So would you say the same as the previous

18   years or --

19        A.   Yes.

20        Q.   -- better or worse?  The same?

21        A.   The same.

22        Q.   You specifically recall a contribution to

23   the friends and family event?

24        A.   Yes.

25        Q.   That was positive?

1      A.   Yes.

2      Q.   Okay.  Anything else you recall about his

3 performance in 2008?

4      A.   No, not anything outstanding and, you know,

5 the reason is, unfortunately what happens is, you say

6 good job, you know, good job, good job, good job, and

7 I'm the type of a manager that always manages with

8 very positive.  I'm a very positive human being, I

9 always look at a glass half full.  So if Larry would

10 come in the office and he did a sale, I would just

11 immediately say great job, give me five, you know, and

12 build him that way.  The ones struggling at the bottom

13 were the ones that were more -- I was more focused on

14 to try and build them up and bring them back.

15      Q.   So you would say that you were not focused

16 on Larry because he was doing well?

17      A.   No, I didn't say that.  I did not say that.

18 I'm saying that I always focused on all the sales

19 associates, I gave them, if they were good, the

20 encouragement was there, I always said high five, good

21 job, you know.  I focused a little bit more on the

22 people that were under that needed to be brought up.

23 But they were -- nobody was ever left out with me.  I

24 always found my time to sit and talk to everybody,

25 even if it wasn't sitting across the table like this.

1   But if they were on the floor and it wasn't busy, I

2   would say, come sit with me for a minute, how is

3   everything going, are you okay, you know, I see you

4   are doing good on this, keep up the good work.  But

5   never did I not focus on any of them.

6       Q.   Okay.  Other than the friends and family

7   event, do you remember anything, any other specific,

8   aspects of Larry's performance in 2008 that were

9   positive?

10      A.   I don't.

11      Q.   Do you remember anything that was negative

12  about Larry's performance in 2008?

13      A.   You know you are going by years and I

14  can't -- no, I don't, I don't know in 2008.  I don't

15  even remember.

16      Q.   Well, let me just -- let me just try to be a

17  little bit more specific.  This would have been the

18  year after the store opened, so it would have been the

19  beginning, the first year of the store opening.  So

20  that's the period that I would ask you to focus on.

21      A.   Larry did well.

22      Q.   Okay.  And you don't remember any specifics?

23      A.   I don't.

24      Q.   Okay.  Do you remember anything negative

25  that occurred in terms of his work performance?

1      A.   No.

2      Q.   Do you remember any issues with Larry's

3   health in 2008?

4      A.   I don't know if it was in 2008.  I know

5   Larry had health issues, but I don't know if it was

6   2008, 2009.  I'm not sure when Larry -- he went out on

7   leave for an operation and I'm not sure the dates.

8   Forgive me, but I just can't remember that.

9      Q.   By the way, of the 34 that you had at Glen

10   Cove, how many were men?

11      A.   Oh, my God, that was split so equally in the

12   stores, men and women.

13      Q.   So it's your testimony that approximately

14   half of the 34 or so were women and half were men?

15      A.   Were very close.  I mean, yes, it was very

16   close, I had Linder and Stacey and Michele and Karen

17   and Nardy -- there was a lot of women in the store

18   also, a lot of women.

19      Q.   Okay.  I'm really not asking you for the

20   names, I just want to know -- I just want your

21   testimony to be clear.  You think that half of the --

22      A.   Listen, if I'm saying half, you know, it

23   could be maybe 17 men and, you know, a little less --

24   but there were a lot of women there.  There were more

25   men, I believe there were more men, but there were a

1   lot of women there also.

2        Q.   Do you recall -- what else do you recall

3   about Larry's health issues?

4        A.   I remember him coming and saying that he

5   needed an operation.  I remember him -- me having a

6   conversation with him telling him not to worry.  When

7   I hire anybody -- from the day I hire somebody, the

8   very first words out of my mouth when we are

9   discussing ... is sit down with them immediately is,

10  if, if anything happens with your health or with your

11  family, understand, do not hesitate to come to me,

12  that comes before anything.  And I've lived by that

13  with everyone of them.

14       Q.   Okay.  I'm just asking about what you recall

15  about Larry health issues.

16       A.   I remember he had a -- he needed an

17  operation and I told him not to worry about it.

18       Q.   Do you recall what operation he had?

19       A.   Something with his back, I believe.

20       Q.   Okay.  And did he have the operation?

21       A.   Yes.

22       Q.   And did he take time off from work?

23       A.   Yes.

24       Q.   Okay.  And did he need to fill out paperwork

25  to take time off of work?

1          A.   I believe he did.

2          Q.   Okay.  As a manager, what is the procedure

3    for a sales associate to request time off of work for

4    an operation?

5          A.   That goes through human resources.

6          Q.   And then did you refer Larry to HR?

7          A.   Yes.

8          Q.   And to whom did you refer him?

9          A.   It was either Patty Delgenio or Chris

10   Rowland.  And I don't know if Chris was on board yet,

11   she might have been on board.

12         Q.   And how would you have done that?

13         A.   Well, basically I would call them and let

14   them know that Larry has requested a leave of absence.

15   And a lot of times they would come down to speak with

16   him or to fill out paperwork, and, you know, let him

17   leave or when is it going to be.  And I don't think

18   Larry left right away, I think he told me the

19   operation was going to be, so he had time to speak

20   with them.

21         Q.   Do you recall how much time he took off?

22         A.   I'm thinking 12 weeks.

23         Q.   Do you know if that was paid time?

24         A.   I don't know how they do that.  I've

25   never -- I really have never been involved in that end

1    of the business.

2         Q.   And do you recall when he took 12 weeks of

3    leave for his back surgery?

4              MRS. CHICLACOS:  Objection to the form.

5              MR. HARMAN, JR.:  You can answer.

6              THE WITNESS:  No, I don't remember the

7    date.

8    BY MR. HARMAN, JR.:

9         Q.   I'm talking about the year, was it in the

10   first year of the opening of the new store?

11        A.   I don't remember.  I don't think so.  I

12   don't -- I think that Larry was with me the first year

13   of the store and we did very well.  I don't remember.

14        Q.   Okay.  Did you terminate Larry?

15        A.   Yes.

16        Q.   When did you do that?

17        A.   June, I think, 2011.

18        Q.   Okay.  So he worked with you at the Garden

19   City store from 2008 to June of 2011?

20        A.   Yes.

21        Q.   Okay.  So do you know when the Garden City

22   store opened?

23        A.   2008.

24        Q.   Do you know what time of the year it was,

25   was it the summertime, was it cold?

1       A.    I believe it was October.

2       Q.    It was October?

3       A.    I believe it was October.

4       Q.    So sort of late 2008?

5       A.    Yes.

6       Q.    So then we've got 2009, we have 2010, and

7    half of --

8       A.    2011.

9       Q.    -- 2011, right.  So we've got a little more

10   than two and a half years, okay.

11           So, during that period, it's your

12   recollection that he had back surgery, correct?

13           MRS. CHICLACOS:  Objection to form.

14           Go ahead and answer.

15           THE WITNESS:  Correct.

16   BY MR. HARMAN, JR.:

17       Q.    Okay.  And do you know whether it was closer

18   to the opening of the store, whether it was closer to

19   you terminating him?

20       A.    It was in -- I would have to say it was

21   maybe a year, a year and a half, a year and three

22   quarters before I terminated him.

23       Q.    Okay.  So that's going back to sometime in

24   2010 or 2009, correct?

25       A.    Correct.

1      Q.   Okay.  So he was out, as far as you recall,

2   for 12 weeks; is that correct?

3      A.   Correct.

4      Q.   And was he out for any other time period

5   related to his back?

6      A.   I don't believe so.

7      Q.   Okay.  So it was just that 12 weeks?

8      A.   Correct.

9      Q.   Okay.  And you said his performance overall

10  in 2008 was good or the same as it had been in the

11  prior years; is that correct?

12     A.   Correct.

13     Q.   Do you know what his performance was like in

14  2009?

15     A.   This was when he came back?

16     Q.   Prior to his surgery, okay, what was his

17  performance like?  So let's -- we talked about 2008,

18  there would have been some period in 2009.  What was

19  his performance like leading up to Larry informing you

20  that he needed to have back surgery?

21          MRS. CHICLACOS:  Objection to form.

22          THE WITNESS:  I believe for -- I think I

23  didn't have any problem with Larry in any way until

24  after he came back from surgery.

25

1   BY MR. HARMAN, JR.:

2        Q.    And when Larry was away for the 12 weeks,

3   was he replaced with anyone?

4        A.    No.

5        Q.    Okay.  And can you describe Larry's job

6   responsibilities as a sales associate?

7        A.    Sure.  He greeted people, customers coming

8   through the door, he worked with them on the floor, he

9   either made the sale, didn't take the sale.

10  Afterwards, sales associates, once they start to get a

11  log of people, they could make a sale and it's not

12  delivered, so it goes into different reports such as

13  10/10's, 12/12's, 6/6's, which all mean different

14  things.  And the sales associates, when they are not

15  on the floor, have the option to sit in the office on

16  the computer and go through their customers and see,

17  make phone calls, see if they can get something

18  delivered that's already been sold, work on people

19  that were supposed to leave deposits and didn't leave

20  deposits, certain things like that, that's what the

21  sales associates do.

22       Q.    Do you recall how many hours Larry worked

23  per week?

24       A.    I would say at least 40.

25       Q.    Was he required to work a certain amount of

1   hours?

2        A.   I think it was 40, yes, 40, 42 they worked.

3        Q.   So he was required to actually be in the

4   store for a certain period of time during a week?

5        A.   Yes.

6        Q.   Was he compensated for that time?

7        A.   Compensated?

8        Q.   Meaning was he paid for that time?

9        A.   I believe they were paid their salaries,

10  yes.

11       Q.   But he was also paid commission; is that

12  correct?

13       A.   Yes.

14       Q.   And were employees allowed to take breaks?

15       A.   Yes.

16       Q.   Sales associates?

17       A.   Yes.

18       Q.   What breaks were they allowed to take?

19       A.   Two 15-minute breaks, morning and afternoon,

20  and lunch.

21       Q.   And how long was the lunch break?

22       A.   They went from -- they are supposed -- I

23  believe it's a half hour, but they used to take

24  longer.  Especially if they were going out to get

25  something to bring in and eat in the back, backroom,

1    we had a lunch room.

2          Q.    So there were some flexibility for --

3          A.    Always flexibility with lunch.

4          Q.    Do you have any employees who smoke?

5          A.    Yes.

6          Q.    Okay.  When an employee wanted to take a

7    cigarette break, would that count toward their

8    15-minute breaks?

9          A.    I would have to say no, I didn't stop

10   somebody from -- you know, I didn't add it on to their

11   thing if they went out.  The only thing I asked was

12   that when they smoked, it would be after a customer

13   they finished with, and their name could not go back

14   on the list to take another up until after they

15   smoked.

16         Q.    Okay.  What about bathroom breaks, did they

17   count towards the 15?

18         A.    No, of course not.

19         Q.    And what about getting something to drink,

20   would that count toward the 15-minute break?

21         A.    No.

22         Q.    Any other job responsibilities that Larry

23   had as a sales associate?

24         A.    Well, during the sales time of friends and

25   family, they were asked to bring in a certain amounts

1    of customers into the store, given a budget of how

2    much they were supposed to do.  And, you know, sale

3    days were always exciting in the stores because you

4    always had the advertising going on and customers

5    coming in and it was their chance to make big money

6    that would cover them now for another month or two.

7         Q.   When you say "big money," what do you mean

8    by that?

9         A.   Well, friends and family now it's three days

10   a week, when we started it was only two days a week.

11   Friend and family is twice a year and the Goldbergs

12   give -- the owners of the company give 20 percent off

13   if, let's say, somebody is buying 2900 -- 29 -- I

14   think it's 2,999 worth of delivered goods, they are

15   entitled to 20 percent discount.  They are entitled to

16   15 percent discount if it's over, I think, 2,499, and

17   10 percent below that or 12 percent below that.

18             So this happened twice a year and,

19   basically, what happened was you got the best -- your

20   best customers would kind of know and you would

21   contact them and you would tell them, okay, I have

22   another friends and family coming in, you know that

23   sofa sectional you were looking for, that you said you

24   were going to do next friends and family, Blah, blah,

25   blah, and they would come into the store at that time

1    and purchase it.  So you could build a clientele of a

2    lot of people.

3              We also let them handwrite sales in advance

4    so that the morning of they can input it into the

5    computer.  Those customers would come in, not have to

6    ask for any of the sales associates, but we as

7    managers would take them up to the desk, let them get

8    finished so the sales associates could be taking

9    somebody else, so there was more of a chance of them

10   making more sales on those two days and building up

11   their finances.

12        Q.   So prior to Larry going on this 12-week

13   leave, did you ever write him up for his performance?

14        A.   I do not believe so.

15        Q.   Did you ever verbally reprimand him?

16        A.   I do not believe so.

17        Q.   Do you recall any performance issue with

18   Larry prior to this 12-week period?

19        A.   No.

20        Q.   While you were at the -- strike that.

21             Was there a certain amount of time that

22   employees, sales associates were required to stand

23   during the day?

24        A.   They only stood until the next customer came

25   in.  So there was a thing in place where you would

1    have the number -- the one that was getting the next

2    customer was called the 10 man, then there was a 20

3    man that was in the second spot, and then the 30

4    person was in the office waiting to move up.  So it

5    would depend on, of course, how long the next customer

6    took to come in.

7         Q.   So there was a 10 man, a 20 man, and what

8    was the third thing?

9         A.   A 30 man.

10        Q.   A 30 man, okay.

11             So how many sales associates were standing

12   at one time?

13        A.   There would be three.

14        Q.   And where were the rest of the sale

15   associates?

16        A.   In the office sitting.  They are working on

17   the computer.

18        Q.   And how many sales associates would

19   generally be at the location on any given day?

20        A.   Well, the weekends everybody was there

21   because that's your money days, so everybody was

22   there, sales, everybody was there.  During the week

23   I'd have to say, you know, 16, 17, some days.  It

24   depended on the day.  Mondays were heavier and Fridays

25   were heavier because Monday was the day after a sale,

1    the weekend, so more sales associates came in to

2    finish up sales from Sunday or people that were coming

3    back on Monday from the weekend.  Friday was the

4    beginning of the sale, so they would come in.

5    Tuesday, Wednesday and Thursday -- Wednesday was an

6    event day every Wednesday where they would come in and

7    they were supposed to bring customers back into the

8    store with a discount, so everybody was in on a

9    Wednesday.  Tuesday and Thursday we were short.  We

10   were like -- I think some were 16 -- I think one was

11   16 and one was 17, if I'm not mistaken.

12        Q.   Okay.  I just -- I'm not familiar with

13   exactly how this works.  I'm trying to just ask you

14   some very basic questions so that I can get clarity on

15   it.

16        A.   Okay.

17        Q.   So on a weekend you would have approximately

18   30 something, 34 to 36 or so sales associates in the

19   large Garden City store; is that correct?

20        A.   Correct.

21        Q.   Okay.  And they would be disbursed

22   throughout the store, but you would have three of

23   those sales associates in line greeting customers?

24        A.   Yes, but not all the time.  The Garden City

25   store was so busy that there were times that there

1    would be nobody on line and I would have to call

2    somebody over to see if they can take a second

3    customer.  Let's say you got somebody with a lamp,

4    okay, and you had to stay with your customer.  Once

5    you saw that the ups -- there was no more people up on

6    10, you can come back up and if I -- you know, I would

7    say to you, take the next one.  Can you handle two?

8    Can you take the next one?  And they'd say yes, so

9    some times they were working with two people.  Garden

10   City was extremely busy store.

11        Q.    Okay.  And I know this is going to be

12   somewhat challenging for you, but I'm asking you more

13   about on a typical day not on the usually busy day or

14   on the sale day?

15        A.    Every weekend was busy in Garden City.

16        Q.    Then let's talk about a weekday.

17        A.    Okay.

18        Q.    On a weekday you said that there would be

19   approximately 16 or so sales associates, and it would

20   vary depending on the day but it would be less than

21   34, correct?

22             MRS. CHICLACOS:  Objection to form.

23             THE WITNESS:  Yes.

24   BY MR. HARMAN, JR.:

25        Q.    And you would have approximately three sales

1   associates lined up?

2        A.   Correct.

3        Q.   Okay.  And would they be physically

4   standing?

5        A.   Yes.

6        Q.   Okay.  In the front of the store?

7        A.   Two out on the floor and one at the doorway

8   of the office.

9        Q.   Okay.  And once one of those three

10  individuals connected with a customer, how was it

11  determined that another sales associates would get in

12  line?  In other words, you have three, one of those --

13  and it's not necessarily --

14       A.   It's a list that they go by.

15       Q.   Do you compile the list?

16       A.   No.

17       Q.   Who compiles the list?

18       A.   The sales associates.

19       Q.   The sales associates.

20            And is the list generally equitable?  And if

21  you don't understand what I mean, I'm happy to

22  explain?

23       A.   Well, I'm assu -- no, go ahead, explain.

24       Q.   Does it generally -- if I have -- you know,

25  if I have A through Z associates, does the list

1    generally just go A through Z or does it vary?

2         A.   It varies.

3         Q.   Why would it vary?

4         A.   Well, let's say you get a customer that's

5    looking for a whole house of furniture and you know

6    it's going to be a big sale, but you are going to have

7    to spend time with that customer, okay, where the

8    person behind you gets a lamp up, they walk the floor,

9    they don't see anything they like and they walk out.

10   Once your customer leaves the store, that person will

11   be able to put his name back on the list and take the

12   next up coming in.

13        Q.   Oh, I see, so the list is circulating --

14        A.   It's rotating.

15        Q.   -- it's formulating throughout the day?

16        A.   Correct.  And you make the decision whether

17   you think the customer -- I mean, you can't take

18   another up until your customer is out of the store

19   because we never wanted to leave a customer alone in

20   the store.  You should always be there to answer

21   questions, of course; be nearby, you know, and just in

22   case they had questions.  And, you know, you don't

23   want people wondering around the store for simple

24   reasons they can pick things up and put them in their

25   pockets, they can walk out, you know, there's a

1   million things.

2       Q.   Right, I understand that.  I'm just

3   getting -- I'm trying to get a sense of that

4   procedure.

5       A.   Right.

6       Q.   So the only requirement to stand was for the

7   three sales associates that were the top three on the

8   list?

9       A.   Correct.

10      Q.   Two of them were at the front of the store,

11  one of them was at the door of the office, and you

12  referred to them as 10 man, 20 man and maybe 30 man?

13           MRS. CHICLACOS:  Objection to form.

14           THE WITNESS:  Yes, that's correct.  And

15  even -- once they took a customer, once they took

16  that customer nine out of ten times the sales

17  associate would be sitting with their customer.  So,

18  in other words, if they stood for 10 minutes, okay,

19  and then they took a customer and the customer

20  stopped at the piece, and they sat down on it, the

21  right form would be for a sales associate not to be

22  higher than a customer but to sit down kind of

23  welcoming a customer, okay.  So they were never

24  forced to stand when they were working the customers,

25  they could sit at a table and discuss what the sale

1    was, they can could sit at a sofa.  They only were

2    required to stand when they -- when a customer came

3    in, you know, to invite them into the store.

4    BY MR. HARMAN, JR.:

5         Q.    And is that a written policy of Raymour?

6         A.    Yeah.

7         Q.    Where is that written down?

8         A.    I guess the sales rules.

9         Q.    And the sales rules state that you are

10   supposed to move your body -- that you supposed to sit

11   down in an inviting way?

12        A.    I don't know if that's written somewhere

13   but, you know, it just is.  I mean, nobody, nobody in

14   the store -- where it's written, it's written that you

15   need to stand on 10, 20, 30, but it's not written

16   anywhere else that you cannot sit when you are working

17   with a customer and any sales associate --

18        Q.    Okay, that's all I needed to know?

19        A.    Okay, I'm sorry.

20        Q.    It's been a little more than an hour, why

21   don't we take just a two-minute break.  I'd like to

22   use the restroom again.

23        A.    Sure.

24        Q.    And it's always good every hour or so to

25   just take a very short break.

1      A.   Okay.

2      Q.   I do not anticipate spending the whole day

3  with you at all and I would hope to wrap within the

4  next few hours or so.

5           MRS. CHICLACOS:  I have a 6:20 flight, so

6  if we are going to be later than 4:00 I would need to

7  know that sooner rather than later.

8           MR. HARMAN, JR.:  I can't imagine why we

9  would be later than 4:00, especially if we don't take

10  any significant breaks.

11          THE WITNESS:  Okay.

12          MRS. CHICLACOS:  I don't think we need to

13  do lunch, I have a little snack.

14          MR. HARMAN, JR.:  I don't anticipate -- I

15  would rather just go directly through, it's what,

16  it's 11:40 now, we are going to take a quick break

17  and start again at 11:45.  I really -- we do have

18  some outstanding discovery issues which are before

19  the court, which I'm not going to get into, I'm not

20  going to waste time doing that today.  But I will

21  take the position that I will leave this deposition

22  open pending the Court's resolution if the discovery

23  issues and your lawyer and I will work together on

24  what would be the appropriate way to continue your

25  deposition, if it is deemed appropriate and necessary

1   by the Court.  In other words, it might be conducted

2   by phone, we might never continue your deposition, or

3   we might continue your deposition perhaps in person

4   at a later date when you return to work.  Do you

5   understand that?

6               THE WITNESS:  Yes, but I don't understand

7   why.

8               MR. HARMAN, JR.:  Well, for instance, it's

9   not really important to get into, I just want you to

10  understand that that is a legal issue that is going to

11  be resolved by the Court.  There are some discovery

12  issues, meaning information and documents that we've

13  requested that haven't been provided.

14              THE WITNESS:  Okay.

15              MR. HARMAN, JR.:  To the extent that I have

16  not had the opportunity to ask you question about

17  that information or those documents and the Court

18  orders that those documents or that information be

19  turned over, I might want to ask you questions about

20  that.

21              THE WITNESS:  I understand completely.

22              MR. HARMAN, JR.:  That would be why.  It's

23  certainly not to harass you or to make your life more

24  difficult, and I just want you to understand that.

25  I'm trying to make today as simple and easy as

1  possible for everybody.  Let me take a quick break

2  and use the restroom and then --

3          MRS. CHICLACOS:  I'd just like to make one

4  statement on the record, that obviously we are not

5  agreeing to keep it open, that would be subject to

6  court order.

7          MR. HARMAN, JR.:  Right.  Well, I'm taking

8  the position that the deposition is open and will let

9  the Court rule on it.

10          MRS. CHICLACOS:  I'm taking my position.

11  Let's take a quick bathroom break.

12      [Short recess taken.]

13  BY MR. HARMAN, JR.:

14      Q.  You were a manager at Raymour from 2005

15  going forward; is that correct?

16      A.  Well, actually 2004.  I was hired

17  October 2004 and I did my training up in Connecticut

18  in Jersey because the store wasn't open yet.

19      Q.  What did that training entail?

20      A.  Their ways of doing things.

21      Q.  Okay.  What do you mean by, "their ways of

22  doing things"?

23      A.  Well, I've been a manager for 32 years.  I

24  had three positions in those 32 years and every

25  company does things a little bit different, so I had

1   to learn their reports, you know, how they opened

2   their books in the morning, how they closed, just

3   normal stuff like that.  Their vendors on the floor,

4   you know, simple -- you know, nothing major-major, but

5   it does take a while.  You know, you have to do

6   repetition.

7       Q.   Did you have any training with respect to

8   discrimination in the work place?

9       A.   Yes.

10      Q.   And what did that entail?

11      A.    It was quite intense and it was done at

12  least once a year, all the managers had to go through

13  it and all the assistant managers had to go through

14  it.  The showroom managers had to go through it and it

15  was done by human resources.  We were brought into a

16  room and we went over everything.

17      Q.   What is everything?

18      A.    Discrimination, how to speak with

19  associates, how you speak with customers, what's --

20  you know, we use to do examples of what is appropriate

21  and what's not appropriate and wording that you should

22  use with associates and customers, and wording that's

23  not permitted to do.  We went over, you know, just all

24  of that kind of -- all those kinds of things.

25      Q.   With respect to age, what would be an

1  example?  Did you ever discuss some what types of

2  statements would be inappropriate with respect to age?

3      A.   Age?  You never ask anybody their age.

4  Basically, you know, age was not an issue, ever, ever

5  in Raymour and Flanigan.

6      Q.   When you say "age was not an issue at

7  Raymour" -- strike that.

8          The questions I'm asking you today are based

9  on your personal knowledge only.

10     A.   Correct.

11     Q.   So did Raymour and Flanigan have a policy

12  against age discrimination?

13     A.   Yes.

14     Q.   Okay.  And then the next question I would

15  have is, just based on your own personal observation,

16  your own personal knowledge, did you ever observe

17  anybody being discriminated against based on their

18  age?

19     A.   No.

20     Q.   Did you ever overhear an inappropriate

21  comment with respect to someone's age?

22     A.   No.

23     Q.   Did you ever observe an inappropriate

24  comment in the workplace with respect to someone's

25  race?

1        A.    No.

2        Q.    Did you ever observe an inappropriate

3   conduct with respect to someone's gender?

4        A.    No.

5        Q.    You said that everything was discussed at

6   the discrimination training which was intense and took

7   place once a year.  Was disability discussed during

8   the discrimination training?

9             MRS. CHICLACOS:  Objection to form.

10            THE WITNESS:  I'm not understanding the

11   question.

12   BY MR. HARMAN, JR.:

13        Q.    If someone has a physical -- do you

14   understand what I mean by disability, by physical

15   disability?

16        A.    Of course, some kind of a physical --

17        Q.    For now, for the sake of the deposition,

18   unless I clarify it further, I mean any physical or

19   mental impairment.

20        A.    Okay.

21        Q.    Okay.

22        A.    Yes, it was discussed where anybody, anybody

23   that had any kind of a problem with any kind of a

24   disability, you were to be lenient with and help them

25   in any way that you could.

1    Q.   And are you referring to customers?

2    A.   I'm referring to sales associates,

3    customers, whomever.

4    Q.   And did you ever have -- did you ever manage

5    a sales associates with a disability?

6    A.   Well, it depends what you call disability.

7    Q.   Okay.  Well --

8    A.   You know, somebody that's pregnant is

9    considered a disability, yes.  Somebody that's hurt or

10   back on leave from an operation, I guess you can say

11   that's a disability, I would say yes.  So I would have

12   to say overall, yes, I have, you know, managed people

13   with disabilities.

14   Q.   Okay.  Who did you manage that was pregnant?

15   A.   Linda Salerno, twice.

16   Q.   Salerno?

17   A.   S-a-l-e-r-n-o.

18   Q.   She was pregnant twice?

19   A.   With me, Huffman Koos.

20   Q.   And that was not at Raymond and Flanigan?

21   A.   (Witness shakes head side to side.)

22   Q.   Okay.  And let's just stick with the times

23   that you were at Raymour and Flanigan from 2004 going

24   forward.

25           During that period, did you manage anyone

1    with a disability?  When I say "disability," I'm

2    talking about based on your training and your

3    extensive experience as a manager, anyone you

4    considered to have a disability.

5              MRS. CHICLACOS:  Objection to form.

6              THE WITNESS:  I'm not sure if it's a

7    disability.  Rafael Gonzalez, he works with a limp,

8    he walks with a cane.  I think Charlie Bruno was out

9    on an operation and he came back, but I think he was

10   okay when he got back.  Those are the only two that I

11   would think of.

12   BY MR. HARMAN, JR.:

13        Q.   Do you recall what type of operation Charlie

14   Bruno had?

15        A.   No, I don't remember, it was a while ago.

16        Q.   And Mr. Gonzalez, did he always have a limp?

17        A.   Yes, we hired him that way.  He was hired

18   that way.  He came from Seaman's.

19        Q.   How old approximately was Mr. Gonzalez?

20        A.   I think that Rafael is -- I'm not good at

21   age, I'm really not.  I don't --

22        Q.   Older or --

23        A.   He's younger than me for sure, but he does

24   have children.  Maybe 50s.  I hope I didn't make him

25   too high.

1        Q.    That's all right.  Mr. Gonzalez, does he get

2   in line as per the policy with respect to 10 --

3        A.    He does.

4        Q.    -- 20 and 30?

5        A.    He does.

6        Q.    And has he ever expressed any difficulty in

7   getting in line for the 10, 20 or the 30?

8        A.    No.

9        Q.    And how about Mr. Bruno, when he returned

10  from his operation, did he express any difficulty in

11  getting in line with the 10, 20, 30?

12       A.    No.

13       Q.    Has any employee that you managed from 2004

14  going forward, ever expressed any difficulty in

15  getting in line with the 10, 20 or the 30?

16       A.    No.

17       Q.    Okay.  So just so the record is clear --

18       A.    Yes.

19       Q.    -- and you are under oath, and this is --

20  might be my only opportunity to ask you these

21  questions, I don't know.  We might, as I said, have a

22  continued deposition or we might have a trial.

23            During your tenure managing at Raymour and

24  Flanigan from 2004 until you left, did you ever have a

25  sales associate express any difficulty at any time in

1    completing their 10, 20, 30 obligations?

2         A.    When you are saying to me did they --

3    nobody liked to stand on 10 because, you know, they

4    don't know when the next customer is coming in, okay.

5    But nobody said they couldn't stand on 10 for any

6    reason.  So, you know, one thing is a little bit

7    different than the other.

8         Q.    So nobody liked to stand on 10?

9         A.    Correct.

10        Q.    Why is that?

11        A.    Well, because you are standing there, you

12   are waiting for the next customer to come in,

13   sometimes it can be 10 minutes, sometimes it could be

14   40 minutes, you know, but you are the next one up and

15   it doesn't happen, you know, constantly, you know,

16   where you are waiting a long time for an up, but you

17   can get caught waiting a long time for an up.

18   Sometimes they come in one, two, three in a row.

19        Q.    But on a slow day it could be a long period

20   of time?

21        A.    It could be.

22        Q.    And you are standing there?

23        A.    Yes.

24        Q.    And that's right in the front of the store?

25        A.    That's correct.

1     Q.   And nobody liked to do that?

2     A.   Right.

3     Q.   But at some point everybody was required to

4   do it?

5     A.   Every day.

6     Q.   From 2004 until you left Raymour and

7   Flanigan, did you, setting Larry aside, did you

8   terminate any employees?

9     A.   There goes my head again.  I'm really

10   getting old.

11        Yes, I know I terminated -- I don't know, I

12   can't remember the names now, but I know I terminated.

13   Hang on, let me think.  You know, I haven't been in

14   Raymour for almost a year and a half because I retired

15   myself.

16     Q.   So you are permanently retired now?

17     A.   Well, at this point I'm not going back, you

18   know.  I can't -- I can't walk the floor anymore.  I

19   can't do the work anymore.

20     Q.   Are you being paid by Raymour and Flanigan?

21     A.   No.

22     Q.   So you are not currently an employee?

23     A.   No.

24     Q.   Okay.  And you have no intention to return

25   as an employee?

1        A.   No, but it's hard to recollect and I know --

2        Q.   Well, let me just --

3        A.   I can picture them and I'm not -- I can

4   picture them and I can't think of the names.

5        Q.   I don't want you to speculate, and let me

6   try to help you a little bit.

7        A.   Okay.

8        Q.   During the Garden City period, that is the

9   new store?

10       A.   Yes.

11       Q.   Okay.  Did you terminate any employees

12   during that period?

13       A.   Yes.

14       Q.   Okay.  And can you tell me their names?

15       A.   I'm thinking of a young fellow, I can't

16   remember his name.

17       Q.   So you remember a young fellow?

18       A.   A young fellow who, you know, just always

19   came in late, wasn't performing, I couldn't, you know,

20   count on.  Oh, God, I can't remember his name.  I

21   can't remember his name.  Oh, my God, where did my

22   mind go?

23       Q.   Do you remember anything about him?  You

24   said he was young, do you remember anything else about

25   him?

1        A.   Yes, he was a good looking, young boy that

2   just got married.  God, I can't remember.

3        Q.   How long did he work for you?

4        A.   I think he was with me for two years prior

5   to --

6        Q.   Did he ever meet his sales figures?

7        A.   He was on coaching plans as well.

8        Q.   Was he on coaching plans the entire time?

9        A.   No.

10        Q.   How long was he on coaching plans?

11        A.   Maybe three, four months.

12        Q.   I'm going to leave that blank in the

13   transcript.  If you could please let your lawyer know,

14   if you happen to remember the name of the individual

15   that was -- that you believed that was terminated, the

16   young fellow?

17        A.   Okay.

18        Q.   I'm going to call for production of any

19   documents related to the termination of the younger

20   individual that you believe was terminated for poor

21   performance.

22             Can you think of anybody else at the Garden

23   City location that you terminated?

24        A.   No.

25        Q.   Do you recall the circumstances of his --

1    strike that.

2              Can you explain to me why this young fellow

3    was put on a coaching plan?

4        A.   His numbers were failing and he wasn't

5    showing up, he was always late -- and he always late.

6        Q.   So he was always late.  Is that most every

7    day he was late?

8        A.   Yes.

9        Q.   Okay.  And is as far as his numbers were

10   concerned, can you explain to me what you recall with

11   respect to the young fellow not meeting his numbers?

12       A.   Again, he was below the 750 mark that was

13   supposed to be done in Garden City.  When you have

14   somebody on a coaching plan, I don't want to go on and

15   on because I shouldn't, but when you have somebody on

16   a coaching plan, if let's say -- I don't know if I

17   said this before, in January, if you see improvement,

18   you can extend their coaching plan because you are

19   seeing improvement.  So as long as we are seeing the

20   improvement going up, you say, okay, you are here.

21   But there are tames when they fall so far behind,

22   there is no way they are coming back, they are really

23   lost and they can't make -- you can't get them back to

24   that way that much.  You can't get them back to the

25   numbers that they need to make.

1      Q.   So they need to complete 750 in one year?

2      A.   Correct.

3      Q.   Okay.  And how many sales associates did you

4  have working for you in the last year?  Tell me when

5  you retired or left --  what term do you prefer,

6  retired or left?

7      A.   Well, I went out on disability first.

8      Q.   Okay.  When you went out on disability, when

9  was that?

10     A.   August 2000 -- oh, God, is it 11? '11.

11     Q.   And when did you terminate Larry?

12     A.   June.

13     Q.   Okay.  So from August of 2010 to August

14  of 2011, how many sales associates did you manage at

15  that store, do you believe?

16     A.   34.

17     Q.   Were all 34 required to hit $750,000 in

18  sales?

19     A.   That's their mark.

20     Q.   Of the 34 or so, did they all complete

21  $750,000 in sales?

22     A.   No, there were -- going through the year

23  there were sales associates on coaching plans like

24  Larry.

25     Q.   Who else was on a coaching plan?

1        A.    Rafael was on the coaching plan and he

2    managed to get himself back.

3        Q.    And is Rafael that gentleman with the cane?

4        A.    Yes.

5        Q.    Okay.  And was anybody else on a coaching

6    plan?

7        A.    I'm thinking.  I know Karen was struggling

8    and I -- would you believe I can't even remember her

9    last name?  Karen ... she's still there, though.

10       Q.    Okay.  I'm asking you specifically who was

11   put on a coaching plan.

12       A.    Yeah, Karen.

13       Q.    Karen was put on a coaching plan?

14       A.    Yeah.

15       Q.    And Rafael was put on a coaching plan?

16       A.    Yes.

17       Q.    And Rafael is still there, as far as you

18   know?

19       A.    Yes.

20       Q.    Well, it doesn't matter what's going on now.

21             Up until the time that you left, Rafael was

22   still there, you hadn't terminated him?

23       A.    He brought himself out of --

24       Q.    Please just answer my -- you just need to

25   answer my question.  I'm not trying to be difficult,

1    but Rafael wasn't terminated; is that correct?

2         A.   Correct.

3         Q.   And Karen was put on a coaching plan; is

4    that correct?

5         A.   Yes.

6         Q.   She wasn't terminated?

7         A.   No.

8         Q.   How old is Karen?

9         A.   Thirties, I guess.

10        Q.   You think Rafael is in his 50s?

11        A.   Yes.

12        Q.   Okay.  Anybody else put on a coaching plan?

13        A.   I don't remember.  I don't remember.

14        Q.   And so of the 34, can you tell me

15   approximately how many met the $750,000 mark?

16        A.   Well, you know, what are you talking about,

17   years end?

18        Q.   Okay.  Well, let's talk about the year end

19   2010, because that would have been the last complete

20   full year before you terminated Larry and you left on

21   disability leave, so let's talk about 2010.

22             The year end 2010, of the 34 or so, because

23   I'm not sure we are clear that's an exact number, but

24   of the approximately 34 sales associates, how many

25   completed the $750,000 target?

1          MRS. CHICLACOS:  Objection to form.

2          MR. HARMAN, JR.:  You can answer.

3          THE WITNESS:  I am thinking it was 33.  I

4     remember -- yeah, I think it was about 33.

5          MR. HARMAN, JR.:  I'm going to call for the

6     production related to the 2010 sales figures for

7     the -- sorry, the 2010 year end sales figures for the

8     associates.

9     BY MR. HARMAN, JR.:

10        Q.   Who was the individual that did not complete

11    the $750,000 mark?

12         MRS. CHICLACOS:  Objection to form.

13         THE WITNESS:  Don't remember.

14    BY MR. HARMAN, JR.:

15        Q.   Okay.  But you remember that one did not?

16        A.   Well, the reason I remember is because just

17    like we do reviews with sale associates, my vice

18    president, Jim Powers, did reviews with us, the

19    sales-- the managers.  And at the end of the year I

20    remember going through it and him saying, you had an

21    excellent year, you only had one under, or something

22    to that effect.

23        Q.   What, if anything, changed in 2011?  Sounds

24    like you had a pretty good year in 2010, right?

25        A.   The year was good.

1       Q.   You had one under?

2       A.   Yes, business was good.

3       Q.   Right.  So the vast majority of your sales

4   associates, almost all of them performed except for

5   one?

6            MRS. CHICLACOS:  Objection to form.

7            THE WITNESS:  If I'm remembering correctly.

8   You know, remember, I'm doing this from guessing.  I

9   didn't look at papers before, I didn't prime myself.

10  BY MR. HARMAN, JR.:

11      Q.   I'm only asking --

12      A.   I know, I just want you to understand.

13      Q.   -- what you remember.

14      A.   Here I am.

15      Q.   And Larry was working for you in 2010?

16      A.   Yes.

17      Q.   And Larry met his target in 2010?

18      A.   Again, if it was the year -- you know, I

19  can't recollect if it was 2010.  It could have been

20  Larry, yeah.  I mean, I don't know.  I don't know who

21  the person is that was under, I don't remember.

22      Q.   What about 2009, did you still have

23  approximately 30 sales associates that you managed in

24  2009?

25           MRS. CHICLACOS:  Objection to form.

1           THE WITNESS:  Yes.

2    BY MR. HARMAN, JR.:

3        Q.   Okay.  And do you recall how many of the 34

4    or so in 2009 met the $750,000 mark?

5        A.   I don't remember.

6        Q.   Do you recall being told in your review that

7    anyone was under in 2009?

8        A.   I don't remember.  I have to tell you, I

9    just don't remember.

10        Q.   You testified that you had in another job

11    for another company, you had a woman who became

12    pregnant.  Did you ever have an employee become

13    pregnant while you were at Raymour and Flanigan?

14        A.   I think Nardy was pregnant when I was there.

15        Q.   What year would that have been?

16        A.   2011.  She went out on disability or leave

17    of absence.

18        Q.   Do you recall how long she was gone?

19        A.   I don't think she was back when I left.  She

20    wasn't back yet.

21        Q.   Was that the first time she had taken leave

22    for maternity?

23        A.   Yes.

24        Q.   And you testified earlier that Bruno took a

25    leave due to having surgery; is that correct?

```
1              MRS. CHICLACOS:  Objection to form.
2              THE WITNESS:  Yes.
3   BY MR. HARMAN, JR.:
4        Q.   Do you recall when that was?
5        A.   No.
6        Q.   Do you recall if it was in the Garden City
7   location?
8        A.   It was in the Garden City location.
9        Q.   Okay.  So that would have been --
10       A.   Anywhere from 2008 up.
11       Q.   2008 up.  And do you recall approximately
12   how long she was gone?
13       A.   No.
14       Q.   Okay.  Was it more than a few weeks?
15       A.   Yes.
16       Q.   Was it a few months?
17       A.   I can't recall, I really can't.
18       Q.   Well, can you tell me, was it a year?
19       A.   No.
20       Q.   Okay.  So it was less, it was -- I'm just
21   trying to get an approximation from you, if you
22   recall.
23       A.   And I'm answering you the best that I can.
24       Q.   More than a few weeks but not a year?
25       A.   Right.
```

1          Q.   Okay.  And I take it that Bruno was also

2     required to hit the $750,000 mark?

3          A.   Correct.

4          Q.   Okay.  Was he still required to hit the

5     $750,000 mark even though he was out of work for a

6     significant period of time?

7               MRS. CHICLACOS:  Objection to form.

8               THE WITNESS:  How do I answer this?  I

9     would say everybody that was out on disability leave

10    or something like that was given extra time when they

11    come back.  In the 32 years I've been a manager in

12    different companies, sales associates always have a

13    number to hit.  If in Huffman Koos, if you didn't hit

14    that number --

15    BY MR. HARMAN, JR.:

16         Q.   Mrs. Goldstein, I'm sorry to interrupt, but

17    I'm going to ask you to just answer my question

18    because this is unfortunately --

19         A.   Then I can't answer it.  I don't know how to

20    say it.

21         Q.   Raymour and Flanigan -- does Raymour and

22    Flanigan -- you testified that there was a policy that

23    the sale associate had to hit $750,000 in sales; is

24    that correct?

25              MRS. CHICLACOS:  Objection to form.

```
 1              THE WITNESS:  That is correct.
 2    BY MR. HARMAN, JR.:
 3         Q.   And when someone such as Charlie Bruno takes
 4    leave during that annual period, are they required to
 5    still hit the $750,000 mark?
 6         A.   No.
 7         Q.   Okay.  And so when Nardy took maternity
 8    leave, would she still have been required to hit the
 9    $750,000 mark?
10         A.   No.
11         Q.   And so when Larry took leave for his
12    surgery, would he still have been required to hit the
13    $750,000 mark?
14         A.   No.
15         Q.   And can you explain to me how that -- would,
16    for instance, a different sales target be set for an
17    individual that took a leave for medical reasons?
18         A.   It's not a different -- it's not a different
19    sales target.  I explained to you before if somebody
20    comes back and they are given a number of 15,000 for
21    that month and they pull 17, 18,000, they are going in
22    the right direction and you can get extended as long
23    as you need, as long as they are continuously climbing
24    the ladder, okay.  So Larry was on a coaching plan for
25    a long, long time when he came back.  We made it a
```

1    point, because of his past record of how good he was

2    and because he was out on disability, we gave him the

3    benefit of going on and on and on.  Even when he

4    wasn't performing we tried to do everything we could

5    to get him back to where he was.

6         Q.   When was Larry first put on a coaching plan?

7         A.   May.  Was it May?  I'm not sure.  I don't

8    have his paper in front of me.

9         Q.   Okay.  But you reviewed some papers

10   yesterday?

11        A.   Yes, but I didn't -- I really didn't look at

12   everything.

13        Q.   Okay.  Well, you just testified that Larry

14   was on coaching plan for a long, long time?

15        A.   He was.

16        Q.   What do you mean by "a long long time"?

17        A.   Okay.  And maybe -- well, let me say it a

18   different way, maybe I said it wrong.  When Larry came

19   back, and I'm not sure the date he came back, I think

20   we gave him the benefit of the doubt and we didn't put

21   him on a coaching plan hoping to get him, his numbers

22   back up.  So Larry could have been going down and --

23        Q.   Mrs. Goldstein, I am not asking you to

24   speculate here today.

25        A.   I'm not speculating.

 1        Q.   I'm asking you to tell me what you remember
 2   specifically from your recollection, okay.  How long,
 3   if you recall, was Larry own a coaching plan?
 4        A.   I don't know.
 5        Q.   Okay.  You testified earlier that he was on
 6   a coaching plan for a long, long time, that was your
 7   testimony.  Do you want to change your testimony?
 8             MRS. CHICLACOS:  Objection to form.
 9             MR. HARMAN, JR.:  Okay.
10             THE WITNESS:  Yes.
11   BY MR. HARMAN, JR.:
12        Q.   How long was Larry on a coaching plan?
13        A.   I don't know.
14        Q.   Okay.  And then you testified that you
15   had -- well, strike that.
16             Do you recall when Larry returned from his
17   medical leave?
18        A.   I don't remember.  Dates, I don't remember.
19        Q.   Okay.  Do you recall how long a period of
20   time it was between when he returned from his medical
21   leave and when you terminated him?
22        A.   No.
23        Q.   Okay.  Was it longer than a year?
24        A.   I don't know.
25        Q.   Did Larry ever tell you that he needed an

1    accommodation with respect to his medical condition?

2         A.   No.

3         Q.   Okay.  Do you know what his medical

4    condition was at the time?

5         A.   No.  I think he had something with his back.

6         Q.   Did you ever ask him?

7         A.   I'm sure I did.  I'm sure Larry told me.

8    I'm sure we had this discussion, and quite honestly I

9    don't remember.

10        Q.   You don't remember -- do you remember if --

11   do you remember any discussions you had with him after

12   he returned with respect to his condition?

13        A.   No.

14        Q.   Was it your recollection that the surgery

15   that he had was successful?

16        A.   I don't remember.

17        Q.   Did he ever complain about his physical

18   condition after he returned?

19        A.   No.

20        Q.   How often did you speak with Larry?

21        A.   Every day that he was there.

22        Q.   Okay.  And what kind of conversations --

23   what would you talk about?

24        A.   Business, his, you know, 10/10's.  We were

25   coming up on friends and family, if he was doing his

1   business that way.  You know, just business.

2        Q.   Did you talk to him about his personal life?

3        A.   No.

4        Q.   Do you know whether he was married?

5        A.   No, I don't know.

6        Q.   Do you know where he lived?

7        A.   Bayside, I believe.

8        Q.   And do you know if he vacationed?

9        A.   Yes.

10        Q.   How do you know that?

11        A.   Because he said that he went out to the

12   Hamptons.

13        Q.   Okay.  Do you know anything else about his

14   personal life?

15        A.   No, I know he has children.  I know he has a

16   son, I think.

17        Q.   Okay.  Anything else about his personal

18   life?

19        A.   No.

20        Q.   Did Larry ever take sick days?

21        A.   I don't know.  I'm sure he did.  I don't

22   know.

23        Q.   If Larry wasn't feeling well, do you think

24   he would have told you?  I'm not asking you to

25   speculate, but did you have that kind of relationship?

1       A.   I would hope so, yes, absolutely, he would

2   have.

3       Q.   Did he ever leave early from work?

4       A.   I don't remember.  Did associates leave

5   early?  Sure.  Did they come to me and say they

6   weren't feeling, well, of course.

7       Q.   When Larry returned from work, did he get

8   right back into the system of having to participate in

9   the 10, 20, 30?

10           MRS. CHICLACOS:  Objection to form.

11           THE WITNESS:  I believe so, yes.

12  BY MR. HARMAN, JR.:

13      Q.   When you say "believe so" --

14      A.   I don't remember anything --

15      Q.   Unusual?

16      A.   -- unusual about him not wanting to go on

17  10, 20 or 30.

18      Q.   Okay.  So did he ever say anything to you

19  negative about participating in the 10, 20, 30?

20      A.   No.

21      Q.   Did he ever refuse to participate in the 10,

22  20, 30?

23      A.   No.

24      Q.   Did he ever complain about having to stand

25  for long periods of time during the 10, 20, 30?

```
1         A.   No.

2         Q.   Did he ever ask to take a break during the

3    10, 20, 30?

4         A.   No.

5         Q.   And did there come a time, because you've

6    almost entirely said positive things about Larry's

7    performance; is that correct?

8         A.   Correct.

9         Q.   And did there come a time when you were not

10   pleased with his performance?

11             MRS. CHICLACOS:  Objection to form.

12             THE WITNESS:  Yes.

13   BY MR. HARMAN, JR.:

14        Q.   When was that?

15        A.   I felt he gave up.  He wasn't giving it his

16   all.

17        Q.   You felt he gave up, when did he give up?

18        A.   After he came back from his surgery and we

19   were trying to get him back up and running, it wasn't

20   the same Larry.

21        Q.   What do you mean by that?

22        A.   His motivation wasn't there, he wasn't

23   trying to produce the way he used to.  He became, I

24   don't know, I guess, you know, lazy.

25        Q.   You felt he was lazy?
```

1       A.   Yes.

2       Q.   What do you mean by that?

3       A.   He wasn't trying to -- I didn't believe he

4   was trying to bring his numbers up.  He wasn't -- I

5   remember before his friends and family where he was so

6   good at prior, in all the years prior, he didn't work

7   his.  He didn't work his friends and family that May.

8       Q.   You are positive he didn't work his friends

9   and family that May?

10      A.   Yes.

11      Q.   What do you mean by that?

12      A.   Friends and family you are supposed to bring

13  a certain amount of people in, you are supposed to

14  bring certain amounts of numbers in, and I'm pretty

15  sure, I'm not going to put, you know -- I'm more than

16  pretty sure that that was one of the reasons.  I think

17  Larry only did $9,000 for the two days and I can't be

18  a hundred percent accurate, but I am almost certain

19  about this in my mind.

20      Q.   Were you having problems with anybody else's

21  performance during the same period?

22      A.   I think we went through this before.  I

23  think it was Rafael that was on a coaching plan.  I

24  think it was Karen that was on a coaching plan.

25      Q.   Anybody else?

1        A.   Not that I can recall right now.

2             MR. HARMAN, JR.:  Okay.  Again, I'm calling

3   for the production of the coaching plans for Rafael

4   and the coaching plans for Karen that were referred

5   to by Mrs. Goldstein.

6   BY MR. HARMAN, JR.:

7        Q.   Were there monthly reports generated of

8   people's sales performance?

9        A.   Yeah, but we didn't do written ones every

10  month.  We sat, you know, their team captains, their

11  showroom manager sat with them and went over.  Written

12  ones was done like every two, two, three months.

13       Q.   Every two to three months?

14       A.   Yes.

15       Q.   So is it fair to say that sometime in 2011,

16  there would have been at least one written report of

17  the sales performance of Larry; is that correct?

18       A.   Sure.

19            MR. HARMAN, JR.:  Okay.  To the extent

20  that's not been produced, I'm going to ask for the

21  production of that.

22  BY MR. HARMAN, JR:

23       Q.   And there would have also been a written

24  report for the sales performance of Rafael; is that

25  correct?

1        A.    Correct.

2        Q.    During the first six months of 2011?

3        A.    Correct.

4              MR. HARMAN, JR.:   Okay.   I'm calling for

5    the production of that and any other written report

6    of Rafael's sales performance during 2011.

7    BY MR. HARMAN, JR.:

8        Q.    And I take it there would have also been a

9    written report of the sales performance of Karen

10   during the 2011; is that correct?

11       A.    Yes.

12       Q.    At least one, probably several; is that

13   correct?

14             MRS. CHICLACOS:   Objection to form.

15             THE WITNESS:   Yes.

16   BY MR. HARMAN, JR.:

17       Q.    Okay.   You testified that -- earlier in the

18   day you testified every three months, moments ago you

19   testified that it was every two months, so it's every

20   two to three months?

21             MRS. CHICLACOS:   Objection to form.

22             THE WITNESS:   Depends how busy it is.   In

23   other words, if it's a friends and family month that

24   it's due and we want them to focus more on the

25   business coming in, then we push it to the next

```
 1   month.  Everything had to do with business.

 2   BY MR. HARMAN, JR.:

 3       Q.   Okay.  So it's your recollection that Rafael

 4   and Karen and Larry were the only that had been given

 5   coaching plans in 2011; is that correct?

 6            MRS. CHICLACOS:  Objection to form.

 7            THE WITNESS:  No, I'm saying I'm not sure

 8   who else, but I think there were --

 9   BY MR. HARMAN, JR.:

10       Q.   There were others?

11       A.   -- there were others.

12       Q.   But you are not sure who?

13       A.   No.

14       Q.   Why do you think there were others?

15       A.   Because I remember there being a few that

16   were in trouble.

17       Q.   Okay.  What makes you think that there were

18   a few that were in trouble?

19            MRS. CHICLACOS:  Objection to form.

20            THE WITNESS:  I just remember, you know,

21   writing up, doing more than three.  I don't know that

22   it's true, I'm just -- I'm trying to be fair here.

23   BY MR. HARMAN, JR.:

24       Q.   You remember writing up others, you just

25   don't remember who?
```

1            MRS. CHICLACOS:  Objection to form.

2            THE WITNESS:  Yeah.

3    BY MR. HARMAN, JR.:

4       Q.   What was the problem with Larry's

5    performance, other than -- you testified that you

6    provided description with some adjectives about his

7    performance, and you said that you believed that

8    during the friends and family he only did 9,000.  Were

9    his numbers low?

10      A.   Yes.

11           MRS. CHICLACOS:  Objection to form.

12           MR. HARMAN, JR.:  What is wrong with, "were

13   his numbers low?"  What is wrong with that form of

14   that question?

15           MRS. CHICLACOS:  It was the previous

16   colloquy before you ask that question.

17           MR. HARMAN, JR.:  Were his numbers low was

18   not an objectionable question.

19   BY MR. HARMAN, JR.:

20      Q.   Were his numbers low?

21      A.   Yes.

22      Q.   Okay.  When did they start?  When did you

23   perceive that his numbers were low for the first time?

24      A.   After Larry came back his number were low,

25   he needed to get them up.

1          Q.   And during that time did anyone else have

2     low numbers?

3               MRS. CHICLACOS:  Objection to form.

4               THE WITNESS:  Yes.

5     BY MR. HARMAN, JR.:

6          Q.   Who else had low numbers?

7          A.   Again, Rafael and Karen I know.  I don't

8     remember who else.

9          Q.   But there were others?

10              MRS. CHICLACOS:  Objection to form.

11              THE WITNESS:  I'm not sure.

12    BY MR. HARMAN, JR.:

13         Q.   You say you remember writing up others?

14         A.   I remember writing up others, I'm not a

15    hundred percent sure.  I mean, I can't remember from

16    so many years ago.

17         Q.   Okay.  But we are talking, it's 2013, we are

18    talking about the spring of 2011?

19         A.   I'm 66 years old.

20         Q.   Yeah, but you seem pretty sharp to me.

21         A.   I'm not stupid but I'm not -- listen, I ran

22    with 34 sales associates, 34, okay?  You do on a daily

23    basis talk to a lot of sales associates, motivate, do

24    this, do that, do other things.  I don't want to

25    give -- I am under oath.  I don't want to give you

1    answers that I'm not a hundred percent about.

2        Q.   Okay.  And I don't want you to speculate,

3    and I also don't want to engage in any kind of

4    argument with you.  But I do want to get to the core

5    of the matter, and the core of the matter is -- well,

6    strike that.

7             Were Larry's numbers the lowest of the 34?

8        A.   I don't remember.

9        Q.   Why did you terminate him?

10       A.   I terminated Larry because he was way past

11   where he could come back.  I think he was trying to

12   trending to something like 600,000.  Garden City is

13   one of the highest producing stores.  I am a manager

14   that's running a business.  I gave him numerous

15   opportunities, numerous opportunities to help him.  I

16   gave him numerous opportunities to relocate to bring

17   his numbers up in another store and then come back.  I

18   did everything in my power.  The last thing in the

19   world that I wanted to do is fire another human being.

20       Q.   Okay.  Did anyone force you to fire him?

21       A.   No, it was a joint, joint decision.

22       Q.   Who was it a joint decision with?

23       A.   Me, Jim Powers, my VP, and my regional.

24       Q.   Who's your regional?

25       A.   Tony Bender.

1        Q.    Did you terminate anyone else in 2011?

2        A.    I don't believe so.

3        Q.    Did you terminate anyone else in 2010?

4        A.    I think that's the year I terminated that

5    young fellow, I can't remember his name.

6        Q.    Okay.  So is it fair to say in the last two

7    years of your employment with Raymour and Flanigan

8    you've only terminated two people, is that correct,

9    that you recall?

10       A.    That I recall, yes.

11       Q.    And that would have been at least 34 sales

12   associates; is that correct?

13       A.    Uh-huh.

14       Q.    Okay.

15       A.    Okay.

16       Q.    And who was present when you terminated

17   Larry?

18       A.    I terminated him alone, with just me and

19   Larry.

20       Q.    What did you say to him?

21       A.    I told him that we couldn't keep him any

22   further, his numbers were below performance.  Here is

23   one, in all the years, in all the companies I worked

24   for that I've terminated people, Larry made it the

25   easiest for me out of everybody.  He was prepared.  He

 1   said to me, "I was waiting for it to happen."  He knew

 2   it was coming.  Normally when you terminate somebody

 3   you walk them to the door and let them leave.  Larry

 4   was fine with this.  He asked me if, "Do you think

 5   they are going to hold back my unemployment?"  I said,

 6   "No, why would they do that, we are terminating you?"

 7   And, you know, I said, "There's no way that's ever

 8   going to happen."  When he left he asked me if he

 9   could say good-bye to everybody in the office, I did

10   not stop him.  We left on good terms.  He made my life

11   so easy and it's the hardest part of my manager's job.

12          Q.   You understand that he sued you initially

13   individually for age and disability discrimination, do

14   you understand?

15          A.   I understand that.

16          Q.   Okay.  When you terminated him in 2011, at

17   that time, did anyone else have numbers that were as

18   low or lower than Larry?

19          A.   I'm not sure, but if that were --

20          Q.   Just please answer my question.  You are not

21   sure?

22          A.   Okay.

23          Q.   Okay.  And at the end of 2010 -- well,

24   strike that.

25               Would you -- these reports that were

1    generated by the reports that were generated every two

2    to three months by the team managers, is that what

3    they are called, team managers?

4        A.   Showroom managers.

5        Q.   Showroom managers, would you review those?

6             MRS. CHICLACOS:  Objection to form.

7             THE WITNESS:  Yes.

8    BY MR. HARMAN, JR.:

9        Q.   And so there would have been at least two

10   reports by June of 2011?

11       A.   I would say yes.

12       Q.   And how many showroom managers were there?

13       A.   Three.

14       Q.   What were their names?

15       A.   They've changed.  When I started I think it

16   was Kevin Sagendorph, he's now a manager in New York

17   City somewhere.

18       Q.   Sagendorph?

19       A.   Sagendorph.

20       Q.   Can you spell it?

21       A.   S-a-g-e-n-d-o-r-p-h, Raf -- not Rafael, my

22   mined is not great.  Can I look at my phone?

23             MRS. CHICLACOS:  No.

24             THE WITNESS:  I can't look at my phone.

25   Cary, Theresa -- Theresa who is now in Lake Grove was

1    one of my managers.

2    BY MR. HARMAN, JR.:

3        Q.   Theresa, what's Theresa's last name?

4        A.   Masera.

5        Q.   Masera?

6        A.   Yeah.  How sad for me, it really for me.

7        Q.   Why is that?

8        A.   Because I can't remember, you know.  I put

9    Raymour out of my mind totally when I walked away from

10   there and I don't talk to those people anymore.

11       Q.   Let's just keep it still approximately.  Let

12   me give you an example just so that you understand

13   that.  I understand I have 30 some odd cases, I manage

14   about 10 employees during all sorts of different

15   things.  Sometimes I really don't remember what

16   happened in court yesterday because I'm juggling a lot

17   of things so I understand.  I'm only asking you to

18   tell me now if you only remember a first name or a

19   gender, just tell me what you remember and we'll move

20   on, okay?  So three managers, you have Kevin, Theresa,

21   and is there a third?

22       A.   Well, Kevin -- really Joann.  Joann.

23       Q.   And these three individuals would have

24   generated reports every few months during the first

25   six months of 2011?

1       A.    2011.

2             MR. HARMAN, JR.:  I'm calling for the

3    production of those reports.

4             THE WITNESS:  I'm pretty sure they were

5    there in 2011, I could be wrong.  They would have

6    changed managers because things changed all the time.

7             MR. HARMAN, JR.:  Okay.  I'm calling for the

8    approximate of the reports that were generated by the

9    three showroom managers.

10            THE WITNESS:  That's A better answer.

11            MR. HARMAN, JR.:  During the first six

12   months, actually during the first nine months of 2011

13   until you went out on disability, whether those

14   showroom managers were Kevin, Theresa or Joann or

15   some other person, I'm going to call for the

16   production of those reports that were generated by

17   those individuals during that period.

18            And I know you think I'm asking the same

19   questions over and over again, but I want to be clear

20   so that we can move on.  Other than what you've

21   already testified to with respect to Larry and with

22   respect to Rafael and with respect to Karen, do you

23   remember any specific individual who had low numbers

24   during the 2011 period?

25            MRS. CHICLACOS:  Objection to form.

```
 1            THE WITNESS:  No.
 2  BY MR. HARMAN, JR.:
 3      Q.   The other thing I want to be clear about is,
 4  you testified that you were told that in 2010 only one
 5  individual did not meet their numbers; is that
 6  correct?
 7            MRS. CHICLACOS:  Objection to form.
 8            THE WITNESS:  I believe, that's what I
 9  remember.
10  BY MR. HARMAN, JR.:
11      Q.   So you only encountered problems with
12  multiple individuals meeting their numbers in 2011; is
13  that correct?
14            MRS. CHICLACOS:  Objection to form.
15            THE WITNESS:  Yes.
16  BY MR. HARMAN, JR.:
17      Q.   Did you did Larry ever ask to take a break
18  to sit down?
19      A.   No.
20      Q.   Did he ever tell you his back hurt?
21      A.   No.
22      Q.   Do you understand that his claim as part of
23  this lawsuit that he had sciatica?
24      A.   No.
25      Q.   So you have no understanding that he had a
```

1    flare up of sciatica?

2         A.   No.

3         Q.   That was never mentioned to you?

4         A.   No.

5         Q.   Do you understand that he claims he had

6    problems with his back?

7         A.   I know he went out for an operation on his

8    back.

9         Q.   When he returned from the operation, do you

10   understand that he claims that at some point he had

11   back problems that prevented him from standing for a

12   long period of time?

13        A.   No.

14        Q.   You were never made aware of that?

15        A.   Never.

16        Q.   Okay.  As you sit here today, do you believe

17   that Larry was your worse performer in 2011?

18        A.   Yes.

19        Q.   Okay.  Are you positive of that?

20        A.   No.

21        Q.   Okay.  Do you understand that as part of

22   Mr. -- as part of Larry's lawsuit, that he claims that

23   he requested reasonable accommodation that he be

24   allowed to rest for short periods of time while on the

25   sales floor so as not to exacerbate his condition?

1      A.   I did not read Larry's lawsuit so I have no

2   idea.

3      Q.   Well, I'm telling you that that's what it

4   says.  And you are telling me that you have no

5   understanding of that; is that correct?

6      A.   That's correct.

7      Q.   Okay.  Are you positive that Karen was put

8   on the performance plan?

9      A.   I'm not positive.  I believe Karen was one

10   of the ones.  I think it was Karen.

11      Q.   Well, you testified that Rafael was on a

12   performance plan; is that correct?

13      A.   Yes.

14      Q.   Because to the extent that records haven't

15   been produced, we are going to ask for production of

16   those records and you've testified them, so you

17   believe that Rafael was on the performance plan,

18   correct?

19      A.   Correct.

20      Q.   Do you believe that Karen was on a

21   performance plan?

22      A.   I do recollect that Karen was on it, but I'm

23   not -- you know, yes, I believe that.

24      Q.   And he was on a performance plan during that

25   same period in 2011?

1        A.   Yes.

2        Q.   But you don't remember anybody else who was

3   on the performance plan?

4        A.   No.

5        Q.   And did you ever ask Larry when he planned

6   to retire?

7        A.   No.

8        Q.   Did you ever hear anyone ask Larry when he

9   planned to retire?

10       A.   No.

11       Q.   Did you plan to retire?

12       A.   No.

13       Q.   So with the exception of your health issues,

14   you had planned to continue working indefinitely?

15       A.   Correct.

16       Q.   So you never discussed your retirement plan

17   with anybody?

18       A.   No, I wouldn't.

19       Q.   Did you ever hear anybody in the workplace

20   discuss their retirement plans?

21       A.   No.

22       Q.   Okay.  Do you understand that -- well, I'm

23   going to tell you that as part of the allegations in

24   this lawsuit, Larry is claiming that he was referred

25   to as old man.  Did you ever hear that?

1        A.    Larry's nickname --

2        Q.    Please just --

3        A.    No.

4        Q.    So you are saying that you did not hear

5   that?

6        A.    No.

7        Q.    Okay.

8        A.    Absolutely not.

9        Q.    Did anyone ever tell you that Larry was

10  being referred to as old man?

11       A.    No.

12       Q.    And can you tell me -- you said you

13  testified that you tried to get him another position

14  at another store, why would you do that?

15       A.    Because he was floundering with his numbers.

16  And instead of firing him -- he was a superstar in

17  call place and sometimes when somebody is floundering

18  they can windup going back to where they were or to

19  another store and instead showing on the bottom of so

20  many superstars in Garden City you go to a store with

21  people that do not perform as well.  And somebody

22  that's in Garden City can come up the ranks in Glen

23  Cove and windup back on the top.  And then if he got

24  to that point, we could have transferred him back

25  over.

1        Q.    But he didn't transfer to the other store?

2        A.    No, he didn't.  When I -- okay.

3        Q.    Yes or no?

4        A.    No.

5        Q.    Okay.  Well, you testified you never read

6    the complaint, so I'm going to tell you that the

7    complaint says that Mr. Larry alleges that eight

8    employees were on a coaching plan and that he was the

9    only one of the eight employees that was terminated.

10       A.    Could be.

11       Q.    Could be.  So you don't have any reason to

12   believe that that's false?

13       A.    No, but again --

14       Q.    Just answer my questions, please.

15             Okay.  So you have no reason to believe that

16   that's a false statement?

17       A.    Right.

18       Q.    And as you said here today, you believe

19   Larry's numbers were the lowest of the 34?

20       A.    As far -- I'm not sure.

21       Q.    Okay.  So when you terminated him, was it

22   based on his numbers?

23       A.    It was based on his number performance, yes.

24       Q.    Was it based on anything else?

25       A.    No.

1          Q.    Just on his numbers?

2          A.    Personally it was all done on performance.

3          Q.    And by performance you mean solely based on

4     his numbers?

5          A.    Yes.

6          Q.    On his sales numbers?

7          A.    Correct.

8          Q.    Okay.  And do you recall whether or not

9     Larry had been out for any period of time during 2011?

10         A.    I don't recall if Larry took time, I don't

11    believe he did.  I don't know.  I can't say for sure.

12         Q.    Have you ever had any conversation, other

13    than with Jessica and with the individual from -- the

14    legal individual from Raymour that you spoke about

15    earlier, have you had any conversation with anyone

16    about this lawsuit?

17         A.    No.

18         Q.    Are you married?

19         A.    Yes.

20         Q.    Did you discuss this lawsuit with your

21    husband?

22         A.    No.

23         Q.    Have you discussed this lawsuit with any of

24    your former colleagues?

25         A.    No.

1       Q.   Okay.  And by discussion I mean any kind of

2  communication?

3       A.   No.

4       Q.   Have you sent e-mails to anyone?

5       A.   No.

6       Q.   Do you text message?

7       A.   Occasionally.

8       Q.   Have you texted anyone regarding Larry?

9       A.   No.

10       Q.   Okay.  When did you say you first learned

11  about this lawsuit?

12       A.   Exactly when or -- a long time ago when Ed

13  called me to tell me that I was being named in a

14  lawsuit.

15       Q.   You said Ed called you?

16       A.   Yes.

17       Q.   Who's Ed?

18       A.   I think he's the represent -- legal

19  representation from Raymour and Flanigan.

20       Q.   So Ed called you to tell you you were named

21  in a lawsuit, and what was your reaction to that?

22       A.   "For what?"

23       Q.   To being named in the lawsuit.

24       A.   I said, "For what?"  That's what I said to

25  Ed.

1      Q.   Okay.  And did he explain why you were

2   named?

3           MRS. CHICLACOS:  No, I instruct her not to

4   answer, it's privileged.

5   BY MR. HARMAN, JR.:

6      Q.   To the extent that you were having a

7   conversation with the lawyer, that's privileged, I'm

8   not asking you about that.  What was your reaction to

9   being named in a lawsuit?

10      A.   Surprised.

11      Q.   Okay.  Why?

12      A.   Because when we left, when Larry and I left,

13   he was the easiest person that I ever had to fire.  He

14   was prepared, ready, asking about unemployment.

15   Shocked that two years later, after he collected

16   unemployment, he was going to do something like this.

17   For what, when he knew that he, as far as I felt, when

18   I sat down with Larry that day to fire him, he was a

19   hundred percent knowing that this was coming.  He was

20   prepared for it.  I had no feeling whatsoever that he

21   was feeling that Raymour did something wrong to him or

22   anything like that, so, of course, I was shocked.

23      Q.   Well, Mrs. Goldstein, in all fairness, you

24   mean -- the lawsuit was filed less than a year after

25   he was terminated.  You understand that?

1          MRS. CHICLACOS:  Objection to form.

2          THE WITNESS:  I did not -- I don't know

3    when the lawsuit was filed.

4    BY MR. HARMAN, JR.:

5      Q.   The lawsuit was filed in March of 2012.

6      A.   Okay.

7      Q.   Okay.  And he was terminated in June

8    of 2011.

9      A.   Uh-huh.

10     Q.   Okay.  And a letter went out the Raymour and

11   Flanigan many months prior to that?

12         MRS. CHICLACOS:  Objection to form.

13         THE WITNESS:  I had no idea.

14   BY MR. HARMAN, JR.:

15     Q.   Were you ever instructed to preserve any

16   information with respect to Larry?

17     A.   I was told not to mention to anybody about

18   this, and I did not.

19     Q.   Okay.  Were you ever told that any point

20   while you were employed to preserve documents and

21   information -- strike that.

22         Did you ever make any efforts to preserve

23   documents and information with respect to Larry

24   Friedmann while you were employed at Raymour and

25   Flanigan?

1      A.   All documents were sent up to corporate.

2      Q.   Okay.  But that's not answering my question.

3   Did you ever make any efforts to preserve documents

4   and information?

5      A.   Yes.

6      Q.   Okay.  So you would, in the normal course of

7   your work responsibilities as a manager, you would

8   send documents to HR; is that correct?

9           MRS. CHICLACOS:  Objection to form.

10          THE WITNESS:  Yes.

11   BY MR. HARMAN, JR.:

12     Q.   Have you ever been involved, during your

13   tenure at Raymour and Flanigan, that Raymour and

14   Flanigan was being sued for any reason?

15          MS. CHICLACOS:  Objection to form, and I'm

16   instructing the witness not to answer subject to the

17   discovery disputes before Magistrate Tomlin.

18     Q.   Were you ever -- were you ever advised to

19   preserve documents and information with respect to

20   Larry Friedmann?

21     A.   No.

22     Q.   Did you ever make any special efforts to

23   look for or preserve documents and information with

24   respect to Larry Friedmann?

25          MRS. CHICLACOS:  Objection to form.

```
 1            THE WITNESS:  No.
 2   BY MR. HARMAN, JR.:
 3       Q.   Just so the record is clear, other than
 4   Jessica, have you had any conversations with anyone
 5   since you terminated Larry Friedmann about Larry
 6   Friedmann?
 7       A.   No.
 8            MRS. CHICLACOS:  Can I take a five-minute
 9   bathroom break, please?
10            MR. HARMAN, JR.:  Sure.
11       [Short recess taken.]
12       [The Documents were marked for identification as
13   Plaintiff's Goldstein's Exhibits 1, 2 and 3.]
14   BY MR. HARMAN, JR.:
15       Q.   I'm sorry, in the midst of my traveling I
16   arrived without a stapler and paperclips, you'll have
17   to forgive me, we'll have to work without them.
18            Mrs. Goldstein, I'm handing you what has
19   been marked for identification as P for
20   plaintiff-Goldstein 1.  Can you please take a look at
21   this document?
22       A.   I see, yes.
23       Q.   Do you recognize this document?
24       A.   Yes.
25       Q.   What is it?
```

1        A.   Coaching plan.

2        Q.   Okay.  For the record it's a document

3   entitled Coaching For Success and it has the

4   associate's name, Larry Friedmann, date of review,

5   5-7-11.  Did you prepare this document?

6        A.   Yes.

7        Q.   Okay.  This is a two-page document, it's

8   Bates stamped D 000039 and D 000040.

9             When you say "coaching plan," is this what

10  you are referring to?

11       A.   Uh-huh, yes.

12       Q.   Okay.  And did you provide a coaching -- so

13  coaching for success is a coaching plan?

14       A.   Correct.

15       Q.   Okay.  And did you provide a coaching plan

16  to Larry Friedmann on May 7th of 2011?

17       A.   Yes.

18       Q.   Okay.  Did you draft this document?

19       A.   I did.

20       Q.   And had you provided a coaching plan

21  prior -- to Larry Friedmann prior to this date?

22       A.   I don't remember.

23       Q.   Okay.  Can you please read what's in the

24  box?  Can you please read it out loud?

25       A.   "I want to review with you your

1    underperformance for delivered sales.  The date range

2    is from January 1st, 2011 to May 5th, 2011.  You

3    underperformed for this year to date to the minimum

4    expectation of 252,750 in delivered sales by 53,537.

5    This dollar amount is based on your 750 business

6    planner for 2011 that we will review.  You are also

7    underperforming to the minimum expectation for

8    delivered sales for the year and are currently

9    projected to finish the year at 617,435.

10            Below will be your specific goals by

11   category for next two weeks and will include in

12   additional dollar in written and delivered

13   expectations per week to help catch up to the amount

14   you are short."

15       Q.   Okay.  Is there anything in what you just

16   read that you believe is inaccurate?

17       A.   No.

18       Q.   Okay.  And you have no recollection as to

19   whether you gave Mr. Friedmann or Larry a coaching

20   plan prior to this date?

21            MRS. CHICLACOS:  Objection to form.

22            THE WITNESS:  Don't remember.

23   BY MR. HARMAN, JR.:

24       Q.   Okay.  And you have no reason to believe

25   that these numbers --

1          MS. CHICLACOS:  Do you have to answer the

2   phone?

3          THE WITNESS:  It's not my phone, it's just

4   letting me know I have to take a certain medicine.

5          MR. HARMAN, JR.:  You want to just take the

6   medicine?  We'll take a break.

7          THE WITNESS:  But let me finish the

8   question.

9   BY MR. HARMAN, JR.:

10     Q.   Okay.  And you have no reason to believe

11  that these numbers in this box that you just read are

12  inaccurate?

13     A.   No reason.

14     Q.   Please take your medicine and do what it is

15  you need to do.

16     [Short recess taken.]

17  BY MR. HARMAN, JR.:

18     Q.   Back to Goldstein 1.  So you were indicating

19  or you were explaining, you've explained to Larry -- I

20  take it you met with him on May 7; is that correct?

21          MRS. CHICLACOS:  Objection to form.

22          THE WITNESS:  Correct.

23  BY MR. HARMAN, JR.:

24     Q.   And that you told him that he was targeted

25  as of May 7 to hit 617,000 in sales.  And what would

1    have been his expectation?

2         A.    750.

3         Q.    Okay.  And do you have any recollection as

4    to whether he had taken any time off during the

5    calendar year 2011?

6         A.    I can't -- I don't remember.

7         Q.    Okay.  Going down to the goals for coaching

8    for success, this says, "Use specific quantitative

9    measures whenever possible.  Clearly describe all

10   behavioral issues as they relate to and affect team

11   morale, departmental/individual performance, customer

12   impact."  Did you do that in this form?  I mean, in

13   other words --

14        A.    Describe behavioral issues.  No, because I

15   don't think it was --  it was performance that we were

16   worried about.

17        Q.    So there weren't behavioral issues?

18        A.    No, not ...

19        Q.    Not from your perspective?

20        A.    No.

21        Q.    No.  And then it looks like, and this is not

22   a form that I'm generally familiar with, it looks like

23   there were written expectations that were set; is that

24   correct?

25        A.    That's correct.

1        Q.   Okay.  Who set them?

2        A.   I did.

3        Q.   Okay.  And then the first column says,

4   written expectation and then it says week one and then

5   it has week one blank.  So you had a written

6   expectation for week one for $24,000; is that correct?

7        A.   Yes.

8        Q.   And then right below it it says actual

9   written and it's blank.

10       A.   Yes, because if you look up in the right

11   hand it says, next review date was 5/21.

12       Q.   Uh-huh.

13       A.   And that's when the numbers should be put

14   in.

15       Q.   Okay.  Was there a review date on 5/21?

16       A.   I believe there was.  I don't know if it was

17   5/21, but there was one after it.  There should have

18   been one after it.

19       Q.   Well, I don't have it.

20            MRS. CHICLACOS:  It was produced.

21   BY MR. HARMAN, JR.:

22       Q.   There's a column in Section 2 that says

23   delivered expectation.  What does that mean?

24       A.   The sales associates each got a performance

25   chart.  I don't know if you have it there.

1        Q.    Uh-huh.

2        A.    And let's say this is May, so in May he

3   might have been -- his expectation is to deliver let's

4   say it's 16,000.

5        Q.    Uh-huh?

6        A.    But because Larry is 53,000 behind, I added

7   another 4,000 in hoping for him to start to move in

8   the right decision -- in the right way.

9        Q.    So his written expectations were higher than

10  they normally would have been?

11       A.    Yes, we are trying to move him in the right

12  direction.

13       Q.    Okay.  And the delivered expectations would

14  have been the normal expectations that you would have

15  had for him?

16       A.    All of these numbers -- written and

17  delivered would have been higher.

18       Q.    So both sections were higher than they

19  normally would have been?

20       A.    Trying to get him to build up.  The other

21  three, AGP, platinum and bedding remained the same.

22       Q.    Okay.  What type of -- gosh, I don't know

23  why I'm having such a difficult time with this

24  question.

25             Is May a busy time of the year?

1        A.    No.

2        Q.    So what's the busy time of the year?

3        A.    September, October, November.

4        Q.    Okay.

5        A.    Although, May is -- this was May 7th.  May

6   was friends and family but this was after friends and

7   family was over.

8        Q.    So this was after friends and family was

9   over, not a busy time of a year?

10       A.    It slows down.

11       Q.    So if Larry was to improve in order to keep

12  his job, he would have had to have met these

13  expectations?

14       A.    Yes.  You know, I don't want to elaborate,

15  so I guess the answer is yes.

16       Q.    I just want you to answer the question.

17       A.    Okay.

18       Q.    And did you set written expectations during

19  this period for other employees?

20       A.    Sure.  Anybody that was on a coaching plan.

21       Q.    And you testified that you recalled that

22  Karen was on a coaching plan and that I think it's

23  Mr. Bruno, Charlie Bruno?

24       A.    No, Rafael.

25       Q.    Rafael was on a coaching plan, sorry.

1  Rafael was on a coaching plan.

2          Now, if Rafael was on a coaching plan, would

3  you are filled out the same coaching for success form?

4          MRS. CHICLACOS:  Objection to form.

5          THE WITNESS:  No.

6  BY MR. HARMAN, JR.:

7      Q.   Okay.  Why not?

8      A.   Depends how -- Larry was behind 53,000.  If

9  Rafael was behind, let's say, 22,000, I wouldn't have

10  had to put as much into his numbers to go forward to

11  make them -- to get to the things for the end of the

12  year.

13      Q.   I'm going to ask you to just focus on my

14  question.

15      A.   I did.

16      Q.   Would you -- if you put -- you testified

17  that you put Rafael on a plan?

18      A.   Correct.

19      Q.   Okay.  And that involves fulling out a form,

20  correct?

21      A.   Correct.

22      Q.   And when you fill out a form, would you have

23  given him written expectations?

24      A.   Yes.

25      Q.   Okay.  And if he didn't meet the written

1   expectations, would he have been terminated?

2        A.   Yes.

3        Q.   Okay.  So is it your testimony, as you sit

4   here today, under oath, that Rafael met his

5   expectations?

6        A.   Yes.

7             MR. HARMAN, JR.:  I'm going to call for the

8   production of all performance plans for Rafael during

9   the 2011 period.  I believe I've already done so, but

10  to the extent that I haven't, I'm going to call for

11  production of those plans.

12  BY MR. HARMAN, JR.:

13       Q.   With respect to Karen, She would have also

14  been given written expectations; is that correct?

15       A.   Yes.

16       Q.   And if She didn't meet those written

17  expectations, she would have been terminated; is that

18  correct?

19       A.   I have to say no.

20       Q.   Okay.  I'm going to hand you what has been

21  marked as P-Goldstein 2.  If you can please take a

22  look at it.

23       A.   Okay.

24       Q.   Do you recognize this document?

25       A.   Yes.

1        Q.    What is it?

2        A.    It's an action plan.

3        Q.    Okay.  Is there a difference between an

4   action plan and a coaching for success?

5        A.    Yes.  An action plan is when -- it's the

6   step before being fired.

7        Q.    And when did you terminate Larry?

8        A.    I don't remember.  I don't have the date.

9        Q.    Okay.  Well, you testified earlier that you

10  went on --

11       A.    June something.

12       Q.    -- leave in August and that you terminated

13  Larry in June; is that correct?

14       A.    I believe it was June.

15       Q.    Okay.  So this action and performance

16  agreement, would have been shortly before his

17  termination; is that correct?

18       A.    Yes.

19       Q.    And can you read what's in the box?

20             MRS. CHICLACOS:  I'm just going to object,

21  the document speaks for itself.

22             Go ahead and read it.

23  BY MR. HARMAN, JR.:

24       Q.    Fine.  This is a two-page document, it's

25  entitled Action Plan and Performance Agreement, it's

1    Bates stamped D 000043 and 000044.

2              On the second page, is that your signature?

3    A.    Yes.

4    Q.    And it's dated 6/13/11; is that correct?

5    A.    That's correct.

6    Q.    And did you date it?

7    A.    Yes.

8    Q.    Okay.  Can you read what's in the box,

9    please?

10             MRS. CHICLACOS:  On the first page, Lucy.

11             THE WITNESS:  "I want to review with you

12   your underperformance for year to date for 2011.  The

13   date range is 01/2011 to June 10, 2011.  You

14   underperformed for this year to date period to the

15   minimum expectation of 322,875 in delivered sales by

16   48,190.  This dollar amount is based on your 750,000

17   business planner for 2011 that we will review.  You

18   are also underperforming to the minimum expectations

19   in written sales, AGP, platinum, bedding and --

20   bedding percent of sales.  Attached is a SAFR showing

21   your actual numbers for year to date versus the

22   minimum expectation in each category.

23             Below will be a specific goal by category

24   for the next three weeks."

25

1   BY MR. HARMAN, JR.:

2        Q.   Okay.  This document is dated June 13th?

3        A.   Correct.

4        Q.   Correct?

5        A.   Uh-huh.

6        Q.   Do you recall Mr. -- do you recall Larry

7   working during the month of July?

8        A.   No.

9        Q.   Okay.  When did you decide to terminate

10  Larry?

11       A.   When or why?

12       Q.   When?

13       A.   I don't remember.

14       Q.   Okay.  But this document says that Larry had

15  specific goals by category for the next three weeks;

16  is that correct?

17       A.   Correct.

18       Q.   And you set them?

19       A.   Yes.

20       Q.   Okay.  And if he had met them, if he had met

21  these specific goals by category for the next three

22  weeks, would he have been terminated?

23       A.   I'm not sure.  And because I wrote on the

24  next page, "failure to meet these minimum expectations

25  at anytime during this action plan will result in

1    further disciplinary action up to an including

2    termination," which means to me that I might have

3    looked at the numbers the following week and he was

4    still falling.

5        Q.   So you were already -- is it fair to say you

6    were already contemplating terminating him at that

7    time?

8        A.   No.

9        Q.   Okay.  Do you know what point you decided to

10   terminate him?

11       A.   When I saw he couldn't get himself out and

12   he didn't want to -- I did want to terminate him,

13   that's when we said -- we gave him offers of go to

14   another store.

15       Q.   Please just answer my question.

16            With respect to the numbers, do you recall a

17   specific week where you looked at his numbers and

18   decide to terminate him?

19       A.   No, do not remember.

20       Q.   Okay.  But you would agree that he did

21   not -- he was not allowed to work the three weeks that

22   the action plan and performance agreement

23   contemplated?

24            MRS. CHICLACOS:  Objection to form.

25            THE WITNESS:  I can't answer that because I

1    don't know which date he was -- you said he was

2    terminated on --

3    BY MR. HARMAN, JR.:

4          Q.   You told me he was terminated in June.

5          A.   Sometime in June, I don't know when exactly,

6    I don't remember.

7          Q.   But you do agree that this is -- this

8    document contemplates a three-week period from

9    June 13th?

10          A.   Unless you read this statement here.

11          Q.   I understand what the statement says.

12          A.   Okay.

13          Q.   Okay.  And it also says, there would be --

14    the next review date would be June 20th.  Do you know

15    if there was a review on June 20th?

16          A.   I do not remember.

17          Q.   Okay.  I'm handing you what's been marked as

18    P, for plaintiff, Goldstein Number 3.  Please take a

19    look at it.

20          A.   Okay.

21          Q.   Do you recognize this document?

22          A.   Yes.

23          Q.   What is it?

24          A.   It's a performance evaluation.

25          Q.   And did you complete it?

1        A.   Yes.

2        Q.   This is your handwriting?

3        A.   Yes.

4        Q.   And do you know when this performance

5   evaluation was completed?

6        A.   I don't have a date on it.  I don't

7   remember.

8        Q.   Is this format typical of the type of

9   performance evaluation that would be given to a sales

10  associate?

11       A.   Yes.  This is one of our reviews.

12       Q.   So they are handwritten?

13       A.   Uh-huh.

14       Q.   And how frequently are handwritten

15  evaluations?

16       A.   These are the ones I spoke to about maybe

17  two to three months.

18       Q.   These are the ones that are prepared by --

19  this was prepared by you, correct?

20       A.   That's correct.

21       Q.   But you testified earlier that normally the

22  reports that are prepared every two to three months

23  are prepared by the --

24       A.   Showroom managers.

25       Q.   -- showroom managers?

1          MRS. CHICLACOS:  Objection to form.

2          Go ahead and answer.

3          THE WITNESS:  Yes, but sometimes if a

4     showroom manager is out, I take their staff and I do

5     it.  So it could have been one of the managers was on

6     vacation.  I'm sorry.

7          MRS. CHICLACOS:  Take your time.

8     [Short recess taken.]

9     BY MR. HARMAN, JR.:

10         Q.  So your testimony is that you would -- this

11    is the type of form, this P-Goldstein 3 is the type of

12    forms that would be filled out by the showroom

13    managers every two to three months --

14         A.  Right.

15         Q.  -- that would be a synopsis of the sales

16    associate's performance and that if a showroom manager

17    was not available for some reason that you might have

18    filled out the form?

19         A.  Correct.

20         Q.  Do you recall who Mr. Friedmann's showroom

21    manager was in 2011?

22         A.  Oh.

23         Q.  Lou?

24         A.  No, oh, I don't remember that.

25         Q.  You don't remember.

1            I've already called for the production of

2    all of the forms for all of the sales associates for

3    2011 of this nature, so I want the record to be clear,

4    Jessica and the judge and I will work out the details.

5    This is not your problem, but for the record, you've

6    identified P-Goldstein 3 as a form that was regularly

7    filled out for each sales associate assessing their

8    sales performance on a period that would average every

9    two to three months, and I'm calling for the

10   production of all of those forms for the period 2011.

11           Now, once these forms are completed, what

12   happens to them?

13       A.   Well, they normally go up to the human

14   resources.

15       Q.   Okay.  And they are sent to human resources

16   for what purpose?

17       A.   I don't know, just always did.  We kept

18   them, you know, for performance reviews.  I had some

19   in my -- you know, I have a locked cabinet, I would

20   keep them under lock and key.  You know, so if I was

21   looking at this, I could go back maybe if the new one

22   was -- came in and if he was doing better I can review

23   what he did last period, you know, to see.

24       Q.    Okay.  For how long a period would you hold

25   on to these in your office?

1      A.   Not long.  Within the month.

2      Q.   And then you would do what with them after

3  that?

4      A.   They would get shredded or sent up to the

5  human resources.  No copies stayed in the office.

6      Q.   When you say shredded or sent up to human

7  resources, what was the regular practice?

8      A.   Sent up to human resources.

9      Q.   So it's your testimony that these forms

10  would be sent to human resources and this human

11  resources would do what if you know with them?

12      A.   I'm not sure.  I'm not sure.

13      Q.   Have you ever reviewed -- strike that.

14          For your 34 sales associates, do you

15  maintain files on them?  Did you maintain files on

16  them in your office?

17      A.   Yes.

18      Q.   Okay.  And were those considered their

19  primary personnel files?

20          MRS. CHICLACOS:  Objection to form.

21          THE WITNESS:  No.

22  BY MR. HARMAN, JR.:

23      Q.   By primary, each company has a different

24  term for it --

25      A.   I used to keep in there doctor's notes or

1   things like that that they wanted me to hold on to if

2   they came back and they were sick for a while and they

3   got -- you know, like coming back from a leave of

4   something like that it, send it to -- you know, we

5   keep a copy.

6          Q.   You'd keep a copy and you would send a copy?

7          A.   Yes.

8          Q.   And working in a big company for a long

9   time, you know what I mean by an official personnel

10  file?

11         A.   Right.

12              MRS. CHICLACOS:  Objection to form.

13              THE WITNESS:  Uh-huh.

14  BY MR. HARMAN, JR.:

15         Q.   Where was the official personnel file

16  located?

17         A.   Syracuse.

18         Q.   In Syracuse?

19         A.   Yes.

20         Q.   So any important documents, would you then

21  send them to Syracuse?

22         A.   Yes.

23         Q.   Would you also send this type of form to

24  Syracuse, this form P-Goldstein 3?

25         A.   We went through different changes, and I

1   don't know when they occurred, but sometimes we sent

2   them, sometimes they wanted us to just keep them in

3   the office under lock and key, so it could be either

4   or.

5        Q.   Okay.   Do you know what the pattern was in

6   2011 towards the end of your time there?

7        A.   I believe we were -- I believe we were

8   sending them to human resources, but if they are not

9   there they are definitely in the office under lock and

10  key.

11       Q.   Okay.   Do you recall whether Mr. Friedmann

12  ever gave you a doctor's note?

13       A.   Well, he had to have given me a doctor's

14  note in order to come back because, you know, he had

15  to be cleared to start to work again.

16       Q.   Okay.   So that's your recollection based on

17  the normal course of what would have had to have

18  happened at Raymour and Flanigan, but you don't

19  specifically recall him giving you a doctor's note?

20            MRS. CHICLACOS:   Objection to form.

21            THE WITNESS:   No.

22  BY MR. HARMAN, JR.:

23       Q.   Do you have a specific recollection of him

24  giving you a doctor's note on any other occasion?

25       A.   No.

122

1      Q.   Did you have any conversation with Christine

2  Rowland about Larry?

3      A.   Before I ever made a decision about anything

4  on sales associates I would run it through the human

5  resources for two reasons.

6      Q.   Okay.  I asked -- it's going to be -- I

7  don't want to argue with you, but I'm trying to sum it

8  up so that we can all go home.

9      A.   Yes.

10     Q.   Do you recall talking to Christine Rowland?

11     A.   Yes.

12     Q.   Okay.  Do you recall what you said to her?

13     A.   I wanted to know how to go forward with the

14  documentation.

15     Q.   Do you recall what she said?

16     A.   She told me which form to use, where I would

17  find it in the computer.

18     Q.   Do you recall when those conversations took

19  place?

20     A.   I'm assuming June, right before he was being

21  terminated.

22     Q.   How about James Powers, do you recall -- is

23  he an attorney?

24     A.   No, Jim Powers is the vice president of the

25  company.

1          Q.    Do you recall having any conversations with

2    him about Larry?

3          A.    I think it was a consensus.

4          Q.    I'm just asking about conversations.

5          A.    Yes.

6          Q.    And what did you say to him?

7          A.    Again, he was my vice president, we sat

8    down, we reviewed our sale associates, Larry was

9    discussed and we felt that he was too far in the red

10    to come back.

11          Q.    And when did that conversation take place?

12          A.    I believe it was after friends and family,

13    which was in May and we, you know, discussed what

14    we -- where we would go because nobody wanted to fire

15    and that's when we decided to ask him about

16    transferring or doing what we could do to help him.

17          Q.    Where did that conversation take place?

18          A.    It would be in Garden City, Jim Powers had

19    his office in my store.

20          Q.    He had his office in your store?

21          A.    Yes.

22          Q.    I see.  Okay.  And do you know -- do you

23    recall if anybody else was present during that

24    conversation?

25          A.    I don't recall.

1          Q.    Okay.  Did you have any conversations with

2     Larry -- did you have any conversations with Iman

3     Cashme (phonetic)?

4          A.    Iman, he was one of my showroom managers.

5          Q.    Did you discuss Larry which him?

6          A.    I'm sure, I'm sure we did.  Iman might have

7     been his -- he might have been his manager.

8          Q.    And do you recall having any discussion with

9     Iman about terminating Larry?

10          A.    I don't remember.

11          Q.    How about Patricia Delgenio?

12          A.    She's human resources.

13          Q.    Do you recall any conversations with her

14     about Larry?

15          A.    No, no, I don't.

16          Q.    Okay.  How about Laura Ambrosia?

17          A.    Laura is the manager of -- did we have a

18     conversation, yes.

19          Q.    Do you recall what you said to her about

20     Larry?

21          A.    Yes, I said I was going to send Larry over

22     for her to interview.  And, you know, she asked me

23     about him, I said, "Laura, he's good a performer, he

24     always did well.  He's falling now, but I think, you

25     know, in a different environment you could probably

1    get him up.  He always produced highly."  She said she

2    wanted to meet him, and I said sent him over.

3         Q.   And when was that?

4         A.   Before he was fired, maybe after -- it was

5    in between those two things, after we decided what we

6    were going to do and we said, let's see if we can

7    transfer Larry to get him --

8         Q.   So it was after you decided to terminate

9    him?

10        A.   No, he was not -- he was never decided to

11   terminate.  We were trying to find something to do to

12   help him so we didn't have to terminate him.

13        Q.   I see.  Was the conversation with Laura

14   Ambrosia, was it after friends and family?

15        A.   Yes.

16        Q.   And how about Mitchel Reich, do you know who

17   that is?

18        A.   Mitch Reich is the new manager that took my

19   spot.

20        Q.   Okay.  Do you ever communicate with -- did

21   you ever communicate with him about Larry?

22        A.   No.

23        Q.   And I'm not going to getting this right, but

24   Michele G-a-i-c-c --

25        A.   Giaccio, no, I've never spoken to her about

1  Larry.

2      Q.   Okay.  And what, if anything, did Laura say

3  in response?

4      A.   Laura said send him over.

5      Q.   And what happened?

6      A.   I believe she didn't take him.  She didn't

7  take him.

8      Q.   Okay.

9      A.   And I told him he can go down to

10 Metropolitan Avenue and interview with that manager,

11 and he said I'm not going there.

12     Q.   Did you ask him why?

13     A.   Yeah, he said he wasn't traveling there.

14     Q.   But you did not want him working in your

15 location any longer, yes or no?

16     A.   No.

17     Q.   Okay.  I don't have any further questions.

18 And I thank you very much and I really, really do

19 appreciate you perseverance throughout the day.

20     A.   Thank you very much sorry.

21          MRS. CHICLACOS:  I don't have any

22 questions.

23          MR. HARMAN, JR.:  I know it's stuff.  I

24 recognize that you had a tough period there and I

25 realize appreciate it.

1            THE WITNESS:  Thank you very much.

2            MS. CHICLACOS:  Thank you for accommodating

3    her in her home.  I assume that issue was put to bed?

4            MR. HARMAN, JR.:  No, no, no, it's clear to

5    me that there is medical issue.  I had requested --

6            MRS. CHICLACOS:  I had explained to her

7    what you had requested.

8            MR. HARMAN, JR.:  I requested a

9    verification of your medical condition.  I had never

10   met you.  I've now met you and I have no reason to

11   believe that you don't have a medical condition that

12   prevents you from traveling or leaving your home

13   and --

14           THE WITNESS:  Thank you.

15           MR. HARMAN, JR.:  I'm happy to have

16   accommodated you and made it easier for you.

17           THE WITNESS:  I just worry so much.  If

18   this goes to trial, I don't know what I would have to

19   do.

20           MRS. CHICLACOS:  That's a long ways about.

21           MR. HARMAN, JR.:  Don't worry about that

22   now.

23

24

25