```
0001
 1
 2   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 3   ----------------------------------------------X
     LAWRENCE I. FRIEDMANN,
 4
                                  Plaintiff,
 5
                      -against-
 6
     RAYMOUR FURNITURE CO., INC., and
 7   LUCY GOLDSTEIN, individually,
 8                                Defendants.
     ----------------------------------------------X
 9
10
11
12                          50 Jericho Quadrangle
                            Jericho, New York
13
                            January 4, 2013
14                          9:52 A.M.
15
16
17
18
19        EXAMINATION BEFORE TRIAL OF LAWRENCE I.
20   FRIEDMANN, the Plaintiff herein, taken pursuant to
21   Order, and held at the above time and place before
22   Terri Fudens, a Stenotype Reporter and Notary
23   Public of the State of New York.
24
25
```

```
0002
 1
 2   A P P E A R A N C E S :
 3        THE HARMAN FIRM
          Attorneys for Plaintiff
 4             200 West 57th Street
               Suite 900
 5             New York, New York  10019
               212.425.2600
 6
          BY:  PETER ANDREWS, ESQ.
 7
 8
          NIXON PEABODY, LLP
 9        Attorneys for Defendants
               50 Jericho Quadrangle
10             Suite 300
               Jericho, New York  11753-2728
11             516.832.7613
12        BY:  JESSICA CHICLACOS, ESQ.
               jchiclacos@nixonpeabody.com
13
                    -and-
14
          TARA EYER DAUB, ESQ.
15        tdaub@nixonpeabody.com
16
17   ALSO PRESENT:
18             Edward T. Groh, ESQ.
               Senior Counsel
19             Raymour & Flanigan
20             *     *     *     *
21
22
23
24
25
```

0003
1
2
3                      FEDERAL STIPULATIONS
4
5          IT IS HEREBY STIPULATED AND AGREED by and
6     between the attorneys for the respective parties
7     hereto, that filing, sealing, and certifications
8     are hereby waived;
9
10         IT IS FURTHER STIPULATED AND AGREED that
11    all objections, except as to the form of the
12    question, shall be reserved to the time of the
13    trial;
14
15         IT IS FURTHER STIPULATED AND AGREED that
16    the within Deposition may be signed before any
17    Notary Public with the same force and effect as
18    though subscribed and sworn to before this Court.
19
20                      *** *** ***
21
22
23
24
25

```
0004
 1
 2     L A W R E N C E   I.    F R I E D M A N N, the
 3                    Plaintiff herein, having been first
 4                    duly sworn by Terri Fudens, a Notary
 5                    Public of the State of New York, was
 6                    examined and testified as follows:
 7   EXAMINATION BY
 8   MS. CHICLACOS:
 9          Q     Please state your name for the
10   record.
11          A     Lawrence I. Friedmann.
12          Q     Where do you presently reside?
13          A     245-30 Grand Central Parkway,
14   Apartment 2F, Bellerose, New York, 11426.
15          Q     Good morning.  My name is Jessica
16   Chiclacos.  I'm an attorney with the law firm of
17   Nixon Peabody.
18          A     Okay.
19          Q     We represent Raymour & Flanigan in
20   connection with the lawsuit that you brought.
21          A     Mm-hmm.
22          Q     We're here today for your
23   deposition --
24          A     Mm-hmm.
25          Q     -- where I'm going to ask you a
```

```
0005
 1                    LAWRENCE I. FRIEDMANN
 2    series of questions.
 3            A       Mm-hmm.
 4            Q       Before we get started, I would like
 5    to go through some instructions for the day.
 6            A       Okay.
 7            Q       As you see, we have a court reporter
 8    here taking down everything that's being said.
 9            A       Mm-hmm.
10            Q       Because of that, all of your
11    responses to my questions need to be verbal.  She
12    can't take down a nod of the head or any
13    non-verbal gesture.
14            A       Mm-hmm.
15            Q       In addition, please let me finish my
16    question before answering, and I will do the same
17    for you --
18            A       Okay.
19            Q       -- because it is difficult for her to
20    take down what is being said if both of us are
21    talking at the same time.
22            A       Right.
23            Q       If you don't understand any of my
24    questions, please let me know, and I will repeat
25    them.
```

```
0006
 1                    LAWRENCE I. FRIEDMANN
 2           A     Okay.
 3           Q     If at any point during the day you
 4    need a break, please let me know, and we will take
 5    one.
 6           A     Okay.
 7           Q     If there is a question pending,
 8    you'll need to answer the question --
 9           A     Mm-hmm.
10           Q     -- and then we will take a break.  Do
11    you understand these instructions?
12           A     Yes.
13           Q     Do you understand you've taken an
14    oath to tell the truth today?
15           A     Yes.
16           Q     Have you taken any medication in the
17    last 24 hours that would affect your ability to
18    recall events?
19           A     Some cold medicine.  'Tis the season.
20           Q     Did you meet with your attorney to
21    prepare for today's deposition?
22           A     Yes.
23           Q     When did you meet with your attorney?
24           A     This morning, and we had conversation
25    over the phone as well.
```

```
0007
 1                  LAWRENCE I. FRIEDMANN
 2          Q      Did you review any documents to
 3   prepare for today's deposition?
 4          A      I just briefly read over the initial
 5   filings.
 6          Q      By filings, what do you mean by that?
 7          A      The EEOC filing and then the
 8   attorney's Complaint.
 9                  MR. ANDREWS:  Jessica, I think
10                  he understands the question to mean
11                  just within the past 24 hours.
12                  THE WITNESS:  Right.
13                  MR. ANDREWS:  He's seen
14                  documents previously.  I'm not sure
15                  of your question.
16          Q      To prepare for today's deposition.
17          A      Right.
18                  MS. CHICLACOS:  Can we have this
19                  marked, please.
20                  (Defendant's Exhibit 1,
21                  Complaint marked for Identification
22                  as of this date.)
23          Q      Mr. Friedmann, I'm going to show you
24   a document that's been marked as Defendant's
25   Exhibit 1.  Please take a moment to review the
```

```
0008
 1                    LAWRENCE I. FRIEDMANN
 2      document.
 3                    MR. ANDREWS:  You can take as
 4              much time, but I'm sure Jessica will
 5              have specific questions for you.
 6         A    I'm good.
 7         Q    Do you recognize this document?
 8         A    I do.
 9         Q    What is it?
10         A    This is the document that my attorney
11      filed.
12         Q    Was this one of the documents you
13      reviewed in preparation for today?
14         A    I just looked at it briefly.  I just
15      hadn't looked in quite a while.
16         Q    Did you review this document before
17      your attorney had signed it?
18         A    Yes.
19         Q    So this document accurately and
20      truthfully contains your claims in this matter?
21                    MR. ANDREWS:  Objection.
22         A    Mm-hmm.  Yes.
23         Q    Did you review any other documents in
24      preparation for today's deposition?
25         A    No.
```

```
0009
 1                 LAWRENCE I. FRIEDMANN
 2          Q     Aside from your attorney, did you
 3   speak to anyone else in preparation --
 4          A     No.
 5          Q     -- for today's deposition?
 6                Just try and let me finish my
 7   question.  I know it's human nature to answer.
 8          A     Okay.
 9          Q     Do you have any audio or video
10   recordings relating to your claims in this action?
11          A     No.
12          Q     Have you ever been a party to a
13   lawsuit before?
14          A     No.
15          Q     Have you ever been deposed before?
16          A     No.
17          Q     Have you ever filed for bankruptcy?
18          A     Maybe 20 years ago.
19          Q     Do you have any judgments against
20   you?
21          A     Nope.  No.
22          Q     Mr. Friedmann, what is your date of
23   birth?
24          A     6/17/41.
25          Q     What is your marital status?
```

```
0010
 1                  LAWRENCE I. FRIEDMANN
 2          A    Divorced, single.
 3          Q    When were you divorced?
 4          A    In the '70s.
 5          Q    How long had you been married for?
 6          A    11 years.
 7          Q    Were you married any other times?
 8          A    No.
 9          Q    Do you have any children?
10          A    Two.
11          Q    What are their ages?
12          A    41 and 45.
13          Q    Do you own or rent the address in
14   Bellerose, New York?
15          A    Rent.
16          Q    How long have you lived there?
17          A    12 years.
18          Q    Do you live by yourself?
19          A    Yes.
20          Q    Are you financially responsible for
21   anyone?
22          A    No.
23          Q    Have you ever gone by any other name?
24          A    Larry.
25          Q    The same last name?
```

```
0011
 1                  LAWRENCE I. FRIEDMANN
 2          A     Right.
 3          Q     If you could please describe for me
 4    your educational background starting with high
 5    school.
 6          A     Academic diploma and then New York
 7    City Community College, two year degree.
 8          Q     Was that degree in any specific area?
 9          A     It was marketing.  Retail
10    merchandising, actually.
11          Q     When did you receive that degree?
12          A     '62, '63.  I'm not sure.
13          Q     Have you received any other degrees?
14          A     No.
15          Q     Any other educational certifications?
16          A     No.
17          Q     Any other educational training?
18          A     No.
19          Q     Are you a member of any professional
20    organization?
21          A     No.
22          Q     Following your degree in '62, '63,
23    you began working?
24          A     Yes.
25          Q     If you could please describe for me
```

```
0012
 1                 LAWRENCE I. FRIEDMANN
 2   your work history.
 3          A     I was on a work study program with
 4   Martin's Department Store.  Then I was retained to
 5   work in the merchandise manager's office as part
 6   of the training.  Then I became an assistant
 7   buyer.  Then after that, I became assistant buyer
 8   in the handbag department.
 9               Then I left the -- left Martin's to
10   go on to others.  I was hired by a company called
11   SORCO, Syracuse Ornamental Company, as a sales rep
12   for the New York -- New York/Connecticut
13   territory.  It was a training territory.  Then I
14   became the department store rep for New York, New
15   Jersey, Pennsylvania, and I was with that company
16   for also 11 years.
17          Q     Your first employment with Martin's
18   Department Store, how long was that employment
19   for?
20          A     Probably two years.
21          Q     Then after that was Syracuse
22   Ornamental Company?
23          A     Syracuse Ornamental Company for 11
24   years.
25          Q     What followed Syracuse Ornamental
```

```
0013
 1                    LAWRENCE I. FRIEDMANN
 2   Company?
 3          A      After that I became an independent
 4   rep.  I had various product lines.  Still, you
 5   know, a regional rep, primarily in home
 6   furnishings.  Not furniture, home furnishings.
 7          Q      How long did you do that for?
 8          A      Probably 10 years.  Then it evolved.
 9   I became a department store rep again, a
10   national -- we opened up a national repping agency
11   catering to small department stores throughout the
12   United States.  Extensive traveling.  Still in the
13   same product category.  We opened up a showroom.
14          Q      When you say "we," who are you
15   referring to?
16          A      Well, I had a partner at the time,
17   and then I bought him out and continued on my own.
18          Q      The merchandise was home furnishings?
19          A      Yeah.  Lighting, lamp shades.  Highly
20   promotional merchandise.
21          Q      You had that company for 10 years?
22          A      Yeah.  I mean I had purchased one of
23   the factories that we represented, Suffolk Lamp
24   Company, a manufacturing -- still, you know,
25   selling to department stores.  I had that company
```

```
0014
 1                  LAWRENCE I. FRIEDMANN
 2  for six years, continuing the repping business
 3  also.
 4          Q       Do you still own that factory?
 5          A       No.
 6          Q       When did you sell that?
 7          A       That we filed for bankruptcy, and
 8  that's probably around 1980, '85.  Maybe '84, '85.
 9  Then I became a rep again.  I took on a product
10  line for the whole northeast and mid-Atlantic
11  states.  Style Craft Lamps.  After that, I really
12  grew tired of, you know, the extensive travel, and
13  I took a job with Seaman's Furniture.
14          Q       When was that?
15          A       '91.  I was with them for 14 years.
16          Q       What was your position?
17          A       Sales associate.
18          Q       Where did you work?
19          A       Marine Park, their Brooklyn location.
20          Q       You worked at that location for the
21  entire length of your employment?
22          A       Well, when I first joined, I was in
23  the Elmhurst store for six months, and then I was
24  transferred to the Marine Park store for the
25  balance.  I did not leave them.  They were
```

```
0015
 1                    LAWRENCE I. FRIEDMANN
 2    liquidated.  They were -- the same ownership owned
 3    Levitz furniture and Seaman's.  They liquidated
 4    Seaman's and reopened all the locations as Levitz
 5    stores.  I went back to Levitz for about 90 days,
 6    and I could see that they were not going to
 7    succeed, so I interviewed with Raymour & Flanigan.
 8           Q     We'll get to that in a minute.
 9           A     Okay.
10           Q     Do you have a resumӨ?
11           A     Yes.  Not with me.
12                 MS. CHICLACOS:  I will ask that
13                 the resumӨ be produced.
14                 MR. ANDREWS:  Okay.
15           Q     Besides this case, have you ever
16    filed a complaint of discrimination against a
17    previous employer?
18           A     No.
19           Q     Besides this case, have you ever made
20    any complaints about discrimination or retaliation
21    in connection with any of your prior employment?
22           A     No.
23           Q     Besides your employment with Raymour
24    & Flanigan, were you ever disciplined at work?
25                 MR. ANDREWS:  Objection.
```

```
0016
 1                   LAWRENCE I. FRIEDMANN
 2          A     No.
 3          Q     Were you ever counseled at work?
 4                   MR. ANDREWS:  Objection.
 5          A     At Raymour in the last eight weeks.
 6          Q     Besides Raymour & Flanigan.
 7          A     No.
 8          Q     Again, besides this case, have you
 9   ever been fired or terminated from a position?
10                   MR. ANDREWS:  Objection.
11          A     No.
12          Q     Have you ever been asked to resign
13   from a position?
14          A     No.
15          Q     You're represented here by counsel
16   today; correct?
17          A     Yes, I am.
18          Q     When did you first seek legal advice
19   in connection with your employment at Raymour &
20   Flanigan?
21          A     After I was let go.
22          Q     Do you recall how soon after you were
23   let go?
24          A     Probably 90 days or so.
25          Q     Was Mr. Andrews the first attorney
```

```
0017
 1                   LAWRENCE I. FRIEDMANN
 2    you contacted?
 3          A     The firm was, yes.
 4          Q     How did you find out about the Harman
 5    firm?
 6          A     From my son.
 7                     MR. ANDREWS:  I caution you.
 8                You know about the attorney/client
 9                privilege?
10                     THE WITNESS:  Yes.  Okay.
11          Q     Your son was familiar with the Harman
12    firm?
13          A     I'm going to defer to his
14    recommendation.
15                     MR. ANDREWS:  His son is also an
16                attorney, for the record.
17          Q     Did you contact any other lawyers in
18    connection with your employment at Raymour &
19    Flanigan?
20          A     No.
21          Q     Did you have a prior relationship
22    with any of the attorneys at the Harman firm?
23          A     No.
24          Q     Have you contacted any current or
25    former employees of Raymour & Flanigan since you
```

```
0018
 1                   LAWRENCE I. FRIEDMANN
 2   left your employment?
 3          A     No.
 4          Q     Other than your attorneys, to whom
 5   have you spoken about your claims in this case?
 6          A     No one.
 7                   MS. CHICLACOS:  Can I have this
 8               marked as 2, please.
 9                   (Defendant's Exhibit 2,
10               Plaintiff's Response to Defendant's
11               First Set of Interrogatories marked
12               for Identification as of this date.)
13          Q     Mr. Friedmann, I'm going to show you
14   what's been marked as Defendant's Exhibit 2.  Do
15   you recognize this document?
16          A     Yes.
17          Q     What is it?
18          A     Plaintiff's Response to Defendant's
19   First Set of Interrogatories.
20          Q     Do you understand that Raymour &
21   Flanigan sent you, through your attorney, a series
22   of questions for you to answer?
23          A     Yes.
24          Q     Did you provide the information for
25   these answers?
```

```
0019
 1                    LAWRENCE I. FRIEDMANN
 2          A      Yes.
 3          Q      If you could just turn to the last
 4    page of the document, please.  Is that your
 5    signature?
 6          A      Yes.
 7          Q      So the information contained in here
 8    is accurate and truthful?
 9          A      Mm-hmm.  Yes.
10                    MS. CHICLACOS:  3, please.
11                    (Defendant's Exhibit 3,
12                    Plaintiff's First Supplemental
13                    Response to Defendant's First Set of
14                    Interrogatories marked for
15                    Identification as of this date.)
16          Q      I would like to show you what's been
17    marked as Defendant's Exhibit 3.  Do you recognize
18    this document?
19          A      Yes.
20          Q      What is this?
21          A      Plaintiff's First Supplemental
22    Response to Defendant's First Set of
23    Interrogatories.
24          Q      Did your attorneys ask you to
25    supplement your responses to this series of
```

```
0020
 1                LAWRENCE I. FRIEDMANN
 2    questions Raymour & Flanigan had sent to you?
 3          A     Yes.
 4          Q     With Defendant's Exhibit 2, there was
 5    a page that you had signed verifying the accuracy
 6    of your answers?
 7          A     Right.
 8          Q     Did you sign a similar page for the
 9    supplemental responses?
10          A     I'm not sure.  Did I sign this?  I'm
11    not sure on this one.
12                MS. CHICLACOS:  I'm going to ask
13                if the verification page exists, that
14                it be produced.
15                MR. ANDREWS:  I'm not sure one
16                exists, but we will look into it.
17          Q     Did you see the answers to this
18    before your attorney signed it?
19          A     I am not sure on this one.  It's
20    starting to look familiar.
21          Q     Based on your review, is the
22    information contained in this document truthful
23    and accurate?
24          A     Yes.
25          Q     If you look at page 3 of the
```

```
0021
 1                LAWRENCE I. FRIEDMANN
 2    document --
 3            A     Okay.
 4            Q     -- it says at the bottom some
 5    individuals that you've discussed your claims in
 6    this matter with.
 7            A     Yes.
 8            Q     Have you discussed your claims with
 9    your son Kevin?
10            A     Not in detail, but I have discussed
11    it with him.
12            Q     What have you discussed with him?
13            A     Just keeping him up to date on what's
14    transpiring.
15            Q     This is the son who is an attorney?
16            A     Yes.
17            Q     That knew the Harman firm?
18            A     Yes.
19            Q     It also says that you've discussed
20    this matter with your other son Eric.
21            A     Yes.
22            Q     Have you discussed this matter with
23    your son Eric?
24            A     Not in great detail.  Just going to a
25    deposition.  You know, very lightly.  Nothing in
```

0022
1                    LAWRENCE I. FRIEDMANN
2     real detail.
3          Q     It also says you discussed it with
4     your former girlfriend Katherine.
5          A     She is former, yes.
6          Q     What have you discussed with her
7     about this case?
8          A     Just surface.  You know, nothing in
9     detail.  That I have a case that was filed, and
10    nothing in real detail at all.
11         Q     It also says that you've discussed
12    the matter with Guy Vacaro, a former salesperson
13    at your former work location.
14         A     He is a personal friend.  I just, you
15    know, mentioned that we filed a lawsuit.  That's
16    really it.  Nothing in any detail at all.
17         Q     Mr. Vacaro works at Raymour &
18    Flanigan?
19         A     No.  Actually, Mr. Vacaro was fired
20    from Raymour & Flanigan, and he is currently with
21    Macy's Furniture.
22         Q     How did you meet Mr. Vacaro?
23         A     At Raymour.
24         Q     The Garden City showroom?
25         A     Yes.

```
0023
 1                    LAWRENCE I. FRIEDMANN
 2            Q      Do you know when he was terminated?
 3            A      Probably maybe a year, a year and a
 4     half before I was.  I wouldn't know exactly.
 5            Q      So you've spoken with him since he's
 6     left Raymour & Flanigan?
 7            A      He is a personal friend.
 8            Q      And what do you recall about your
 9     conversations with him about the lawsuit?
10            A      Just that I have a lawsuit that was
11     filed.  Nothing -- no detail or anything like
12     that.
13            Q      Can you recall anyone else that
14     you've spoken with about your claims in this
15     action?
16            A      I mean any close friends that I might
17     have just mentioned that I have a lawsuit.
18            Q      Anyone else from Raymour & Flanigan
19     that you've discussed the case with?
20            A      Another personal friend, Joseph
21     Marscone.  That's just, again, nothing in detail.
22            Q      Is Mr. Marscone currently employed by
23     Raymour & Flanigan?
24            A      Yes.
25            Q      Did you work with him at a particular
```

```
0024
 1                LAWRENCE I. FRIEDMANN
 2  location?
 3          A     Garden City.
 4          Q     To your knowledge, he's still
 5  employed there?
 6          A     He's still employed there.
 7          Q     You've spoken with him since you left
 8  Raymour & Flanigan?
 9          A     Yes.  He also is a personal friend.
10          Q     What have you told him about your
11  lawsuit?
12          A     Just that there's a lawsuit filed.
13  Nothing in detail.
14          Q     Has Mr. Marscone said anything to you
15  about your lawsuit?
16          A     No.
17          Q     I'm sorry.  He's a sale associate?
18          A     He is a sales associate, yes.
19          Q     Do you recall the last time you spoke
20  with him?
21          A     New Year's Eve when he was at my
22  house.
23          Q     As you've testified, there came a
24  point in time when you became employed with
25  Raymour & Flanigan?
```

```
0025
 1                   LAWRENCE I. FRIEDMANN
 2          A       Correct.
 3          Q       When did you first apply for a job
 4   with Raymour & Flanigan?
 5          A       2005.   Towards the end of 2005.
 6          Q       What position were you applying for?
 7          A       Sales associate.
 8          Q       How did you learn about the opening?
 9          A       Some Seaman's -- former Seaman's
10   employees had already joined Raymour and, you
11   know, me being disenchanted with Levitz, I decided
12   to pursue that.
13          Q       Was there a particular location?
14          A       I interviewed in Yonkers with Larry
15   Gallagher, who was the regional manager at the
16   time.
17          Q       Okay.
18          A       I mean the personnel person was
19   Clayton -- I forgot his last name.  I don't think
20   he's with Raymour any longer.  Clayton Marcus.
21   No, it can't be Clayton Marcus.  That's a
22   furniture company.
23          Q       You interviewed with Mr. Gallagher
24   before you were offered the position?
25          A       Yes, and then he hired me on the
```

```
0026
 1                  LAWRENCE I. FRIEDMANN
 2   spot.
 3          Q      Where was your interview?
 4          A      In the Yonkers location.
 5          Q      What was discussed during this
 6   interview?
 7          A      My background and -- you know,
 8   basically my background and that I wanted to join
 9   their company.  He hired me to start in the
10   Yonkers location with the understanding that I
11   lived in -- you know, on the Queens/Nassau border
12   and wanted to eventually transfer to, you know, a
13   Long Island location.
14          Q      Did you complete an employment
15   application when you applied for Raymour &
16   Flanigan?
17          A      I'm sure, yeah.  Yes.
18                  MS. CHICLACOS:  Mark this as 4,
19                  please.
20                  (Defendant's Exhibit 4,
21                  Application for Employment marked for
22                  Identification as of this date.)
23          Q      I would like to show you what's been
24   marked as Defendant's Exhibit 4.  Do you recognize
25   this document?
```

```
0027
 1                  LAWRENCE I. FRIEDMANN
 2          A      Yes.
 3          Q      What is it?
 4          A      It's an employment application from
 5   Raymour & Flanigan.
 6          Q      Is this the application that you
 7   filled out?
 8          A      Yes.
 9          Q      If you turn to the second page of the
10   document, is that your signature at the bottom?
11          A      Yes.
12          Q      On the application, if you look on
13   the first page, sort of towards the middle, it
14   says names of friends or relatives employed in
15   this location, and you said Stacey Ross, Bill
16   Camaris.  Who are those individuals?
17          A      Stacey Ross is a sales associate in
18   Garden City, and Bill Camaris is a sales associate
19   in Farmingdale.
20          Q      Those were friends of yours?
21          A      Yes.  I worked with Stacey and Bill
22   at Seaman's furniture.
23          Q      You testified that after you
24   interviewed with Mr. Gallagher, he offered you a
25   position?
```

```
0028
 1                    LAWRENCE I. FRIEDMANN
 2          A     Yes.
 3          Q     Do you recall when you started with
 4  Raymour & Flanigan?
 5          A     In October of 2005.
 6          Q     Was there an orientation process when
 7  you started with the company?
 8          A     There is a training program, yes.  At
 9  the time there was a two-week training program.
10          Q     What did that training consist of?
11          A     Well, you went to a location in
12  Jersey and you basically trained for a five-day
13  period and then came back home for the weekend,
14  and then trained for a second week again, and then
15  went to the Yonkers store.
16          Q     When you say trained, what do you
17  mean by that?
18          A     Well, their computer systems, their
19  product philosophy, their product mix, went out on
20  the sales floor.  You know, just got a feel for
21  the store.
22          Q     Was there any training related to
23  Human Resources policies and procedures?
24          A     Yes.
25          Q     What did that training consist of?
```

```
0029
 1                    LAWRENCE I. FRIEDMANN
 2          A     General Human Resource information of
 3     what to do, what not to do.
 4          Q     Do you recall receiving any handbooks
 5     or policies relating to Human Resources
 6     procedures?
 7          A     Yes.
 8          Q     What do you recall receiving?
 9          A     A handbook, which is no longer --
10     everything is on their computer now.
11          Q     Anything else?
12          A     That's really it.
13                    MS. CHICLACOS:  Defendant's
14                Exhibit 5, please.
15                    (Defendant's Exhibit 5, Raymour
16                & Flanigan New Hire Form marked for
17                Identification as of this date.)
18          Q     Mr. Friedmann, I would like to show
19     you what's been marked as Defendant's Exhibit 5.
20                Do you recognize this document?
21          A     Not really.
22          Q     If you look towards the bottom of the
23     document, is that your signature?
24          A     Yes.
25          Q     Does this refresh your recollection
```

```
0030
  1                  LAWRENCE I. FRIEDMANN
  2    as to any other documents you might have received
  3    during this training process?
  4         A    No.
  5         Q    You testified you were hired as a
  6    sales associate?
  7         A    Correct.
  8         Q    When you were hired, did Raymour &
  9    Flanigan have any policy with respect to sales
 10    that needed to be generated by a sales associate
 11    at a particular showroom?
 12         A    Yes.
 13         Q    If you could please describe that
 14    policy to me.
 15         A    Minimum sales volume was $750,000 per
 16    year.
 17         Q    Meaning that as a sales associate,
 18    you needed to have sales of a minimum --
 19         A    A minimum of --
 20         Q    -- of $750,000 per year?
 21         A    Correct, yes.
 22         Q    Then how did your compensation work
 23    with respect to that?
 24         A    Commission against a draw.
 25         Q    What does delivered sales mean?
```

```
0031
 1                    LAWRENCE I. FRIEDMANN
 2          A       That's what you're paid on.
 3                    MR. ANDREWS:  Objection.
 4          A       That's what you're paid on.
 5          Q       Meaning what?
 6          A       That's the merchandise that you have
 7    to deliver.
 8          Q       Delivered meaning has to be delivered
 9    to the customer?
10          A       Correct.
11          Q       Not just writing up an invoice for
12    the merchandise?
13          A       No.  It has to be delivered.
14          Q       So the $750,000 was based on --
15          A       Is delivered sales.
16          Q       Let me finish my question -- is based
17    on delivered sales?
18          A       Correct.
19          Q       When you started working in the
20    Yonkers location, who did you report to?
21          A       Richard Petransky was the showroom
22    manager at the time.  He since went on to become
23    the regional manager of the -- you know, the
24    Garden City, Long Island store, and to my
25    knowledge after that became store manager at
```

```
0032
 1                  LAWRENCE I. FRIEDMANN
 2    Farmingdale.  I don't know if he's still with the
 3    firm.
 4          Q      During the time you were in the
 5    Yonkers location, did you report -- was he the
 6    showroom manager during the entire time you were
 7    there?
 8          A      The store manager, yes.
 9          Q      Anyone else that you reported to; an
10    assistant store manager?
11          A      No.  He's deceased.  He was a young
12    guy.  I forgot his name.
13                  MR. ANDREWS:  Is that someone
14                  you would have reported to?
15          A      Well, he was assistant manager there,
16    and he was also in Garden City.  But he passed
17    away while I was still with the company.
18          Q      As a sales associate, what were your
19    duties and responsibilities?
20          A      To sell the customer, to maintain the
21    store.  Basically sales and, you know, follow up
22    on paperwork and general sales responsibilities.
23          Q      So you had interaction with the
24    public?
25          A      Yes.
```

0033
```
 1                  LAWRENCE I. FRIEDMANN
 2         Q      And you say maintain the store.  What
 3   did you mean by that?
 4         A      Each morning you would go around and
 5   fix up the store before the store opening if you
 6   were on the morning shift, and -- you know, just
 7   for presentation purposes.
 8         Q      Did there come a point in time when
 9   you requested a transfer to a different location?
10         A      Well, I did.  I requested a transfer
11   to the Carle Place location.
12         Q      Why was that?
13         A      Because I lived 10 minutes away from
14   that store.
15         Q      Do you recall when you requested that
16   transfer?
17         A      Well, from the beginning actually,
18   because that was the underlying agreement, that I
19   would eventually be transferred to Carle Place.
20                Eventually Mr. Petransky gave into my
21   requests and I was transferred.  I think if I
22   joined in October, I was probably transferred to
23   Carle Place either by April or May.
24         Q      Of 2006?
25         A      Correct.
```

```
0034
 1                  LAWRENCE I. FRIEDMANN
 2          Q      In connection with your request for a
 3  transfer, did you interview with anyone at the
 4  Carle Place showroom?
 5          A      Not really interview.  I mean I was
 6  introduced to the store manager at the time.
 7          Q      Who was that?
 8          A      Lucy Goldstein.
 9          Q      Did you meet with her before your
10  transfer?
11          A      I would meet her -- actually, I met
12  her once when I was still in training.  There
13  really was no formal interview with her to come to
14  that location.
15          Q      Do you know if Miss Goldstein had to
16  approve your transfer request?
17          A      I'm sure she did, but my performance
18  was deserving.
19          Q      You said you met her while you were
20  in training?
21          A      I met her briefly in the Fairfield
22  store.  She was probably out there for a meeting.
23          Q      So before starting at the Carle Place
24  showroom, did you have any other interaction with
25  her besides meeting her during the training
```

```
0035
 1                  LAWRENCE I. FRIEDMANN
 2   process?
 3          A      No.  No.
 4          Q      At the Carle Place location, she was
 5   the store manager when you transferred there?
 6          A      Yes.
 7          Q      Did you report to her?
 8          A      Yes.
 9          Q      You remained a sales associate?
10          A      Correct, yes.
11          Q      Did your duties and responsibilities
12   stay the same?
13          A      Yes.
14          Q      Did the requirement that you have
15   $750,000 in delivered sales annually remain the
16   same in the Carle Place location?
17          A      Yes.
18          Q      Did your compensation structure
19   remain the same in how you described, it was a
20   commission against a draw?
21          A      Yes.
22          Q      Was there an assistant manager that
23   you reported to in the Carle Place location?
24          A      Well, there were a few different
25   assistant managers.  There was a Chris Bonaventura
```

```
0036
 1                LAWRENCE I. FRIEDMANN
 2   at one time.  I really forget who else was the
 3   assistant manager.  There were others, but I don't
 4   recall who they were.
 5           Q       Did there come a point in time when
 6   you requested another transfer to a different
 7   location?
 8           A       When they opened the Garden City
 9   store.
10           Q       When was that?
11           A       Probably two years after.  Maybe
12   2008.  I'm not sure.  When the store opened.  But
13   I was in Carle Place for a couple -- at least a
14   couple of years.
15           Q       Why did you want to transfer to the
16   Garden City showroom?
17           A       Well, it was a new location.  It was
18   a much larger store, much more potential.
19           Q       Potential for what?
20           A       Sales volume.  Income, sales volume.
21           Q       Did you interview with anyone in your
22   request for a transfer to the new showroom?
23           A       Lucy Goldstein was the manager of the
24   Garden City store, so she chose who she wanted to
25   come to the store.
```

```
0037
 1                  LAWRENCE I. FRIEDMANN
 2          Q      Miss Goldstein chose you to join her,
 3     as well as others, in the Garden City showroom?
 4          A      Mm-hmm.  She asked who wanted to come
 5     there, and I said I wanted to, and she said okay.
 6          Q      At the Garden City showroom, you
 7     remained a sales associate?
 8          A      Mm-hmm.  Yes.
 9          Q      Did your duties and responsibilities
10     remain the same?
11          A      Yes.
12          Q      Did the requirement that you have
13     $750,000 in delivered sales annually remain when
14     you started working at the Garden City showroom?
15          A      Yes.
16          Q      You reported to Lucy Goldstein at
17     this location?
18          A      Yes.
19          Q      Were there assistant managers at this
20     location?
21          A      There were.
22          Q      When you started there in 2008, who
23     were the assistant managers?
24          A      Mitchell Medonic (phonetic) was one
25     of them for a time.  The person who is deceased,
```

0038
1                    LAWRENCE I. FRIEDMANN
2    his first name was John.  He was also a showroom
3    manager there at one point.  Iman Kasmi was later
4    on.
5              Q      Anyone else, assistant managers?
6              A      Anthony Baines was there for a while.
7              Q      Anyone else?
8              A      There were a couple of others, but I
9    really have forgotten their names.
10             Q      During your time at the Garden City
11   showroom, did Miss Goldstein remain the manager of
12   that showroom?
13             A      Yes.
14             Q      Besides Yonkers, Carle Place and
15   Garden City, did you work at any other locations?
16             A      I was asked to interview for another
17   location just prior to me being dismissed.
18             Q      Tell me about that.
19             A      I was asked to interview at the Carle
20   Place location again.
21             Q      Who asked you to interview?
22             A      Lucy Goldstein and Tony Bender, who
23   was the regional at the time.
24             Q      Do you know why they asked you to
25   interview for a position at Carle Place?

```
0039
 1                  LAWRENCE I. FRIEDMANN
 2          A       They felt I would be more comfortable
 3   in a smaller location.  I didn't request it.
 4          Q       Did they say that to you?
 5          A       Yes.
 6          Q       Did they explain what they meant by
 7   that?
 8          A       Well, I was already on a coaching
 9   plan.
10          Q       Did you interview?
11          A       I did.
12          Q       Who did you meet with there?
13          A       The first name was Laura.  I don't
14   remember her last name.
15          Q       Do you recall when you met with
16   Laura?
17          A       Probably six weeks before I was let
18   go.
19          Q       You're referring to your termination
20   from Raymour & Flanigan?
21          A       Yes.
22          Q       Where did you meet with Laura?
23          A       In the Carle Place location.
24          Q       Was it just you and her, or was
25   anyone else present?
```

0040
```
 1                   LAWRENCE I. FRIEDMANN
 2          A      Tony Bender did walk in in the middle
 3   of the meeting and told her what a tremendous
 4   asset I would be to the store.  We exchanged a few
 5   friendly commentary, which to me was suspect.
 6          Q      Why was that suspect to you?
 7          A      Well, actually Laura, during the
 8   interview, you know, she did most of the -- you
 9   know, just giving her philosophy and everything,
10   and she said to me that she wasn't looking for
11   anyone in her store who might have a few bucks in
12   the bank, which I was a little offended with.
13          Q      Did she explain what she meant by
14   that?
15          A      I think she was referring to me
16   being, you know, an older gentleman who might have
17   a few bucks in the bank.
18          Q      Did she say that?
19          A      No, but the remark was sarcastic.
20          Q      Let's take a step back for a moment.
21                 The meeting took place in her office?
22          A      No.  At a dining room table in the
23   main showroom just off of the hallway.
24          Q      You testified that she spent most of
25   the time talking about her philosophy?
```

```
0041
 1                    LAWRENCE I. FRIEDMANN
 2          A     Yes.
 3          Q     What do you mean by that?
 4          A     Well, she did most of the talking,
 5   and I was advised that she likes to talk, so I let
 6   her talk.
 7          Q     Who told you that she likes to talk?
 8          A     Actually, Iman Kasmi.
 9          Q     When you say philosophy, do you mean
10   her sales philosophy?
11          A     Her sales philosophy, her
12   requirements.
13          Q     You're referring to her requirements
14   for sales associates?
15          A     Yeah.  I felt the interview went
16   well, but then that afternoon I was informed that
17   she would not be taking me to the Carle Place
18   store, that I would be staying in Garden City and
19   remain on the coaching plan.
20          Q     What do you recall you said during
21   the interview with Laura?
22          A     That I felt it was a good idea to go
23   to the Carle Place store, that perhaps because of
24   my sciatic condition -- it's really one-third the
25   size of the Garden City store, so I felt that --
```

```
0042
 1                    LAWRENCE I. FRIEDMANN
 2     and I was familiar with the store.  I was there
 3     for two years.  It's a good customer.  It's a
 4     little bit different customer than the Garden City
 5     store.  It's more of a North Shore customer.
 6             Q     What do you mean by that?
 7             A     I mean even though you had this huge
 8     store just a quarter of a mile away, the other
 9     location, the Garden City store, this store has
10     remained open and does fairly well.
11             Q     What do you mean by a North Shore
12     customer?
13             A     For some reason they seem to attract,
14     because of the location, clientele that live more
15     on the North Shore, where Garden City really just
16     attracts the customer that's from all over.  It's
17     just in a different location.
18             Q     Is there something particular about a
19     North Shore customer?
20             A     No.  No.  It was a good customer.
21             Q     You said that you thought that the
22     transfer to Carle Place was a good idea?
23             A     For me.
24             Q     Did you explain to her during that
25     interview why you thought it was a good idea?
```

0043
```
 1                    LAWRENCE I. FRIEDMANN
 2          A      I did.  I went there highly
 3  motivated.  I thought the interview went well, and
 4  apparently it didn't.
 5          Q      What exactly did you say to her
 6  during the interview why you believed that the
 7  transfer would be a good idea?
 8          A      I really said to her what one says in
 9  an interview.  You come on motivated and say the
10  right things.
11          Q      Can you recall any of the specifics?
12          A      Not really.
13          Q      You mentioned briefly just now about
14  your sciatica.  Did you discuss that with her?
15          A      I mean there is a history of it.  You
16  have all the documentation on that.  There is
17  quite a history on the sciatica problem, and
18  that's when my volume started to slide in 2010.
19          Q      During your interview with Laura at
20  the Carle Place showroom, did you discuss your
21  sciatica with her?
22          A      No.
23          Q      Did you, during that interview,
24  discuss with her why your sales volume had begun
25  to drop?
```

```
0044
 1                    LAWRENCE I. FRIEDMANN
 2           A      I probably said -- you know, referred
 3    back to, you know, the health issue.  I really
 4    don't recall what I discussed with her.
 5           Q      Do you recall discussing your health
 6    issue with Laura during this interview?
 7           A      I don't believe so.
 8           Q      Can you recall anything else that was
 9    discussed during this interview?
10           A      No.  The only thing that stayed clear
11    in my mind was:  I don't want anyone in my store
12    who has a few bucks in the bank.
13           Q      Do you recall what, if anything, you
14    said after Laura allegedly made that comment to
15    you?
16           A      I didn't react to it.
17           Q      You didn't ask her what she meant?
18           A      No.
19           Q      Did she say anything further along
20    those lines?
21           A      No.
22           Q      Can you recall anything else that she
23    said during the interview?
24           A      No.
25           Q      During your employment with Raymour &
```

0045
```
 1                 LAWRENCE I. FRIEDMANN
 2    Flanigan, did any of your supervisors ever discuss
 3    your performance with you?
 4         A     Only when I wound up on the coaching
 5    plan.
 6         Q     During your employment with Raymour &
 7    Flanigan, did you ever receive any performance
 8    evaluations?
 9         A     Yes.
10         Q     Do you recall when you received
11    evaluations?
12         A     Well, the first four years of my
13    employment -- the first year my sales volume was a
14    million 19.  The second year it was 856,000.  The
15    third year it was 846.  The fourth year it was
16    792, and the fifth year was the sciatica issue,
17    which I was, you know, under doctor's care for
18    about seven months.  That's when my volume started
19    to drop.
20                 MR. ANDREWS:  I think Jessica's
21                 question was did you receive
22                 performance evaluations.
23                 MS. CHICLACOS:  That's fine.
24                 And I will clarify with him, if
25                 necessary.
```

```
0046
 1                  LAWRENCE I. FRIEDMANN
 2         A      Well, you always received performance
 3  evaluations.
 4                  MS. CHICLACOS:  Can I have this
 5               marked, please, as 6.
 6                  (Defendant's Exhibit 6, Raymour
 7               & Flanigan Furniture Performance
 8               Evaluation and Development Form
 9               marked for Identification as of this
10               date.)
11         Q      Mr. Friedmann, I would like to show
12  you what's been marked as Defendant's Exhibit 6.
13  Do you recognize this document?
14         A      I mean it's one of many.
15         Q      Is that your signature at the bottom?
16         A      It is.
17         Q      Do you recall when you received this
18  document?
19         A      It's not dated.
20         Q      By looking at the budget and actual,
21  does that refresh your recollection?
22         A      Not really.  It looks from here that
23  I exceeded what the requested amount was, if I'm
24  looking at the actual.  If I'm looking at the two
25  months combined, I was minus 1,500 in whatever the
```

```
0047
 1                   LAWRENCE I. FRIEDMANN
 2    first month was.  And then I was plus 21,000 for
 3    the second month.  So I have no idea when this --
 4    I see a manager's comment on the bottom:  Great
 5    month.
 6            Q     But you don't recall who gave this to
 7    you?
 8            A     No.  It had to be in one of the first
 9    four years.
10                   MS. CHICLACOS:  7, please.
11                   (Defendant's Exhibit 7, Raymour
12                   & Flanigan Furniture Performance
13                   Evaluation and Development Form dated
14                   6/7/08 marked for Identification as
15                   of this date.)
16            Q     Mr. Friedmann, I will show you what's
17    been marked as Defendant's Exhibit 7.  Do you
18    recognize this document?
19            A     Again, not really.  This is 6/7/08.
20    I mean I see that again the volume exceeded their
21    expectations.
22            Q     At this point in time in June of
23    2008, Lucy Goldstein was your manager?
24            A     Yes.
25            Q     Is that your signature on the bottom
```

```
0048
 1                LAWRENCE I. FRIEDMANN
 2  line?
 3        A     It is.  I see the comment on the
 4  bottom, works and plays well with all.
 5        Q     Are you referring to works well --
 6        A     Works well with all.
 7        Q     Do you recall who gave you this
 8  document?
 9        A     No, and I really can't make out the
10  signature.
11        Q     Do you recall if it was
12  Miss Goldstein?
13        A     No, because they -- they actually
14  divided up the evaluation responsibility by teams,
15  so it could have been one of three managers
16  possibly.
17        Q     In June of 2008, do you recall who
18  those managers could have been?
19        A     No.
20                MS. CHICLACOS:  8, please.
21                (Defendant's Exhibit 8, Raymour
22                & Flanigan Furniture Performance
23                Evaluation and Development Form dated
24                August 17, 2008 marked for
25                Identification as of this date.)
```

```
0049
 1                  LAWRENCE I. FRIEDMANN
 2          Q      I would like to show you what's been
 3   marked as Defendant's Exhibit 8.  Do you recognize
 4   this document?
 5          A      Again, not really.
 6          Q      Do you see that the document is dated
 7   August 17, 2008?
 8          A      Yes.
 9          Q      Is that your signature?
10          A      Yes.
11          Q      If you could turn your attention to
12   the section marked goals, point 1.
13          A      Okay.
14          Q      It says -- and I'm trying to read my
15   best with the writing:  Will work on CO apps, more
16   preferreds.
17          A      Preferred referring to the credit
18   where they pay when they get the first bill, where
19   the customer pays when they get the first bill.
20   That's what a preferred account refers to as
21   opposed to long-term financing.
22          Q      So a preferred account is when a
23   customer pays in full?
24          A      Pays in 30 days, yes.  Otherwise they
25   will start to pay interest if they don't.
```

```
0050
 1                   LAWRENCE I. FRIEDMANN
 2          Q      It says under manager's comments:
 3   Has had a bad month, vacations, et cetera.
 4          A      Yeah.
 5          Q      Do you recall what was going on at
 6   this point in time?
 7          A      I honestly don't remember.  I mean at
 8   that point I was probably entitled to two or three
 9   weeks vacation.  I don't recall how long -- you
10   know what kind of a vacation I took at that point.
11          Q      But if you look at the top --
12          A      Yes.
13          Q      -- where it says volume, rent and
14   budget, 117 --
15          A      Right.
16          Q      -- is that referring to the amount of
17   sales that should have been written during that --
18          A      Correct, yes.
19          Q      And then the actual was --
20          A      Was 77,000 and delivered was 55.  May
21   I point out that this 2008 was the year that I
22   wound up with 792?
23          Q      When you say 792, are you referring
24   to $792,000 in delivered sales for that year?
25          A      Yes.  Yes.
```

```
0051
 1                    LAWRENCE I. FRIEDMANN
 2          Q     Besides the three documents we've
 3    just looked at, do you recall receiving any other
 4    documents like this during your employment?
 5          A     Probably.  I mean probably.  I mean I
 6    don't -- you know, I don't recall receiving these
 7    documents.  I mean I signed them, but --
 8                    MS. CHICLACOS:  Can we take a
 9                    five-minute break, please.
10                    (At this time, a brief recess
11                    was taken.)
12    CONTINUED EXAMINATION
13    BY MS. CHICLACOS:
14          Q     While working at Raymour & Flanigan,
15    did you ever receive any disciplines?
16          A     No.
17          Q     While working at Raymour & Flanigan,
18    were you ever placed on a Coaching for Success
19    plan?
20          A     Just prior to me being let go.
21          Q     Tell me what you recall about being
22    placed on the Coaching for Success plan.
23          A     I think the coaching plan started
24    after I was turned down to transfer to Carle
25    Place.  I really don't recall exactly when it
```

```
0052
 1                  LAWRENCE I. FRIEDMANN
 2   started, but I believe it started then.
 3         Q      Who placed you on this Coaching for
 4   Success plan?
 5         A      Lucy Goldstein.
 6         Q      Why did she do so?
 7                  MR. ANDREWS:  Objection.
 8         Q      Did she explain to you why she placed
 9   you on a Coaching for Success plan?
10         A      Sales volume, where there would be
11   coaching and training and follow-up every two
12   weeks, which was nonexistent.
13                  MS. CHICLACOS:  Defendant's
14                  Exhibit 9, please.
15                    (Defendant's Exhibit 9, Raymour
16                  & Flanigan Coaching for Success
17                  document dated May 7, 2011 marked for
18                  Identification as of this date.)
19         Q      Mr. Friedmann, I would like to show
20   you what's been marked as Defendant's Exhibit 9.
21         A      Okay.
22         Q      Do you recognize this document?
23         A      Yes.
24         Q      What is it?
25         A      It's a coaching plan.
```

```
0053
 1                    LAWRENCE I. FRIEDMANN
 2          Q      Is this the coaching plan you were
 3  just testifying about?
 4          A      Yes.
 5          Q      Do you see that the document on the
 6  second page is dated May 7, 2011?
 7          A      Yes.
 8          Q      Is that your signature --
 9          A      Yes, it is.
10          Q      -- on the second page?
11                 Did Miss Goldstein provide you with
12  this document?
13          A      Yes.
14          Q      Did she meet with you to give it to
15  you?
16          A      Yes.
17          Q      What did she say?
18          A      Along with Anthony Baines.
19          Q      He was the assistant store manager at
20  that time?
21          A      Yes.
22          Q      Where did you meet with
23  Miss Goldstein and Mr. Baines?
24          A      At a dining room table in the main
25  showroom.
```

```
0054
 1                   LAWRENCE I. FRIEDMANN
 2         Q      Was anyone else present?
 3         A      No.
 4         Q      What did Miss Goldstein say to you
 5   when she provided you with this document?
 6         A      That this was the requirements, you
 7   know, the expectations.
 8         Q      Are you referring to --
 9         A      Well, I'm looking at the goal
10   figures.  These are expected -- you know,
11   expectations of goals.  I don't know what the
12   actual is.  Is it listed here?  No, I don't see
13   any.
14         Q      If you look at the top of the
15   document --
16         A      Yes.
17         Q      -- it refers to a 750,000 business
18   planner for 2011.
19         A      Yes.
20         Q      Does that refer to the $750,000
21   requirement --
22         A      Yes, it does.
23         Q      Let me finish my question.
24         A      Sorry.
25         Q      -- of delivered sales for the year?
```

```
0055
 1                    LAWRENCE I. FRIEDMANN
 2          A      Yes.
 3          Q      If you see there as well, does it say
 4   that your delivered sales to date thus far were
 5   $252,750?
 6          A      And projected out to 617,435.
 7          Q      For the year?
 8          A      Yes.
 9          Q      Do you recall anything that
10   Miss Goldstein said to you when she gave this to
11   you?
12          A      Honestly, at this point I started to
13   sense that they had an agenda, because the 617,435
14   on May 7th projected out could change rapidly.
15   It's only five months into the year.
16          Q      What was your sense of an agenda?
17          A      Well, just things were happening.  I
18   didn't like the interview in Carle Place to begin
19   with.  I had a sense there.  I had a sense
20   afterwards too, but I just looked aside and said
21   maybe things will change.  But I just started to
22   feel something was changing.
23          Q      What do you mean by that?
24          A      That it was the beginning of what
25   happened.
```

```
0056
 1                   LAWRENCE I. FRIEDMANN
 2          Q      What do you mean by what happened?
 3          A      That I was let go.
 4          Q      If you look at this document, like
 5    you said, it's dated May 7, 2011.
 6          A      Mm-hmm.
 7          Q      Do you recall if you met with Laura
 8    in Carle Place before or after this date?
 9          A      Probably before, maybe a day or two.
10    It's right around this date, because this is when
11    the coaching plan started.
12          Q      Going back to the meeting with
13    Miss Goldstein and Mr. Baines when she provided
14    you this document --
15          A      Right.
16          Q      -- can you recall what Miss Goldstein
17    said to you during this meeting?
18          A      Not really.
19          Q      Do you recall what Mr. Baines said
20    during this meeting?
21          A      Not really.
22          Q      Do you recall what, if anything, you
23    said during this meeting?
24          A      Not really.
25          Q      If you see in the document it says:
```

```
0057
 1                LAWRENCE I. FRIEDMANN
 2  Below will be your goals for the next two weeks.
 3          A     Right.
 4          Q     And that there would be follow-up?
 5          A     Correct.
 6          Q     Was there follow-up?
 7          A     Not really.  I mean there's follow-up
 8  where you're signing another piece of paper every
 9  two weeks, but there was no coaching to speak of.
10  There was no initiation of coaching or intent to
11  coach.
12          Q     Did you ask Miss Goldstein for any
13  assistance to help raise your sales volume at this
14  point?
15          A     I was starting to feel it was
16  pointless.
17          Q     Please answer the question.  Did you
18  at this point ask her for any assistance to help
19  raise your sales volume?
20          A     No.
21          Q     Did you ask Mr. Baines?
22          A     No.
23          Q     Did you ask anyone at the Garden City
24  showroom at this point for any assistance to help
25  raise your sales volume?
```

```
0058
 1                  LAWRENCE I. FRIEDMANN
 2          A     No.
 3          Q     Did you ask anyone at Raymour &
 4  Flanigan for assistance in help raising your sales
 5  volume?
 6          A     No.
 7                    MS. CHICLACOS:  10, please.
 8                    (Defendant's Exhibit 10, Raymour
 9                    & Flanigan Coaching for Success
10                    document dated May 23, 2011 marked
11                    for Identification as of this date.)
12          Q     Mr. Friedmann, I show you what's been
13  marked as Defendant's Exhibit 10.  Do you
14  recognize this document?
15          A     Same coaching plan.
16          Q     If you look at the second page of the
17  document, it's dated May 23, 2011; is that
18  correct?
19          A     Yes.
20          Q     Is that your signature?
21          A     Yes.
22          Q     Is that Miss Goldstein's signature on
23  the document?
24          A     Yes.
25          Q     So this is different than Defendant's
```

```
0059
  1                    LAWRENCE I. FRIEDMANN
  2    Exhibit 9, the previous Coaching for Success plan
  3    we looked at?
  4            A      It's the second review date.
  5            Q      Is it the follow-up that was
  6    discussed when you were initially provided with
  7    the plan?
  8            A      Well, it's dated 5/23, so it is the
  9    follow-up.
 10            Q      It was approximately two weeks later?
 11            A      Correct.
 12            Q      Did Miss Goldstein provide you with
 13    this document?
 14            A      Yes, she did.
 15            Q      When did she do so?
 16            A      Actually, you know, she did not
 17    provide me with documents.  She did not provide me
 18    with copies of these.
 19            Q      Did you sign this document?
 20            A      I signed it, but she didn't provide
 21    me with a copy of the document.
 22            Q      Did you have an opportunity to review
 23    it before signing it?
 24            A      Yes.
 25            Q      You met with her and she showed you
```

```
0060
 1                  LAWRENCE I. FRIEDMANN
 2  this document, and you reviewed it for you to
 3  sign?
 4         A      I signed it because that's what you
 5  have to do, sign it.
 6         Q      Where did she do that?
 7         A      At the same dining room table.
 8         Q      Was anyone else present?
 9         A      I don't remember who else was
10  present.  There's two or three different showroom
11  managers, so I really don't recall who was there.
12         Q      At this point in time in May of 2008,
13  there was Anthony Baines; correct?
14         A      Yes.  Iman Kasmi was also there as a
15  showroom manager.  I don't recall if there was a
16  third manager at this point.
17         Q      Do you recall what Miss Goldstein
18  said to you when she met with you to provide you
19  with this document?
20         A      Not really.
21         Q      Do you remember what you said to
22  Miss Goldstein when you met with her when she gave
23  you this document?
24         A      Not really.
25         Q      If you look at the column on the
```

```
0061
 1                 LAWRENCE I. FRIEDMANN
 2   bottom of the page --
 3          A    Okay.
 4          Q    -- showing that for one week the
 5   expectation for delivered sales is $20,000; do you
 6   see that?
 7          A    Yes.
 8          Q    Then are there numbers written in
 9   showing what your actual delivered sales were?
10          A    Yes.
11          Q    And then at the bottom there's a
12   notation as of 5/23, year to date, minus 63,799.
13   Is that your handwriting?
14          A    Yes.  No.  No, that's not my
15   handwriting.
16          Q    Do you know whose handwriting that
17   is?
18          A    I have no idea.
19          Q    Do you know what that's referring to?
20          A    Not really.  I mean maybe this is a
21   make-up figure for the -- I really don't.
22          Q    At this point in time, did you ask
23   Miss Goldstein for any assistance in helping raise
24   your sales goals?
25          A    No.
```

```
0062
 1                  LAWRENCE I. FRIEDMANN
 2          Q      Did you ask anyone else at Raymour &
 3     Flanigan for assistance?
 4          A      No, nor was any offered.
 5          Q      Did Miss Goldstein discuss with you
 6     any follow-up that would be taken following this
 7     with respect to your sales goals?
 8          A      I don't recall.
 9          Q      While you were working at the Garden
10     City showroom, did you ever receive an action plan
11     and performance agreement?
12          A      Prior to this?
13          Q      Following this.
14          A      The final -- well, there might have
15     been one other -- I mean I was let go on June 18,
16     so there had to be another.
17                  MS. CHICLACOS:  Defendant's
18                  Exhibit 11, please.
19                     (Defendant's Exhibit 11, Raymour
20                  & Flanigan Coaching for Success
21                  document dated June 13, 2011 marked
22                  for Identification as of this date.)
23          Q      Mr. Friedmann, this is what's been
24     marked as Defendant's Exhibit 11.
25          A      Okay.
```

```
0063
 1                  LAWRENCE I. FRIEDMANN
 2         Q     Do you recognize this document?
 3         A     Yes.
 4         Q     What is it?
 5         A     It's the -- it's an action plan.
 6         Q     What is an action plan?
 7         A     Which an action plan would ultimately
 8    lead to termination.
 9         Q     Who provided you with this action
10    plan?
11         A     I see Lucy Goldstein signed it, so it
12    would be here.
13         Q     On the second page, that's your
14    signature?
15         A     Yes.
16         Q     The document is dated June 13, 2011?
17         A     Yes, it is.
18         Q     Do you recall meeting with
19    Miss Goldstein when she provided you with this
20    action plan?
21         A     At the same dining room table.
22         Q     Do you recall if anyone else was
23    present?
24         A     No, I do not.
25         Q     Do you recall what Miss Goldstein
```

```
0064
 1                LAWRENCE I. FRIEDMANN
 2   said during this meeting?
 3          A     No.
 4          Q     Do you recall what you said during
 5   this meeting?
 6          A     No.
 7          Q     Were you meeting your sales goals at
 8   this point in time?
 9          A     I'm not sure.  I mean I'm not sure if
10   I met my sales goals to come up to the level of
11   750 or the action plan.  No, I don't know.
12          Q     If you look to the top square of the
13   document, it shows that the date range that they
14   were analyzing your sales goals was January 1,
15   2011 through June 10, 2011; correct?
16          A     Correct.
17          Q     That would be for the first half of
18   the year?
19          A     Right.
20          Q     Do you see where it says that your
21   delivered sales are $322,875?
22          A     Yes.
23          Q     So based on the $750,000 requirement
24   in delivered sales, at this point in time were you
25   meeting your goals to have met that number?
```

0065
```
 1                 LAWRENCE I. FRIEDMANN
 2        A      No, I was not, but I believe the
 3   projection would be higher than the 617,435 that
 4   was dated 5/7.  So I was making progress at that
 5   point, because 322,875, if you project it out to
 6   the end of the year, would probably be 660, 670.
 7   So it was climbing, because this is only through
 8   June 13th.
 9        Q      I understand that.  But the number at
10   this point in time for the year was $750,000;
11   correct?
12        A      That was the goal figure.
13        Q      In delivered sales?
14        A      The goal figure, but it was climbing.
15   The figure -- if you look at it from May 7th where
16   they projected 617,435, the 322,875 would probably
17   project out to 660, 675, so it was climbing.
18        Q      You're referring to the document
19   Defendant's Exhibit 10 where the previous month, a
20   month before --
21        A      No.  I'm looking at the action plan
22   on June -- dated June 13th.  It shows that my
23   annual expectation was 322,875 in delivered sales.
24                    MR. ANDREWS:  Is that year to
25              date?
```

```
0066
 1                    LAWRENCE I. FRIEDMANN
 2                    THE WITNESS:  Year to date.
 3                    MS. DAUB:  Off the record for a
 4         second.
 5                    (Discussion held off the
 6         record.)
 7    CONTINUED EXAMINATION
 8    BY MS. CHICLACOS:
 9         Q      Mr. Friedmann, if you could look at
10    Exhibit 9, which is the May 7, 2011 Coaching for
11    Success plan, if you could take that out, please.
12    They're tagged at the bottom.
13         A      I see that.
14         Q      If you could focus on that one,
15    please.
16         A      Yes.
17         Q      At the top of the document it states
18    that you underperformed for this year to date to
19    the minimum expectation of $252,750 in delivered
20    sales by $53,537.
21         A      Okay.
22         Q      Is it correct that this document is
23    saying that at this point the minimum expectation
24    of delivered sales was $252,750?
25         A      Right.
```

```
0067
 1                   LAWRENCE I. FRIEDMANN
 2          Q     And what does the document reflect
 3   with respect to your performance?
 4                   MR. ANDREWS:  Objection.  I
 5                   think that's a compound question.
 6          A     The 53,000?
 7          Q     Does that reflect that you were under
 8   the minimum expectation by $53,537?
 9          A     Yes, to get to 750.
10          Q     Okay.  Do you have any reason to
11   believe that this number is inaccurate?
12          A     I have no reason to believe it's
13   accurate or inaccurate.  I don't.  I mean no, I
14   have no reason to believe it's inaccurate.
15          Q     The minimum expectation at this point
16   was $252,750, still looking at Defendant's
17   Exhibit 9.
18          A     Okay.
19          Q     So you underperformed by $53,537?
20          A     Correct.
21          Q     Does that mean that your actual
22   delivered sales up to that point in time were less
23   than $200,000?
24          A     By $53,000.  I don't know at this
25   point.  I'm assuming that's yes.
```

0068
```
 1                 LAWRENCE I. FRIEDMANN
 2         Q     You testified that you had no reason
 3   to believe that these numbers aren't accurate.
 4         A     Okay.
 5         Q     So if the minimum expectation was
 6   $252,750 --
 7         A     Correct.
 8         Q     -- you underperformed by $53,537;
 9   correct?
10         A     Correct.
11         Q     So that would mean that your actual
12   delivered sales to that point were less than
13   $200,000; correct?
14         A     I'm assuming so.  I mean I don't
15   know.
16         Q     Based on this document.
17         A     Well, that it was under it by a
18   thousand dollars.  I mean is that what you're --
19   it would be the difference between the two
20   numbers.
21         Q     The difference between the two
22   numbers, correct, which is less than $200,000?
23         A     Correct.  Yes.
24         Q     If you could, please look at
25   Defendant's Exhibit 10 now, please.
```

```
0069
 1                LAWRENCE I. FRIEDMANN
 2          A     Yes.
 3          Q     You have to make sure you have 10 in
 4     front of you.
 5          A     I do.  I have 10, yes.
 6          Q     Why don't you put 10 on top to make
 7     it easier.
 8          A     Okay.
 9          Q     This document has handwritten numbers
10     in the chart on the bottom; correct?
11          A     Correct, yes.
12          Q     So let's take it column by column.
13          A     Okay.
14          Q     The first column, which is your
15     written expectation for one week, says the
16     expectation is $24,000; correct?
17          A     Correct.
18          Q     The document reflects that your
19     actual written sales were $11,799; correct?
20          A     Yes.
21          Q     So the actual written sales were
22     lower than the written expected sales?
23          A     Okay.
24          Q     Correct?
25          A     Yes.
```

```
0070
 1                   LAWRENCE I. FRIEDMANN
 2          Q       By more than half?
 3          A       Right.
 4          Q       If we look at the next column,
 5   delivered expectation, the expectation is $20,000;
 6   correct?
 7          A       Yes.
 8          Q       If you see what your actual delivered
 9   sales were, the number is $6,807; correct?
10          A       Correct.
11          Q       The actual delivered sales is less
12   than the delivered expected sales; correct?
13          A       Okay.  Yes.
14          Q       If you look at the following column,
15   AGP --
16          A       Yes.
17          Q       -- what does AGP stand for?
18          A       Adjusted gross profit?  I mean I
19   don't know.
20          Q       It shows that that number should have
21   been 2.5 percent?
22          A       Right.
23          Q       And it shows that your actual AGP was
24   $1,588?
25          A       Right.
```

```
0071
 1                    LAWRENCE I. FRIEDMANN
 2          Q      For the next column, platinum
 3   expectation --
 4          A      Yes.
 5          Q      -- what does platinum expectation
 6   refer to?
 7          A      That's the five-year protection plan
 8   that they offer.
 9          Q      That's the platinum plan?
10          A      Yes.
11          Q      That's offered to customers in
12   connection with the purchase of furniture?
13          A      Right.
14          Q      The expectation is 50 percent;
15   correct?
16          A      Yes.
17          Q      And your actual was 44 percent?
18          A      Yes.
19          Q      And so your actual was less than the
20   expected?
21          A      Correct.
22          Q      The final column, bedding
23   expectation.
24          A      That's a percentage of overall
25   volume.
```

```
0072
 1                   LAWRENCE I. FRIEDMANN
 2          Q       Does that refer to the bedding to be
 3   sold?
 4          A       Yes.   The expectations are
 5   18 percent.
 6          Q       So Raymour & Flanigan expected for
 7   the week that you would sell 18 percent of --
 8          A       Of your total.
 9          Q       Of your total sales would be bedding?
10          A       Correct.
11          Q       Does it show that your actual bedding
12   sales were $1,579?
13          A       Yes.
14          Q       That number being less than
15   18 percent of the actual?
16          A       Yes.
17          Q       On the bottom of the document, the
18   handwritten numbers that we discussed before --
19          A       Yes.
20          Q       -- it says as of 5/23, year to date,
21   minus $63,799; correct?
22          A       Okay.  Yes.
23          Q       You testified that Lucy wrote that?
24          A       Yes.
25          Q       Do you have any reason --
```

```
0073
 1                    LAWRENCE I. FRIEDMANN
 2          A     I mean I'm assuming it's the same
 3   handwriting.
 4          Q     Do you have any reason to believe
 5   that these numbers are inaccurate?
 6          A     No.
 7          Q     Do you have any reason to believe
 8   that the numbers in the chart regarding the
 9   expected and the actual are inaccurate?
10          A     No.
11          Q     So looking at the five categories in
12   this chart --
13          A     Yes.
14          Q     -- you were failing to meet the
15   expected in all five categories; correct?
16               MR. ANDREWS:  Objection.
17          A     On 5/7.
18          Q     I believe actually the date of this
19   one is 5/23.
20          A     On 5/23.
21          Q     As of 5/23?
22          A     Okay.
23                    MR. ANDREWS:  Which exhibit are
24               we looking at?
25                    MS. CHICLACOS:  Exhibit 10.
```

0074
 1                    LAWRENCE I. FRIEDMANN
 2                    MR. ANDREWS:  Okay.
 3          Q     So your actual for all of these five
 4   categories in which you were evaluated was less
 5   than the expected?
 6          A     Yes.
 7          Q     Then if we can take a look at
 8   Defendant's Exhibit 11 one more time, please, the
 9   last one I've given you.
10          A     Yes.
11          Q     This is the action plan and
12   performance agreement dated June 13, 2011;
13   correct?
14          A     Yes.
15          Q     If you look at the square box at the
16   top --
17          A     Yes.
18          Q     -- it says you underperformed for
19   this year-to-date period to the minium expectation
20   of $322,875 in delivered sales by $48,190;
21   correct?
22          A     Yes.  So that went down.
23          Q     So this document says that at this
24   point in time as of June 13th, the minimum
25   expectation of sales was approximately $322,000?

```
0075
 1                    LAWRENCE I. FRIEDMANN
 2          A      Correct.
 3          Q      And it shows that your delivered
 4   sales were almost $50,000 less than the minimum
 5   expectation; correct?
 6                       MR. ANDREWS:  Objection.
 7          A      But it also improved by $5,000 over
 8   the previous.
 9          Q      It shows it's approximately $50,000
10   less than the expected sales?
11          A      Yes.
12          Q      So based on this, you were less than
13   $300,000 for the minimum expectation for the year
14   at this point?
15          A      Yes.
16          Q      Do you have any reason to believe
17   that those numbers aren't accurate?
18          A      No.
19          Q      I would like to turn your attention
20   to the second page of Defendant's Exhibit 11,
21   please, at the top the box marked actions for the
22   associate.
23          A      Yes.
24          Q      It says:  Larry needs to consistently
25   turn any of his ups over to a manager if he could
```

```
0076
 1                    LAWRENCE I. FRIEDMANN
 2    not close them.  Do you know what that is in
 3    reference to?
 4           A      Yes.  Any customer that I cannot
 5    sell, I would get a manager involved.
 6           Q      Did you do that?
 7           A      I did that.
 8           Q      It says that he should be going
 9    through all of his 1010s, 1212s and 66s to try and
10    get as much delivered from this past business.
11                  What is a 1010?
12           A      1010s are undated sales.
13           Q      What does that mean?
14           A      Sales that you have taken that do not
15    have delivery dates on them.
16           Q      What is a 1212?
17           A      1212 are special orders, I believe.
18           Q      And a 66?
19           A      I have forgotten what a 66 is.
20           Q      Was Miss Goldstein trying to offer
21    you suggestions here as to how to help improve
22    your sales volume?
23                    MR. ANDREWS:  Objection.
24           A      Well, it's typed in.
25           Q      So yes?
```

```
0077
 1                    LAWRENCE I. FRIEDMANN
 2                    MR. ANDREWS:  Objection.
 3         A     I don't believe she typed it.  I
 4    think this is a standard form.
 5         Q     If you look at the document, it
 6    specifically says Larry.
 7         A     Yes.
 8         Q     What reason did you have to believe
 9    that this document wasn't created with comments
10    especially for you?
11         A     Well, it's created for me, but it's a
12    standard form.
13         Q     But the comments are specific to you?
14         A     Yes, they are.
15                    MR. ANDREWS:  Objection.
16         Q     So someone at Raymour & Flanigan
17    entered these comments in for you?
18         A     Correct.
19                    MR. ANDREWS:  Objection.
20         Q     If you went through your 1010s, 1212s
21    and 66s, would that be a possible way for you to
22    increase your sales volume?
23         A     In five days?
24         Q     Answer my question, please.  If you
25    went through your 1010s, 1212s and 66s, would that
```

```
0078
 1                  LAWRENCE I. FRIEDMANN
 2  be a way to increase your sales volume?
 3           A     Yes, I did.
 4           Q     You did do that?
 5           A     Sure.
 6           Q     It also says below that under actions
 7  for the management team, the managers will review
 8  with you your ups, closes, GEBS and appointments
 9  and give you any assistance they can.
10                 What is GEBS?
11           A     I really have forgotten.
12           Q     Did you ask managers for any
13  assistance in closing sales and ups to help
14  increase your sales volume?
15           A     I did.
16           Q     Who did you ask?
17           A     Anthony Baines.
18           Q     Did he provide you with assistance?
19           A     He did.
20           Q     What kind of assistance did he
21  provide you with?
22           A     Well, he got involved with the
23  customer and tried to close the sale, but that
24  doesn't necessarily mean that he did.
25           Q     Anyone else?
```

```
0079
 1                    LAWRENCE I. FRIEDMANN
 2          A      There was also a woman there, I've
 3    forgotten her name, that was an assistant manager
 4    that I also got involved with sales.  I really
 5    have forgotten her name.
 6          Q      Does Raymour & Flanigan have any
 7    special promotions during the month of May?
 8          A      Yes.  Friends and family.
 9          Q      What is friends and family?
10          A      That's where you contact customers
11    twice a year.  They offer 20 percent discounts,
12    you know, on merchandise, and they do quite well
13    with that.  End of sentence.
14          Q      I would like to turn your attention
15    to June 18, 2011.
16          A      Mm-hmm.
17          Q      What happened that day?
18          A      Well, I was off on the 17th, had a
19    very nice birthday party, and then came in on the
20    18th, and I was not able to get on to the
21    computer.  I wasn't even suspicious at the time.
22    I just thought something happened with my -- you
23    know, just to get on.
24                 And then about 12, 1 o'clock Lucy
25    called me to -- you know, to ask me to come to the
```

0080
```
 1                 LAWRENCE I. FRIEDMANN
 2    office.  And then she sat me down at that famous
 3    dining room table, and her and Iman Kasmi told
 4    me -- well, she did.  She told me that I was being
 5    terminated and to, you know, get my stuff together
 6    and leave.
 7                 So I challenged the reasons, and then
 8    she brought me into the back office with Tony
 9    Bender, the regional manager, and we hugged and
10    exchanged niceties.  And he said to me:  You're a
11    great guy, but your numbers are going to slip
12    again, which was a judgment call in my opinion.
13         Q       Anything else that you were going to
14    add?
15         A       No.  Then I left the store.  I mean I
16    got my stuff together and left and forgot a few
17    things, so I came back later in the day.  You
18    know, I was -- it wasn't really registering yet
19    what transpired.  I was actually meeting my former
20    girlfriend for dinner right in the immediate area,
21    and we sat down at the table, and I said I was let
22    go.  And then we had a nice dinner.
23         Q       Let's go back.  So you said at about
24    12, 1 o'clock, Lucy --
25         A       I'm assuming.
```

```
0081
 1                    LAWRENCE I. FRIEDMANN
 2          Q     Lucy asked to speak with you?
 3          A     Yes.
 4          Q     So you sat down at the dining room
 5     table in the showroom?
 6          A     Yes.
 7          Q     Mr. Kasmi was also present with you?
 8          A     Yes.
 9          Q     Was anyone else sitting with you?
10          A     That was it.
11          Q     Do you recall anyone else being
12     within the vicinity of that table?
13          A     No.
14          Q     What exactly did Miss Goldstein say
15     to you during this meeting?
16          A     Basically that I'm terminated.  It
17     wasn't much of a -- much more of a commentary.
18          Q     What else did she say?
19          A     I don't recall.
20          Q     Do you recall what Mr. Kasmi said
21     during this meeting?
22          A     Yes.  He told me how his father had
23     resisted retirement, but once he did, he really
24     enjoyed it, and that I would collect unemployment,
25     and that's not a bad thing.
```

0082
```
 1                 LAWRENCE I. FRIEDMANN
 2          Q     This was in the presence of
 3   Miss Goldstein?
 4          A     No.  It was in the presence of the
 5   office, the sales office.
 6          Q     But just at the meeting at the table
 7   with Miss Goldstein and Mr. Kasmi, do you recall
 8   what he said during that meeting?
 9          A     He didn't say anything.  He was there
10   to second the signature or to be a witness.
11          Q     What did you say?
12          A     Well, I don't recall what I said, but
13   at that point Miss Goldstein brought me into the
14   back office where Tony Bender was, the regional,
15   and we exchanged a few words.  And again he said
16   to me what a great guy I am, but he doesn't
17   believe I can get my figures up again.
18          Q     Did you say anything to him in
19   response?
20          A     No.  It was pointless.
21          Q     Did he say anything else?
22          A     No.
23          Q     Did Miss Goldstein say anything else?
24          A     No.
25          Q     You said Mr. Kasmi was talking to you
```

```
0083
 1                   LAWRENCE I. FRIEDMANN
 2    about his father's situation?
 3          A    Yes.
 4          Q    When did that happen?
 5          A    When I went back to the sales office
 6    to collect my things.
 7          Q    Do you recall if anyone else was
 8    present?
 9          A    The office is filled with sales
10    associates.
11          Q    Do you recall in particular who was
12    present?
13          A    No.
14          Q    What exactly did Mr. Kasmi say to
15    you?
16                   MR. ANDREWS:  Objection.
17          A    Again, he told me that his father had
18    resisted retirement, and that once he retired, he
19    was very happy with it, and that I could collect
20    unemployment, and that's not a bad thing.
21          Q    Did you say anything in response to
22    him?
23          A    There was no point to.
24          Q    Did you mention retirement to him?
25          A    No.  Actually, Miss Goldstein had
```

0084
```
 1                LAWRENCE I. FRIEDMANN
 2   asked me prior to that when I planned to retire,
 3   and I said maybe in another five years.
 4        Q     During this conversation with
 5   Mr. Kasmi after your employment was terminated,
 6   did you mention that you were going to retire?
 7        A     No.
 8        Q     So why would Mr. Kasmi mention his
 9   father's retirement?
10                MR. ANDREWS:  Objection.
11        A     Because he was, in his way, trying to
12   be a nice guy.  I don't know what he was trying to
13   say, but it was irritating.
14        Q     Why was it irritating?
15        A     Why was it irritating?  Because it
16   was referring to age.
17        Q     How is that referring to age?
18        A     Well, Mr. Kasmi is in his mid 40s,
19   the same age as my sons, so I'm assuming his
20   father is around my age.  End of sentence.
21        Q     In your Complaint you state that when
22   Miss Goldstein terminated you on June 18, 2011,
23   she stated:  Enjoy your summer in the Hamptons.
24        A     Yes, she did.
25        Q     When did she make that statement?
```

```
0085
 1                    LAWRENCE I. FRIEDMANN
 2           A     As she was walking me out the door.
 3           Q     The door to the back office or the
 4   door to the showroom?
 5           A     No.  The door to the showroom.
 6           Q     Did you have a Hamptons home?
 7           A     I don't own a Hamptons home.
 8           Q     Did you rent in the Hamptons?
 9           A     No, I didn't rent in the Hamptons.
10           Q     You never rented in the Hamptons?
11           A     I rented in the Hamptons when I was
12   27 years old or 19 years old.
13           Q     Did you vacation in the Hamptons?
14           A     I did.
15           Q     What years did you vacation in the
16   Hamptons?
17           A     From 19 on.  I mean -- no.  My
18   ex-wife has a home in the Hamptons.
19           Q     Do you visit her in that home every
20   summer?
21                    MR. ANDREWS:  Objection.
22           A     She lives in California.  My son --
23   my older son uses the home regularly.  I use the
24   home regularly.
25           Q     Do you use the home every summer?
```

```
0086
 1                    LAWRENCE I. FRIEDMANN
 2          A      As much as I can, yes.
 3          Q      Did you use the home in 2008?
 4          A      In 2008?
 5          Q      Yes.  During the summer.
 6          A      Probably on my days off.
 7          Q      Did you use the home --
 8          A      Or vacation time.
 9          Q      Did you use the home in 2009?
10          A      Probably.
11          Q      Did you use the home in 2010?
12          A      Probably.
13          Q      Did you have plans to use the home
14   during the summer of 2011?
15          A      No.  I had plans to figure out what I
16   was going to do after my termination.
17          Q      Before your termination.
18          A      Did I have plans to use it?  Again,
19   on my days off or vacation time.
20          Q      Did you discuss the fact that your
21   ex-wife owned a home in the Hamptons with people
22   from work?
23          A      I mean people were aware that there
24   was a home in the Hamptons.
25          Q      Did you tell Miss Goldstein that your
```

```
0087
 1                    LAWRENCE I. FRIEDMANN
 2   ex-wife owned a home in the Hamptons?
 3           A      She was aware that there was a home
 4   in the Hamptons.  I didn't discuss who owned the
 5   home.
 6           Q      That's fine.  Just that you had use
 7   of a home in the Hamptons for the summer?
 8           A      Yes.  She was wishing me well.
 9           Q      What do you mean, when she said that
10   to you?
11           A      Yes.
12           Q      Do you know who made the decision to
13   terminate your employment?
14           A      No.
15           Q      Did you ask Miss Goldstein why you
16   were being terminated?
17           A      It was pointless.
18           Q      Did you ask her why you were being
19   terminated?
20           A      No.
21           Q      Did she provide you with a reason why
22   you were being terminated?
23           A      Well, she would go back to sales
24   figures.
25           Q      Did she provide you with a reason
```

```
0088
 1                    LAWRENCE I. FRIEDMANN
 2    that day?
 3            A      Not an adequate reason in my opinion.
 4            Q      What did she say was the reason for
 5    your termination?
 6            A      Well, it's the coaching plan leading
 7    to an action plan.
 8            Q      Did she explain that your sales
 9    volume was below expectations?
10            A      She didn't need to explain it.  It's
11    here.
12            Q      So the documents reflect --
13            A      Again, it's five months into the
14    year.
15            Q      The documents reflect that your sales
16    performance was down?
17            A      Yes, they do.
18                    MS. CHICLACOS:  Can we pause for
19                    one moment off the record.
20                    (At this time, a brief recess
21                    was taken.)
22    CONTINUED EXAMINATION
23    BY MS. CHICLACOS:
24            Q      Mr. Friedmann, one question.  Did you
25    ever have a different spelling of your last name?
```

```
0089
 1                   LAWRENCE I. FRIEDMANN
 2         A     Sometimes they would leave an "N"
 3   off, and I would not dispute it, you know, but
 4   that's it.  F-R-I-E-D-M-A-N-N is the way it's
 5   supposed to be spelled.
 6         Q     You've never used a different
 7   spelling.
 8         A     No.
 9                   MS. CHICLACOS:  Let's take
10                   lunch.
11                   (After a luncheon recess was
12                   taken, the following was had:)
13
14         A F T E R N O O N   S E S S I O N
15   CONTINUED EXAMINATION
16   BY MS. CHICLACOS:
17         Q     Mr. Friedmann, in this case you
18   allege that you have a disability?
19         A     Yes.
20         Q     What is this disability?
21         A     Well, I had back surgery in 2002,
22   herniated disks, L4 and L5.  That occurred when I
23   was still with Seaman's.  And I was out of work
24   for four months.  I had attempted to avoid surgery
25   by taking epidural injections, and after two
```

```
0090
 1                  LAWRENCE I. FRIEDMANN
 2   shots, they didn't work.  So then I went for the
 3   surgery, and the rehab was about eight weeks.
 4                  Along with the disk problem, it was
 5   severe sciatica pain.  So I would try -- you
 6   really don't know how -- what triggers the
 7   sciatica pain, so I would do different things to
 8   try and avoid it.  I had a minor episode in 2008.
 9   I always start by going to my orthopedist, and
10   then he would refer me to, you know, a specialist
11   if necessary.  That probably lasted a month or so.
12                  But I believe in 2009 or 10, you
13   know, I don't have the exact dates, I had a severe
14   occurrence.  That was early in the year.  It was
15   probably like January or the beginning of
16   February.  It was already bothering me.  And then
17   by the time I went to the orthopedist, it was
18   another three weeks.  At this point it was
19   serious.  I was not able to stand up.  The pain
20   was severe again, and he referred me to a pain
21   management doctor, Dr. Britestein.
22                  So, you know, I went for the initial
23   consultation, and then he sent me for an MRI.  And
24   the MRI said that the sciatica condition exists
25   and that there's an increasing -- not severe, but
```

```
0091
 1                 LAWRENCE I. FRIEDMANN
 2    arthritis increases.  So to basically sum up, this
 3    took about seven months until I was back to normal
 4    again.  I went for the epidural -- I was cynical
 5    about the epidural injections because they didn't
 6    work the first time prior to the surgery.  But,
 7    you know, he said why are we being negative.  So
 8    we went forward with it, and it did help.
 9                 By the time the injections -- it's
10    like two or three injections spaced out two or
11    three weeks apart, you know, took hold, it then --
12    then the pain subsided.  I went for physical
13    therapy.  But I was not able to really stay on my
14    feet at work for too long a period, because with
15    their up system at Raymour, which is a good
16    system, you have to stand at the door on the 10
17    spot.  And you could be standing there for 15, 20,
18    25 minutes until a customer walks through the
19    door.
20                 I just couldn't stand like that for
21    that period of time.  I would try to lean on a
22    dining room table.  I would try different things
23    to just relieve the pain.  And it just -- the
24    sciatica is just excruciating when it occurs.
25    Finally after seven months it got, you know, under
```

0092
```
 1                LAWRENCE I. FRIEDMANN
 2   control again, but that destroyed that year.  I
 3   mean up until then, the prior year I had done
 4   $792,000 in volume, and I think I wound up the
 5   year, that particular year, with 646, something
 6   like that, in volume.
 7        Q     What is a 10 spot?
 8        A     This is Raymour & Flanigan's up
 9   system.  They have a 10, which is you're in
10   position to greet the customer.  The 20 spot, the
11   customer -- when the 10 man greets the customer,
12   the 20 man moves up to the 10 spot to be in
13   position to greet a customer.  And then there is a
14   30 spot, which is by the entrance of the office,
15   you know, and you have to be ready to assume the
16   20 spot.
17              But I could not -- I constantly had
18   to sit down to relieve the pain.  I just
19   couldn't -- no matter what I did during that
20   period, I just couldn't make the pain disappear.
21        Q     So let's backtrack for a second.  So
22   you first experienced an issue in 2002?
23        A     That was when I had gone for surgery,
24   yes.
25              Q     What had happened that you had a
```

```
0093
 1                    LAWRENCE I. FRIEDMANN
 2   herniated disk?
 3        A    I had herniated disks, L4 and L5.  I
 4   initially went to the same orthopedist, but he
 5   doesn't do surgery on a herniated disk, so he
 6   referred me to a surgeon.  And along with the
 7   surgeon, he also referred me to a pain management
 8   doctor, and he believes in pain management.
 9             So the surgeon really told me that I
10   should go for the surgery immediately instead of
11   going to the -- but I had the orthopedist telling
12   me to try the pain management first.  So that
13   wasted probably another six, eight weeks until I
14   finally said I'm going for the surgery.  Then I
15   had an 8-week rehab.
16        Q    That was in 2002?
17        A    That was 2002.
18        Q    So the next time that you have issues
19   relating to your back is in 2008?
20        A    I had before that too, minor things,
21   and then it would disappear.  I've had three or
22   four MRIs for the same incident.  Each incident,
23   you know, it gets progressively worse.  So I did
24   whatever I could do physically.
25             I no longer lift weights which -- you
```

```
0094
 1                 LAWRENCE I. FRIEDMANN
 2    know, I do a lot of bike riding, and, you know,
 3    this type of exercise is healthy for this.  I'm
 4    just very careful though because it -- once it
 5    flares up, it's impossible for it to -- it just
 6    doesn't go away on its own.
 7           Q      You testified earlier you started
 8    working for Raymour & Flanigan --
 9           A      In 2005.
10           Q      -- in October of 2005; correct?
11           A      Right.
12           Q      When was the first time that you had
13    a flare-up with your sciatica while working at
14    Raymour & Flanigan?
15           A      I might have had one in 2007.  I
16    mean -- but that was not -- you know, that went
17    away relatively quickly.  Then I had another
18    flare-up I think in 2008, and I went for an MRI
19    again.  You know, again the dates I'm really --
20    but the major one was, I believe, in 2009 when my
21    volume dipped.  The year before I did 792,000.
22    The year that I had this, you know, issue for
23    seven months, my volume dropped to 636, 646.
24           Q      You believe that was 2009?
25           A      2010.  I'm not sure.  I would have to
```

```
0095
 1              LAWRENCE I. FRIEDMANN
 2  refer back to my medical records.
 3       Q     Well, if we take a look at your
 4  Complaint --
 5       A     Right.
 6       Q     -- which was the first exhibit.
 7       A     This one.
 8       Q     It's probably at the bottom of the
 9  pile.  It was the first one.
10       A     Okay.
11       Q     If you look at page 3 of that
12  document.
13       A     Okay.
14       Q     It states there that you did not have
15  any significant flare-ups in your sciatica from
16  May 1, 2008 until March of 2010.  Does that help
17  refresh your recollection as to when you had this
18  significant flare-up?
19       A     Probably.  Yeah, it would be -- I
20  mean it flared up before that until I -- you know,
21  until I went to the -- until it didn't go away on
22  its own.  I probably took three weeks until I went
23  to the orthopedist.
24       Q     If you look at the next page, there
25  is detailed medical treatment ranging from
```

```
0096
 1              LAWRENCE I. FRIEDMANN
 2  March 3rd, 2010 through August 9, 2010.
 3       A     Right.
 4       Q     Does that help refresh your
 5  recollection as to what year you had the flare-up?
 6       A     Yes.
 7       Q     When did you have this significant
 8  flare-up?
 9       A     Well, the first time I went to the
10  orthopedist was on March 3rd.
11       Q     So it was in 2010?
12       A     Correct.
13       Q     You testified you believe that the
14  flare-up lasted approximately seven months?
15       A     Six months, seven.
16       Q     That was in 2010?
17       A     Correct.
18       Q     So after this flare-up ended and you
19  went through various treatments, did you have
20  another flare-up during the course of your
21  employment with Raymour & Flanigan?
22       A     Minor.  Not -- not anything that
23  would inhibit my health at this point.  But again,
24  I was always careful after that incident, because
25  that was seven months, and I was ready to go for
```

0097
1                   LAWRENCE I. FRIEDMANN
2    surgery again.  The pain management guy said why
3    are we talking about surgery.  So I'm constantly
4    cautious about it, because I try to avoid any
5    flare-ups.
6          Q      Are you currently receiving any
7    treatment --
8          A      No.
9          Q      -- for your sciatica?
10         A      No.
11         Q      Are you currently taking any
12   medications for your condition?
13         A      No.  Once in a while Aleve, but not
14   often.
15         Q      Are you currently using any medical
16   devices to help with your condition?
17         A      Just exercise.
18         Q      What, if any, limitations does your
19   condition currently impose upon you?
20         A      At this point, nothing.  But any time
21   I get a little pain in that area, I'm cautious.  I
22   mean I -- I mean I've always challenged myself
23   physically, but now I restrict it to an indoor
24   life cycle, which I do five hours a week, and then
25   long distance bike riding in the summertime, which

```
0098
 1                 LAWRENCE I. FRIEDMANN
 2   the doctors say is the most perfect exercise to
 3   control this.
 4        Q      Does your condition interfere with
 5   your ability to take care of yourself?
 6                   MR. ANDREWS:  Objection.
 7        A      No.
 8        Q      Currently does it interfere with your
 9   ability to work?
10        A      No.
11        Q      Did you ever advise anyone at Raymour
12   & Flanigan of your condition?
13        A      Everyone was aware of it.
14        Q      When you say everyone, tell me who
15   specifically.
16        A      Lucy Goldstein, Iman Kasmi, Anthony
17   Baines.  All my fellow associates.  I mean all
18   they had to do was see me hobbling around.  It
19   didn't take much explanation.
20        Q      What are the names of your fellow
21   associates?
22        A      You want all 37?
23        Q      Yes.  We do need to go through the
24   ones who --
25        A      Well, I listed some here.  I mean Joe
```

```
0099
 1                LAWRENCE I. FRIEDMANN
 2   Marscone, Guy Vacaro, Mike Mosca, Rafael Gonzales,
 3   I think.  Actually, I would have to refer back to
 4   see some of the other names.  You know, it's a
 5   couple of years now.  Stacey Ross probably was
 6   aware.  Lucy was definitely aware.
 7           Q       Is there anyone else you can remember
 8   at this point?
 9           A       Without referring back, no.
10           Q       Referring back to what?
11           A       To look at the names that were
12   listed.  I mean everybody was aware of it, because
13   I could not stand at all during the seven-month
14   period.  Tony Bender was aware of it.  He used to
15   discuss his back problems with me.  Jim Powers the
16   VP was aware.
17           Q       You had mentioned looking back at
18   something.  If you would like, you can take a
19   moment and look at your interrogatory responses to
20   see if there's anyone else who might have been
21   aware of it.
22           A       Danguole Pasyte.  The spelling of the
23   first name is D-A-N-G-U-O-L-E.  P-A-S-Y-T-E.  You
24   have Charles Bruno, Judith Rubin, R-U-B-I-N.
25   Anthony Baines was aware of it.  That pretty much
```

```
0100
 1                 LAWRENCE I. FRIEDMANN
 2   sums it up.  I mean everybody was aware of it, but
 3   these are people that I interacted with on a daily
 4   basis.
 5         Q     Let's start with Miss Goldstein.
 6   When did you first discuss your condition with
 7   her?
 8         A     When I was going for medical
 9   treatment.
10         Q     When was that?
11         A     Prior to 2010, because I had to, you
12   know, either take off for appointments or -- I
13   mean prior to March 3rd, prior to the --
14         Q     Of 2010?
15         A     Yeah, because it already was
16   bothering me.  But before I made a decision to go
17   to the doctor, I wanted to see if it was going to
18   go away on its own.  But after two or three weeks,
19   I knew I had to seek medical attention.
20         Q     So you asked Miss Goldstein for time
21   off for doctor's appointments?
22               MR. ANDREWS:  Objection.
23         A     If it wasn't my regular day off, I
24   would have asked her to switch my day off so I can
25   make an appointment.  It's possible it was my day
```

```
0101
 1                 LAWRENCE I. FRIEDMANN
 2   off, but I made her aware of my --
 3        Q      What do you recall telling her
 4   specifically?
 5        A      That I had a flare-up of sciatica,
 6   and this one seems to be serious.
 7        Q      Anything else?
 8        A      That's it.
 9        Q      Do you recall what she said in
10   response?
11        A      Well, I could tell you that later on
12   any time I discussed something with her, she would
13   say oh, that sciatica issue again, which didn't
14   seem too sympathetic to me.
15        Q      When you say discuss things with her,
16   what were you discussing with her?
17        A      The fact that I couldn't stand for
18   extended periods of time without being in
19   excruciating pain.  So if I was on the 10 spot --
20   there's a dining room table that's right adjacent
21   to the 10 spot.  So to relieve a little pressure,
22   I would lean on the dining room, and she would
23   tell me to get back on the 10 spot.  So I got back
24   on the 10 spot.  And then as it flared up again, I
25   would move back to the table again, just to lean
```

```
0102
 1                    LAWRENCE I. FRIEDMANN
 2     on it, you know, to lift a leg, to relieve it a
 3     bit.
 4             Q      When she would ask you to get back to
 5     the 10 spot, what would you say to her?
 6             A      I got back to the 10 spot.
 7             Q      Did you tell her that you needed
 8     some --
 9             A      Well, I told her that --
10             Q      -- relief?  Go ahead.
11             A      I told her that the pain was
12     excruciating, and she told me to get back on the
13     10 spot anyway.
14             Q      Did you ask her if you could sit
15     down?
16             A      I couldn't sit down on the 10 spot.
17             Q      Did you ask to sit down elsewhere?
18             A      Well, I've asked.  I mean I was
19     caught sitting down, and I got smart remarks
20     constantly, but I had to sit down.  If I walked --
21     you know, it's a large showroom, so I walked
22     through the showroom.  And then it flares up a
23     bit, and I have to do something to relieve it,
24     otherwise it gets more intense.
25             Q      Who did you ask to sit down?
```

0103
```
 1                  LAWRENCE I. FRIEDMANN
 2          A       Any names that I mentioned before
 3    were all aware of the problem.  Jim Powers -- as
 4    an example, I sat down on this large ottoman for
 5    like two, three minutes, and I happened to be
 6    sitting like this.  And he passed by and he says
 7    to me:  You look like the thinker.  I mean we
 8    laughed, but I knew it didn't look great to him.
 9          Q       Did he say anything else?
10          A       No.  He just kept, you know, on his
11    way.
12          Q       Do you know what he was referring to
13    when he said the thinker?
14          A       Yes.  First of all, he was referring
15    to me sitting down, period.
16          Q       Do you know what the thinker is?
17          A       I know what the thinker is.
18          Q       What is it?
19          A       Isn't that a classical -- I know who
20    the thinker is.
21          Q       A statue?
22          A       Yes.
23          Q       So he was comparing you to that?
24          A       Yes.
25          Q       Let's get back.  You said you asked
```

0104
```
 1                 LAWRENCE I. FRIEDMANN
 2   people if you would be allowed to sit down.  Who
 3   specifically did you ask?
 4        A     I would ask Lucy.  Really Lucy,
 5   because -- or I would sit down.  I mean if I had
 6   to sit down, I had to sit down.
 7        Q     When you asked Lucy, what would she
 8   say?
 9        A     She wouldn't let me sit down.  She
10   would say go in the office, get off the floor.
11        Q     She allowed you to leave the floor to
12   go sit down?
13        A     Well, you're not supposed to leave
14   the floor.
15        Q     She allowed you to leave the floor so
16   you could sit down?
17        A     No.  She was being sarcastic.  That's
18   what she was being.
19        Q     She said go to the office?
20        A     Yeah.  But if I'm with a customer, I
21   can't go to the office.
22        Q     So there were situations while you
23   were helping a customer where you asked
24   Miss Goldstein if you could sit down?
25        A     No.  I sat down.  I sat down for two
```

```
0105
 1                    LAWRENCE I. FRIEDMANN
 2  minutes.  You don't understand the intensity of
 3  this pain, so you have to do something to relieve
 4  it.
 5          Q      Okay.  But you just testified that
 6  you asked Miss Goldstein if you could sit down?
 7          A      Well, I would.
 8          Q      What would she say to you?
 9          A      She would not really approve me
10  sitting down on the sales floor.
11          Q      What would she say?
12          A      Go in the office.
13          Q      Did you go into the office?
14          A      No, I didn't go in the office,
15  because I was with a customer.  I was always in
16  earshot of the customer.  But if I had to do
17  something to relieve the pain during that period,
18  I had to do it.
19          Q      When you asked Miss Goldstein to sit
20  down, her response was to go into the office?
21          A      To go into the office or you can't
22  sit down.
23          Q      When did she tell you you couldn't
24  sit down?
25          A      I don't remember the dates.
```

```
0106
 1                    LAWRENCE I. FRIEDMANN
 2          Q      How many times did she tell you you
 3    couldn't sit down?
 4          A      Several.
 5          Q      Once?
 6          A      Several.
 7                    MR. ANDREWS:  Objection.
 8          A      Several.
 9          Q      Less than five?
10          A      More than five.
11          Q      Less than 10?
12          A      More than 10.
13          Q      15?
14          A      Perhaps.
15          Q      Who was present on any of these
16    occasions when Miss Goldstein told you you
17    couldn't sit down?
18          A      There were other managers there too.
19          Q      Who specifically?
20          A      Anthony Baines.
21          Q      Anyone else?
22          A      Well, he was sitting right at the
23    table when she said to me:  Oh, that sciatica
24    thing again.
25          Q      Anyone else who was present when
```

```
0107
 1                    LAWRENCE I. FRIEDMANN
 2   Miss Goldstein told you you couldn't sit down?
 3            A      No.
 4            Q      You say Miss Goldstein would say:
 5   Oh, that sciatica thing again.
 6            A      Right.
 7            Q      Please describe to me the
 8   circumstances under which she said that to you?
 9            A      Well, if she would tell me my volume
10   was sliding in 2010, I would say I'm -- I'm in
11   difficult pain, I'm under medical treatment, and
12   she would say:  Oh, that sciatica thing again.
13            Q      Who else was present when she said
14   this?
15            A      Probably no one.  I didn't get a
16   crowd around me to develop a witness.
17            Q      Did she say this to you in 2011?
18            A      Yes.
19            Q      When did she tell you this in 2011?
20            A      Probably during one of the coaching
21   sessions also at which Anthony Baines happened to
22   be sitting at the table, and he started laughing.
23            Q      Started laughing?
24            A      Mm-hmm.
25            Q      What did you say?
```

```
0108
 1                   LAWRENCE I. FRIEDMANN
 2           A     Nothing.
 3           Q     You testified about a number of
 4  coaching sessions you had with Miss Goldstein.  Do
 5  you recall which one she said this at?
 6           A     No.
 7           Q     Would it refresh your recollection to
 8  look at the documents to help you remember?
 9           A     It probably -- I mean I could look,
10  but it probably isn't specific as to which session
11  it is.
12           Q     Why don't you take a look anyway at
13  Defendant's Exhibits 11, 10 and 9.
14           A     It wouldn't be on there.
15           Q     Is there anything else that would
16  help refresh your recollection?
17           A     Not really.
18           Q     You said that you were caught sitting
19  down?
20           A     Yes.
21           Q     Who caught you sitting down?
22           A     That was Jim Powers.  That was the
23  incident with the thinker.
24           Q     Did anyone else catch you sitting
25  down?
```

```
0109
 1                LAWRENCE I. FRIEDMANN
 2         A     Well, any managers.  If I had to sit
 3  down, I sat down.  Just the general -- the general
 4  feeling was that -- not to sit down regardless.
 5         Q     Did anyone else catch you sitting
 6  down?
 7         A     No.
 8         Q     Did anyone see you sitting down and
 9  tell you to stand up?
10         A     Yes.
11         Q     Who?
12         A     Lucy Goldstein.
13         Q     Who else?
14         A     Anthony Baines, Iman.  And, you know,
15  without being told to stand up, Jim Powers.  Just
16  his comment, I knew I should stand up.  But he
17  didn't say it harshly, but I knew I should stand
18  up.
19         Q     Did Mr. Powers tell you to stand up?
20         A     No.
21         Q     You testified that this flare-up in
22  2010 lasted about six or seven months.
23         A     About six, yeah.
24         Q     Looking at the Complaint, your
25  treatment began on March 3rd.
```

```
0110
 1                    LAWRENCE I. FRIEDMANN
 2          A     Page 3 and 4?
 3          Q     Yes.  The Complaint says that the
 4  flare-up started in March; correct?
 5          A     Yes.
 6          Q     And that your treatment began --
 7          A     It began on -- March 3rd was the
 8  first time I went to the orthopedist, and it went
 9  through it looks like August, but there was not
10  full recovery for another 30 days or so because
11  these -- the physical therapy and the epidural
12  injections really take time before they restore
13  you to complete normalcy.
14          Q     So by the end of September of 2010,
15  you had had a full recovery from this flare-up?
16          A     Pretty much.
17          Q     After September of 2010, did you
18  still need to sit down?
19          A     Not as much.
20          Q     Using September, 2010, after this
21  point, did you ask anyone if you could sit down?
22          A     No, not at that point, because it
23  really wasn't anything that was going to be
24  lengthy.
25          Q     Did you ask anyone at Raymour &
```

```
0111
 1                  LAWRENCE I. FRIEDMANN
 2    Flanigan for any kind of assistance after the
 3    flare-up ended?
 4          A     No.
 5          Q     So during the flare-up, you said you
 6    needed to sit down?
 7          A     Yes.
 8          Q     Anything else that you asked Raymour
 9    & Flanigan for?
10          A     No.
11          Q     Did you ask them for a leave of
12    absence?
13          A     No.
14          Q     When you say that you asked them if
15    you could sit down, were these requests made
16    orally?
17          A     Yes.
18          Q     Did you ever put this request in
19    writing?
20          A     No.
21          Q     You made these requests to the
22    individuals at the Garden City showroom?
23          A     Correct.
24          Q     You testified earlier that you were
25    in receipt of Raymour & Flanigan's employee
```

```
0112
 1                    LAWRENCE I. FRIEDMANN
 2    handbook?
 3          A      Right.
 4                    MS. CHICLACOS:  12, please.
 5                    (Defendant's Exhibit 12, Raymour
 6                & Flanigan Furniture Associate
 7                Handbook marked for Identification as
 8                of this date.)
 9          Q      Mr. Friedmann, I would like to show
10    you what's been marked as Defendant's Exhibit 11.
11          A      Okay.
12          Q      Please take a look at this document.
13    Do you recognize it?
14          A      Not really.
15          Q      Do you recall receiving an employee
16    handbook during that period?
17          A      I did.
18          Q      If you take a look at the second page
19    of this document in the section entitled Americans
20    with Disability Act --
21          A      I see.
22          Q      -- towards the end of that paragraph
23    it states:  To request an accommodation or other
24    assistance, please contact your HR field
25    specialist or regional HR manager as he or she is
```

```
0113
 1                    LAWRENCE I. FRIEDMANN
 2     qualified to discuss this with you.
 3            A     Yes.
 4            Q     Do you see that?
 5            A     Yes.
 6            Q     Did you ever speak with anyone at
 7     Human Resources about your need to sit down?
 8            A     No.
 9            Q     Did you ever speak to anyone from
10     Human Resources regarding your medical condition?
11            A     No.
12            Q     Did you apply for short-term
13     disability while employed by Raymour & Flanigan?
14            A     No.
15            Q     Did you apply for a long-term
16     disability while employed by Raymour & Flanigan?
17            A     No.
18            Q     Have you applied for short-term
19     disability since leaving Raymour & Flanigan?
20            A     No.
21            Q     Have you applied for long-term
22     disability since leaving Raymour & Flanigan?
23            A     No.
24            Q     Have you ever applied for Social
25     Security Disability payments?
```

```
0114
 1                  LAWRENCE I. FRIEDMANN
 2          A     No.
 3          Q     Is it your claim that due to your
 4   condition, you can't perform a particular job?
 5                  MR. ANDREWS:  Objection.
 6          A     At this point?
 7          Q     Yes.
 8          A     There would be weight limitations to
 9   lifting.
10          Q     What kind of weight limitations?
11          A     Just anything that requires dead
12   lifting.
13          Q     Of a certain amount of weight?
14          A     Or size which could trigger something
15   also.
16          Q     You testified earlier that you spoke
17   with Mr. Kasmi about your medical condition.  Do
18   you recall what you specifically told him?
19          A     No.
20          Q     Do you recall when you told him?
21          A     No.
22          Q     Do you recall what he said to you?
23          A     No.
24          Q     You testified you spoke to Mr. Baines
25   about your medical condition?
```

```
0115
 1                LAWRENCE I. FRIEDMANN
 2         A    Yes.
 3         Q    Do you recall what you told him?
 4         A    No.
 5         Q    Do you recall when you spoke to him?
 6         A    No.
 7         Q    Do you recall what he said to you?
 8         A    No.
 9         Q    You testified you spoke to Tony
10    Bender about your medical condition.
11         A    Yes.
12         Q    Do you recall what you told
13    Mr. Bender?
14         A    No.
15         Q    Do you recall when you spoke to him?
16         A    No.
17         Q    Do you recall what Mr. Bender said to
18    you?
19         A    Well, he would tell me about his back
20    conditions.  That's the only thing.
21         Q    What were his back conditions?
22         A    He said he had disk problems as well.
23         Q    You testified you spoke to Jim Powers
24    about your medical condition?
25         A    Yes.
```

```
0116
 1                    LAWRENCE I. FRIEDMANN
 2          Q      Do you recall what you said to
 3   Mr. Powers?
 4          A      No.
 5          Q      Do you recall when you spoke to him?
 6          A      No.
 7          Q      Do you recall what Mr. Powers said to
 8   you?
 9          A      No.
10          Q      Are there any documents that could
11   help you refresh your recollection as to what you
12   spoke to Miss Goldstein, Mr. Baines, Mr. Kasmi,
13   Mr. Bender and Mr. Powers about?
14          A      No.
15                    MR. ANDREWS:  Objection.
16          Q      Are you currently working?
17          A      Yes.
18          Q      Where are you employed?
19          A      Joseph A. Bank's Men's Clothiers.
20          Q      What is your position?
21          A      Sales associate.
22          Q      What location do you work at?
23          A      Garden City.
24          Q      How long have you worked there?
25          A      34 weeks.
```

```
0117
 1              LAWRENCE I. FRIEDMANN
 2         Q    So when did you start working there?
 3         A    Let's back up for 34 weeks.  I had a
 4  job prior to that which I left in three months.
 5         Q    Why don't we start with after leaving
 6  Raymour & Flanigan on June 18 of 2011.
 7         A    All right.
 8         Q    When did you get your first job?
 9         A    I was on unemployment until -- I
10  think I started with La-Z-Boy Galleries sometime
11  in January, maybe the end of January.
12         Q    Of 2012?
13         A    Yes.  I left them in three months to
14  join Joseph A. Bank's.
15         Q    So you were unemployed from
16  approximately June 18, 2011 until January of 2012?
17         A    Yes.
18         Q    Did you collect unemployment during
19  that time period?
20         A    Yes.
21         Q    For the full period?
22         A    For the full period that I was
23  unemployed, yes.  Except for that two-week waiting
24  period.
25         Q    Do you know how much you collected in
```

```
0118
 1                    LAWRENCE I. FRIEDMANN
 2   unemployment?
 3          A     I think the gross was 405 a week
 4   minus whatever deductions I told them to take out.
 5          Q     During that time period, did you look
 6   for work?
 7          A     Yes.
 8          Q     What did you do to look for work?
 9          A     I went out and got myself an Apple
10   computer with my son's assistance.  I updated my
11   resumΘ, because my initial resumΘ went back to the
12   Civil War, and I understand that that's not the
13   way to do things.  So I spent time preparing a
14   resumΘ.
15                    I primarily looked aggressively to
16   get into Bob's Discount Furniture, and I did try
17   to contact the manager in the Garden City store.
18   I did have an interview in the Farmingdale store,
19   but for whatever reason, I was not hired by them.
20          Q     With Bob's?
21          A     Yes.  Correct.
22          Q     Did you apply anywhere else?
23          A     I started to look at -- I didn't
24   really apply to anything else.  Then I went to
25   La-Z-Boy after that.  I tried to -- you know, I
```

0119
```
 1                LAWRENCE I. FRIEDMANN
 2    looked at different work, but I could see already
 3    that -- I was used to large companies, so beyond
 4    Bob's and Raymour & Flanigan, in the furniture
 5    field there really isn't much else.
 6           Q     Where did you look for employment?
 7           A     I tried with Macy's, but I didn't get
 8    in.  I didn't apply.  I went into the store with
 9    my resumⓔ, and I didn't do anything online.
10    Actually, then I -- I did call Joseph A. Bank's,
11    because I was familiar with their product as a
12    consumer, and I was told to apply online.  And I
13    kind of took that as a rejection, so I never did.
14                Bear in mind that for the past 20
15    years I've been on two interviews, and life has
16    changed since then.  So I was a good customer of
17    Joseph A. Bank's.  I went in there to buy a tie,
18    and I'm now employed there because I did apply
19    online, and I'm there now for 34 weeks.
20           Q     I'm going to ask again for production
21    of the resumⓔ as well as documents relating to
22    your search for employment after leaving Raymour &
23    Flanigan.
24           A     I also have a letter of
25    recommendation from Anthony Baines.
```

```
0120
 1                    LAWRENCE I. FRIEDMANN
 2          Q       So in January you became employed by
 3    La-Z-Boy Furniture?
 4          A       Yes.
 5          Q       What was your position there?
 6          A       Sales associate.
 7          Q       Where was that?
 8          A       Carle Place.  Right next to the
 9    Raymour & Flanigan store in Carle Place, on Glen
10    Cove Road.
11          Q       What was your compensation there?
12          A       Not much.
13          Q       What was it?
14          A       Your draw was 400 a week, and the way
15    they're set up commission-wise, it would take
16    forever to get out of deficit with them.  So the
17    income was 400 a week.  So I knew that I had to
18    leave there, and I did.
19          Q       I'm going to ask for the production
20    of any payroll records you have from La-Z-Boy
21    Furniture as well as any records from Joseph A.
22    Bank's continuing.
23          Q       So you voluntarily left La-Z-Boy?
24          A       Yes.
25          Q       Was there a gap in time before you
```

```
0121
 1                  LAWRENCE I. FRIEDMANN
 2   started employment with Joseph A. Bank's?
 3          A     Less than a week, I think.
 4          Q     So you've been with Joseph A. Bank's
 5   since then?
 6          A     Yes.
 7          Q     What is your salary there?
 8          A     The salary is 340 a week plus
 9   commissions, plus overtime if you work overtime,
10   which during the holiday season there was a lot of
11   overtime.  But the projected income potential at
12   this point, because I do chart out on each pay
13   stub, I project out in the course of a year is
14   right around $33,000.
15          Q     Since leaving Raymour & Flanigan,
16   have you collected any other form of income?
17          A     I have Social Security, which I've
18   been collecting since I reached 66 and eight
19   months.
20          Q     You collect a monthly benefit?
21          A     From Social Security, yes.
22          Q     How much is that?
23          A     Well, the net is -- I think the gross
24   now is about 24 or 25,000 a year.  I have
25   substantial taxes taken out of that, so my net
```

```
0122
 1                    LAWRENCE I. FRIEDMANN
 2    check is 15 something.
 3          Q     1,500 a month?
 4          A     Roughly 1,530, something like that.
 5          Q     Any other forms of income?
 6          A     I have a pension from Seaman's
 7    furniture.
 8          Q     When did you start collecting that?
 9          A     I guess on my 65th birthday.
10          Q     That's a monthly benefit?
11          A     Yes.
12          Q     How much do you collect from that?
13          A     Well, the net is 1,179.  The gross is
14    really 19,600 a year.
15          Q     1,179 a month?
16          A     Yes.  The gross is 19,600.
17          Q     And that is the Local A10 affiliated
18    pension fund?
19          A     Correct.  Yes.
20          Q     Any other sources of income?
21          A     That's it.
22                    MS. CHICLACOS:  Can we take a
23                break.
24                    (At this time, a brief recess
25                was taken.)
```

0123
```
 1                LAWRENCE I. FRIEDMANN
 2  CONTINUED EXAMINATION
 3  BY MS. CHICLACOS:
 4          Q     Mr. Friedmann, in this lawsuit you
 5  allege that you were subject to age
 6  discrimination.
 7          A     Yes.
 8          Q     So you claim that you were subject to
 9  discrimination because of your age.
10          A     I can explain how, if you like.
11          Q     Please go ahead.
12          A     Okay.  Well, I was always teased by
13  co-workers, old man, old man, because there is
14  probably an eight year difference in my age versus
15  anybody that's relatively close to me, so
16  especially by some of the younger people.
17              But what happened in 2011, again with
18  Lucy, the first thing she did was ask me when I
19  planned to retire, and I said in about five years,
20  because I deal with five-year plans.  If my energy
21  holds up, I add another five years.
22              Then she asked me my age, and I was
23  evasive.  She asked me, you know, a little while
24  later my age again, and I told her.  And from that
25  point on, she would start to call me old man.  So
```

0124
```
 1                  LAWRENCE I. FRIEDMANN
 2   suddenly even though my energy in the store
 3   probably is higher than 75 percent of my
 4   co-workers, all of a sudden I felt that my age
 5   became an issue for some reason or another.  It
 6   was discussed, you know.  I never felt that way
 7   before, but I felt at that point that there's
 8   probably a reason why suddenly my age is being
 9   focused on.
10          Q     So you testified that beginning in
11   2011, Lucy started making comments about your age;
12   correct?
13          A     Correct.
14          Q     Prior to 2011, had Miss Goldstein
15   made any comments about your age?
16          A     Yeah, but it wasn't really in a
17   serious way.
18          Q     What do you mean by that?
19          A     She would still say old man or, you
20   know, comments like that, which I didn't really
21   pay attention to.  It's only when it really
22   started to intensify.  And even some of my friends
23   who would call me old man, I told them to cut it
24   out because I sensed something.
25          Q     So when did it start to intensify
```

```
0125
 1                LAWRENCE I. FRIEDMANN
 2   with Miss Goldstein?
 3         A     As it got closer to what happened.
 4   It was the beginning of building a case, in my
 5   opinion.
 6         Q     When did it start?
 7         A     Early spring.
 8         Q     Of what year?
 9         A     Of 2011 was when it intensified.
10         Q     You testified that Lucy asked you
11   when you plan to retire.
12         A     Right.
13         Q     Tell me what you remember about that
14   conversation.
15         A     That was the question.  We were
16   standing by the podium out on the sales floor,
17   right outside the sales office, and that's when
18   she asked me my age.  And I was evasive about
19   that.  And then she asked me when I planned to
20   retire, and I said five years.  That was the
21   extent of the conversation.
22         Q     Did she say anything in response?
23         A     No.
24         Q     Did she say that she thought you
25   should retire?
```

```
0126
 1                  LAWRENCE I. FRIEDMANN
 2          A     No.
 3          Q     Did she bring up retirement again
 4   with you?
 5          A     No.
 6          Q     You said then at another point she
 7   asked your age, and you told her?
 8          A     Yes.
 9          Q     Do you recall when that was?
10          A     Not really.
11          Q     Was it after the conversation about
12   planning to retire?
13          A     Yes.
14          Q     It was before your termination in
15   June?
16          A     Yes.
17          Q     Was anyone else present for that
18   conversation?
19          A     Well, you would have -- even Iman
20   would call me old man, or Anthony Baines would
21   call me old man.
22          Q     The conversation with Lucy where she
23   asked you your age and you told her, was anyone
24   else present for that conversation?
25          A     Not that I'm aware of, but I've heard
```

```
0127
 1                    LAWRENCE I. FRIEDMANN
 2   stories where she's referred to me as old man when
 3   I'm not even around.
 4          Q      You told her your age?
 5          A      I did.
 6          Q      You said that she called you old man?
 7          A      Right.
 8          Q      To you personally?
 9          A      To me personally.
10          Q      When did she do that?
11          A      I don't have dates.
12          Q      What year?
13          A      2011.
14          Q      What about 2010?
15          A      She would say it, but it wasn't -- it
16   was a different tone.
17          Q      How was the tone different?
18          A      It was just different.  It wasn't --
19   it was nothing that I became conscious of at that
20   point.  In 2011 I started to realize that my age
21   might possibly be an issue for whatever reasons.
22          Q      Why, if she had made those comments
23   before?
24          A      Because the tone changed, the purpose
25   changed.
```

```
0128
 1                    LAWRENCE I. FRIEDMANN
 2          Q     Who was present when Miss Goldstein
 3   would call you old man?
 4          A     She did it right in the office, and
 5   people would laugh.  I mean I don't have names.
 6   The whole office would laugh.  Iman Kasmi would
 7   call me old man, and Anthony Baines called me old
 8   man.
 9          Q     When did Mr. Kasmi do that?
10          A     I don't have a date for you.
11          Q     Was it in 2011?
12          A     2011.
13          Q     2010?
14          A     2011.
15          Q     Who was present?
16          A     No one was present.
17          Q     Mr. Baines, when did he refer to you
18   as old man?
19          A     He would do it frequently.
20          Q     2011?
21          A     Yes.
22          Q     2010?
23          A     I don't know how long he was there in
24   2010.
25          Q     Who was present when Mr. Baines would
```

```
0129
 1                    LAWRENCE I. FRIEDMANN
 2   refer to you as old man?
 3          A     I really can't recall.
 4          Q     Do you recall any other comments
 5   Miss Goldstein made about your age?
 6          A     No.  That's enough.
 7          Q     Do you know how old Miss Goldstein
 8   is?
 9          A     Yes.
10          Q     How old is she?
11          A     62, 63.
12          Q     Besides the three individuals that
13   you just mentioned, did anyone else at Raymour &
14   Flanigan make any comments about your age?
15                    MR. ANDREWS:  Objection.
16          A     No.
17          Q     You testified earlier about Laura
18   from Carle Place --
19          A     Yes.
20          Q     -- making a comment that you
21   attributed to your age.
22          A     I attributed that to age.  To me the
23   comment was just out of left field.
24          Q     The comment was she was not looking
25   for anyone in her store who had a few bucks in the
```

```
0130
 1                   LAWRENCE I. FRIEDMANN
 2     bank; is that correct?
 3             A     Exactly, word for word.
 4             Q     You met with Miss D'Ambrosio in June
 5     of 2011; is that correct?
 6                       MR. ANDREWS:  Objection.
 7             A     No.  It was earlier.  It was before
 8     the coaching plan.
 9             Q     If you could take out the Complaint,
10     Defendant's Exhibit 1, please.
11             A     Is this it?
12             Q     The Complaint is right there
13     underneath.  If you turn to page 7 of the
14     document, paragraph 35.
15             A     Okay.
16             Q     It states that on May 18, 2011, you
17     met with Laura at Carle Place.
18             A     Okay.
19             Q     Does that help you remember?
20             A     I don't remember the date, if
21     that's --
22             Q     Do you have any documents regarding
23     your meeting with Laura?
24             A     No.  I just went for an interview,
25     and then Lucy told me that I did not get the job.
```

```
0131
 1                    LAWRENCE I. FRIEDMANN
 2           Q      Did you keep a calendar in 2011?
 3           A      No.
 4           Q      Did you use any sort of calendar on
 5     your phone or any other electronic device?
 6           A      No.
 7           Q      Did you use a paper calendar?
 8           A      No.
 9           Q      Did you keep a diary?
10           A      No.
11           Q      A journal?
12           A      No.
13           Q      A log?
14           A      No.
15           Q      You testified that Miss Goldstein
16     said that you were not going to get the transfer;
17     correct?
18           A      Yes.
19           Q      Do you know who made the decision not
20     to transfer you?
21           A      Laura.
22           Q      How do you know that?
23           A      According to Lucy, it was Laura.  I
24     really don't know who made the decision.
25           Q      What did Miss Goldstein say?
```

```
0132
 1                  LAWRENCE I. FRIEDMANN
 2          A      That I'm not going to get -- I got
 3     turned down for the transfer.
 4          Q      Did she say that Laura made the
 5     decision?
 6          A      She said Laura made the decision, but
 7     I don't know who made the decision.  It could have
 8     been Tony Bender.
 9          Q      Besides the comments that you just
10     described --
11          A      Right.
12          Q      -- by Miss Goldstein, Mr. Kasmi and
13     Mr. Baines, what else do you allege happened to
14     you because of age discrimination?
15          A      I got fired.
16          Q      What facts or evidence do you have to
17     support your claim --
18                      MR. ANDREWS:  Objection.
19          Q      -- that the decision to terminate
20     your employment was due to age?
21                  Let me finish my question first.
22                      MR. ANDREWS:  I'm sorry.
23                  Objection.
24          A      It just happened too quickly.
25          Q      What do you mean by that?
```

```
0133
 1                 LAWRENCE I. FRIEDMANN
 2         A      Just from the coaching until the
 3  final termination was a period of six weeks,
 4  without taking into accountability four high
 5  performance years plus the year of my disability
 6  that was extended for six or seven months.  It was
 7  kind of insensitive to me.
 8         Q      Besides the timing, do you have any
 9  other facts or evidence to support your contention
10  that the decision to terminate your employment was
11  due to your age?
12         A      That's enough for me to believe that.
13         Q      Nothing else?
14         A      No.  Well, there were other people on
15  that same plan who also were underperforming.
16  Some had been underperforming for a couple of
17  years.  Now, I don't know the status of them at
18  this point.
19         Q      Let's go through that now then.
20                Who are these other people?
21         A      There were seven or eight different
22  people that were on a coaching plan.
23         Q      What were their names?
24         A      I believe Nardia Palmentair
25  (phonetic) was -- I don't know how to spell her
```

```
0134
 1                  LAWRENCE I. FRIEDMANN
 2    last name.
 3           Q      Nardia?
 4           A      Nardia.  I believe Rafael was also
 5    one of them.  I believe Rob Revel was another one.
 6           Q      Revel?
 7           A      I believe it's R-E-V-E-L.  I think
 8    Karen Ali was part of it.  There were seven or
 9    eight.  The other names I can't really remember.
10           Q      You've mentioned four.  Is there a
11    document that could help you refresh your
12    recollection to the other names?
13           A      Not -- I wouldn't have it.  It would
14    be this type of document with dates.
15           Q      Nardia, what was her position?
16           A      Sales associate.  All of them were
17    sales associates.
18           Q      And all of them worked in the Garden
19    City showroom?
20           A      Correct.  Yes.
21           Q      What is the basis for your knowledge
22    that Nardia was placed on a coaching plan?
23           A      Well, because they all talked about
24    it.
25           Q      Did you ever see her coaching plan,
```

```
0135
 1                 LAWRENCE I. FRIEDMANN
 2   the actual document?
 3          A    No.  But I saw them sitting at this
 4   famous designing room table.
 5          Q    Were you present at any meeting with
 6   Nardia and Miss Goldstein?
 7          A    No.  I wouldn't be.
 8          Q    Do you know what Nardia's sales
 9   figures were?
10          A    No.
11          Q    Do you know if in addition to a
12   coaching plan Nardia was subject to any other
13   discipline?
14          A    I'm not aware of anything.  I mean
15   figures -- you have to understand that the figures
16   for the entire store are hanging on the wall,
17   because they want to create a competitive
18   atmosphere.  That's understandable.  So you can
19   see everybody's figures posted on a sheet.
20          Q    What figures are posted on that
21   sheet?
22          A    Sales figures on a corkboard in the
23   office.
24          Q    Bimonthly?
25          A    Biweekly, bimonthly.  It's perpetual.
```

```
0136
 1                    LAWRENCE I. FRIEDMANN
 2          Q      Are they changed every week or every
 3   month?
 4          A      They're changed every week, updated,
 5   yes.
 6          Q      Do those list a sales associate's
 7   actual delivered sales?
 8          A      Yes.
 9          Q      For Rafael, what's the basis for your
10   knowledge that he was placed on a coaching plan?
11          A      Same thing.  He mentioned it.  I mean
12   he mentioned it.
13          Q      Did he mention it to you?
14          A      Yeah.
15          Q      What did he say?
16          A      He said:  I'm on a coaching plan.
17   That's all.
18          Q      When did he say that?
19          A      About the same time that we all went
20   on the coaching plan.  It all happened
21   simultaneously around the 7th of May, whatever the
22   first date was.
23          Q      Did you see his plan?
24          A      No.
25          Q      Did you see his sales figures?
```

```
0137
 1                LAWRENCE I. FRIEDMANN
 2          A    No.
 3          Q    Were you present at any meetings with
 4   Rafael and management regarding his coaching plan?
 5          A    No.
 6          Q    Rob Revel?
 7          A    Yes.
 8          Q    What's the basis of your knowledge
 9   that he was placed on a coaching plan?
10          A    Same.  He told me he was.
11          Q    Did you see his coaching plan?
12          A    No.
13          Q    Did you see his sales figures?
14          A    No.
15          Q    Were you present at any meetings with
16   him and management regarding his placement on a
17   coaching plan?
18          A    No.
19          Q    Karen Ali --
20          A    Yes.
21          Q    -- what's the basis for your
22   knowledge that she was placed on a coaching plan?
23          A    Just communication.
24          Q    Did you see her coaching plan?
25          A    No.
```

```
0138
 1                  LAWRENCE I. FRIEDMANN
 2          Q      Did you see her sales figures?
 3          A      No.
 4          Q      Were you present at any meetings with
 5   management where her coaching plan was discussed?
 6          A      No.
 7          Q      For Nardia, how was she -- is it your
 8   contention that those individuals were treated
 9   more favorably than you?
10                  MR. ANDREWS:  Objection.
11          A      I can't answer that.
12          Q      You say in your Complaint that out of
13   the eight employees who were placed on a coaching
14   plan, you were the only one who was terminated; is
15   that correct?
16          A      Yes.
17          Q      In your Complaint --
18          A      To my knowledge, yes.
19          Q      In your Complaint you say eight,
20   eight employees.
21          A      Yes.
22          Q      But you've identified only four
23   today; correct?
24          A      Well, I don't remember the other
25   names.
```

```
0139
 1                 LAWRENCE I. FRIEDMANN
 2         Q      Do you know if Nardia is still
 3  employed by Raymour & Flanigan?
 4         A      I have no contact with Raymour at
 5  all.
 6         Q      Do you know if Rafael is still
 7  employed by Raymour & Flanigan?
 8         A      I have no contact.
 9         Q      Do you know if Rob is still employed
10  by Raymour & Flanigan?
11         A      I have no contact.
12         Q      Do you know if Karen is still
13  employed by Raymour & Flanigan?
14         A      I have no contact.
15         Q      Besides what you've already
16  discussed, is there anything else that you claim
17  happened to you because of age discrimination?
18                 MR. ANDREWS:  Objection.
19         A      I don't know how to answer that.  I
20  just know I'm not there any longer.
21         Q      Was Rafael Gonzales ever, to your
22  knowledge, placed on a coaching plan?
23         A      At the same time frame.
24         Q      What's the basis of your knowledge
25  for Rafael?
```

```
0140
 1                  LAWRENCE I. FRIEDMANN
 2          A      The same thing.  Conversation.
 3          Q      Did you ever see his plan?
 4          A      No.
 5          Q      Did you know what his sales figures
 6   were?
 7          A      No.
 8          Q      Were you ever present at any meetings
 9   with management regarding him being placed on a
10   coaching plan?
11          A      No.
12          Q      Do you know if Rafael is still
13   employed by Raymour & Flanigan?
14          A      I have no contact with Raymour.
15          Q      Was there a sales associate named
16   Maria Panya?  (Phonetic)
17          A      Yes.
18          Q      Was she one of these individuals that
19   was placed on a coaching plan?
20          A      I believe she was.
21          Q      What's the basis for your
22   knowledge --
23          A      I also believe she was the other
24   person that interviewed for the Carle Place job,
25   and I believe she got the job.
```

```
0141
 1                  LAWRENCE I. FRIEDMANN
 2          Q       -- with respect to her being placed
 3   on a coaching plan?
 4          A       Right.
 5          Q       What's the basis for your knowledge
 6   that she was placed on a coaching plan?
 7          A       Conversation.
 8          Q       Did you ever see her coaching plan?
 9          A       No.
10          Q       Were you aware of what her sales
11   were?
12          A       No, other than on the -- you know,
13   the posted sales figures.
14          Q       Were you present at any meeting with
15   management regarding her being placed on a
16   coaching plan?
17          A       No.
18          Q       Is she still employed by Raymour &
19   Flanigan?
20          A       I don't know.
21          Q       You said that she was transferred to
22   Carle Place?
23          A       Yes.
24          Q       When was she transferred?
25          A       I was still there when she got
```

```
0142
 1                  LAWRENCE I. FRIEDMANN
 2    transferred.
 3          Q     Your Complaint says on May 18th you
 4    interviewed for the position.  Do you recall if it
 5    was before or after that?
 6          A     That I -- she was transferred after
 7    that date.
 8          Q     Do you know if she requested a
 9    transfer?
10          A     No.  She didn't request a transfer,
11    nor did I.
12          Q     What's the basis for your knowledge
13    that she didn't request a transfer?
14          A     Conversation.
15          Q     With who?
16          A     With her.
17          Q     What did she say to you?
18          A     I mean we were both asked to
19    interview for Carle Place.
20          Q     Who asked Maria to interview?
21          A     Lucy Goldstein.
22          Q     Did you know why she was being asked
23    to interview?
24          A     No.
25                     MR. ANDREWS:  Off the record.
```

0143
1               LAWRENCE I. FRIEDMANN
2                    (Discussion held off the
3          record.)
4    CONTINUED EXAMINATION
5    BY MS. CHICLACOS:
6          Q       In your Complaint when you refer to
7    these eight other individuals who were placed on a
8    coaching plan, you claim that many other younger
9    employees had been kept on the coaching plan for a
10   number of years without being terminated.
11                 Do you recall that?
12         A       Yes.
13         Q       What employees are you referring to
14   that were kept on the coaching plan?
15         A       I don't have names at this point, but
16   the -- you know, the year ending sales figures
17   that again are posted in the office would bear
18   that out.  I don't have figures from prior years.
19         Q       Do you recall any of the names of the
20   individuals who were kept on plans for a number of
21   years?
22         A       I believe Karen was on the coaching
23   plan in prior years.  Not on a coaching plan.  I
24   think her figures were under 750 in prior years.
25   I think Maria's figures were under -- under 750

```
0144
 1                    LAWRENCE I. FRIEDMANN
 2    more than once in a calendar year.
 3           Q      What's the basis of your knowledge
 4    for Karen's figures being under 750?
 5           A      Just the figures posted on the wall.
 6           Q      Did the figures on the wall list your
 7    year end?
 8           A      Yes.  I mean in prior years it did,
 9    sure.  Not in 2011, because I wasn't there, but in
10    2010 or 9 or 8 or 7, year end figures were always
11    posted on the wall on a weekly basis.
12           Q      What's the basis for your knowledge
13    that Karen had been on a plan for years?
14           A      I could see it.  Not on the coaching
15    plan.  I said her figures were under 750 more than
16    once.  That's all I said.
17           Q      Do you know if she was placed on a
18    coaching plan as a result of that?
19           A      I don't know.
20           Q      For Maria, her figures you say were
21    under 750 as well?
22           A      I believe so.  In 2010, yes.
23           Q      Do you know if she was placed on a
24    coaching plan?
25           A      I have no knowledge of that.
```

```
0145
 1                   LAWRENCE I. FRIEDMANN
 2         Q      You interviewed with Laura, and you
 3    claim that she said he was not looking for anyone
 4    who had a few bucks in the bank; correct?
 5         A      Right.
 6         Q      You testified earlier that during the
 7    month of May, Raymour & Flanigan ran its family
 8    and friends promotion?
 9         A      Yes.
10         Q      Based on your Complaint, you
11    interviewed with her on or about May 18, 2011?
12         A      Yes.
13         Q      So you were interviewing with her
14    during the time this promotion plan was going on?
15         A      Probably after it.
16         Q      Did Laura discuss this promotion plan
17    with you during your interview?
18         A      No.
19         Q      Did she discuss with you any ways
20    that you could increase your sales volume?
21         A      No.
22         Q      Did Laura ever make any comments
23    about your age?
24                   MR. ANDREWS:  Objection.
25         A      Maybe a few bucks in the bank is
```

```
0146
 1                    LAWRENCE I. FRIEDMANN
 2    referring to my age.
 3           Q      That's your belief; correct?
 4           A      Yes.
 5           Q      Did she ask you about your sales for
 6    the year?
 7           A      She was aware of my figures.
 8           Q      How do you know that she was aware?
 9           A      Everybody is aware of figures.
10           Q      Did she discuss your sales with you?
11           A      No.  No.
12           Q      In this lawsuit you allege that you
13    were subject to disability discrimination; is that
14    correct?
15           A      Yes.
16           Q      What do you allege happened to you
17    because of disability discrimination?
18                    MR. ANDREWS:  Objection.
19           A      I feel after four years of
20    performing, that the six or seven-month period
21    when my sales figures dipped down because of this
22    sciatica issue, that that was not taken into
23    account in my final termination.
24           Q      Are you referring to the six or
25    seven-month period in 2010?
```

```
0147
 1                   LAWRENCE I. FRIEDMANN
 2          A     Right.
 3          Q     The period that ended in September of
 4  2010?
 5          A     Yes.
 6          Q     When you received the coaching plan
 7  in May of 2011, did anyone discuss your 2010 sales
 8  figures with you?
 9          A     Well, yes.  Lucy, when I brought up
10  the sciatica incident again, she says:  Oh, that
11  sciatica thing again.
12          Q     When did you bring up the sciatica
13  with her?
14          A     The prior year I did 792.
15          Q     Prior, which year?
16          A     2009.  That was my annual figure for
17  the year.  In 2010, not being able to function
18  properly for six months, my figures dipped
19  $100,000, which considering the condition that I
20  was in is really not -- and let's not forget the
21  down economy, because everybody's figures were
22  down.  Even the top performers' figures were way
23  off during the downed economy in 2009, 2010.
24          Q     During 2010 while you were dealing
25  with your sciatica flare-up and your sales figures
```

```
0148
 1                  LAWRENCE I. FRIEDMANN
 2   decreased, were you placed on a coaching plan?
 3          A      I don't believe so.
 4          Q      Were you placed on an action plan?
 5          A      No.
 6          Q      Were you disciplined in any way with
 7   respect to your sales figures?
 8          A      Well, they would discuss it with me,
 9   but I really was not put on a coaching plan.
10          Q      Did you receive any discipline?
11          A      No.  I didn't receive discipline.
12          Q      So the first time that you were
13   disciplined was in May of 2011 when you were
14   placed on a coaching plan; correct?
15          A      Yes.
16          Q      And by that time, your sciatica
17   flare-up had subsided; correct?
18          A      Subsided, yes.
19          Q      So when Miss Goldstein discussed this
20   coaching plan for you --
21          A      Yes.
22          Q      -- with you in May of 2011, why did
23   you raise your sciatica?
24          A      Because I knew that they were looking
25   at the two years combined.
```

```
0149
 1                    LAWRENCE I. FRIEDMANN
 2           Q     Let me turn your attention to
 3    Defendant's Exhibit 9.  Please take a look at that
 4    plan and tell me where it discusses your 2010
 5    numbers.
 6           A     It doesn't.
 7           Q     Let's take a look at the May 23rd
 8    follow-up, Exhibit 10.  Does that discuss your
 9    2010 --
10           A     No.
11           Q     And then let's finally look at
12    Defendant's Exhibit 11, the action plan.  Does
13    that discuss your 2010 numbers?
14           A     No.
15           Q     Were you having a flare-up with
16    sciatica when you received the Coaching for
17    Success plan in May?
18           A     No.
19           Q     In addition to what you described,
20    what do you allege happened to you because of
21    disability discrimination?
22                     MR. ANDREWS:  Objection.
23           A     I really don't know how to answer
24    that.
25           Q     You claim that you were subject to
```

```
0150
 1                    LAWRENCE I. FRIEDMANN
 2   discrimination because of your disability in your
 3   Complaint; correct?
 4        A     I believe that whether I was placed
 5   on a coaching plan or not in 2010, that it was
 6   still -- whether it's on paper or not, it was
 7   taken into account with the final decision.
 8        Q     So in 2010 when you were suffering
 9   from this flare-up, you testified earlier that you
10   wanted to be able to sit down; correct?
11        A     Yes.
12        Q     Please explain how your ability to
13   sit down should have affected your sales numbers.
14        A     The showroom is 85,000 square feet.
15   Now, if I'm with a customer and I have a flare-up,
16   the only way to relieve it is to sit down.  So
17   once you lose track of a customer in that store,
18   you could be wandering around forever, and each
19   person is circling and circling.  You don't see
20   them again.
21              It had an effect on my overall
22   volume.  My ability to stay in earshot of my
23   customer because of this disability affected my
24   performance in 2010.
25        Q     So you did sit down when you were
```

```
0151
 1                   LAWRENCE I. FRIEDMANN
 2   having pain then?
 3         A     Briefly.  If somebody saw me sitting
 4   down, they would tell me to get up.
 5         Q     Did you get up?
 6         A     Yes.
 7         Q     What could Raymour & Flanigan have
 8   done to assist you while you were having pain?
 9                   MR. ANDREWS:  Objection.
10         A     I really can't answer that.
11         Q     In your Complaint you claim that
12   Miss Goldstein allowed certain individuals to sit
13   down without being reprimanded and without having
14   to request a reasonable accommodation.  Who were
15   you referring to?
16         A     Stacey Ross, who had an operation and
17   was a close friend of hers.
18         Q     A close friend of who?
19         A     Lucy Goldstein.
20         Q     What's the basis of your knowledge
21   that they never requested an accommodation to sit
22   down?
23                   MR. ANDREWS:  Objection.
24         A     They never did.  She would sit down
25   in the front of the store.
```

```
0152
 1                    LAWRENCE I. FRIEDMANN
 2          Q      How do you know that she never, for
 3   example, went to Human Resources and requested an
 4   accommodation?
 5          A      I don't know.
 6          Q      Stacey Ross is a sales associate?
 7          A      Yes.
 8          Q      Did Raymour & Flanigan make any
 9   changes, to your knowledge, to Stacey Ross' sales
10   figure requirements?
11          A      I don't know how to answer that.
12          Q      Anyone else that Miss Goldstein
13   allowed to sit down without having to request a
14   reasonable accommodation?
15          A      I really don't know how to answer
16   that.
17          Q      Michelle Napoli, who is she?
18          A      She also was a friend of Lucy's.
19          Q      Is it your position that
20   Miss Goldstein allowed her to sit down?
21          A      With Stacey.
22          Q      What's the basis of your knowledge
23   that she didn't have to request a reasonable
24   accommodation?
25          A      Visibility of where they sat.
```

```
0153
 1                     LAWRENCE I. FRIEDMANN
 2          Q      Do you know if she ever went to Human
 3   Resources to request an accommodation?
 4          A      I have no knowledge of that.
 5          Q      In your Complaint, you claim that you
 6   were the only individual put on a performance plan
 7   because of disability along with one other man who
 8   used a cane.  Who was that individual?
 9          A      Rafael.
10          Q      Mr. Rafael Gonzales?
11          A      Yes.
12          Q      He used a cane temporarily?
13                     MR. ANDREWS:  Objection.
14          A      He used a cane.
15          Q      What's the basis for your knowledge
16   that he was put on a performance improvement plan?
17          A      That was the same time frame that I
18   was put on.
19          Q      You never saw his plan?
20          A      I didn't see it.
21          Q      Do you know if Mr. Gonzales ever
22   requested any accommodations?
23          A      I have no idea.
24          Q      Is there anything else that you
25   believe happened to you because of your
```

```
0154
 1                   LAWRENCE I. FRIEDMANN
 2    disability?
 3                   MR. ANDREWS:  Objection.
 4         A     I don't know how to answer that.
 5         Q     Can you point to any specific factual
 6    circumstances that occurred that you believe were
 7    the result of disability discrimination?
 8         A     I was fired.
 9                   MR. ANDREWS:  Objection.
10         Q     Besides being terminated.
11         A     That was enough for me.
12         Q     Did anyone at Raymour & Flanigan ever
13    make any comments about your medical condition?
14         A     Yes.
15                   MR. ANDREWS:  Objection.
16         Q     What was that?
17         A     Just silly jokes.
18         Q     What kind of silly jokes?
19         A     I really don't recall the specifics.
20         Q     Who made the jokes?
21         A     Many people.
22         Q     Please, to the best of your
23    recollection, tell me who.
24         A     I don't recall.
25         Q     Did you ever request that your sales
```

```
0155
 1                  LAWRENCE I. FRIEDMANN
 2   quotas be adjusted?
 3          A     No.
 4          Q     When you were presented with the
 5   coaching plan in May, 2011, did you request that?
 6          A     No.
 7          Q     You also claim in this lawsuit that
 8   you were subject to retaliation in connection with
 9   your employment; is that correct?
10          A     Retaliation?
11          Q     Yes.  Are you familiar with that
12   term?
13          A     No.
14          Q     If you look at paragraph 31 of the
15   Complaint, it should be right in front of you, it
16   says that:  Upon plaintiff complaining to his
17   supervisors about age and disability
18   discrimination, nothing changed.  Moreover,
19   plaintiff Friedmann was terminated because of his
20   age and disability in retaliation for his
21   complaints of discrimination.
22                  Do you see that?
23          A     Yes.
24          Q     Reading that, does that help you
25   understand what I'm asking about, that you were
```

```
0156
  1                     LAWRENCE I. FRIEDMANN
  2    subject to retaliation in connection with a
  3    complaint that you made?
  4                     MR. ANDREWS:  Objection.
  5         A     I don't know how to answer that.
  6         Q     Did you ever complain to anyone at
  7    Raymour & Flanigan about age discrimination?
  8                     MR. ANDREWS:  Objection.
  9         A     I don't know how to answer it.
 10         Q     Did you ever discuss with anyone at
 11    Raymour & Flanigan your belief that you were being
 12    discriminated against because of your age?
 13         A     No.
 14         Q     Did you ever discuss with anyone at
 15    Raymour & Flanigan your belief that you were being
 16    discriminated against because of your disability?
 17         A     No.
 18         Q     So in the Complaint where it says
 19    that you complained to your supervisors about age
 20    and disability discrimination, what are you
 21    referring to there?
 22                     MR. ANDREWS:  Objection.
 23         A     Being fired.
 24         Q     Anything else?
 25         A     That's it.  That's enough.  I was
```

0157
```
 1                LAWRENCE I. FRIEDMANN
 2    fired the day after my 70th birthday.  I couldn't
 3    get into the computers.  The decision was already
 4    made.  I was off on the 17th, my birthday, and the
 5    decision was already made, because the computer
 6    for me was inactive when I came to work on the
 7    18th.
 8            Q      In your Complaint you allege to
 9    suffer emotional injuries.
10            A      Yes.
11            Q      When did those emotional injuries
12    begin?
13            A      Well, after I was fired.  I mean I
14    realized very quickly regardless of my attitude or
15    confidence or whatever that I was going to be
16    entering the job market at the ripe old age of 70,
17    and that the whole concept of interviewing has
18    changed completely.  It's become impersonal.  It's
19    all computer generated.
20            It's no longer walking in and shaking
21    hands and meeting someone face to face.  You're
22    already pre-judged at the age of 70.  They didn't
23    see me, they didn't know me, but they rejected me.
24            Q      In connection with the mental
25    injuries you claim to have suffered, what are your
```

```
0158
 1                LAWRENCE I. FRIEDMANN
 2   symptoms?
 3         A     Well, the day I was fired -- I mean
 4   just going to dinner with my former girlfriend,
 5   who was a very successful business woman, and
 6   telling her that I was no longer employed, I don't
 7   have to go into further detail.  I mean then it
 8   started to sink in.
 9                In the beginning you don't really
10   believe it happened, and then going on two
11   interviews in the past 20 years, one with Seaman's
12   and one with Raymour & Flanigan, you really don't
13   know what to do.  I mean -- so I had to develop a
14   resumΘ.  I was used to, you know, putting
15   everything in a resumΘ.
16                And I quickly understood from the
17   unemployment office and other advisors that that's
18   not the way you do a resumΘ today.  So it took
19   me -- along with purchasing an Apple computer, I
20   also, for an additional hundred dollars, took --
21   that I could go into the Apple store and drive
22   them crazy at my will and learn how to do things.
23                So it really was traumatic, because
24   for the first time I really, you know, felt a
25   little helpless.  I mean I got, you know,
```

```
0159
 1                  LAWRENCE I. FRIEDMANN
 2    encouragement from my boys.  They really are both
 3    busy, and my daughter-in-law is busy too, so they
 4    didn't have time to spoon feed me and give me --
 5    you know, work with me on developing, you know, a
 6    resumΘ and stuff.  So I really had -- I understood
 7    that nothing was going to happen without a proper
 8    resumΘ, and nothing did happen, even with the
 9    resumΘ.  My income has dipped down considerably.
10          Q      With respect to the emotional
11    distress, what were the symptoms of the distress?
12          A      Sitting in my apartment doing
13    nothing, just looking out the window until, you
14    know, I knew I had to get started.  It took time.
15    It really took time.
16          Q      Did you seek any medical treatment in
17    connection with the emotional distress?
18          A      No.
19          Q      Did you take any medication in
20    connection with the emotional distress?
21          A      No.
22          Q      Did you see a counselor?
23          A      No.
24          Q      A religious figure?
25          A      No.
```

```
0160
 1                    LAWRENCE I. FRIEDMANN
 2          Q     Did you speak to anybody about it?
 3          A     My kids.
 4          Q     Besides your kids?
 5          A     That's it.
 6          Q     Are you still suffering from
 7    emotional distress today?
 8          A     I've recovered.  I've got a job.  I
 9    move on.
10                    MR. ANDREWS:  Could we take a
11                short break at the right time?
12                    MS. CHICLACOS:  Can we wait five
13                minutes, please?
14                    MR. ANDREWS:  Sure.
15          Q     Have you engaged an expert to testify
16    about any of your emotional injuries?
17          A     No.
18          Q     Prior to your termination from
19    Raymour & Flanigan, had you ever sought medical
20    treatment for any type of mental illnesses?
21          A     Never in my life.
22          Q     Have you ever been diagnosed with a
23    mental illness?
24          A     Never in my life.
25          Q     Besides your termination, is there
```

```
0161
 1                    LAWRENCE I. FRIEDMANN
 2   anything else that was done by Raymour & Flanigan
 3   that caused you emotional distress?
 4         A     That was enough.
 5         Q     Anything else?
 6         A     No.
 7         Q     In your Complaint you're seeking
 8   damages, monetary damages.  What is your total
 9   amount of damages?
10                    MR. ANDREWS:  Objection.
11         A     I defer to my attorney.
12         Q     Well, you're the one answering the
13   questions.  So what are your economic damages?
14         A     I haven't given that any thought.
15         Q     You claim in your interrogatory
16   responses that you've been emotionally damaged in
17   the amount of $250,000.  Can you please explain
18   that calculation to me?
19                    MR. ANDREWS:  Objection.
20         A     No.
21         Q     You can't explain it?
22                    MR. ANDREWS:  Objection.
23         A     No.
24         Q     Have you engaged any expert witnesses
25   to testify about your damages?
```

```
0162
 1                    LAWRENCE I. FRIEDMANN
 2                    MR. ANDREWS:  Objection.
 3         A    No.
 4         Q    You claim that you're seeking damages
 5    for past and future earnings.  Can you provide the
 6    total amount of those damages?
 7                    MR. ANDREWS:  Objection.
 8         A    No.
 9                    MS. CHICLACOS:  Why don't we
10                    take the break now.
11                    (At this time, a brief recess
12                    was taken.)
13    CONTINUED EXAMINATION
14    BY MS. CHICLACOS:
15         Q    Do you have any documents reflecting
16    your belief that you were discriminated against
17    because of your age?
18         A    No.
19         Q    Do you have any documents reflecting
20    your belief that you were discriminated against
21    because of your disability?
22                    MR. ANDREWS:  Objection.
23         A    No.
24         Q    Do you have a Facebook account?
25         A    No.
```

```
0163
 1                    LAWRENCE I. FRIEDMANN
 2          Q       Do you have a Twitter account?
 3          A       No.
 4          Q       Do you have a LinkedIn account?
 5          A       No.
 6          Q       Do you have any social media
 7   accounts?
 8          A       No and I never will.
 9          Q       What could Raymour & Flanigan have
10   done in 2011 to help you improve your sales goals?
11                    MR. ANDREWS:  Objection.
12          A       I have to say it's what they didn't
13   do, not what they could have done.  I mean the
14   coaching was just a facade.  I was never coached.
15   I was never assisted.  This all transpired in the
16   six-week period culminating in termination.
17          Q       What in about 2010, what could they
18   have done to help you improve your sales goals?
19                    MR. ANDREWS:  Objection.
20          A       Ignore the decline in my figures
21   because of, you know, my health issues.
22          Q       Anything else?
23          A       That in itself would be enough.  I
24   mean I had proven myself for the four years prior
25   rather well.
```

0164
1                     LAWRENCE I. FRIEDMANN
2           Q      You testified earlier in 2011
3    Miss Goldstein asked you when you were going to
4    retire and what your age was; correct?
5           A      Yes.
6           Q      Did you have any conversations with
7    her about your age prior to that?
8           A      No.
9           Q      If you had been permitted to sit down
10   more in 2011, would that have helped you reach
11   your sales goals?
12                      MR. ANDREWS:  Objection.
13          A      No.
14          Q      If you had been permitted to sit down
15   more in 2010, would that have helped you reach
16   your sales goals?
17                      MR. ANDREWS:  Objection.
18          A      2010?
19          Q      Yes.
20          A      That's when the six-month incident
21   was.  No.  I mean it was just circumstances.  I
22   just could not as aggressively pursue customers
23   because of limitations.  I mean it's an 85,000
24   square feet store.  It's enormous.
25          Q      So the only accommodation you were

```
0165
 1                    LAWRENCE I. FRIEDMANN
 2     seeking was a forgiveness of sales figures?
 3                    MR. ANDREWS:  Objection.
 4          A     I think it should have been taken
 5     into consideration.  I do.
 6          Q     What should have been taken into
 7     consideration?
 8          A     The decline in my sales figures
 9     because of my physical limitations at that point.
10          Q     Other than what we've discussed
11     today, do you have any other facts or evidence of
12     discrimination based on your disability?
13          A     No.
14                    MR. ANDREWS:  Objection.
15          Q     Other than what we've discussed
16     today, do you have any other facts or evidence of
17     discrimination based on your age?
18                    MR. ANDREWS:  Objection.
19          A     No.
20                    MS. CHICLACOS:  Thank you very
21                 much for your time.
22                    MR. ANDREWS:  I have five
23                 minutes of cross for Mr. Friedmann.
24     EXAMINATION BY
25     MR. ANDREWS:
```

```
0166
 1                LAWRENCE I. FRIEDMANN
 2          Q     Mr. Friedmann, I just wanted to ask
 3   you a few brief questions about a couple of the
 4   exhibits that you were asked about earlier today.
 5                I want to direct your attention to
 6   what was introduced as Defendant's Exhibit 12.
 7          A     Yes.
 8          Q     Can you describe what that is?
 9          A     Well, it says Associate Handbook.
10          Q     Do you recall if this is from the
11   Associate Handbook that you received when you
12   commenced employment at the company?
13          A     I have no idea.
14          Q     That's the only question I have about
15   that document.
16                I wanted to just ask you a few
17   questions about your last day with the company.
18          A     Yes.
19          Q     What time did your shift begin that
20   day?
21          A     Probably 9:30.
22          Q     Did you arrive at or around that
23   time?
24          A     Yes.
25          Q     What did you do upon arriving at the
```

```
0167
 1                    LAWRENCE I. FRIEDMANN
 2      store?
 3              A     Well, you have a meeting in the
 4      morning, you know, in the sales office with the
 5      managers.  That's basically what the purpose of
 6      the meeting is.
 7              Q     Do you recall attending such a
 8      meeting on the last day of your employment?
 9              A     Yeah.  I was there, yeah.
10              Q     After that meeting, what did you do
11      next?
12              A     Well, I went on the computer to try
13      and, you know, look at business or shipments or
14      whatever I needed to do at the time, and I
15      couldn't get on the computer.  So I kept trying.
16              And then eventually I asked one of
17      the managers -- I told one of the managers, I
18      can't get on the computer.  So they told me to
19      call IT.
20              And I called IT and I told them I
21      can't get on the computer.  I thought perhaps
22      there was a problem with my password.  I didn't
23      think anything of it.  And then they said they
24      would get back to me.  And I kept -- and they
25      didn't get back to me, so I, you know, kept
```

0168
```
 1                LAWRENCE I. FRIEDMANN
 2   complaining that I can't get on the computer.
 3               Then I broke for lunch.  I was
 4   paying -- I was in the lunch room in the store.  I
 5   was paged by Miss Goldstein to come to the office,
 6   and then I got a second page saying it's not
 7   necessary.  And then when I came back from lunch,
 8   she asked me to sit down at this famous dining
 9   room table, and I was terminated.
10         Q     You testified that shortly after that
11   conversation you were brought into the office and
12   met the regional manager?
13         A     I was brought into the back office,
14   which is really Jim Powers' office when he's in
15   the store.  Well, that was -- yes, at the meeting,
16   because I kept questioning, you know,
17   Miss Goldstein about what was going on.  So she
18   brought me into the back office, and we sat down.
19   And he gave me his few pearls of wisdom and told
20   me what a great guy I was, but my figures were not
21   going to -- you know, they'll go up for a while,
22   but you're not going to maintain your figures.
23   That's exactly it.  We shook hands and I went on
24   my merry way.
25         Q     When you say "he," you're referring
```

```
0169
 1                  LAWRENCE I. FRIEDMANN
 2    to Mr. Powers?
 3          A    No.  To Tony Bender.  It was Tony
 4    Bender that was in the office.
 5          Q    I see.  Would Tony Bender ordinarily
 6    be in the office on a day-to-day basis?
 7          A    No.  He was the regional sales
 8    manager at the time.  He would be in the store,
 9    but he probably was there in conjunction with, you
10    know, my firing that day.
11          Q    Do you believe that he was in the
12    store because you were being terminated that day?
13          A    I believe he would be there for that.
14          Q    You testified that on your last day,
15    one of the things Miss Goldstein said to you was
16    enjoy your summer in the Hamptons.  Do you recall
17    that testimony?
18          A    Yes.  That wasn't out of kindness.
19    If I interpreted it as kindness, I was being
20    sarcastic.
21                  MR. ANDREWS:  I don't have any
22                  further questions.
23                  (Time noted: 2:52 P.M.)
24          *     *     *     *     *
25
```

```
0170
 1
 2                A C K N O W L E D G M E N T
 3
 4  STATE OF NEW YORK      )
 5                               ss:
 6  COUNTY OF _____  )
 7
 8          I, Lawrence I. Friedmann, hereby certify
 9  that I have read the transcript of my testimony
10  taken under oath in my deposition of January 6,
11  2013; that the transcript is a true and complete
12  record of my testimony, and that the answers on
13  the record as given by me are true and correct.
14
15
16                      _____
17                           LAWRENCE I. FRIEDMANN
18
19
20  Subscribed and sworn to before me
21  this       day of            2013.
22  _____
23           (NOTARY PUBLIC)
24
25
```

```
0171
 1
 2                      I N D E X
 3   WITNESS:          EXAMINATION BY:              PAGES:
 4   Lawrence I. Friedmann
 5                      Ms. Chiclacos                  4
 6                      Mr. Andrews                  165
 7
 8                   E X H I B I T S
 9   DEFENDANT'S:     DESCRIPTION:                  PAGES:
10   1              Complaint                          7
11   2              Plaintiff's Response to          18
12                  Defendant's First Set of
                    Interrogatories
13   3              Plaintiff's First Supplemental   19
                    Response to Defendant's First
14                  Set of Interrogatories
15   4              Application for Employment       26
16   5              Raymour & Flanigan New Hire      29
                    Form
17
     6              Raymour & Flanigan Furniture     46
18                  Performance Evaluation and
                    Development Form
19
     7              Raymour & Flanigan Furniture     47
20                  Performance Evaluation and
                    Development Form dated 6/7/08
21
     8              Raymour & Flanigan Furniture     48
22                  Performance Evaluation and
                    Development Form dated August
23                  17, 2008
24   9              Raymour & Flanigan Coaching      52
                    for Success document dated May
25                  7, 2011
```

```
0172
 1
 2                       EXHIBITS CONTINUED
 3    DEFENDANT'S:     DESCRIPTION:              PAGES:
 4    10          Raymour & Flanigan Coaching      58
                  for Success document dated May
 5                23, 2011
 6    11          Raymour & Flanigan Coaching      62
                  for Success document dated
 7                June 13, 2011
 8    12          Raymour & Flanigan Furniture    112
                  Associate Handbook
 9
10
11        D O C U M E N T S   R E Q U E S T E D
12    DESCRIPTION:                             PAGES:
13    (1)  Mr. Freidmann's resumⒺ               15
14    (2)  The verification page, if it         20
           exists, for Defendant's Exhibit 3
15
      (3)  Mr. Freidmann's resumⒺ as well as   119
16         documents relating to his search
           for employment after leaving
17         Raymour & Flanigan
18    (4)  Any payroll records from La-Z-Boy    120
           Furniture as well as any records
19         from Joseph A. Bank's
20
21
22
23
24
25
```

0173
1
2
3                    C E R T I F I C A T E
4
5          I, Terri Fudens, a stenotype reporter
6    and Notary Public within and for the State of New
7    York, do hereby certify:
8               That the witness whose testimony is
9    hereinbefore set forth was duly sworn by me and
10   that such testimony is a true record of the
11   testimony given by such witness.
12              I further certify that I am not related
13   to any of the parties by blood or marriage, and
14   that I am in no way interested in the outcome of
15   this matter.
16              IN WITNESS WHEREOF, I have hereunto set
17   my hand.
18
19
20
21
22              _____
23                    Terri Fudens
24
25