1

2  UNITED STATES DISTRICT COURT
   EASTERN DISTRICT OF NEW YORK
3  ----------------------------------------X
   LAWRENCE I. FRIEDMANN,
4
                              PLAINTIFF,
5

6      -against-          Case No:
                          12 CV 1307
7                         (LDW)(AKT)

8
   RAYMOUR FURNITURE CO., INC., and
9  LUCY GOLDSTEIN, individually,

10                          DEFENDANTS.
   ----------------------------------------X
11

12              DATE: February 13, 2013

13              TIME: 10:52 A.M.

14

15

16          DEPOSITION of the Defendant,

17  RAYMOUR FURNITURE CO., INC., by a Witness,

18  PATRICIA DELGENIO, taken by the Plaintiff,

19  pursuant to a 30(b)(6) and to the Federal

20  Rules of Civil Procedure, held at the

21  offices of The Harman Firm, PC, 200 West

22  57th Street, New York, New York 10019,

23  before Deborah Garzaniti, a Notary Public

24  of the State of New York.

25

```
1

2      A P P E A R A N C E S:

3

4      THE HARMAN FIRM, PC
          Attorneys for the Plaintiff
5          200 West 57th Street
           New York, New York 10019
6          BY: PETER ANDREWS, ESQ.

7

8      NIXON PEABODY, LLP
          Attorneys for the Defendants
9          50 Jericho Quadrangle  - Suite 300 -
           Jericho, New York 11753
10         BY: JESSICA CHICLACOS, ESQ.

11

12

13     ALSO PRESENT:
           Edward T. Groh,
14         Senior Counsel Labor & Employment with
           Raymour & Flanigan Furniture
15         1314 US Highway No. 22
           Phillipsburg, NJ 08865

16
           Alex Howe
17

18              *          *          *
19

20

21

22

23

24

25
```

```
 1
 2        F E D E R A L   S T I P U L A T I O N S
 3
 4
 5        IT IS HEREBY STIPULATED AND AGREED by and
 6     between the counsel for the respective
 7     parties herein that the sealing, filing and
 8     certification of the within deposition be
 9     waived; that the original of the deposition
10     may be signed and sworn to by the witness
11     before anyone authorized to administer an
12     oath, with the same effect as if signed
13     before a Judge of the Court; that an
14     unsigned copy of the deposition may be used
15     with the same force and effect as if signed
16     by the witness, 30 days after service of
17     the original & 1 copy of same upon counsel
18     for the witness.
19
20        IT IS FURTHER STIPULATED AND AGREED that
21     all objections except as to form, are
22     reserved to the time of trial.
23
24                *     *     *     *
25
```

```
 1                    P. DELGENIO
 2      P A T R I C I A  D E L G E N I O, called as
 3      a witness, having been first duly sworn by
 4      a Notary Public of the State of New York,
 5      was examined and testified as follows:
 6      EXAMINATION BY
 7      MR. ANDREWS:
 8            Q.     Please state your name for the
 9      record.
10            A.     Patricia Delgenio.
11            Q.     What is your address?
12            A.     1645 Broadhollow Road,
13      Farmingdale, New York 11735.
14            Q.     Hi, how are you?
15            A.     Good.  Thank you.
16            Q.     I am Peter Andrews, Counsel for
17      the Plaintiff, Lawrence Friedmann, in this
18      matter.  I will be taking your deposition
19      today.  You are here pursuant to Federal
20      Rule of Civil Procedure 30(b)(6), so let me
21      begin by firstly asking you your name?
22            A.     My name is Patricia Delgenio.
23            Q.     Ms. Delgenio, have you ever
24      been deposed previously?
25            A.     No.
```

P. DELGENIO

1

2    Q.    Let me just tell you a little

3    bit about how depositions in general work

4    and what the structure is.  It is a

5    question and answer format.  I ask the

6    questions, you answer them to the best of

7    your knowledge.  If you don't understand

8    one of my questions, please say so and I

9    will do my best to clarify.  If you can't

10   recall or you don't know, just say that so

11   that the Court Reporter can take down all

12   of your answers.  Your responses have to be

13   verbal, so nods or body language won't work

14   for the Court Reporter.  So verbal

15   responses, please.

16          If you need to take a break at

17   any time, please just ask for one.  The

18   only thing that I will request is that you

19   not ask for a break while a question is

20   pending.  Other than that, we will probably

21   just break once an hour to give everyone a

22   chance to stretch and coffee.

23          Are you represented by Counsel

24   here today?

25   A.    Yes.

```
 1                    P. DELGENIO
 2         Q.    Is that Ms. Chiclacos?
 3         A.    Yes.
 4              MR. ANDREWS:  Just for the
 5         record, can we have your name just
 6         stated as present?
 7              MR. GRUN:  Edward Groh, I am
 8         senior counsel for Raymour &
 9         Flanigan.
10              MS. CHICLACOS:  His appearance
11         will be noted in the transcript.
12              MR. ANDREWS:  With me is Alex
13         Howe.  He is a legal assistant from
14         our office, from the Harman Firm.
15         Q.    Ms. Delgenio, what is your
16    current position?
17         A.    I am the vice president of
18    Human Resources field services.
19         Q.    For Raymour Furniture?
20         A.    Raymour & Flanigan.
21         Q.    The Defendant in this case is
22    Raymour Furniture Company, Inc.  Do you
23    have an understanding of the relationship
24    between those two companies?
25              MS. CHICLACOS:  Objection to
```

```
 1                    P. DELGENIO
 2         the form.  Go ahead and answer.
 3         A.    No, I don't have an
 4    understanding of the relation.  I don't
 5    know exactly what you said.
 6         Q.    You work for Raymour &
 7    Flanigan?
 8         A.    Yes.
 9         Q.    Where is your office located?
10         A.    My office is in Farmingdale,
11    New York.
12         Q.    How long have you held your
13    current position?
14         A.    My current position, a year.
15         Q.    Approximately a year?
16         A.    Approximately a year, January.
17         Q.    Before your current position,
18    were you employed with Raymour & Flanigan?
19         A.    Yes.
20         Q.    What was your position before
21    that?
22         A.    I was a director of Human
23    Resources.
24         Q.    Was that in the same unit of
25    the company?
```

```
 1                    P. DELGENIO
 2          A.    Yes.
 3          Q.    You mentioned before field
 4     services?
 5          A.    Yes.
 6          Q.    Can you explain what that is?
 7          A.    Yes.  We have a central
 8     services department in Syracuse and I
 9     oversee HR field services which is store
10     and warehouse locations.
11          Q.    What geographic area do you
12     oversee?
13          A.    Metropolitan New York and New
14     Jersey.
15          Q.    Before your current position
16     when you were director of Human Resources,
17     where was that office located?
18          A.    The office was the same, but it
19     was Metropolitan Long Island region.
20          Q.    Does the current position cover
21     a larger geographic area --
22          A.    Yes.
23          Q.    -- than the previous position?
24     Thank you.
25                How long did you hold that
```

```
1                    P. DELGENIO
2  position, the previous position?
3         A.    Approximately five years.
4         Q.    Did that position cover stores
5  in Long Island?
6         A.    Yes.
7         Q.    Before that position, were you
8  employed with Raymour & Flanigan?
9         A.    Yes.
10        Q.    What was your prior position?
11        A.    Human Resources manager,
12 regional Human Resources manager.
13        Q.    Where was that job located?
14        A.    Long Island.
15        Q.    Farmingdale?
16        A.    That is where my office is, but
17 it was every location on Long Island.
18        Q.    But was your office in
19 Farmingdale at that time?
20        A.    Yes.
21        Q.    What period of time did you
22 hold that position?
23        A.    I would say 2007 to 2011, so
24 maybe four years.
25        Q.    When did you first begin
```

                             P. DELGENIO

1
2      working with Raymour & Flanigan?
3              A.      May of 2006.
4              Q.      What was your position with
5      them?
6              A.      HR field specialist, like a
7      generalist.
8              Q.      Before coming to Raymour &
9      Flanigan, what position did you hold?
10             A.      I was the director of HR for a
11     financial services firm in Syossett, New
12     York for six years prior to working for
13     Raymour & Flanigan.
14             Q.      Do you recall the name of that
15     company?
16             A.      It was Americorp.
17             Q.      Before that?
18             A.      Before that, I worked for an
19     Internet company here in Manhattan.  I was
20     there for a year, Opus 360.
21             Q.      Are you a college graduate?
22             A.      Yes.
23             Q.      When did you graduate college?
24             A.      1995, December of 1995, I
25     think.

```
 1                        P. DELGENIO
 2         Q.    Where did you attend college?
 3         A.    Dowling College.   It is in
 4    Oakdale, New York.
 5         Q.    Dowling?
 6         A.    D-O-W-L-I-N-G.
 7         Q.    Thank you.
 8               What was your major?
 9         A.    Business administration.
10         Q.    I would like to introduce for
11    identification Plaintiff's Exhibit 1 and
12    ask that you take a few minutes to look at
13    it.   Take as much time as you need to look
14    at it.   I will have specific questions.
15               (Whereupon, the aforementioned
16               document was marked as Plaintiff's
17               Exhibit 1 for identification as of
18               this date by the Reporter.)
19         Q.    Again, I will have specific
20    questions, but take as much time as you
21    need to look at that.
22         A.    Okay.
23         Q.    Have you seen this document
24    previously?
25         A.    No.
```

                          P. DELGENIO

1

2         Q.     Do you have an understanding of

3     what this document is?

4         A.     I read it and I understand what

5     it says.

6         Q.     Thank you.

7                I just want to direct you to

8     the third page of the document which says

9     "Exhibit A.   Testimony Sought by Plaintiff

10    from Witnesses pursuant to Federal Rule

11    Civil Procedure 30(b)(6)."

12               I just wanted to clarify.   You

13    have not seen this page previously; is that

14    correct?

15        A.     Yes, that's correct.

16        Q.     This page, Exhibit A, states

17    "Plaintiffs seeks testimony from

18    Defendant's 30(b)(6) witnesses on the

19    following matters:

20               One, all information related to

21    anti-discrimination policies at Defendant,

22    Raymour Furniture Company, Inc.   Two, all

23    information related to disabilities and

24    accommodation of disabilities in the

25    workplace at Defendant, Raymour Furniture

```
 1                       P. DELGENIO
 2    Company, Inc.  Three, all affirmative
 3    defenses asserted by Defendants and or to
 4    be relied upon in any pleading up to and
 5    including trial."
 6               Do you see that?
 7       A.    Yes.
 8       Q.    Do you have an understanding
 9    that you are here to testify regarding
10    those subjects today?
11       A.    Yes.
12       Q.    How did you acquire that
13    understanding?
14               MS. CHICLACOS:  Objection.
15          That calls for information protected
16          by the attorney-client privilege.
17       Q.    How did you prepare for today's
18    deposition?
19               MS. CHICLACOS:  Objection.
20          Again, it calls for information
21          protected by the attorney-client
22          privilege.
23       Q.    Other than discussions with
24    your attorneys, how did you prepare for
25    today's deposition?
```

```
 1                    P. DELGENIO
 2        A.    I didn't, other than
 3   discussions with my attorneys.
 4        Q.    How many times did you meet
 5   with your attorneys to prepare for today's
 6   deposition?
 7        A.    Once.
 8        Q.    Do you recall when that was?
 9        A.    Yes.
10        Q.    Can you tell me when that was?
11        A.    Tuesday this week.
12        Q.    Do you recall how long you
13   spent meeting with your attorney regarding
14   this deposition?
15             MS. CHICLACOS:   Objection.
16         That calls for information.
17        A.    Yes, I do recall.
18        Q.    Can you tell me, approximately?
19        A.    A little over an hour.
20        Q.    I am not going to ask you to
21   tell me anything about what you discussed
22   with your attorney and you shouldn't answer
23   those types of questions and I am sure your
24   attorney will object, so I am just getting
25   at the preparation.  Did you review
```

1           P. DELGENIO

2    documents to prepare for today's

3    deposition?

4           A.    Yes.

5           Q.    Do you recall what documents

6    you reviewed to prepare for today's

7    deposition?

8           A.    The Associate Handbook.

9           Q.    The Associate Handbook?

10          A.    Yes.

11          Q.    Did you review any other

12   documents to prepare for today's

13   deposition?

14          A.    No.

15          Q.    The Associate Handbook that you

16   reviewed to prepare for today's deposition,

17   do you recall whether that is the current

18   Associate Handbook or a prior version of

19   the Associate Handbook?

20          A.    Both, the current and a prior

21   version of the Associate Handbook.

22          Q.    Do you recall what the date of

23   the prior version was?

24          A.    I want to say 2006 or '07.

25          Q.    In your role, in your current

1                          P. DELGENIO

2     role or in any positions that you

3     previously held with Raymour & Flanigan,

4     have you, yourself, participated in writing

5     the Associate Handbook?

6                    MS. CHICLACOS:  Objection to

7               the form.  Go ahead and answer.

8          A.    Did I participate in writing

9     the Associate Handbook?

10         Q.    I will strike that.  Let me

11    rephrase the question.

12               Do you know how the Associate

13    Handbook is prepared?

14         A.    Can you clarify your question?

15         Q.    I will try.

16               You testified that you reviewed

17    the current version of the Associate

18    Handbook and a prior version of that

19    handbook.  I assume someone or one or more

20    people prepares that handbook.  Do you know

21    how that handbook is prepared?

22                    MS. CHICLACOS:  Objection to

23               the form.

24         A.    I have an idea how it is

25    prepared.  I don't know that I would be

                              P. DELGENIO

1
2    comfortable declaring exactly how the
3    handbook is prepared.
4          Q.    I am asking you for your
5    understanding of how it is prepared?
6          A.    My understanding of how the
7    handbook is prepared is that the handbook
8    is reviewed on an annual basis and any
9    updates that need to be done to policies
10   are conferred with our legal counsel and
11   owners of our company and if there are
12   adjustments to be made, they are made and
13   represented in the next edition of the
14   handbook.
15         Q.    Do you participate in the
16   annual review of the handbook?
17         A.    I always have input into -- I
18   am always welcome to give my opinion to
19   anything in the handbook.
20         Q.    Do you know who oversees the
21   handbook revision process?
22         A.    I could tell you who I believe
23   it is.
24         Q.    Who do you believe it is?
25         A.    I believe it is Steve McPeak.

```
 1                    P. DELGENIO

 2        Q.    Who is Mr. McPeak?

 3        A.    He is the vice president of

 4   Human Resources for Raymour & Flanigan.

 5        Q.    Is he the person who you

 6   currently report to?

 7        A.    Yes.

 8        Q.    Do you report directly to him?

 9        A.    Yes.

10        Q.    Where is Mr. Peak's office?

11        A.    McPeak.

12        Q.    McPeak's office located?

13        A.    Liverpool, New York.

14        Q.    Do you have an understanding of

15   what his responsibilities are within the

16   company?

17             MS. CHICLACOS:   Objection to

18        the form.

19        A.    My understanding of his

20   responsibilities are that he oversees all

21   functions of Human Resources.

22        Q.    Is that national?

23        A.    Yes.

24        Q.    For all of Raymour & Flanigan

25   stores?
```

P. DELGENIO

1

2      A.     Yes.

3      Q.     The Plaintiff in this case is

4  Mr. Lawrence Friedmann.  Do you understand

5  that that is the case?

6      A.     Yes.

7      Q.     Have you ever met Mr.

8  Friedmann?

9      A.     Yes.

10     Q.     How many times have you met Mr.

11 Friedmann?

12     A.     Oh, gosh.  Many times in the

13 years that he worked with us.  Many times.

14 I don't know that I can give you an exact

15 number.

16     Q.     Did you ever speak with him?

17     A.     Yes.

18     Q.     Do you recall speaking with him

19 regarding Human Resources issues?

20     A.     No.

21     Q.     Do you recall in general what

22 you would speak with him about?

23     A.     My only recollection of

24 conversations with Larry Friedmann, as we

25 called him at the time, was hey, how are

P. DELGENIO

2  you?  How was your weekend?  How are things

3  going?  How is your family?  Normal

4  conversations that I would have with any

5  associate upon greeting them.

6      Q.    In the position that you held

7  immediately prior to your current position,

8  which, correct me if I am mistaken,

9  director of Human Resources?

10      A.    Yes.

11      Q.    Again, what period of time

12  would you have held that position?

13      A.    I am guessing.

14      Q.    Yes.  Approximately.

15      A.    I would say approximately from

16  2007 to 2011.

17      Q.    During that period of time in

18  that position as director of Human

19  Resources, would your job have entailed

20  visiting Raymour & Flanigan stores on a

21  regular basis?

22      A.    Yes.

23      Q.    Why would you be visiting the

24  stores on a regular basis?

25      A.    I would visit stores on a

                    P. DELGENIO

1
2    regular basis to meet with associates, take
3    an assessment of the location, of
4    the associate's location, an assessment of
5    leadership in the location.  If there are
6    meetings in store locations, I would go to
7    in store locations for meetings.
8         Q.    Did you ever have any
9    responsibility for supervising Mr.
10   Friedmann?
11        A.    No.
12        Q.    Did you ever participate in
13   evaluating Mr. Friedmann's performance?
14        A.    No.
15        Q.    Are you aware of any complaints
16   anyone may have made regarding Mr.
17   Friedmann's performance?
18        A.    Can you help me understand what
19   you mean by complaints?  Complaints is an
20   HR term.  Generally managers don't complain
21   about their associates.  So can you help
22   me?
23        Q.    I will try my best to clarify.
24              You testified that you had no
25   responsibility for supervising Mr.

```
 1                    P. DELGENIO
 2    Friedmann and that you never participated
 3    in evaluating Mr. Friedmann's performance;
 4    is that correct?
 5         A.    That is correct.
 6         Q.    In your various roles, I know
 7    you have had numerous HR roles for the
 8    company, did you become aware of complaints
 9    made by anyone to the company regarding Mr.
10    Friedmann's performance?
11              MS. CHICLACOS:  Objection to
12          the form.
13         A.    I never received a complaint
14    from a store leader about Mr. Friedmann's
15    performance.
16         Q.    Did you ever participate in an
17    investigation of Mr. Friedmann's
18    performance?
19         A.    No, I never investigated Mr.
20    Friedmann's performance.
21         Q.    Did anyone ever speak with you
22    about a recommendation he or she wished to
23    make regarding Mr. Friedmann's employment
24    with the organization?
25         A.    Yes.
```

P. DELGENIO

1

2      Q.    Do you recall when that was?

3      A.    I don't recall the exact time

4  frame or the exact day.

5      Q.    Can you give me an approximate

6  year, month?

7      A.    It has been a lot of years.

8  No, I can't.

9      Q.    Would it have been within the

10  past three years or longer?

11      A.    It would have been within --

12  this is a guesstimate.  Whenever the date

13  of his release from service was, it would

14  have been approximately six weeks,

15  two months before that time.

16      Q.    To the best of your

17  recollection, would that have been the

18  first time --

19      A.    Yes.

20      Q.    -- that someone made a

21  recommendation to you regarding Mr.

22  Friedmann's employment?

23      A.    Yes.  I would like to clarify?

24      Q.    Yes.

25      A.    It was at that time that I was

<pre>
 1                    P. DELGENIO
 2    made aware that Mr. Friedmann was having
 3    performance discussions or the leadership
 4    team was having performance-related
 5    discussions with Mr. Friedmann.  There was
 6    no recommendation made about his employment
 7    at that time.
 8         Q.    Okay.  I don't want us to get
 9    ahead of ourselves.  I will go back.
10              You testified that you became
11    aware that certain members of store
12    leadership or management were having
13    discussions with Mr. Friedmann regarding
14    his performance and that you became aware
15    of those discussions approximately six
16    weeks to eight weeks prior to his release?
17              MS. CHICLACOS:  Objection.  It
18         is a mischaracterization of her
19         testimony.
20              Go ahead and answer, please.
21         Q.    Well, since your Counsel feels
22    that that is a mischaracterization, I am
23    going to have to ask you the question
24    again.
25              When did you become aware of
</pre>

                          P. DELGENIO

1
2    the fact that store leaders were having
3    discussions with Mr. Friedmann regarding
4    his performance?
5         A.    After they sat down with him
6    and presented him with a Performance
7    Improvement Plan or a Coaching Plan.
8         Q.    How did you become aware of the
9    fact that that had happened?
10        A.    One of my direct reports let me
11   know.
12        Q.    Do you recall who that was?
13        A.    Yes, Christine Roland.
14        Q.    Who is Christine Roland?
15        A.    Christine Roland is currently
16   the HR field specialist for the Metro east
17   region.
18        Q.    What area does the Metro east
19   region encompass?
20        A.    Well, it is Suffolk and Nassau
21   County.
22        Q.    You testified that she reported
23   to you?
24        A.    Yes.
25        Q.    How many HR field specialists

1                    P. DELGENIO

2    report to you?

3         A.    Currently?

4         Q.    Currently?

5         A.    Five.

6         Q.    At the time that this report

7    from Mr. Roland to you was made, how many

8    HR field specialists reported to you?

9         A.    I am going to say two.

10         Q.    What was reported to you?

11         A.    Everyone who was put on a

12    Performance Plan in that location, actually

13    I would say in any of Chris' locations.

14    She just made me aware, hey, the following

15    people have been put on Performance Plan.

16         Q.    Just so I am clear, you did not

17    participate in placing anyone on a

18    Performance Plan?

19         A.    No.

20         Q.    Did, to your knowledge,

21    Ms. Roland participate in placing any

22    people on a Performance Plan?

23         A.    No.

24         Q.    Do you have an understanding of

25    how people would get placed on Performance

1               P. DELGENIO

2    Plans?

3        A.    Yes.

4        Q.    Can you describe that process?

5        A.    Generally in the sales

6    organization, which is very heavily metric

7    driven, there is a weekly commission review

8    where a leader in the store will sit down

9    with an associate and measure their success

10   or their performance, metrics against the

11   standard expectation or the minimum

12   expectation, and discuss whether their

13   performance is either better than the

14   expectation, not on par with the

15   expectation.

16          If over a period of time an

17   associate performs below expectation, the

18   store leader will generally summarize the

19   amount of time that the person has been

20   performing below expectation and

21   specifically to what extent, in what areas

22   of their business and offer them assistance

23   if they need it to hit the goals and a time

24   frame in which they are expected to hit set

25   goals.

P. DELGENIO

1

2      Q.    In general, what is your role

3  currently with respect to the oversight of

4  Performance Plans, Performance Improvement

5  Plans?

6      A.    My role, my current role with

7  oversight to administration of Performance

8  Improvement Plans are generally knowledge

9  that they have happened.

10      Q.    Was that true during your prior

11  position as well?

12      A.    Yes.

13      Q.    Did you personally review the

14  Performance Plans?

15      A.    No.

16      Q.    Would it be fair to say that

17  apart from knowing who had been placed on a

18  Performance Plan, you did not concern

19  yourself with why they had been placed on a

20  Performance Plan?

21      MS. CHICLACOS:  Objection to

22    the form.

23      A.    When I am made aware of Action

24  Plans or Performance Plans that are

25  administered, I use my knowledge of the

P. DELGENIO

associate and of the store and if I have

any questions related, I will ask them, so

it would be accurate to say that I don't

concern myself.

     Q.    But you don't actually read the

Performance Plans?

     A.    I have.  I can't say that I

read every single one, but I have read

Performance Improvement Plans.

     Q.    Do you recall reading any of

Mr. Friedmann's Performance Improvement

Plans?

     A.    I don't recall reviewing them

at that time.

     Q.    Once you became aware that Mr.

Friedmann had been placed on a Performance

Improvement Plan, did you take any action

at that time?

     A.    No.

     Q.    Did you investigate the Plan or

why he had been put on the Plan?

     A.    It is my recollection that I

worked with Christine Roland and my

recollection is that it was her assertion

```
1                    P. DELGENIO
2   that the Plan seemed standard.
3          Q.    Could you elaborate on what you
4   mean by that, when you say that the Plan
5   seemed standard?
6          A.    Yes.  As I previously
7   described, Plans generally say this is your
8   performance, measure it against the
9   expectation, here is the difference between
10  the two, here is where you need to go and
11  how to get there.  It is my recollection
12  that Mr. Friedmann's Performance Plan was
13  very much in the line of that standard type
14  Performance Plan.
15         Q.    Do you know if Ms. Roland would
16  have participated in the decision to place
17  Mr. Friedmann on a Performance Plan?
18         A.    She would not have.
19         Q.    She would not have?
20         A.    She would not have, unless the
21  leadership team had questions about it.
22         Q.    When you say "the leadership
23  team," who are you referring to?
24         A.    Any store leaders, store
25  manager, showroom managers.
```

```
 1                    P. DELGENIO
 2          Q.    Do you recall who the store
 3     manager was at the location where Mr.
 4     Friedmann worked at the time that he was
 5     placed on the Performance Plan?
 6          A.    Yes, Lucy Goldstein.
 7          Q.    So just to recap, approximately
 8     six to eight weeks prior to Mr. Friedmann's
 9     release you became aware of the fact that
10     he was on a Performance Improvement Plan?
11          A.    Yes, and I capture it that way
12     because I am not sure where it was in the
13     year, but my guess is that it was about six
14     to eight weeks prior.
15          Q.    Can you describe what, if any,
16     actions you took with respect to Mr.
17     Friedmann's employment after becoming aware
18     of that?
19          A.    I don't recall taking any
20     actions specific to his employment after
21     that.
22          Q.    Were you updated in the
23     intervening period as to what was happening
24     to Mr. Friedmann?
25          A.    Yes.
```

```
 1                    P. DELGENIO
 2         Q.    Can you describe the nature of
 3    those updates?
 4         A.    My updates would of come
 5    through Chris Roland and my recollection is
 6    that Mr. Friedmann was given the
 7    opportunity to interview at another
 8    location and that there wasn't a tremendous
 9    interest on either side at that location,
10    so Mr. Friedmann remained in the Garden
11    City location.
12         Q.    When you say "there wasn't a
13    tremendous interest on either side," what
14    do you mean?
15         A.    My recollection is that, and
16    this is my recollection through Chris
17    Roland, however many years ago, but my
18    recollection is that when Mr. Friedmann was
19    offered the opportunity to interview at
20    Carle Place, he was not excited about it.
21    That's the best way that I can capture it.
22         Q.    Do you know why Mr. Friedmann
23    was asked to interview at the Carle Place
24    store?
25         A.    I wasn't told specifically by
```

```
 1              P. DELGENIO
 2   store leadership, but very often we will
 3   look to find a location that can help make
 4   an associate successful and my
 5   understanding is that Mr. Friedmann started
 6   in the Carle Place location and the hope
 7   was in returning to the Carle Place
 8   location he would be better able to be
 9   successful.
10        Q.    Just to recap, all of this was
11   relayed to you by Ms. Roland?
12        A.    Correct.
13        Q.    You had no discussions with
14   store leadership about this situation?
15        A.    Not that I recall, no.
16        Q.    Do you recall who the store
17   leadership at his location would have been
18   at the time?
19        A.    Other than Lucy Goldstein?
20        Q.    Other than Lucy Goldstein?
21        A.    Oh, gosh.  It would be a best
22   guess who the showroom managers were.  I
23   would guess Kevin Sagendorf (phonetic), and
24   I can't recall who the other one was at
25   that period of time.
```

```
 1                    P. DELGENIO
 2        Q.    So Chris Roland advised you
 3   that Mr. Friedmann had interviewed at the
 4   Carle Place location?
 5        A.    Yes.
 6        Q.    Did she advise you what the
 7   upshot of that interview was?
 8        A.    Yes.  Her summary was, A, as I
 9   had previously said, Mr. Friedmann wasn't
10   particularly interested in the opportunity
11   at Carle Place and that the store manager
12   was not impressed in her interview with Mr.
13   Friedmann and declined to have him come on
14   board.
15        Q.    To the best of your knowledge,
16   would that have been a decision to be made
17   by the store manager at his or her
18   discretion?
19        A.    Yes.
20        Q.    Do you recall Ms. Roland
21   telling you anything else at that time?
22        A.    No.
23        Q.    Was it your understanding that
24   Mr. Friedmann was, therefore, going to
25   continue to work at the Garden City
```

```
 1                      P. DELGENIO
 2     location?
 3          A.    Yes.
 4          Q.    Under Ms. Lucy Goldstein's
 5     supervision?
 6          A.    Yes.
 7          Q.    Did you hear about Mr.
 8     Friedmann's employment again after that
 9     point?
10          A.    When his employment was
11     terminated is my next recollection of
12     anything related to his status.
13          Q.    How were you advised that he
14     had been terminated?
15          A.    It would have been by Chris
16     Roland.
17          Q.    Would it be fair to say -- I am
18     sorry.
19          A.    Go ahead.
20          Q.    I didn't mean to interrupt you.
21          A.    That's okay.
22          Q.    You testified it would have
23     been by Chris Roland?
24          A.    Yes.
25          Q.    Do you recall what Chris Roland
```

1                    P. DELGENIO

2     told you?

3          A.     Do I recall?

4          Q.     What Chris Roland told you?

5          A.     Yes, my -- again, this is a

6     guess, not a recollection.  My guess is

7     that Chris Roland said Larry Friedmann

8     didn't make his Performance Improvement

9     Plan and they released him from service or

10    they are going to release him from service.

11    I am not sure if it was precisely before or

12    after.

13         Q.     Correct me if I am wrong, you

14    did not play a role in that decision?

15         A.     No.

16         Q.     Is that standard practice in

17    your position, to not play a role in that

18    decision?

19         A.     No.  If I believe there is

20    reason to insert myself into a

21    decision-making process related to an

22    associate, I will.

23         Q.     Can you give me some examples

24    of when you might consider inserting

25    yourself into the process?

1                    P. DELGENIO

2          A.     Sure.  If an associate has

3    complained to Chris Roland or complained to

4    myself or complained to leadership about

5    maltreatment, about the environment in the

6    store location prior to being advised of

7    their intent to terminate, I would look

8    more closely at it to determine any

9    validity, if it exists, before giving my

10   input or opinion on the decision that is

11   being made.

12         Q.     Did you give your input or

13   opinion on the decision to terminate Mr.

14   Friedmann?

15         A.     I don't recall doing so, no.

16         Q.     Would it have been part of your

17   job to do so?

18         A.     If I determined it was

19   appropriate to insert myself into the

20   decision-making process, yes, it would have

21   been part of my job to do so.  I don't

22   always do that.

23         Q.     When a store manager, in your

24   experience, such as Ms. Goldstein, believes

25   that a sales associate, such as Mr.

```
 1                    P. DELGENIO
 2   Friedmann, is not meeting his performance
 3   objectives and wishes to move towards the
 4   termination of the employment of the
 5   associate, what is your understanding of
 6   that process?
 7                  MS. CHICLACOS:  Objection to
 8            the form.
 9        A.    Generally a store manager will
10   work with their direct leader and advise
11   them of their decision or intent to take
12   action related to an associate's
13   performance and the regional director would
14   partner with the HR field specialist to
15   advise them of their intent.
16        Q.    Do you recall who, at the time
17   that Mr. Friedmann was terminated, do you
18   recall who Ms. Lucy Goldstein's direct
19   supervisor was?
20        A.    I don't recall exactly who it
21   was.
22        Q.    Do you recall what position
23   that person would have held?
24        A.    Who Lucy would of reported to
25   organizationally?
```

```
1                      P. DELGENIO
2        Q.    That's correct.
3        A.    It would have been a regional
4   director of sales.
5        Q.    For the region in which the
6   Garden City store was located in?
7        A.    Correct.
8        Q.    You don't recall that person's
9   name?
10       A.    I am trying to.  I am thinking.
11       Q.    And if you remember, please
12  tell me.
13       A.    I will.
14       Q.    And organizationally, who would
15  a regional director report to?
16       A.    A vice president.
17       Q.    A vice president?
18       A.    Of sales.
19       Q.    A vice president of sales.  Do
20  you recall who the vice president of sales
21  was in the area that would cover the Garden
22  City location?
23       A.    James Powers.
24       Q.    There would have been one
25  person between Ms. Goldstein and Mr.
```

1                    P. DELGENIO

2    Powers?

3         A.    Yes.

4         Q.    Just to review the process for

5    recommending a termination, if that is what

6    a store leader was inclined to do, you

7    testified that Ms. Goldstein would work

8    with her regional director?

9         A.    Yes.  My best guess is that it

10   would have been Tony Bender.  Again, the

11   time frame I am not exactly sure.

12        Q.    What is your understanding of

13   that process of the store manager working

14   with the regional director?

15        A.    A phone call, an e-mail, any

16   number of ways.  There is not a defined

17   required process, to my knowledge.

18        Q.    Does HR have a role in that

19   process?

20        A.    Yes.  As I stated, the regional

21   director would partner with the HR field

22   specialist and advise of their

23   decision-making or their intent to take

24   action with said associate or associates

25   and the HR specialist would determine if

1                    P. DELGENIO
2    they need to involve themselves or inquire
3    further into the decision-making and, you
4    know, loop me in if they felt there was
5    additional inquiries that should be made or
6    questions that should be asked.
7          Q.    That person, the HR field
8    specialist, that would have been
9    Ms. Roland?
10         A.    Correct.
11         Q.    So is it accurate to say that
12   Ms. Roland would have been contacted by Mr.
13   Bender or whoever the regional director
14   was?
15         A.    Likely.
16         Q.    Likely?
17         A.    Yes.
18         Q.    Would that process ordinarily
19   have been in writing?
20         A.    As I said, there is no
21   requirement of process, so I can't tell you
22   what it would ordinarily have been.
23         Q.    At the time that Mr. Friedmann
24   was terminated, do you recall seeing any
25   documentation or paperwork regarding his

```
 1                    P. DELGENIO
 2   termination?
 3          A.    I don't believe I saw his
 4   Performance Improvement Plan, no.
 5          Q.    Do you recall if Ms. Roland
 6   would of had to prepare documentation?
 7          A.    No, she would not have.
 8          Q.    She would not have had to
 9   prepare documentation?
10          A.    No.
11          Q.    Do you recall if someone from
12   Human Resources would have to be present
13   when the sales associate was advised of his
14   termination?
15          A.    No.
16          Q.    Do you know if Ms. Roland was
17   involved in communicating Mr. Friedmann's
18   termination to Mr. Friedmann?
19          A.    I don't believe so.
20          Q.    Do you know whether Ms. Roland
21   had any direct communications with Mr.
22   Friedmann in his last eight weeks of
23   employment with the company?
24          A.    I don't know.  I don't believe
25   so, but I don't know.
```

1                    P. DELGENIO

2         Q.    Is it fair to say that you

3    don't know whether anyone from HR even

4    spoke with Mr. Friedmann regarding his

5    performance issues in his last eight weeks

6    of employment?

7              MS. CHICLACOS:   Objection to

8          the form.

9         A.    It is fair to say that if Chris

10   Roland or anyone who reported to me had a

11   conversation with Larry Friedmann about his

12   performance, they would of let me know

13   about it.

14        Q.    Your testimony is that no one

15   did?

16        A.    Correct.   I don't recall.

17        Q.    In your experience, is that

18   unusual?

19        A.    Is what unusual?

20        Q.    For an HR representative to not

21   have any communications with an employee in

22   his last weeks prior to being terminated?

23        A.    No, it is not unusual.

24        Q.    You testified previously, early

25   on in your deposition, that you met Mr.

P. DELGENIO

1

2  Friedmann on several occasions just in the

3  course of visiting stores?

4       A.    Yes.

5       Q.    At any point in those

6  interactions with Mr. Friedmann, do you

7  recall discussing any HR concerns with him?

8       A.    No.

9       Q.    Do you recall him raising any

10  HR concerns with you?

11       A.    No.

12       Q.    Do you recall Ms. Roland ever

13  discussing with you that Mr. Friedmann had

14  raised any HR concerns?

15       A.    I don't recall that, no.

16       Q.    Prior to being made aware of

17  the fact that Mr. Friedmann had been placed

18  on a Performance Plan approximately six to

19  eight weeks prior to his termination, were

20  you aware of any performance issues with

21  Mr. Friedmann's employment?

22       A.    No.

23       Q.    Did you, at any point, review

24  Mr. Friedmann's history of performance with

25  the company?

1                    P. DELGENIO

2        A.    No.

3        Q.    I am sorry if we have gone over

4   this before, but I do want the record to be

5   clear.

6              Is it fair to say that you had

7   no role at all in making any recommendation

8   as to whether Mr. Friedmann should be

9   terminated?

10       A.    It is fair to say that.  If I

11  felt there was a need to insert myself into

12  that process, I would of done so, but my

13  role is dictated by my assessment of the

14  situation.

15       Q.    Have you inserted yourself into

16  the process in other proposed terminations?

17       A.    Yes.

18       Q.    Could you describe some

19  examples of when you inserted yourself into

20  the process?

21       A.    If I had an associate who

22  complained that their leader was

23  maltreating them or if I knew that the

24  overall morale in a location was poor, just

25  for a couple of examples, I would insert

                              P. DELGENIO
1
2    myself in, ask more questions and try to
3    gather information.
4         Q.    Is it fair to say that you were
5    not aware of the existence of any of those
6    issues with respect to Mr. Friedmann's
7    employment?
8         A.    That's correct.
9         Q.    Is it also fair to say that Mr.
10   Friedmann was never offered the opportunity
11   to meet with an HR representative during
12   the last eight weeks of his employment?
13        A.    No.
14             MS. CHICLACOS:   Objection to
15         the form.  Go ahead.
16        A.    We have an open door policy at
17   Raymour & Flanigan.  It is posted on our
18   walls and an HR field person is in every
19   location once a week, having the kinds of
20   conversations that I spoke about before,
21   hi, how are you?  How is everything going?
22   How is your day?  You know, did you have a
23   good weekend?  Things of that nature.  So
24   there is at least a weekly opportunity for
25   any associate to speak to their HR person

1                    P. DELGENIO

2     face-to-face.  So whether an opportunity

3     was offered, I don't know, but the

4     opportunity is very apparent.

5          Q.    Would it have been Ms. Roland

6     who would have been the HR representative

7     visiting Mr. Friedmann's location?

8          A.    Yes.  I may have visited also

9     during that time, it was part of my region,

10    but I can't specifically tell you what

11    weeks I was there.

12         Q.    How are sales associates made

13    aware of the open door policy that you just

14    described?

15         A.    Well, in the orientation

16    process, it is discussed by their HR

17    person, it is listed out in our Associate

18    Handbook, there is a Workers 1 poster.

19    Workers 1 is a 1-800 hotline number that

20    they can call if they are not comfortable

21    speaking to someone in the field.  That

22    goes to an anonymous service that is

23    checked by our central services team in

24    Syracuse.  There is a sheet in the break

25    room and in the sales office that has the

P. DELGENIO

1
2  contact information for every HR person in

3  the market with their cell phone numbers,

4  fax number, e-mail address and things like

5  that.  That is standard in every location

6  that we have.

7      Q.  Do you know when Mr. Friedmann

8  first began working with Raymour &

9  Flanigan?

10      A.  Well, I know it was before my

11  time.  I guess it is 2005.

12      Q.  Why do you believe it was 2005?

13      A.  Because he was there before me

14  and I started in 2006.

15      Q.  Do you know anything about Mr.

16  Friedmann's performance in 2005?

17      A.  No.

18      Q.  Do you know anything about Mr.

19  Friedmann's performance in 2006?

20      A.  No.

21      Q.  Do you know anything about his

22  performance in 2007?

23      A.  No, not specifically to him,

24  no.  I didn't have any specific information

25  presented to me about Mr. Friedmann's

1                    P. DELGENIO

2    performance until he was put on a

3    Performance Plan.

4         Q.    So again, just for clarity of

5    the record, the six to eight weeks prior to

6    his termination, to the best of your

7    recollection, is the first time you were

8    ever alerted to anyone having any issue

9    with Mr. Friedmann's work performance?

10        A.    That's my recollection, yes.

11        Q.    You stated or you testified

12   earlier that Ms. Roland indicated to you

13   that Mr. Friedmann was terminated?

14        A.    I am not sure if it was right

15   before or immediately after, but I was

16   advised by Chris either that he imminently

17   was going to be terminated or had been.  I

18   am not sure of the time frame.

19        Q.    And your decision was to not

20   get involved further at that point?

21        A.    It was my understanding that he

22   had not met the expectation laid out in his

23   Performance Plan, so I didn't insert myself

24   further.

25        Q.    Apart from Ms. Roland, did

```
 1                     P. DELGENIO
 2    anyone else communicate with you about Mr.
 3    Friedmann at that time?
 4         A.    Not to my recollection, no.
 5         Q.    What does HR do when an
 6    employee is about to be terminated?
 7         A.    In field HR, as I said
 8    earlier -- well, central services does
 9    compensation and payroll, so they have the
10    compensation and benefits, they have things
11    that they do that we are not responsible
12    for in the field, but the HR function, as I
13    said, we will take a look at the associate,
14    the location, the leadership team, the
15    performance management documentation, how
16    the associate is measured and, as I said
17    earlier, determine if there is anything
18    that stands out to us that would cause us
19    to ask more questions or do further
20    inquiries with the leadership as to the
21    decision-making.
22         Q.    You testified that in Mr.
23    Friedmann's case, you felt that that was
24    not necessary?
25         A.    Yes, that is what I testified.
```

```
 1                      P. DELGENIO
 2          Q.     Do you know if other employees
 3     at Mr. Friedmann's location were on
 4     Performance Improvement Plans?
 5          A.     I believe --
 6                 MS. CHICLACOS:    Time frame?
 7          Q.     In the year in which Mr.
 8     Friedmann was terminated?
 9          A.     I believe there were several.
10                 MS. CHICLACOS:  Can we take a
11            five-minute break, please?
12                 MR. ANDREWS:  Absolutely.  I
13            was going to suggest the same thing.
14            Five, ten minutes.
15                 (Whereupon, a short recess was
16            taken.)
17          Q.     We are back on the record after
18     a break.
19                 I want to take us right around
20     the time that you were advised that Mr.
21     Friedmann was being terminated or about to
22     be terminated.  Do you recall when that
23     was?
24          A.     No.
25          Q.     Do you recall what year it was?
```

```
 1                      P. DELGENIO
 2        A.    Is it 2010?  That's my best
 3   guess.
 4        Q.    If I told you it was June 18,
 5   2011 or approximately June 18, 2011, would
 6   you have any reason to believe that that
 7   was incorrect?
 8        A.    I wouldn't have any reason to
 9   believe that that was incorrect.
10        Q.    At the time that you were
11   advised that he was going to be terminated
12   or was being terminated by Ms. Roland, you
13   testified that Ms. Roland advised you that
14   Larry didn't make his numbers?
15             MS. CHICLACOS:  Objection.
16        A.    Yes.
17        Q.    Can you tell us what you were
18   advised at the time?
19        A.    That Larry Friedmann was going
20   to be released from service, he didn't meet
21   the expectations of his Performance
22   Improvement Plan, something to that effect,
23   and in addition to anyone being released
24   from service at that time.
25        Q.    It is your testimony at that
```

```
 1              P. DELGENIO
 2   time that you did not feel that there was
 3   any need for you to become involved in that
 4   situation?
 5        A.    I wasn't advised of any reason
 6   to be, and, therefore, I didn't feel there
 7   was.
 8        Q.    After Mr. Friedmann was
 9   terminated, did there ever come a point in
10   time when you once again heard about Mr.
11   Friedmann's relationship with the company?
12        A.    Can you clarify your question?
13        Q.    After his termination, were you
14   ever advised that Mr. Friedmann was
15   challenging his termination in some way?
16            MS. CHICLACOS:  I am going to
17        object.  The question calls for the
18        production of attorney-client
19        privilege information.
20            MR. ANDREWS:  So you are
21        directing your Witness not to answer?
22            MS. CHICLACOS:   Yes.
23        Q.    Are you aware of the fact that
24   Mr. Friedmann has filed a lawsuit in this
25   action?
```

```
 1                    P. DELGENIO
 2        A.    Yes.
 3        Q.    Do you recall when you became
 4   aware of that?
 5        A.    I guess shortly after Counsel
 6   became aware.
 7        Q.    Are you aware of the
 8   allegations that Mr. Friedmann has made in
 9   his Complaint?
10        A.    Yes, I believe so.
11             MR. ANDREWS:  I would like to
12        mark as Plaintiff's Exhibit 2 a
13        document.  If you can mark it first
14        before the Witness sees it.
15             (Whereupon, the aforementioned
16        document was marked as Plaintiff's
17        Exhibit 2 for identification as of
18        this date by the Reporter.)
19        A.    Okay.
20        Q.    Have you seen this document
21   previously?
22        A.    No.
23        Q.    In your current position, if a
24   former employee sues the company, would you
25   ordinarily become aware of that fact?
```

```
 1                    P. DELGENIO
 2        A.    Yes.
 3        Q.    How would you become aware of
 4   that fact?
 5        A.    By Counsel.
 6        Q.    In general, I know you
 7   testified that you have not seen this
 8   document previously, I am just asking about
 9   the general process, what does that general
10   process consist of?
11             MS. CHICLACOS:  I am going to
12        object and instruct the Witness not
13        to answer, as this is beyond the
14        scope of the 30(b)(6) Deposition
15        Notice which related to, one,
16        information related to
17        anti-discrimination policies, two,
18        information related to disabilities
19        and accommodation of disabilities in
20        the workplace, and three, affirmative
21        defenses asserted by Defendants.
22             HR's knowledge of lawsuits does
23        not fall within any three of these
24        categories.
25             MR. ANDREWS:  I respectfully
```

```
 1              P. DELGENIO
 2    disagree.  The 30(b)(6) Witness has
 3    testified firstly that she has not
 4    previously seen even the Notice of
 5    Deposition for her in this action and
 6    now has testified that she has not
 7    previously seen the very Complaint
 8    filed by the Plaintiff in this
 9    action.  In light of that, we feel
10    that the line of questioning is
11    appropriate regarding the company's
12    policies for handling discrimination
13    related complaints regarding
14    employees.
15         If you are going to direct your
16    Witness not to answer, we may need to
17    take a break and I may need to
18    discuss the matter with Mr. Harman.
19         MS. CHICLACOS:  I am going to
20    direct her not to answer.  I have
21    given you a lot of leeway already in
22    terms of questions that went beyond
23    the scope.  The Complaint is not even
24    listed within the 30(b)(6) Notice,
25    nor is anything related to the
```

```
 1                    P. DELGENIO
 2         company's knowledge of the
 3         complaints.  It is related to, again,
 4         discrimination policies, disability
 5         and accommodation policies and
 6         Defendant's affirmative defenses.
 7         Because of that, because it is our
 8         position that Mr. Friedmann was
 9         terminated for legitimate
10         non-discriminatory and
11         non-retaliatory reasons, I gave you a
12         little leeway earlier, that's it.
13              The Complaint and the company's
14         receipt of it and upon receipt, what
15         it did, is not on the 30(b)(6)
16         Notice.  If you would like to call
17         the Court, call the Court.
18              MR. ANDREWS:  Before we do
19         that, just to make my position clear,
20         Mr. Friedmann's Complaint that the
21         Witness said she did not previously
22         review or seen contains numerous
23         allegations of age discrimination and
24         disability discrimination, and in
25         light of the Witness' inability to
```

P. DELGENIO

1
2  even recognize the document, we
3  believe that this line of questioning
4  is appropriate.
5      MS. CHICLACOS:  Mr. Andrews, if
6  I may, you questioned the Witness
7  about her particular knowledge of
8  Plaintiff Friedmann's complaints,
9  which is part of his lawsuit.
10  Whether or not she seen the actual
11  document is irrelevant.
12      The 30(b)(6) Notice, again,
13  does not ask for a witness who has
14  knowledge of Mr. Friedmann's claims
15  and allegations in this action.  It
16  asks for a witness with knowledge of
17  policies and our affirmative defenses
18  and Ms. Delgenio is well versed in
19  both of these.  We have proven that
20  already today.  What you are asking
21  at this point is beyond the scope.
22      MR. ANDREWS:  We have to take a
23  break.  I am going to have to discuss
24  it.  I believe that your
25  interpretation is overly narrow and I

P. DELGENIO

1        do not believe that the Court would

2        agree with it, but there is no point

3        in wasting more time about that.  We

4        will go off the record for a few

5        minutes and hopefully resolve this.

6            MS. CHICLACOS:  Okay.

7            (Whereupon, a short recess was

8        taken.)

9            MR. ANDREWS:  We are back on

10       the record.  Our office is attempting

11       to, just so everyone knows, to

12       contact Judge Tomlinson to ascertain

13       her availability to rule on this

14       matter.

15           I will ask you, the Court

16       Reporter, to just mark this section

17       of the deposition so if we come back

18       to it, we know where to come back to

19       it.  I don't want to waste time, so

20       we will move on.

21       Q.   We are up to 3.  I would like

22   to mark as Exhibit 3 a document and ask

23   that, as with the previous exhibit, you

24   take some time to review it and I will have

1                    P. DELGENIO

2    specific questions for you.

3                    (Whereupon, the aforementioned

4          document was marked as Plaintiff's

5          Exhibit 3 for identification as of

6          this date by the Reporter.)

7          A.    Okay.

8          Q.    Have you had the opportunity to

9    review the document marked as Plaintiff's

10   Exhibit 3?

11         A.    Today, yes.

12         Q.    Have you seen this document

13   previously?

14         A.    No.

15         Q.    I take it that you did not

16   participate in the preparation of this

17   document?

18         A.    No, I did not participate in

19   the preparation of this document.

20         Q.    I just want to turn your

21   attention back to Exhibit 1, the Notice of

22   Deposition.  It is the third page of that.

23   I direct you to point three.  Well, I will

24   direct you to the section that says

25   "Plaintiffs seeks testimony from

```
 1              P. DELGENIO
 2    Defendant's 30(b)(6) witnesses on the
 3    following matters:
 4              All affirmative defenses
 5    asserted by Defendants and or to be relied
 6    upon in any pleading up to and including
 7    trial."
 8              Do you see that comment?
 9    A.    Yes.
10    Q.    You testified earlier that you
11    were prepared to testify regarding that
12    subject?
13    A.    Prepared to testify to
14    everything we have affirmed as a defense.
15              MR. ANDREWS:  I am sorry.  Off
16         the record.
17              (Whereupon, an off-the-record
18         discussion was held.)
19              MR. ANDREWS:  Can I ask you to
20         bring me back to where we were right
21         before the call came in.
22              (Whereupon, the referred to
23         question and answer was read back by
24         the Reporter.)
25    Q.    Let's go back to the Exhibit 1
```

```
 1                    P. DELGENIO
 2   at the third page which is labeled Exhibit
 3   A and where it says "Plaintiffs seeks
 4   testimony from Defendant's 30(b)(6)
 5   witnesses on the following matters:"
 6              Matter number three, "All
 7   affirmative defenses asserted by Defendants
 8   and or to be relied upon in any pleading up
 9   to and including trial."
10              Do you see that statement?
11       A.    Yes.
12       Q.    Are you prepared to testify
13   regarding that subject?
14       A.    Regarding all of the
15   affirmative defenses in this third document
16   that you just had me look at?
17       Q.    Well, including but not limited
18   to that.  It is all affirmative defenses
19   asserted by Defendants and or to be relied
20   upon in any pleading up to and including
21   trial.
22       A.    I am prepared to testify to
23   anything that I know about.
24       Q.    I respect your answer.
25              MR. ANDREWS:  I will object for
```

1                    P. DELGENIO

2        the record with respect to the

3        appropriateness of a 30(b)(6) witness

4        who has testified that she has not

5        seen the Notice of Deposition, not

6        seen the Complaint and not seen the

7        Answer and the affirmative defenses.

8        I believe that we do not have an

9        appropriate 30(b)(6) witness and I

10       want to make that objection clear for

11       the record, but again, I will

12       continue with the questioning.

13          MS. CHICLACOS:  I will note in

14       response there has yet to be one

15       question that you asked the Witness

16       that she is unable to answer based on

17       the topics in the 30(b)(6) Notice.

18          MR. ANDREWS:  I would like to

19       move on with the questioning and

20       limit exchanges with Counsel.  I do

21       want to note for the record that the

22       Witness has testified that she has

23       not previously seen the Notice of

24       Deposition, the Plaintiff's Complaint

25       or the Defendant's Answer.  We will

```
 1              P. DELGENIO
 2        proceed with the questions.
 3        Q.    Exhibit Number 3, Defendant's
 4   Answer with Affirmative Defenses.  I
 5   understand it is your testimony that you
 6   have not previously seen this document?
 7              MS. CHICLACOS:  Objection.  It
 8          doesn't say Answer within the
 9          Deposition Notice.
10              MR. ANDREWS:  Your objection is
11          noted.
12        Q.    Again, I direct your attention
13   to Exhibit 3, the document that is entitled
14   Defendant's Answer with Affirmative
15   Defenses.  Do you see that document?
16        A.    Yes.
17        Q.    Again, it is your testimony
18   that you have not previously seen this
19   document?
20        A.    Correct.
21        Q.    Thank you.
22              I would like to direct your
23   attention to page six of this document,
24   marked as Exhibit 3, where it says at the
25   very bottom, it says First Affirmative
```

```
 1                    P. DELGENIO
 2    Defense.
 3         A.    Yes.
 4         Q.    Do you see that?
 5         A.    Yes.
 6         Q.    Have you seen this previously?
 7         A.    No.
 8         Q.    I would like to just turn to
 9    page seven where it says Second Affirmative
10    Defense.
11         A.    Yes.
12         Q.    Have you seen that previously?
13         A.    No.
14         Q.    I would like you to take a look
15    at the next item, Third Affirmative
16    Defense.  The next question, have you seen
17    that statement previously?
18         A.    No.
19         Q.    The answer is no?
20         A.    No.
21         Q.    I would like you to take a look
22    at the next one, Fourth Affirmative Defense
23    and ask you the same question?
24         A.    No, I haven't seen the Fourth
25    Affirmative Defense.
```

```
 1                    P. DELGENIO
 2         Q.    Have you seen the Fifth
 3   Affirmative Defense before?
 4         A.    No, I have not.
 5         Q.    Have you seen the Sixth
 6   Affirmative Defense before?
 7         A.    No, I have not.
 8         Q.    Have you seen the Seventh
 9   Affirmative Defense before?
10         A.    No, I have not.
11         Q.    Have you seen the Eighth
12   Affirmative Defense before?
13         A.    No, I have not.
14         Q.    On page eight, there are a
15   number of other affirmative defenses.
16   There is the Ninth, Tenth, Eleventh,
17   Twelfth, Thirteenth, Fourteenth and the
18   Fifteenth.  Have you seen any of those
19   affirmative defenses previously?
20         A.    No, I have not seen this
21   document or these affirmative defenses
22   previously.
23         Q.    And finally on page nine, there
24   is a Sixteenth Affirmative Defense.
25         A.    Yes.
```

P. DELGENIO

1
2      Q.     Have you seen that affirmative

3   defense previously?

4      A.     No, I have not.

5      Q.     Thank you.

6             MR. ANDREWS:   Again, we note

7        for the record that, at this time, we

8        believe that the Defendants have not

9        designated an appropriate 30(b)(6)

10       witness in response to the Deposition

11       Notice.   That being said, I will

12       continue with the questions.

13      A.     Can I just add to that?

14      Q.     Well, there is no question

15   pending.   I prefer that I ask the

16   questions.

17      A.     Okay.

18      Q.     But if you want to correct

19   something that you previously said.

20      A.     I want to correct.   I haven't

21   seen this document before, but I see what

22   you presented to me in Document 2.

23      Q.     Yes.

24      A.     That's all.

25      Q.     Thank you.

1                    P. DELGENIO

2          A.     And one record is --

3          Q.     Thank you.  Just to be clear,

4    you also testified that you had not

5    previously seen Document 2?

6          A.     Correct, that is correct.

7          Q.     Do you know why Mr. Friedmann

8    is suing Raymour & Flanigan?

9          A.     Yes.

10         Q.     What is your understanding why

11   he is suing Raymour & Flanigan?

12         A.     My understanding that he is

13   suing Raymour & Flanigan is because he

14   believes that we discriminated against him

15   on the basis of his age and his sciatica

16   condition.

17         Q.     How did you learn of that?

18                MS. CHICLACOS:  Objection.  I

19           am instructing her not to answer as

20           it calls for the production of

21           attorney-client privilege

22           information.

23         Q.     Are you, in your current

24   position, responsible for training other

25   Raymour & Flanigan employees regarding

1          P. DELGENIO

2   Human Resources policies and procedures?

3          A.    Yes, I am responsible for that

4   function, yes.

5          Q.    Do you train store managers?

6          A.    Yes.

7          Q.    How do you train store

8   managers?

9          A.    There is a variety of different

10  trainings that I am ultimately responsible

11  for.  I don't physically facilitate all of

12  the trainings myself.

13         Q.    Do you conduct, do you

14  personally conduct any training?

15         A.    I personally have conducted

16  every training in the HR suite.

17         Q.    When you say "the HR suite" --

18         A.    Any of the HR trainings that we

19  would provide, I have facilitated each and

20  every one.  I don't currently in my

21  position facilitate each and every one

22  myself.

23         Q.    When you say "the HR suite," I

24  understand you to mean training of other HR

25  professionals; is that correct?

1                      P. DELGENIO

2           A.    No.  I mean training, anything

3      in the HR, the trainings that HR provides.

4           Q.    What types of trainings does HR

5      provide?

6           A.    HR provides new hire

7      orientation.  HR provides professional

8      conduct and harassment awareness training.

9      HR provides management training,

10     communication, effective listening, on the

11     role of the supervisor assertive influence,

12     diversity and coaching.  There are two or

13     three coaching workshops that the HR team

14     facilitates as part of the HR service that

15     we provide to our leaders.

16          Q.    Have you ever trained Ms. Lucy

17     Goldstein?

18          A.    Yes.

19          Q.    Can you recall what training

20     you provided Ms. Lucy Goldstein?

21          A.    Yes.  I recall at least one

22     time where I facilitated a professional

23     conduct and harassment awareness refresher

24     training.

25          Q.    Can you describe in summary

1                    P. DELGENIO

2    form what that type of session would have

3    consisted of?

4         A.    Sure.  Each year we refresh

5    professional conduct and harassment

6    awareness training for our managers and the

7    training that I am thinking of now, Lucy

8    was present, it was either her second or

9    third time attending, and we talk about the

10   laws related to discrimination on the basis

11   of protected categories, age, race,

12   disability, family, marital status, now

13   sexual orientation, things of that matter.

14   We talk about third-party harassment, we

15   talk about quid pro quo, peer harassment,

16   we talk about hostile working environment.

17   Anything that would, I assume, customarily

18   would be included in sexual conduct and

19   sexual harassment workshop.

20        Q.    Are store managers advised to

21   reach out to Human Resources if they have

22   questions?

23        A.    Yes.

24        Q.    How are they advised to do

25   that?

                              P. DELGENIO

1
2        A.     At the end of any HR workshop,
3    if you have questions, if you have
4    concerns, if there is anything that you are
5    unsure about, feel freely to reach out to
6    any member of our team.  Are numbers are
7    posted on the wall, as I stated previously.
8    You know, when we are in your location,
9    feel free to pull us aside, that is what we
10   are here for.
11       Q.     If a store manager received a
12   complaint from an employee alleging some
13   form of prohibited discrimination and
14   didn't reach out to Human Resources, would
15   that be a violation of company policy?
16       A.     Yes.
17       Q.     To your knowledge, did Mr.
18   Friedmann ever complain to Ms. Goldstein
19   regarding any issues concerning his
20   employment during the time that he was
21   employed there?
22       A.     Not to my knowledge, no.
23       Q.     To your knowledge, did
24   Ms. Goldstein ever reach out to you or to
25   any one of your colleagues in HR regarding

```
 1                    P. DELGENIO
 2    any complaints that Mr. Friedmann may have
 3    made regarding his employment?
 4         A.    Not to my knowledge or
 5    recollection, no.
 6         Q.    If such an effort to reach out
 7    to you had been made, would that have been
 8    documented in your files, in HR's files?
 9         A.    Customarily, yes.
10         Q.    Would HR customarily have
11    conducted an investigation?
12         A.    I have semantics.  So
13    investigation is a very broad term.  We
14    would of inquired, we would of sought to
15    find additional information, seek to
16    understand what the associate's concern
17    was, speak with the leadership team.  So
18    yes, if a complaint came to HR from a store
19    manager or from an associate, we would
20    reach back out to try to better understand
21    the situation, gather some more
22    information.
23         Q.    Would you meet with the
24    associate himself or herself who had made
25    the complaint?
```

```
 1                    P. DELGENIO
 2        A.    I personally or someone on the
 3    HR team?
 4        Q.    Someone on the HR side?
 5        A.    Yes.
 6        Q.    In Mr. Friedmann's case, and I
 7    understand that you testified that you are
 8    not aware of any complaints that Mr.
 9    Friedmann made while employed, but in Mr.
10    Friedmann's case, would it have been
11    Ms. Roland who would have fulfilled that
12    function had a complaint been made?
13        A.    If a complaint would of been
14    made to her, she would of followed up on
15    it.  Whoever the complaint goes to would be
16    the person who would follow-up on it.
17        Q.    Would Ms. Roland be the person
18    that Ms. Goldstein would have gone to if
19    she had an issue that she needed to consult
20    with HR about?
21        A.    It could have been Chris Roland
22    or it could have been myself.
23        Q.    Has Ms. Goldstein ever reached
24    out to you or Ms. Roland regarding any
25    employee complaint?
```

```
 1                    P. DELGENIO
 2         A.    An employee complaint, no, not
 3    to my recollection.
 4         Q.    Does Ms. Goldstein work with
 5    the company any longer?
 6         A.    Yes.  She is on leave of
 7    absence, I believe.
 8         Q.    Do you know when she went on
 9    leave of absence?
10         A.    Last year.
11         Q.    During the time when she was
12    actively employed, that is not including
13    the time that she was on leave of absence,
14    can you give me an estimate of how long you
15    overlapped with Ms. Goldstein as employees,
16    active duty employees?
17         A.    She went out in 2011.  It would
18    be my entire time there, 7, 8, 9, 10,
19    four years.
20         Q.    Four years?
21         A.    Four, five years.
22         Q.    Is it your testimony in those
23    four years you are not aware of
24    Ms. Goldstein ever reaching out to anyone
25    in HR regarding an employee complaint?
```

<pre>
 1                    P. DELGENIO
 2        A.     I can't recall.
 3        Q.     Do you recall any employees
 4   under Ms. Goldstein's supervision
 5   complaining to HR?
 6             MS. CHICLACOS:  I think that I
 7             am going to object on the grounds
 8             that this exceeds the scope of the
 9             30(b)(6) Notice again.  It doesn't
10             pertain to a policy.  If you would
11             like to point me to an affirmative
12             defense in the Answer that you
13             believe this relates to, I will
14             reconsider, but it is beyond the
15             scope.
16             MR. ANDREWS:  Just to respond
17             briefly, I will try to keep my
18             comments very brief, the Deposition
19             Notice which the Witness has
20             testified she has not previously seen
21             seeks in point one "All information
22             related to anti-discrimination
23             policies at Defendant, Raymour
24             Furniture Company, Inc."
25                  The Plaintiffs feel that
</pre>

```
 1                    P. DELGENIO
 2        questions regarding complaints made
 3        by employees regarding their managers
 4        to Human Resources fall within the
 5        scope of that category.
 6             Secondly, with all due respect
 7        to Ms. Chiclacos, the Witness has,
 8        within the past few minutes,
 9        testified that she has not previously
10        seen any affirmative defense asserted
11        by the Defendant in this matter, so I
12        don't know what else further to add
13        to that, but I would like to continue
14        with the questions and your objection
15        is noted for the record.  I would
16        like to move on.
17             MS. CHICLACOS:  Okay.
18             MR. ANDREWS:  Can we have the
19        last question and answer read back,
20        please.
21             (Whereupon, the referred to
22        question and answer was read back by
23        the Reporter.)
24             MR. ANDREWS:  There was an
25        instruction to not answer that
```

```
 1              P. DELGENIO
 2        question and do you stand by that
 3        instruction to not answer?
 4             MS. CHICLACOS:  Yes.
 5             MR. ANDREWS:  I would like to
 6        go off the record.
 7             (Whereupon, an off-the-record
 8        discussion was held.)
 9        Q.    Are you generally familiar with
10   the company's policies regarding employee
11   disability?
12        A.    Yes.
13        Q.    Do you participate in
14   formulating those policies?
15        A.    I participate in the
16   administration of those policies.  The
17   formulation I would say no.
18        Q.    Do you know who formulates
19   those policies?
20        A.    I would assume that it is in
21   conjunction with counsel as those policies
22   are saved in the Associate Handbook, so the
23   same process would apply.
24        Q.    You used the word before, I
25   don't want to misstate what you said, you
```

```
 1                    P. DELGENIO
 2    stated before that you participate in the
 3    administration of those policies?
 4         A.    The administration of the
 5    disability policies?
 6         Q.    Yes.
 7         A.    Yes, or the oversight of the,
 8    you know, how they are carried out.
 9         Q.    I will use the word
10    administration for now.  That's okay.  How
11    are you trained in how to administer those
12    policies?
13         A.    How am I personally trained in
14    how to administer those policies?  Frankly,
15    my years of experience in the HR field and
16    all of the training and experience that I
17    have had to date, conferring with counsel
18    if I have questions or clarifications that
19    need to be made to the policy, that I
20    oversee and administer the following of the
21    policy.  So specific training, I can't tell
22    you.
23         Q.    And your supervisor, the
24    overall head of human resources is Mr.?
25         A.    McPeak.
```

P. DELGENIO

1

2      Q.      McPeak.  Does he provide you

3   with input on the administration of those

4   policies?

5      A.      Yes.

6      Q.      How does he do that?

7      A.      If I was to confer with him

8   that I needed additional support or

9   resources to help me determine how to

10  administer a policy or situation that I was

11  specifically working with, I might reach

12  out to Steve or to counsel to make sure

13  that we are following through in the

14  appropriate fashion.

15     Q.      When you become aware one way

16  or the other that an employee, such as a

17  sales associate, is temporarily disabled,

18  what is the process for dealing with that?

19     A.      Temporarily disabled, meaning

20  that they are out of work?

21     Q.      Let's start with that.

22     A.      An associate is out of work, I

23  would determine the reason why, the amount

24  of time that they need to be out of work,

25  if they were eligible for any -- entitled

1                    P. DELGENIO

2     leaves, family medical leaves and the

3     paperwork associated, health care

4     certifications associated with those leaves

5     to determine the amount of leave that they

6     are entitled to.

7          Q.    If it is a situation where the

8     employee is able to report to work, but is

9     requesting some modification in his

10    schedule, how is that handled?

11         A.    They would let their manager

12    know that they need an accommodation or a

13    schedule adjustment based on whatever

14    condition they are managing at the time.

15    If the store manager has questions about

16    being able to make those adjustments or

17    accommodations, they reach out to the Human

18    Resource team and we would help them

19    determine what accommodations can and

20    should be made.

21         Q.    If a manager did not reach out

22    to your team, would that be a violation of

23    company policy?

24         A.    Yes, they should reach out.

25    They should reach out if they feel they are

1                        P. DELGENIO

2    not able to make the accommodation or the

3    adjustment.  If they are able to make the

4    accommodation or adjustment, then they do

5    it.

6          Q.    Is any type of documentation

7    required of managers in those situations?

8          A.    No, no specific documentation.

9          Q.    If a manager feels that he or

10   she is unable to make the adjustment or

11   accommodation, is any documentation

12   required of that?

13         A.    No.

14         Q.    So if a manager refused to

15   accommodate an employee and didn't reach

16   out to Human Resources, you would have no

17   way to know that that request had been

18   made?

19         A.    Unless the associate themselves

20   reached out to Human Resources.  If the

21   manager didn't tell us, we wouldn't know.

22   If the associate didn't tell us, we

23   wouldn't know.

24         Q.    Is it fair to say that if Mr.

25   Friedmann was having an issue with Ms.

P. DELGENIO

2  Goldstein and neither of them reached out

3  to Human Resources, Human Resources would

4  not necessarily know even the existence of

5  such issues?

6       A.    I think that is fair.

7            MR. ANDREWS:  I would like to

8       mark as Exhibit 4 a two-page

9       document.

10           (Whereupon, the aforementioned

11      document was marked as Plaintiff's

12      Exhibit 4 for identification as of

13      this date by the Reporter.)

14           (Whereupon, a lunch recess was

15      taken from 1:25 to 2:10 p.m.)

16      Q.    Back on the record after lunch.

17           We were about to talk about an

18  exhibit which I marked as Plaintiff's

19  Exhibit 4, which is an October 11, 2011

20  document.  I will ask the Witness to review

21  that and I will have some questions for

22  you.

23           Have you ever seen this

24  document previously?

25      A.    Not this specific document, no.

```
 1                    P. DELGENIO
 2        Q.    Did anyone discuss with you the
 3   preservation of documents relating to Mr.
 4   Friedmann's employment?
 5        A.    Yes.
 6        Q.    Do you recall when that
 7   discussion took place?
 8        A.    In conjunction with my being
 9   advised that there was a case, which was
10   probably shortly after counsel advised,
11   found out, whenever that was.
12        Q.    Without disclosing any
13   attorney-client communication, do you have
14   an understanding of what documents you are
15   supposed to retain?
16        A.    Anything, e-mails, any hard
17   copies, anything related to discussion of
18   the associate's performance or anything at
19   all related to the associate's time with
20   us.
21        Q.    Did you follow those
22   instructions?
23        A.    Yes.
24             MR. ANDREWS:  To the extent any
25        of those documents have not yet been
```

1                    P. DELGENIO

2           already produced, we call for their

3           production at the earliest

4           convenience of the Defendants.

5                I would like to just move on.

6           Q.    Do you have an understanding in

7      what form these materials would be

8      preserved in, what medium?

9           A.    Mostly e-mails I guess would be

10     the only thing that I would have, that I

11     specifically would have had, but I am not

12     sure I exactly understand your question.

13          Q.    Well, what types of materials

14     do you have in Mr. Friedmann's file in

15     Human Resources?

16               MS. CHICLACOS:   Objection to

17          the form.

18          A.    Well, the Human Resources

19     personnel files are maintained in our

20     central services area in Liverpool, so I

21     don't maintain his personnel file.

22          Q.    Have you ever seen his

23     personnel file?

24          A.    I don't recall seeing his

25     personnel file.

                              P. DELGENIO
1
2          Q.     Do you use a BlackBerry or
3    iPhone at work?
4          A.     Yes.
5          Q.     Are communications retained on
6    those devices that you receive from
7    Ms. Roland?
8                 MS. CHICLACOS:   Objection to
9           form.
10         Q.     Does Ms. Roland communicate
11   with you using e-mail and text messages?
12         A.     Yes.
13         Q.     How do you retain those e-mails
14   and text messages?
15         A.     Well, the e-mails are on the
16   company server, so they are maintained
17   through the normal course of how the
18   company archives e-mails, and I don't
19   believe that I had my phone at the time
20   that I would of had any communication about
21   Larry Friedmann, so I don't know.
22         Q.     Would you have had another type
23   of device, such as a BlackBerry?
24         A.     I would of had -- I did not
25   have a BlackBerry.  I did not have e-mail

1                    P. DELGENIO

2    on my phone until got an iPhone, which was

3    probably a year and a half ago.

4              MR. ANDREWS:  We are up to 5.

5         I would like to introduce as

6         Plaintiff's Exhibit 5 a document.

7              MS. CHICLACOS:  I am going to

8         object at this point and to instruct

9         the Witness not to even look at this

10        document.  Again, showing her this,

11        it is beyond the scope of the

12        30(b)(6) Notice.  If you would like

13        to wait until the judge calls us, but

14        she is not going to look at the

15        exhibit at this point.

16             MR. ANDREWS:  We understand

17        your instruction to the Witness.  I

18        will do my best to keep my comments

19        brief.

20             The Notice of Deposition, which

21        was marked as Exhibit 1, which the

22        Witness testified that she had not

23        previously seen, sought from the

24        Defendant's 30(b)(6) witness

25        testimony regarding all affirmative

```
 1              P. DELGENIO
 2    defenses asserted by Defendants and
 3    or to be relied upon in any pleading
 4    up to and including trial.
 5         Up to this point in the
 6    deposition, the Plaintiffs note that
 7    the witness designated as the
 8    30(b)(6) witness has testified that
 9    she has not seen her Notice of
10    Deposition previously, she has not
11    seen Plaintiff's Complaint
12    previously, she has not seen
13    Defendant's Answers with Affirmative
14    Defenses previously, could not
15    recognize any of the Defendant's
16    affirmative defenses and now that I
17    have introduced Defendant's Responses
18    and Objections to Plaintiff's First
19    Set of Document Requests, which
20    include responses and objections, the
21    Defendant's Counsel has now
22    instructed the Witness to not even
23    look at the document.
24         For these reasons, the
25    Plaintiffs again reiterate that we do
```

```
1              P. DELGENIO
2        not feel that the Witness is a proper
3        30(b)(6) witness.  We also feel that
4        Counsel has improperly interfered
5        with the taking of this 30(b)(6)
6        deposition.  That being said, I would
7        like to continue with the deposition,
8        unless you wanted to say something on
9        the record.
10             MS. CHICLACOS:  No.
11             MR. ANDREWS:  I understand
12       Jessica is not going to let the
13       Witness see it, but I want it marked
14       as Exhibit 5.
15             (Whereupon, the aforementioned
16       document was marked as Plaintiff's
17       Exhibit 5 for identification as of
18       this date by the Reporter.)
19        Q.    Ms. Delgenio, have you reviewed
20   any pleadings in this case?
21             MS. CHICLACOS:  Objection to
22        the form.
23        Q.    Let me go back for a second.
24   Do you know what a pleading is?
25        A.    That is what I was going to ask
```

1                    P. DELGENIO

2       you to clarify.

3            Q.    A pleading is a document

4       prepared by attorneys, either the attorneys

5       for the Plaintiff or the attorneys for the

6       Defendant in the litigation, in this

7       litigation, Friedmann versus Raymour

8       Furniture Company.  Do you now understand

9       what a pleading is?

10           A.    Yes.

11           Q.    Based on that understanding,

12      have you previously reviewed any pleadings

13      in this case?

14           A.    No, I have not previously

15      reviewed any pleadings in this case.

16           Q.    Either prepared by Defendants

17      or by Plaintiffs?

18           A.    By neither.

19           Q.    Did you discuss your deposition

20      with Counsel during lunch today?

21           A.    No.

22           Q.    Thank you.

23           MR. ANDREWS:  Let me just get

24           my copies ready.  I would like to

25           introduce as Plaintiff's Exhibit 6 a

```
 1                    P. DELGENIO
 2         two-page document by Defendants,
 3         D000039 and D000040.
 4              (Whereupon, the aforementioned
 5         document was marked as Plaintiff's
 6         Exhibit 6 for identification as of
 7         this date by the Reporter.)
 8         Q.    I would like you to review this
 9   document and I will have some specific
10   questions for you.
11         A.    Okay.
12         Q.    Do you recognize what this
13   document is?
14         A.    Yes.
15         Q.    Can you tell me what this
16   document is?
17         A.    It is a Coaching For Success
18   Form.
19         Q.    Is it for Mr. Friedmann?
20         A.    Yes, it is a Coaching For
21   Success Form for Larry Friedmann.
22         Q.    The date on this is May 7,
23   2011; is that correct?
24         A.    Yes.
25         Q.    It is the Plaintiff's
```

P. DELGENIO

1

2    contention in this case that Mr. Friedmann

3    was terminated in approximately August of

4    2011?

5        A.    Did I say July 18th?  Is that

6    what you said?  Sorry.

7        Q.    Let me refresh my recollection.

8        A.    Or June?

9        Q.    Earlier today I asked you if

10   you remembered when Mr. Friedmann was

11   terminated and you didn't recall the

12   specific date and I asked you whether if I

13   tell you it was June 18, 2011, you would

14   disagree and you said that that may be the

15   correct date.

16        MS. CHICLACOS:  Objection to

17     the form.

18        Q.    Is that correct?

19        MS. CHICLACOS:  Objection to

20     the form.

21        Q.    Let me rephrase the question.

22        It is the Plaintiff's

23   contention that Mr. Friedmann was

24   terminated on June 18, 2011.  Do you have

25   any specific reason to believe that that is

1                    P. DELGENIO

2    not the correct date on which he was

3    terminated?

4         A.    No.

5                    MS. CHICLACOS:   Objection to

6         the form.

7         Q.    You testified that you first

8    were advised that Mr. Friedmann was on a

9    Coaching For Success Plan several weeks

10   prior to his termination and I believe that

11   you testified that it was roughly eight

12   weeks, six to eight weeks?

13        A.    I think I said four to six.

14        Q.    Four to six weeks.  Do you

15   recall seeing this particular document

16   previously?

17        A.    I don't recall seeing this

18   particular document at this time.

19        Q.    You don't recall, okay.  Is

20   this the type of document that would have

21   been brought to your attention?

22        A.    These documents, I am not sure.

23   I don't recall reviewing the document.  I

24   believe I was made aware that a document

25   was created and administered, I believe I

1                       P. DELGENIO

2   was advised that by Chris Roland.

3        Q.    But you don't know if it was

4   this document?

5        A.    I don't know if it was this

6   document.   There are signatures on the

7   document that leads me to believe that it

8   was this document.

9             MR. ANDREWS:   I would like to

10        mark as Exhibit 7 a two-page

11        document, D000043 and D000044.

12            (Whereupon, the aforementioned

13        document was marked as Plaintiff's

14        Exhibit 7 for identification as of

15        this date by the Reporter.)

16            MR. ANDREWS:   I am sorry.   I

17        stand corrected.   It is a three-page

18        document.   D000045.

19        A.    Okay.

20        Q.    Do you know what this document

21   is?

22        A.    It is an Action Plan for Larry

23   Friedmann.   It looks like it was

24   administered on 6/13/11.

25        Q.    Do you recall seeing this

1                       P. DELGENIO

2    document previously?

3          A.    No.

4          Q.    Is this the type of document

5    that would have been forwarded to you in

6    the course of your duties?

7          A.    It could be, but not something

8    that as a matter of course we review each

9    and every one.  We don't review each and

10   every Action Plan for each and every

11   associate.

12         Q.    Do you receive each and every

13   Action Plan for each associate?

14         A.    Not always.  Sometimes they are

15   forwarded directly up to our central

16   services area in Liverpool for filing.

17         Q.    Do you know if anyone reviews

18   them in Liverpool?

19         A.    Not to my knowledge.

20         Q.    So it is your testimony that a

21   manager could generate performance Action

22   Plans that would not be reviewed by anyone

23   else?

24              MS. CHICLACOS:  Objection to

25         the form.

1                    P. DELGENIO

2        A.     It is possible.

3        Q.     What are the exhibit numbers?

4        A.     This is 7 and this is 6.

5        Q.     Is it possible that Exhibits 6

6   and 7 were never reviewed by anyone other

7   than Ms. Goldstein?

8        A.     It is possible.

9        Q.     I would like to switch

10  direction for a moment and go back to the

11  Deposition Notice, Exhibit Number 1.  I

12  will get my copy.

13           Exhibit Number 1, I direct you

14  to the third page which says "Exhibit A,

15  Testimony Sought by Plaintiff from

16  Witnesses pursuant to Federal Rule of Civil

17  Procedure 30(b)(6).  Plaintiffs seeks

18  testimony" and, point one, "All information

19  related to anti-discrimination policies at

20  Defendant, Raymour Furniture Company,

21  Incorporated."

22           To your knowledge, does the

23  Defendant, Raymour Furniture Company,

24  Incorporated, maintain anti-discrimination

25  policies?

1                      P. DELGENIO

2          A.    Yes.

3          Q.    How are those policies

4    maintained?

5          A.    The policies are maintained,

6    they exist in the Associate Handbook and

7    they are maintained through the leadership

8    and the field leadership in conjunction

9    with the Human Resources department.

10         Q.    Apart from the employee

11   handbooks which are disseminated through

12   employees, do members of the HR department

13   maintain anti-discrimination policies in

14   their offices?

15         A.    Do you mean that they maintain

16   copies of the anti-discrimination policy?

17         Q.    Well, let me ask a different

18   question that hopefully is clearer.

19                You testified that in part,

20   anti-discrimination policies are

21   articulated in the employee handbooks which

22   are disseminated to employees?

23         A.    Yes.

24         Q.    You also testified that

25   anti-discrimination policies are developed

```
1                    P. DELGENIO
2      by the company's leadership?
3           A.    Yes.
4           Q.    And maintained by management as
5      well as by persons in the Human Resources
6      function?
7           A.    Yes.
8           Q.    Is that your testimony?
9           A.    Yes.
10          Q.    Apart from the employee manuals
11     that are disseminated to employees, are
12     there other written anti-discrimination
13     policies that are maintained within the
14     company?
15          A.    Well, the leaders get a copy of
16     our anti-discrimination policy,
17     non-harassment policy I believe in their
18     take-away materials from the professional
19     conduct and harassment training that they
20     go to each year.  I also believe that we
21     have as part of required postings in each
22     break room anti-harassment -- I don't know
23     if it is policy or if it is law, in our
24     five in one posters, our State required
25     posters in each location.
```

```
 1              P. DELGENIO
 2        Q.    When you say in your last
 3   answer, when you say leadership or leaders,
 4   who are you referring to?
 5        A.    One who has an associate
 6   directly reporting to them has a
 7   responsibility to uphold our
 8   anti-discrimination policies.
 9        Q.    So any employee responsible for
10   supervising any other employee has
11   materials other than the standard employee
12   handbook?
13              MS. CHICLACOS:   Objection to
14        the form.
15        A.    If they attended the
16   professional conduct and harassment
17   awareness training, they would of gotten
18   collateral materials that reiterate our
19   anti-harassment and anti-discrimination
20   policies.
21        Q.    Do you maintain copies of those
22   materials in your office?
23        A.    Copies like in a file cabinet,
24   copies of those?  I am not sure of your
25   question.
```

```
1                      P. DELGENIO
2        Q.    Well, you testified that you
3    disseminate collateral materials to leaders
4    at training sessions?
5        A.    Yes.
6        Q.    Do you maintain copies of those
7    collateral materials in your office?
8        A.    No.  Those are maintained in
9    the HR share drive and we create them as
10   needed, but I don't maintain copies.
11            MR. ANDREWS:  We call for the
12            production of those documents during
13            the course of the litigation at the
14            Defendant's earliest convenience.
15            MS. CHICLACOS:  They were
16            previously produced, Peter.
17       Q.    These collateral materials that
18   you used, that you and your colleagues in
19   HR used to train employees or supervisor
20   employees, who develops those collateral
21   materials?
22       A.    They are developed in
23   conjunction with counsel by the HR team.
24       Q.    Are you a member of the HR
25   team?
```

```
1                    P. DELGENIO
2          A.     Yes, I am.
3          Q.     Do you participate in
4    developing those collateral materials?
5          A.     Yes.
6          Q.     Are the collateral materials
7    periodically updated?
8          A.     Yes.
9          Q.     Are they updated annually?
10         A.     I would say they are reviewed
11   annually and updated as necessary.
12         Q.     When they are disseminated to
13   leadership employees, do leadership
14   employees have to sign for their receipt?
15         A.     They sign an acknowledgment
16   that they attended the workshop, the
17   training.
18         Q.     Do you recall if Lucy Goldstein
19   attended these sessions?
20         A.     Yes.
21         Q.     Do you recall how many sessions
22   she attended?
23         A.     My guess would be three or
24   four.
25         Q.     Can you articulate what
```

P. DELGENIO

1

2    specific areas these collateral materials

3    on anti-discrimination cover?

4         A.    Sure.  We talk about race, age,

5    ethnicity, country of origin, sexual

6    orientation, marital status, family status,

7    disability, and then, you know, we talk

8    about the different forms of sexual

9    harassment that I referenced earlier.

10        Q.    Have you, yourself, ever been

11   involved in a situation where an employee

12   of the company complained of a violation of

13   the anti-discrimination policies?

14        A.    Yes.

15        Q.    Do you recall how many times

16   that happened?

17        A.    That I was directly involved

18   in?

19        Q.    Yes, that you were directly

20   involved in?

21        A.    I have been there for seven

22   years.  I am trying to scan the scope of my

23   entire tenure.  I would say ten or less,

24   that I can recall.

25        Q.    Your best estimate is what I

1           P. DELGENIO

2   was seeking.

3        A.    Less than ten.

4        Q.    These were instances where an

5   employee felt that a violation of an

6   anti-discrimination policy had taken place?

7        A.    Yes, or some other type of

8   harassment.

9        Q.    We are now talking about

10  matters that you were involved with?

11       A.    Yes.

12       Q.    Could you describe in general

13  your approach for responding to such

14  allegations?

15       A.    Sure.  If the person came

16  directly to me or if the person came

17  through someone on my team?

18       Q.    Let's start with you first.

19       A.    Okay.  If the person came

20  directly to me, via a voicemail, I would

21  return the call and try to understand

22  during that initial call the sense of

23  urgency, the sense of severity of the

24  person's claims or experience.  After that,

25  I would likely schedule a face-to-face

```
 1                    P. DELGENIO
 2     meeting with the person at a time that is
 3     mutually convenient.
 4                    I would then reach out to my HR
 5     field team member to see if they knew
 6     anything about it.  Had the person come to
 7     them, were they aware that there was
 8     anything going on.  I would reach out to my
 9     leader and I would say, hey, I have this
10     going on, I am going to follow-up with this
11     person and meet with them on this date.  I
12     would reach out to counsel and say, hey, I
13     have a person who is claiming whatever they
14     are claiming, this is my understanding from
15     my HR field team of anything that I should
16     know before going in and being with this
17     person, vis-à-vis, these are questions that
18     I intend to ask them.  Do you have any
19     insight or guidance related to that?  I
20     would proceed with the meeting, meet with
21     the person, get more information, seek to
22     understand in more detail, weigh that
23     against our anti-discrimination policy.  If
24     there is a need to meet with additional
25     people who may have witnessed, I meet with
```

```
 1                    P. DELGENIO
 2   those people.  I would likely meet with the
 3   person who is alleged to have engaged in
 4   unlawful conduct.  Last, once I gathered
 5   all of my information and then, you know,
 6   reconvene with counsel, come to a
 7   determination and make a recommendation for
 8   action.
 9        Q.    Would your recommendation for
10   action be in writing?
11        A.    In some cases, yes.  Not
12   always.
13        Q.    I would like to come back to
14   that in a moment, but can you just tell me
15   how, if at all, the process would be
16   different if the complaint was coming to
17   you, from someone who reported to you?
18        A.    Most of the difference would be
19   the person who reported to me would be
20   letting me know.  If the person came to
21   them, I would ask them the same questions,
22   try to understand the history, try to
23   understand the dynamic.  Either I, myself,
24   or I would direct them or advise them to
25   reach out to counsel to get additional
```

P. DELGENIO

1

2      advice.  If it comes to me, I own it.  If

3      it comes to someone on my team, I endeavor

4      to have them own it for as long as it makes

5      sense.

6          Q.    Do you recall any instances

7      that you were directly involved with in

8      which you recommended that disciplinary

9      action be taken because of a violation of

10     anti-discrimination policy?

11         A.    With a leader?  To a leader?

12         Q.    Let's start with leaders.

13             MS. CHICLACOS:  I am going to

14         object here.  This falls within the

15         scope of the discovery disputes

16         currently before Magistrate Tomlinson

17         and beyond the scope of her

18         Deposition Notice.  So absent a Court

19         ruling on that issue, I am going to

20         instruct the Witness not to answer,

21         specifically referring to the

22         category of documents that you are

23         seeking about complaints filed

24         internally against Raymour & Flanigan

25         in connection with that dispute.

1           P. DELGENIO

2           MR. ANDREWS:  Again, I will

3      keep my comments brief.  I note that

4      I have been impeded in taking this

5      deposition in various ways.  I

6      strongly disagree with the suggestion

7      that my questions go beyond the scope

8      of the Deposition Notice.  The

9      Deposition Notice clearly states all

10     information related to

11     anti-discrimination policies at

12     Defendant, Raymour Furniture Company,

13     Inc.

14          I have now asked the Witness to

15     testify regarding specific instances

16     that she was personally involved with

17     where allegations of

18     anti-discrimination events took place

19     that resulted in discipline or

20     recommendation of discipline, and if

21     I understand correctly, Ms. Chiclacos

22     is directing the Witness to not

23     respond to such questions.

24          MS. CHICLACOS:  Correct.

25          MR. ANDREWS:  Again, that is

                           P. DELGENIO

1
2          for the record.  I don't want to
3          waste time.  Now we will move on, but
4          again, we feel that we are not being
5          allowed to take a 30(b)(6) deposition
6          and that will be taken up with the
7          Court at an appropriate time.
8              Q.    I would like to move to point
9    two of the Deposition Notice, Exhibit A,
10   "All information related to disabilities
11   and accomodation of disabilies in the
12   workplace at Defendant, Raymour Furniture
13   Company."
14              My first question is:  Does the
15   company maintain policies regarding
16   disabilities and accommodation of
17   disabilities?
18         A.    Can you repeat the question?
19         Q.    Sure, sure.
20              Does your company maintain
21   policies related to employee disabilities
22   and accommodation of those disabilities in
23   the workplace?
24         A.    The company maintains policies,
25   anti-discrimination policies related to

```
 1                    P. DELGENIO

 2   associates with disabilities, period.

 3        Q.    Do those policies encompass

 4   procedures or policies for accommodating or

 5   conditions under which persons with

 6   disabilities might be accommodated?

 7        A.    I don't have knowledge of

 8   specific processes that must be followed

 9   related to accommodations related to

10   disabilities, other than I stated

11   previously, if an associate goes to a

12   leader with a request for an accommodation,

13   they try to do it first and if they can't

14   do it, then they, you know, loop us in,

15   then we see how we can try to do it.

16        Q.    Have you, yourself, ever been

17   involved in a situation where a leader was

18   unable to accommodate an employee with a

19   disability?

20        A.    I don't know that -- I am

21   uncomfortable with the question, unable to.

22   Maybe I use that word, you use that word.

23   Can you clarify for me?

24        Q.    I will change the question.  I

25   will strike the question and ask a
```

```
 1                    P. DELGENIO
 2   different question.
 3              Were you ever involved in a
 4   situation where an employee reached out to
 5   Human Resources and complained that he had
 6   requested, he or she had requested an
 7   accommodation, which his leader had not
 8   been able to grant?
 9        A.    A disability-based
10   accommodation?
11        Q.    That's correct.
12        A.    I don't recall that, no.
13        Q.    Do you recall ever intervening
14   in a dispute between a leader and an
15   employee regarding a proposed or requested
16   accommodation based on a disability?
17              MS. CHICLACOS:  Objection to
18         the form.
19        A.    A dispute between a leader and
20   associate based on the associate's request
21   for accommodation for disability, contacted
22   by the associate, no, I don't recall.
23        Q.    Do you recall being contacted
24   by a leader?
25        A.    Yes, that has happened.
```

P. DELGENIO

1

2      Q.    Just to be clear, we are

3  talking about situations where leaders

4  contacted you because they had been unable

5  to resolve a request from an employee

6  regarding an accommodation?

7      A.    Because they wanted guidance as

8  to whether it was an appropriate request or

9  a request that created an undue hardship to

10  the company if it was or if it were to be,

11  if the accommodation was to be made, so in

12  that circumstance, yes.

13      Q.    You recall leaders reaching out

14  to you for that input?

15      A.    Yes.

16      Q.    How many times did that happen?

17      A.    I would say less than 20.

18      Q.    Less than 20?

19      A.    As an estimate.

20      Q.    This would have been between

21  2005?

22      A.    2006.

23      Q.    2006 and the present day?

24      A.    Yes.

25      Q.    Can you describe for me in a

                        P. DELGENIO

1   general sense when you did receive such a
2   request for guidance from a leader in that
3   type of situation, how you would respond?
4       A.    You know, if we are using the
5   word disability loosely, if someone has a
6   health condition that they are managing and
7   they come to their leader and say something
8   to the effect of I can only stand for a
9   certain period of time, I have to sit for a
10  certain period of time.  However, a
11  function of a sales associate requires,
12  technically requires that they be on their
13  feet for a long period of time, a leader
14  might call and say, hey, can I do this
15  because we don't allow associates to sit
16  while they are waiting for the next guest
17  to come in, it is not part of the brand
18  that we want to present, then I would say
19  something to the effect of, well, okay,
20  maybe for this person they can sit for ten
21  minutes or go into the sales office and
22  when the customer comes in, then they can
23  come out and greet the guest so the guest
24  doesn't see them sitting as they are coming

*Line numbers 1–25 appear in left margin.*

                              P. DELGENIO

1

2    in through the showroom doors.

3                    So we engage in a dialogue

4    about how we could best accommodate the

5    associate and still meet the needs of the

6    business.

7         Q.    Now, you said before for this

8    person.

9         A.    I am sorry.

10        Q.    You used the phrase for this

11   person?

12        A.    Yes.

13        Q.    Can you elaborate on why the

14   analysis would be different for different

15   employees?

16              MS. CHICLACOS:  Objection to

17          the form.

18        A.    I didn't mean to infer that

19   that was the case.  It wouldn't necessarily

20   be different for different employees.

21        Q.    Do you recall instances that

22   you were involved with where you were not

23   able to successfully accommodate the

24   request?

25              MS. CHICLACOS:  I am going to

1          P. DELGENIO

2     object as falling within the scope of

3     the issues currently before

4     Magistrate Tomlinson.

5          MR. ANDREWS:  You are

6     instructing the Witness to not answer

7     the question?

8          MS. CHICLACOS:  Yes.

9          MR. ANDREWS:  Again, for the

10    record, we feel this impedes our

11    ability to take a 30(b)(6) deposition

12    of all information related to

13    disabilities and accommodation of

14    disabilities in the workplace at

15    Defendant, Raymour Furniture Company,

16    Inc.  We reserve the right to request

17    that this or another 30(b)(6)

18    deposition be reopened when such

19    matters can be inquired into.

20          Can we take a one-minute break?

21          MS. CHICLACOS:  Sure.

22          (Whereupon, a short recess was

23    taken.)

24     Q.    When you reached an opinion or

25    a recommendation as to how to accommodate a

```
1                    P. DELGENIO
2    disability-related request, how do you
3    communicate that to leaders who have sought
4    your input?
5         A.    Either over the phone or in
6    e-mail, dependant on how we were
7    communicating with that particular case.
8         Q.    Do you not maintain a record of
9    your recommendation or decision in your
10   files?
11             MS. CHICLACOS:  Objection to
12         the form.  You can answer, if you
13         can.
14        A.    I do not maintain.  I do not
15   always maintain a record of a
16   recommendation that I give.
17        Q.    Have there been instances where
18   you have sought guidance from your
19   supervisors with respect to such issues?
20        A.    Yes.
21        Q.    Have you received input from
22   them on those occasions?
23        A.    Consultation, input, guidance
24   from my leader and from counsel.
25        Q.    Do you recall any instances in
```

1                    P. DELGENIO

2    which an employee sued the company alleging

3    that a disability-related request for an

4    accommodation could not be reached?

5              MS. CHICLACOS:   Objection.

6         This is squarely within the issues

7         currently pending in your motion to

8         compel before Magistrate Tomlinson

9         and I am instructing the Witness not

10        to answer.

11        Q.    Have you, yourself, ever had to

12   terminate an employee?

13        A.    At Raymour & Flanigan?

14        Q.    Yes.

15        A.    Yes.

16        Q.    Do you recall how many times

17   that took place?

18        A.    An associate on my team or

19   where I participated in the termination of

20   an associate?

21        Q.    We will take both.

22             MS. CHICLACOS:   Unfortunately I

23        am going to have to object.   This

24        doesn't fall within the scope of the

25        30(b)(6) Notice which is limited to

```
1                    P. DELGENIO
2         anti-discrimination policies,
3         disabilities and accommodation and
4         affirmative defenses.  I am
5         instructing the Witness not to
6         answer.  You can wait for the Court
7         to call for a ruling on that.
8              MR. ANDREWS:  Again, we
9         respectfully disagree.  The Witness
10        is an HR professional who has been
11        designated in response to our
12        30(b)(6) Notice.  Her procedures and
13        practices for terminating employees
14        are proper we feel areas of
15        examination.  We understand
16        Ms. Chiclacos has instructed the
17        Witness not to answer.  I will do my
18        best to ask some additional
19        questions, although we will see what
20        happens.
21             Q.   Do you recall participating in
22   the termination of an employee who had
23   alleged a violation of anti-discrimination
24   policy?
25             MS. CHICLACOS:  Objection.  It
```

```
 1            P. DELGENIO
 2      falls outside of the scope of the
 3      30(b)(6) Notice.  The Notice is
 4      limited to the anti-discrimination
 5      policy, not termination of employees.
 6            MR. ANDREWS:  We believe that
 7      the termination of employees
 8      complaining about discrimination fall
 9      within the scope of all information
10      related to anti-discrimination
11      policies, however, we understand you
12      are directing the Witness not to
13      answer.
14         Q.    Have you ever participated in a
15   termination of an employee who alleged that
16   the company had failed to accommodate a
17   disability?
18            MS. CHICLACOS:  Same objection.
19      The Witness is instructed not to
20      answer.  The question is outside of
21      the scope of the 30(b)(6) Notice.
22         Q.    You testified earlier that you
23   had never seen a pleading in this
24   litigation; is that correct?
25         A.    Correct.
```

1                    P. DELGENIO

2           Q.    Have you ever participated in

3    the preparation of a pleading in this

4    litigation?

5           A.    No.

6           Q.    Your current position again is

7    vice president Human Resources field

8    services?

9           A.    Correct.

10          Q.    How many other people within

11   Raymour & Flanigan hold that position, to

12   your knowledge?

13          A.    One.

14          Q.    One other person?

15          A.    Yes.

16          Q.    Do you know where that other

17   person is located?

18          A.    She is in the Philadelphia

19   region.

20          Q.    You are the only person who

21   holds that position in the Tristate, New

22   York Metropolitan region?

23          A.    Not Tristate.  Not Connecticut.

24   I have New York and New Jersey.

25          Q.    Does someone hold that position

```
 1                    P. DELGENIO
 2   in Connecticut?
 3        A.    There is an HR director in
 4   Connecticut.
 5        Q.    How is the position of an HR
 6   director different than the position that
 7   you hold?
 8        A.    Scope.
 9        Q.    How is the scope?
10        A.    Volume.  It is a significantly
11   greater amount of locations and associates,
12   my role.
13        Q.    Your role has a greater number
14   of associates and locations?
15        A.    Yes.
16        Q.    Currently how many stores do
17   you oversee?
18        A.    29.
19        Q.    Do you know how many employees
20   roughly?
21        A.    About 1750.
22        Q.    17?
23        A.    50.  1,750.
24        Q.    Of those employees, do you know
25   how many are management employees?
```

```
 1                      P. DELGENIO
 2           A.    I want to say 200 is the number
 3    that comes to mind.
 4           Q.    You testified that Ms. Roland
 5    reports to you and her position is a?
 6           A.    HR field specialist.
 7           Q.    How many HR field specialists
 8    do you have reporting to you?
 9           A.    Five.
10           Q.    Do they each cover different
11    geographic locations?
12           A.    Correct.
13           Q.    Does anyone report to them?
14           A.    No.
15           Q.    Are you responsible for hiring
16    them?
17           A.    Yes.
18           Q.    Are you responsible for
19    training them?
20           A.    Yes.
21           Q.    Evaluating them?
22           A.    Yes.
23           Q.    Have you, yourself, taken
24    courses in anti-discrimination laws?
25           A.    Yes, I have been -- I didn't
```

```
1                    P. DELGENIO
2    renew it.  I had my PHR certification.
3               MR. ANDREWS:  I am sorry.  Off
4         the record.
5               (Whereupon, an off-the-record
6         discussion was held.)
7               (Whereupon, Magistrate
8         Tomlinson gave a ruling via
9         conference call.)
10              MAGISTRATE TOMLINSON:  Whose
11        application is it?  I understand you
12        are in the midst of a rule 30(b)(6)
13        deposition of the Defendant's
14        representative and it is about the
15        scope of a line of questioning, and
16        so I don't know whose application
17        this is, but whoever it is, you
18        certainly can proceed.
19              MR. ANDREWS:  Thank you, Your
20        Honor.  This is Peter Andrews
21        representing the Plaintiff, Larry
22        Friedmann.  We called earlier today
23        and actually we have had a number of
24        issues arise in this 30(b)(6)
25        deposition.  The 30(b)(6) deponent,
```

P. DELGENIO

1
2    who has been excused from the room,
3    is a Human Resources professional at
4    the Defendant's organization.  The
5    specific issues that I had were that
6    the Witness has testified that she
7    has, A, not seen previously her
8    Notice of Deposition, B, has not
9    previously seen the Complaint in this
10   matter and, C, has not previously
11   seen the Defendant's Answer and
12   Affirmative Defenses.
13       The Notice of Deposition that
14   we served seeks, and I am reading
15   from it, "Plaintiffs seek testimony
16   from Defendant's 30(b)(6) witnesses
17   on the following matters:"  And there
18   is three matters listed.
19       Item number three is "All
20   affirmative defenses asserted by
21   Defendants and or to be relied upon
22   in any pleading up to and including
23   trial."
24       I believe, and I may need the
25   Court Reporter's assistance, I

```
 1                    P. DELGENIO
 2      believe when we initially called the
 3      Court, it was at the point where I
 4      had introduced the Complaint as an
 5      exhibit to the deposition and Counsel
 6      for the Defendant objected to me
 7      asking the Witness questions about
 8      the allegations in the Complaint.  I
 9      asked the Court Reporter to mark that
10      area previously.  Do you have that
11      section marked?  We will get you the
12      exact point at which that happened.
13          MAGISTRATE TOMLINSON:   That's
14      fine.
15          MR. ANDREWS:  Then I will be
16      quiet and let Counsel for the Defense
17      speak for herself.
18          (Whereupon, the referred to
19      testimony was read back by the
20      Reporter.)
21          MS. CHICLACOS:  Jessica
22      Chiclacos for the Defendant.  I will
23      try to be brief.
24          MAGISTRATE TOMLINSON:  First of
25      all, you have to slow down.  I do
```

```
 1                    P. DELGENIO

 2      want to ask another question before

 3      so I can put your answer in context.

 4            Mr. Andrews, the three matters

 5      on the 30(b)(6) Notice, please review

 6      those with me again.

 7            MR. ANDREWS:  Of course.  The

 8      three matters, "Plaintiffs seeks

 9      testimony from Defendant's 30(b)(6)

10      witnesses on the following matters:

11      One, all information related to

12      anti-discrimination policies at

13      Defendant, Raymour Furniture Company,

14      Inc.  Two, all information related to

15      disabilities and accomodation of

16      disabilities in the workplace of

17      Defendant, Raymour Furniture Company

18      Inc., and three, all affirmative

19      defenses asserted by Defendants and

20      or to be relied upon in any pleading

21      up to and including trial."  That's

22      it.

23            MAGISTRATE TOMLINSON:  Go

24      ahead, Ms. Chiclacos.

25            MS. CHICLACOS:  We have
```

```
 1                    P. DELGENIO

 2        produced an HR employee to respond to

 3        the 30(b)(6) Notice.  She has

 4        testified about the company's

 5        anti-discrimination policies, she

 6        testified about the company's

 7        disability and accommodation

 8        policies, she also testified about

 9        the affirmative defenses contained in

10        the Answer.

11             For example, we allege as an

12        affirmative defense that the

13        Plaintiff was terminated for

14        legitimate non-discriminatory and

15        non-retaliatory reasons.  She talked

16        about her knowledge of the

17        information and her circumstances

18        surrounding it.

19             Throughout the day, Plaintiff's

20        Counsel has tried to ask a number of

21        questions that go beyond the scope of

22        this.  This one example that was read

23        to you dealt with the company's

24        response to lawsuits when they are

25        filed, not related to their
```

P. DELGENIO

1          anti-discrimination policies.  He
2          most recently was just trying to ask
3          about other complaints filed about
4          the company.  So it is our position
5          that that line of questioning that
6          was just described to you, as well as
7          some others that we objected to, is
8          beyond the scope of the 30(b)(6)
9          witness.  She is not a fact witness.
10         She has testified to the information
11         in the notice.
12
13              We have been here almost five
14         hours, with some breaks here today.
15         I have given Plaintiff's Counsel a
16         lot of leeway and there have just
17         unfortunately been points where we
18         have had to object and I instructed
19         the Witness not to answer.
20              MAGISTRATE TOMLINSON:  Well,
21         let me say a couple of things here.
22         First of all, since this is a
23         representative from HR, Mr. Andrews,
24         I can understand you asking about the
25         policies and the procedures here, in

1        P. DELGENIO
2        particularly, for example, if the
3        policy statement calls for an
4        internal investigation when a
5        Complaint is made and circumstances
6        that might be similar to the ones
7        underlined in this Complaint, then
8        certainly the Witness should be
9        answering those questions.  The
10       Witness, because the Witness is a
11       representative of the company, she
12       can certainly testify to what the
13       general procedures are when somebody
14       makes a Complaint, either informally,
15       internally or once, for example, they
16       get served with a document from the
17       EEOC.  Most of this should focus on
18       what the internal procedures are.
19       That is what she is capable of and
20       has the competency to answer.
21            As far as how the company
22       generally handles litigation, I don't
23       care if it is a Complaint or any
24       other, frankly now you are getting
25       into an area that borders on

1                    P. DELGENIO

2        litigation strategy, among other

3        things.  I don't think it is

4        appropriate for the Witness to answer

5        that type of a question.

6            As far as her not having seen

7        the Notice, it is a little discerning

8        to me, but I am going to go on the

9        assumption that without having seen

10       the Notice, Counsel prepped her

11       witness and she is required to do

12       sufficiently to answer the categories

13       that are in the Notice.  And so I

14       don't believe that even for the

15       Complaint, if she has answered the

16       questions with regard to the policy,

17       with regard to the disability and any

18       accommodations and addressed your

19       questions with regard to the

20       affirmative defenses, it seems to me

21       she has done her job there.

22           The other question that I just

23       heard to me is outside of the scope

24       of what she is required to do and,

25       frankly, it falls under more of a

1              P. DELGENIO

2     litigation strategy which is

3     protected.

4          MR. ANDREWS:  May I be heard,

5     Your Honor, briefly?

6          MAGISTRATE TOMLINSON:  Go

7     ahead.

8          MR. ANDREWS:  Thank you, Your

9     Honor.

10          We understand and respect all

11     that Your Honor has said.  I do want

12     to note that after our initial call

13     to you this morning, I also

14     introduced not only the Complaint as

15     an exhibit, but my third exhibit was

16     the Defendant's Answer with

17     Affirmative Defenses.  Thereafter I

18     asked the Witness if she had ever

19     seen the Answer with the Affirmative

20     Defenses.  She replied that she had

21     never seen the document before, then

22     I directed her to all, I believe it

23     is 16 affirmative defenses that the

24     Defendants have interposed and asked

25     her about each one of the 16 and she

1                    P. DELGENIO

2         testified that she was not aware of

3         or familiar with any of those

4         affirmative defenses.  It is our

5         position --

6              MAGISTRATE TOMLINSON:  I don't

7         mean to interrupt you, but if that is

8         the case, I will give Ms. Chiclacos

9         an opportunity to respond to that,

10        but if the affirmative defense here

11        is clearly a category in a notice,

12        since she was handed the document and

13        asked about those affirmative

14        defenses, then she has an obligation

15        to answer those questions.  If she

16        said she doesn't have the

17        information, then you need another

18        30(b)(6) to answer those questions

19        and you will have to bring back

20        another witness.

21             MS. CHICLACOS:  If we may, the

22        Court Reporter can pull this up,

23        Mr. Andrews asked her if she seen the

24        document.  He did not ask her any

25        specific questions about the content

```
 1              P. DELGENIO
 2      of the affirmative defenses.  The
 3      statement that she is unable to
 4      testify about the content of those
 5      matters is inaccurate.
 6              I will say this, I am not
 7      disclosing anything privileged, the
 8      Witness did testify that she was
 9      prepared for this deposition.  To go
10      along your point before, there has
11      been no claim or question by Mr.
12      Andrews about the content of the
13      affirmative defenses.  In fact, as I
14      stated earlier, she has testified to
15      the content of some of them and that
16      we allege that the company maintains
17      a complaint procedure, it maintains
18      polices and the Plaintiff failed to
19      avail himself of these policies which
20      she testified to.
21              She testified as to the
22      legitimate reasons for his
23      termination, which is one of our
24      affirmative defenses.
25              There has been no specific
```

```
 1              P. DELGENIO
 2      question by Mr. Andrews about the
 3      affirmative defenses that the Witness
 4      has not been able to answer because
 5      she did not specifically see the
 6      legal language of the Complaint
 7      failed to state a claim upon which
 8      relief might be granted, yes, but she
 9      has not been able to specifically
10      answer any substantive questions
11      about them.
12              MAGISTRATE TOMLINSON:  Well,
13      look, two things to note here.  One,
14      the Complaint and the Answer are not
15      evidence in this case in any event.
16      From a standpoint, I am not quite
17      sure what the end goal is here with
18      regard to showing the document itself
19      and then asking questions.  However,
20      I don't want to put form over
21      substance here.
22              The question is if you made an
23      inquiry of her regarding one of those
24      affirmative defenses, did she answer
25      the questions that you asked her?  If
```

```
 1              P. DELGENIO
 2      you haven't done that yet, then that
 3      is something that you may want to get
 4      to before the examination is over
 5      today, but otherwise, whether or not
 6      she saw the documents is really -- in
 7      the upshot of this, it is not
 8      positive with regard to her ability
 9      to testify here today.  Is she
10      competent to answer questions about
11      the affirmative defense, whether she
12      ever seen the formal document itself
13      or not, from the representation from
14      Counsel, she was prepared and she is
15      prepared, so that is something, as I
16      said, you may want to explore before
17      the afternoon is over.
18          I haven't heard anything yet
19      thus far, now that I heard from
20      Ms. Chiclacos, I haven't heard
21      anything that indicates to me that
22      the Witness is not prepared to answer
23      questions with regard to those
24      affirmative defenses.
25          MR. ANDREWS:  Your Honor, we
```

```
 1              P. DELGENIO
 2       respectfully disagree with
 3       Ms. Chiclacos' characterizations.  I
 4       did ask the Witness about each one of
 5       the 16 affirmative defenses and she
 6       told me that she was unfamiliar with
 7       each one of the 16 affirmative
 8       defenses.  If it is necessary for me
 9       to obtain that exhibit again and
10       reask questions about each one of
11       those 16 affirmative defenses, we
12       will have a longer afternoon than I
13       had hoped, but that is what I will
14       have to do.
15              MAGISTRATE TOMLINSON:  Look, I
16       will leave that up to you, the
17       examination.  If you believe that the
18       Witness was not properly prepared and
19       didn't sufficiently answer the
20       question, then you can provide me
21       with a copy of the transcript and
22       make an application for relief.
23              MR. ANDREWS:  Yes, Your Honor.
24              I believe we are probably going
25       to have to do that.  I don't believe
```

1            P. DELGENIO

2    that it is something that we need to

3    explore at this moment.

4            MAGISTRATE TOMLINSON:  All

5    right.  I will leave that up to you.

6            MR. ANDREWS:  Thank you.

7            MS. CHICLACOS:  Thank you for

8    your time, Your Honor.

9            MAGISTRATE TOMLINSON:  Is there

10   anything else?

11           MR. ANDREWS:  I don't think

12   anything that we need to take up

13   right now.

14           MAGISTRATE TOMLINSON:  Mr.

15   Andrews, you are taking the

16   deposition, so my normal practice

17   here when I have call-ins regarding

18   deposition disputes is to ask the

19   parties, the attorney who is taking

20   the deposition, when the transcript

21   is prepared, to at least provide me,

22   and I am not looking for the entire

23   thing unless there is an application

24   coming in with it, but I would like

25   to have just the excerpts, a copy of

```
 1                    P. DELGENIO
 2       the excerpts of the application and
 3       the ruling, that would be helpful.
 4       All right?
 5            MR. ANDREWS:  Absolutely, Your
 6       Honor.
 7            MAGISTRATE TOMLINSON:  Thank
 8       you both.  Have a good rest of the
 9       day.
10            MR. ANDREWS:  Thank you.  Have
11       a nice day.
12            MAGISTRATE TOMLINSON:   Thank
13       you, Madame Court Reporter.
14            (Whereupon, a short recess was
15       taken.)
16            MR. ANDREWS:  Back on the
17       record.  The Witness is back in the
18       room.  At this time, the Plaintiff
19       would like to reiterate on the record
20       that we do not believe that the
21       witness offered today is an adequate
22       30(b)(6) deponent with respect to the
23       matters in the Notice of Deposition.
24            We also note that we, I, the
25       Plaintiff's attorney, have been
```

1                    P. DELGENIO

2        obstructed from completing the

3        deposition by Defendant's Counsel's

4        instructions and the Witness did not

5        answer certain questions.  We do

6        intend to seek relief from the Court,

7        including costs, as well as another

8        30(b)(6) witness as the Court may

9        deem appropriate and, at this time,

10       we have no additional questions that

11       we intend to pursue in light of how

12       this deposition has been conducted.

13       That is it for the Plaintiff.

14            (Continues on next page to

15       include jurat.)

16            MS. CHICLACOS:  Off the record.

17            (Whereupon, an off-the-record

18       discussion was held.)

19            (Continued on next page to

20       include jurat.)

21

22

23

24

25

```
 1                    P. DELGENIO
 2              MS. CHICLACOS:  Okay.  Thank
 3         you.
 4                    (Whereupon, at 3:45 P.M., the
 5         Examination of this Witness was
 6         concluded.)
 7
 8
 9
10                    _____
                              PATRICIA DELGENIO
11
12         Subscribed and sworn to before me
13         this _____ day of _____ 2013.
14
15         _____
                  NOTARY PUBLIC
16
17
18
19
20
21
22
23
24
25
```

1                    P. DELGENIO

2                  E X H I B I T S

3

4      PLAINTIFF'S EXHIBITS:

5

6      EXHIBIT     EXHIBIT                      PAGE

7      NUMBER      DESCRIPTION

8        1         Notice to Take Deposition
                   Upon Oral Examination    11
9
         2         Complaint                  54
10
         3         Defendant's Answer with
11                 Affirmative Defenses       60

12       4         Letter from the Harman
                   Firm                       83
13
         5         Defendant's Responses and
14                 Objections to Plaintiff's
                   First Set of Document
15                 Requests                   89

16       6         Coaching For Success       91

17       7         Action Plan & Performance
                   Agreement                  94
18

19

20

21

22

23

24

25

DIAMOND  REPORTING    (718) 624-7200    info@diamondreporting .com

```
 1                    P. DELGENIO

 2                   I N D E X

 3

 4   EXAMINATION BY                    PAGE

 5   MR. ANDREWS                       4

 6

 7

 8     INFORMATION AND/OR DOCUMENTS REQUESTED

 9   INFORMATION AND/OR DOCUMENTS      PAGE

10   1) Any documents relating to Mr.

11   Friedmann's employment           84

12

13   2) Collateral materials regarding

14   anti-harassment and

15   anti-discrimination policies      100

16

17

18

19

20

21

22

23

24

25
```

1                    P. DELGENIO

2              C E R T I F I C A T E

3

4    STATE OF NEW YORK        )
                              :  SS.:
5    COUNTY OF RICHMOND        )

6

7         I, DEBORAH GARZANITI, a Notary Public

8    for and within the State of New York, do

9    hereby certify:

10        That the witness whose examination is

11   hereinbefore set forth was duly sworn and

12   that such examination is a true record of

13   the testimony given by that witness.

14        I further certify that I am not

15   related to any of the parties to this

16   action by blood or by marriage and that I

17   am in no way interested in the outcome of

18   this matter.

19        IN WITNESS WHEREOF, I have hereunto

20   set my hand this 14th day of February 2013.

21

22

23   _____
              DEBORAH GARZANITI
24

25

P. DELGENIO

143

| ' | 2:10 [1] - 83:15 | A | administer [5] - 3:11, 79:11, 79:14, 79:20, 80:10 |
|---|---|---|---|

**'07** [1] - 15:24

**0**

**08865** [1] - 2:15

**1**

**1** [7] - 3:17, 47:18, 47:19, 96:11, 96:13, 140:8, 141:10
**1,750** [1] - 120:23
**1-800** [1] - 47:19
**10** [1] - 75:18
**100** [1] - 141:15
**10019** [2] - 1:22, 2:5
**10:52** [1] - 1:13
**11** [2] - 83:19, 140:8
**11735** [1] - 4:13
**11753** [1] - 2:9
**12** [1] - 1:6
**13** [1] - 1:12
**1307** [1] - 1:6
**1314** [1] - 2:15
**14th** [1] - 142:20
**16** [5] - 130:23, 130:25, 135:5, 135:7, 135:11
**1645** [1] - 4:12
**17** [1] - 120:22
**1750** [1] - 120:21
**18** [4] - 52:4, 52:5, 92:13, 92:24
**18th** [1] - 92:5
**1995** [2] - 10:24
**1:25** [1] - 83:15

**2**

**2** [4] - 67:22, 68:5, 140:9, 141:13
**20** [2] - 111:17, 111:18
**200** [3] - 1:21, 2:5, 121:2
**2005** [4] - 48:11, 48:12, 48:16, 111:21
**2006** [6] - 10:3, 15:24, 48:14, 48:19, 111:22, 111:23
**2007** [3] - 9:23, 20:16, 48:22
**2010** [1] - 52:2
**2011** [10] - 9:23, 20:16, 52:5, 75:17, 83:19, 91:23, 92:4, 92:13, 92:24
**2013** [3] - 1:12, 139:13, 142:20
**22** [1] - 2:15
**29** [1] - 120:18

**3**

**3** [3] - 59:22, 64:3, 140:10
**30** [1] - 3:16
**30(b)(6** [38] - 1:19, 4:20, 12:18, 55:14, 56:2, 56:24, 57:15, 58:12, 61:2, 62:4, 63:3, 63:9, 63:17, 67:9, 76:9, 87:12, 87:24, 88:8, 89:3, 89:5, 108:5, 114:11, 114:17, 116:25, 117:12, 118:3, 118:21, 122:12, 122:24, 122:25, 123:16, 125:5, 125:9, 126:3, 127:9, 131:18, 137:22, 138:8
**30(b)(6)** [2] - 12:11, 96:17
**300** [1] - 2:9
**360** [1] - 10:20
**3:45** [1] - 139:4

**4**

**4** [2] - 140:12, 141:5

**5**

**5** [2] - 87:4, 140:13
**50** [2] - 2:9, 120:23
**54** [1] - 140:9
**57th** [2] - 1:22, 2:5

**6**

**6** [3] - 96:4, 96:5, 140:16
**6/13/11** [1] - 94:24
**60** [1] - 140:11

**7**

**7** [5] - 75:18, 91:22, 96:4, 96:6, 140:17

**8**

**8** [1] - 75:18
**83** [1] - 140:12
**84** [1] - 141:11
**89** [1] - 140:15

**9**

**9** [1] - 75:18
**91** [1] - 140:16
**94** [1] - 140:17

**A.M** [1] - 1:13
**ability** [2] - 114:11, 134:8
**able** [9] - 33:8, 81:8, 81:16, 82:2, 82:3, 110:8, 113:23, 133:4, 133:9
**absence** [3] - 75:7, 75:9, 75:13
**absent** [1] - 106:18
**absolutely** [2] - 51:12, 137:5
**accommodate** [6] - 82:15, 109:18, 113:4, 113:23, 114:25, 118:16
**accommodated** [1] - 109:6
**accommodating** [1] - 109:4
**accommodation** [20] - 12:24, 55:19, 57:5, 81:12, 82:2, 82:4, 82:11, 108:16, 108:22, 109:12, 110:7, 110:10, 110:16, 110:21, 111:6, 111:11, 114:13, 116:4, 117:3, 126:7
**accommodations** [4] - 81:17, 81:19, 109:9, 129:18
**accomodation** [2] - 108:11, 125:15
**accurate** [2] - 29:4, 41:11
**acknowledgment** [1] - 101:15
**acquire** [1] - 13:12
**Action** [6] - 28:23, 94:22, 95:10, 95:13, 95:21, 140:17
**action** [11] - 29:18, 38:12, 40:24, 53:25, 56:5, 56:9, 58:15, 105:8, 105:10, 106:9, 142:16
**actions** [2] - 31:16, 31:20
**active** [1] - 75:16
**actively** [1] - 75:12
**actual** [1] - 58:10
**add** [2] - 67:13, 77:12
**addition** [1] - 52:23
**additional** [7] - 41:5, 73:15, 80:8, 104:24, 105:25, 117:18, 138:10
**address** [2] - 4:11, 48:4
**addressed** [1] - 129:18
**adequate** [1] - 137:21
**adjustment** [4] - 81:13, 82:3, 82:4, 82:10
**adjustments** [2] - 17:12, 81:16

**administered** [3] - 28:25, 93:25, 94:24
**administration** [7] - 11:9, 28:7, 78:16, 79:3, 79:4, 79:10, 80:3
**advice** [1] - 106:2
**advise** [5] - 34:6, 38:10, 38:15, 40:22, 105:24
**advised** [17] - 34:2, 35:13, 37:6, 42:13, 49:16, 51:20, 52:11, 52:13, 52:18, 53:5, 53:14, 71:20, 71:24, 84:9, 84:10, 93:8, 94:2
**Affirmative** [17] - 64:4, 64:14, 64:25, 65:9, 65:15, 65:22, 65:25, 66:3, 66:6, 66:9, 66:12, 66:24, 88:13, 123:12, 130:17, 130:19, 140:11
**affirmative** [37] - 13:2, 55:20, 57:6, 58:17, 61:4, 62:7, 62:15, 62:18, 63:7, 66:15, 66:19, 66:21, 67:2, 76:11, 77:10, 87:25, 88:16, 117:4, 123:20, 125:18, 126:9, 126:12, 129:20, 130:23, 131:4, 131:10, 131:13, 132:2, 132:13, 132:24, 133:3, 133:24, 134:11, 134:24, 135:5, 135:7, 135:11
**affirmed** [1] - 61:14
**aforementioned** [7] - 11:15, 54:15, 60:3, 83:10, 89:15, 91:4, 94:12
**afternoon** [2] - 134:17, 135:12
**age** [4] - 57:23, 68:15, 71:11, 102:4
**agree** [1] - 59:3
**AGREED** [2] - 3:5, 3:20
**Agreement** [1] - 140:17
**alerted** [1] - 49:8
**Alex** [2] - 2:16, 6:12
**allegations** [6] - 54:8, 57:23, 58:15, 103:14, 107:17, 124:8
**allege** [2] - 126:11, 132:16
**alleged** [3] - 105:3, 117:23, 118:15
**alleging** [2] - 72:12, 116:2

P. DELGENIO

allow [1] - 112:16
allowed [1] - 108:5
ALSO [1] - 2:13
Americorp [1] - 10:16
amount [4] - 27:19, 80:23, 81:5, 120:11
analysis [1] - 113:14
AND [2] - 3:5, 3:20
AND/OR [2] - 141:8, 141:9
andrews [2] - 125:4, 136:15
ANDREWS [50] - 2:6, 4:7, 6:4, 6:12, 51:12, 53:20, 54:11, 55:25, 57:18, 58:22, 59:10, 61:15, 61:19, 62:25, 63:18, 64:10, 67:6, 76:16, 77:18, 77:24, 78:5, 83:7, 84:24, 87:4, 87:16, 89:11, 90:23, 94:9, 94:16, 100:11, 107:2, 107:25, 114:5, 114:9, 117:8, 118:6, 122:3, 122:19, 124:15, 125:7, 130:4, 130:8, 134:25, 135:23, 136:6, 136:11, 137:5, 137:10, 137:16, 141:5
Andrews [7] - 4:16, 58:5, 122:20, 127:23, 131:23, 132:12, 133:2
annual [2] - 17:8, 17:16
annually [2] - 101:9, 101:11
anonymous [1] - 47:22
Answer [12] - 63:7, 63:25, 64:4, 64:8, 64:14, 76:12, 123:11, 126:10, 130:16, 130:19, 133:14, 140:10
answer [42] - 5:5, 5:6, 7:2, 14:22, 16:7, 24:20, 53:21, 55:13, 56:16, 56:20, 61:23, 62:24, 63:16, 65:19, 68:19, 77:19, 77:22, 77:25, 78:3, 99:3, 106:20, 114:6, 115:12, 116:10, 117:6, 117:17, 118:13, 118:20, 125:3, 127:19, 128:20, 129:4, 129:12, 131:15, 131:18, 133:4, 133:10, 133:24, 134:10, 134:22, 135:19, 138:5
answered [1] - 129:15
answering [1] - 128:9
Answers [1] - 88:13
answers [1] - 5:12

anti [33] - 12:21, 55:17, 76:22, 96:19, 96:24, 97:13, 97:16, 97:20, 97:25, 98:12, 98:16, 98:22, 99:8, 99:19, 102:3, 102:13, 103:6, 104:23, 106:10, 107:11, 107:18, 108:25, 117:2, 117:23, 118:4, 118:10, 121:24, 125:12, 126:5, 127:2, 141:14, 141:15
anti-discrimination [30] - 12:21, 55:17, 76:22, 96:19, 96:24, 97:13, 97:16, 97:20, 97:25, 98:12, 98:16, 99:8, 99:19, 102:3, 102:13, 103:6, 104:23, 106:10, 107:11, 107:18, 108:25, 117:2, 117:23, 118:4, 118:10, 121:24, 125:12, 126:5, 127:2, 141:15
anti-harassment [3] - 98:22, 99:19, 141:14
apart [4] - 28:17, 49:25, 97:10, 98:10
apparent [1] - 47:4
appearance [1] - 6:10
application [5] - 122:11, 122:16, 135:22, 136:23, 137:2
apply [1] - 78:23
approach [1] - 103:13
appropriate [10] - 37:19, 56:11, 58:4, 63:9, 67:9, 80:14, 108:7, 111:8, 129:4, 138:9
appropriateness [1] - 63:3
approximate [1] - 23:5
approximately [12] - 7:15, 7:16, 9:3, 14:18, 20:14, 20:15, 23:14, 24:15, 31:7, 44:18, 52:5, 92:3
archives [1] - 86:18
are there [1] - 98:11
area [8] - 8:11, 8:21, 25:18, 39:21, 85:20, 95:16, 124:10, 128:25
areas [3] - 27:21, 102:2, 117:14
arise [1] - 122:24
articulate [1] - 101:25
articulated [1] - 97:21
ascertain [1] - 59:13
aside [1] - 72:9
asking [7] - 4:21, 17:4,

55:8, 58:20, 124:7, 127:24, 133:19
asks [1] - 58:16
asserted [9] - 13:3, 55:21, 61:5, 62:7, 62:19, 77:10, 88:2, 123:20, 125:19
assertion [1] - 29:25
assertive [1] - 70:11
assessment [3] - 21:3, 21:4, 45:13
assistance [2] - 27:22, 123:25
assistant [1] - 6:13
associate [31] - 20:5, 27:9, 27:17, 29:2, 33:4, 36:22, 37:2, 37:25, 38:5, 40:24, 42:13, 45:21, 46:25, 50:13, 50:16, 73:19, 73:24, 80:17, 80:22, 82:19, 82:22, 95:11, 95:13, 99:5, 109:11, 110:20, 110:22, 112:12, 113:5, 116:18, 116:20
Associate [13] - 15:8, 15:9, 15:15, 15:18, 15:19, 15:21, 16:5, 16:9, 16:12, 16:17, 47:17, 78:22, 97:6
associate's [5] - 21:4, 38:12, 73:16, 84:18, 84:19, 110:20
associated [2] - 81:3, 81:4
associates [8] - 21:2, 21:21, 40:24, 47:12, 109:2, 112:16, 120:11, 120:14
assume [3] - 16:19, 71:17, 78:20
assumption [1] - 129:9
attempting [1] - 59:11
attend [1] - 11:2
attended [4] - 99:15, 101:16, 101:19, 101:22
attending [1] - 71:9
attention [4] - 60:21, 64:12, 64:23, 93:21
attorney [10] - 13:16, 13:21, 14:13, 14:22, 14:24, 53:18, 68:21, 84:13, 136:19, 137:25
attorney-client [5] - 13:16, 13:21, 53:18, 68:21, 84:13
Attorneys [2] - 2:4, 2:8
attorneys [6] - 13:24, 14:3, 14:5, 90:4, 90:5
August [1] - 92:3

authorized [1] - 3:11
avail [1] - 132:19
availability [1] - 59:14
aware [28] - 21:15, 22:8, 24:2, 24:11, 24:14, 24:25, 25:8, 26:14, 28:23, 29:16, 31:9, 31:17, 44:16, 44:20, 46:5, 47:13, 53:23, 54:4, 54:6, 54:7, 54:25, 55:3, 74:8, 75:23, 80:15, 93:24, 104:7, 131:2
awareness [4] - 70:8, 70:23, 71:6, 99:17

## B

based [6] - 63:16, 81:13, 90:11, 110:9, 110:16, 110:20
basis [6] - 17:8, 20:21, 20:24, 21:2, 68:15, 71:10
becoming [1] - 31:17
believe [37] - 17:22, 17:24, 17:25, 36:19, 42:3, 42:19, 42:24, 48:12, 51:5, 51:9, 52:6, 52:9, 54:10, 58:3, 58:24, 59:2, 63:8, 67:8, 75:7, 76:13, 86:19, 92:25, 93:10, 93:24, 93:25, 94:7, 98:17, 98:20, 118:6, 123:24, 124:2, 129:14, 130:22, 135:17, 135:24, 135:25, 137:20
believes [2] - 37:24, 68:14
Bender [1] - 40:10
bender [1] - 41:13
benefits [1] - 50:10
bit [1] - 5:3
BlackBerry [3] - 86:2, 86:23, 86:25
blood [1] - 142:16
board [1] - 34:14
body [1] - 5:13
borders [1] - 128:25
brand [1] - 112:18
break [5] - 5:16, 5:19, 5:21, 47:24, 51:11, 51:18, 56:17, 58:23, 98:22, 114:20
breaks [1] - 127:14
brief [4] - 76:18, 87:19, 107:3, 124:23
briefly [2] - 76:17, 130:5
broad [1] - 73:13

**Broadhollow** [1] - 4:12
**business** [3] - 11:9, 27:22, 113:6
**BY** [4] - 2:6, 2:10, 4:6, 141:4

## C

**cabinet** [1] - 99:23
**call** [14] - 40:15, 47:20, 57:16, 57:17, 61:21, 85:2, 100:11, 103:21, 103:22, 112:15, 117:7, 122:9, 130:12, 136:17
**call-ins** [1] - 136:17
**calls** [7] - 13:15, 13:20, 14:16, 53:17, 68:20, 87:13, 128:3
**can you** [23] - 8:6, 14:10, 14:18, 16:14, 21:18, 21:21, 23:5, 27:4, 31:15, 32:2, 36:23, 52:17, 53:12, 70:19, 70:25, 75:14, 91:15, 101:25, 105:14, 108:18, 109:23, 111:25, 113:13
**capable** [1] - 128:19
**capture** [2] - 31:11, 32:21
**care** [2] - 81:3, 128:23
**Carle** [6] - 32:20, 32:23, 33:6, 33:7, 34:4, 34:11
**carried** [1] - 79:8
**Case** [1] - 1:6
**case** [15] - 6:21, 19:3, 19:5, 50:23, 74:6, 74:10, 84:9, 89:20, 90:13, 90:15, 92:2, 113:19, 115:7, 131:8, 133:15
**cases** [1] - 105:11
**categories** [3] - 55:24, 71:11, 129:12
**category** [3] - 77:5, 106:22, 131:11
**cell** [1] - 48:3
**central** [5] - 8:7, 47:23, 50:8, 85:20, 95:15
**certification** [2] - 3:8, 122:2
**certifications** [1] - 81:4
**certify** [2] - 142:9, 142:14
**challenging** [1] - 53:15
**chance** [1] - 5:22
**change** [1] - 109:24
**characterizations** [1] - 135:3
**checked** [1] - 47:23
**CHICLACOS** [59] - 2:10, 6:10, 6:25, 13:14,

13:19, 14:15, 16:6, 16:22, 18:17, 22:11, 24:17, 28:21, 38:7, 43:7, 46:14, 51:6, 51:10, 52:15, 53:16, 53:22, 55:11, 56:19, 58:5, 59:7, 63:13, 64:7, 68:18, 76:6, 77:17, 78:4, 85:16, 86:8, 87:7, 89:10, 89:21, 92:16, 92:19, 93:5, 95:24, 99:13, 100:15, 106:13, 107:24, 110:17, 113:16, 113:25, 114:8, 114:21, 115:11, 116:5, 116:22, 117:25, 118:18, 124:21, 125:25, 131:21, 136:7, 138:16, 139:2
**Chiclacos** [8] - 6:2, 77:7, 107:21, 117:16, 124:22, 125:24, 131:8, 134:20
**Chiclacos'** [1] - 135:3
**Chris** [13] - 32:5, 32:16, 34:2, 35:15, 35:23, 35:25, 36:4, 36:7, 37:3, 43:9, 49:16, 74:21, 94:2
**Chris'** [1] - 26:13
**Christine** [4] - 25:13, 25:14, 25:15, 29:24
**circumstance** [1] - 111:12
**circumstances** [2] - 126:17, 128:5
**City** [4] - 32:11, 34:25, 39:6, 39:22
**Civil** [4] - 1:20, 4:20, 12:11, 96:16
**claim** [2] - 132:11, 133:7
**claiming** [2] - 104:13, 104:14
**claims** [2] - 58:14, 103:24
**clarifications** [1] - 79:18
**clarify** [8] - 5:9, 12:12, 16:14, 21:23, 23:23, 53:12, 90:2, 109:23
**clarity** [1] - 49:4
**clear** [6] - 26:16, 45:5, 57:19, 63:10, 68:3, 111:2
**clearer** [1] - 97:18
**client** [5] - 13:16, 13:21, 53:18, 68:21, 84:13
**CO** [2] - 1:8, 1:17
**Coaching** [5] - 25:7, 91:17, 91:20, 93:9, 140:16
**coaching** [2] - 70:12,

70:13
**coffee** [1] - 5:22
**Collateral** [1] - 141:13
**collateral** [8] - 99:18, 100:3, 100:7, 100:17, 100:20, 101:4, 101:6, 102:2
**colleagues** [2] - 72:25, 100:18
**college** [3] - 10:21, 10:23, 11:2
**College** [1] - 11:3
**comfortable** [2] - 17:2, 47:20
**coming** [4] - 10:8, 105:16, 112:25, 136:24
**comment** [1] - 61:8
**comments** [3] - 76:18, 87:18, 107:3
**commission** [1] - 27:7
**communicate** [2] - 50:2, 86:10, 115:3
**communicating** [2] - 42:17, 115:7
**communication** [3] - 70:10, 84:13, 86:20
**communications** [3] - 42:21, 43:21, 86:5
**companies** [1] - 6:24
**Company** [12] - 6:22, 12:22, 13:2, 76:24, 90:8, 96:20, 96:23, 107:12, 108:13, 114:15, 125:13, 125:17
**company** [28] - 7:25, 10:15, 10:19, 17:11, 18:16, 22:8, 22:9, 42:23, 44:25, 53:11, 54:24, 72:15, 75:5, 81:23, 86:16, 86:18, 98:14, 102:12, 108:15, 108:20, 108:24, 111:10, 116:2, 118:16, 127:5, 128:11, 128:21, 132:16
**company's** [8] - 56:11, 57:2, 57:13, 78:10, 98:2, 126:4, 126:6, 126:23
**compel** [1] - 116:8
**compensation** [2] - 50:9, 50:10
**competency** [1] - 128:20
**competent** [1] - 134:10
**complain** [2] - 21:20, 72:18
**complained** [6] - 37:3, 37:4, 45:22, 102:12, 110:5
**complaining** [2] - 76:5,

118:8
**Complaint** [20] - 54:9, 56:7, 56:23, 57:13, 57:20, 63:6, 63:24, 88:11, 123:9, 124:4, 124:8, 128:5, 128:7, 128:14, 128:23, 129:15, 130:14, 133:6, 133:14, 140:9
**complaint** [12] - 22:13, 72:12, 73:18, 73:25, 74:12, 74:13, 74:15, 74:25, 75:2, 75:25, 105:16, 132:17
**complaints** [12] - 21:15, 21:19, 22:8, 56:13, 57:3, 58:8, 73:2, 74:8, 77:2, 106:23, 127:4
**completing** [1] - 138:2
**concern** [3] - 28:18, 29:5, 73:16
**concerning** [1] - 72:19
**concerns** [4] - 44:7, 44:10, 44:14, 72:4
**concluded** [1] - 139:6
**condition** [3] - 68:16, 81:14, 112:7
**conditions** [1] - 109:5
**conduct** [9] - 69:13, 69:14, 70:8, 70:23, 71:5, 71:18, 98:19, 99:16, 105:4
**conducted** [3] - 69:15, 73:11, 138:12
**confer** [1] - 80:7
**conference** [1] - 122:9
**conferred** [1] - 17:10
**conferring** [1] - 79:17
**conjunction** [4] - 78:21, 84:8, 97:8, 100:23
**Connecticut** [3] - 119:23, 120:2, 120:4
**connection** [1] - 106:25
**consider** [1] - 36:24
**consist** [1] - 55:10
**consisted** [1] - 71:3
**consult** [1] - 74:19
**consultation** [1] - 115:23
**contact** [2] - 48:2, 59:13
**contacted** [4] - 41:12, 110:21, 110:23, 111:4
**contained** [1] - 126:9
**contains** [1] - 57:22
**content** [4] - 131:25, 132:4, 132:12, 132:15
**contention** [2] - 92:2, 92:23
**context** [1] - 125:3
**continue** [5] - 34:25,

63:12, 67:12, 77:13, 89:7
**Continued** [1] - 138:19
**Continues** [1] - 138:14
**convenience** [2] - 85:4, 100:14
**convenient** [1] - 104:3
**conversation** [1] - 43:11
**conversations** [3] - 19:24, 20:4, 46:20
**copies** [8] - 84:17, 90:24, 97:16, 99:21, 99:23, 99:24, 100:6, 100:10
**copy** [6] - 3:14, 3:17, 96:12, 98:15, 135:21, 136:25
**corrected** [1] - 94:17
**correctly** [1] - 107:21
**costs** [1] - 138:7
**Counsel** [16] - 2:14, 4:16, 5:23, 24:21, 54:5, 55:5, 63:20, 88:21, 89:4, 90:20, 124:5, 124:16, 126:20, 127:15, 129:10, 134:14
**counsel** [13] - 3:6, 3:17, 6:8, 17:10, 78:21, 79:17, 80:12, 84:10, 100:23, 104:12, 105:6, 105:25, 115:24
**Counsel's** [1] - 138:3
**country** [1] - 102:5
**County** [1] - 25:21
**COUNTY** [1] - 142:5
**couple** [2] - 45:25, 127:21
**course** [6] - 44:3, 86:17, 95:6, 95:8, 100:13, 125:7
**courses** [1] - 121:24
**COURT** [1] - 1:2
**Court** [17] - 3:13, 5:11, 5:14, 57:17, 59:2, 59:16, 106:18, 108:7, 117:6, 123:25, 124:3, 124:9, 131:22, 137:13, 138:6, 138:8
**cover** [5] - 8:20, 9:4, 39:21, 102:3, 121:10
**create** [1] - 100:9
**created** [2] - 93:25, 111:9
**current** [15] - 6:16, 7:13, 7:14, 7:17, 8:15, 8:20, 15:17, 15:20, 15:25, 16:17, 20:7, 28:6, 54:23, 68:23, 119:6
**currently** [10] - 18:6, 25:15, 26:3, 26:4, 28:3, 69:20, 106:16, 114:3, 116:7, 120:16

**customarily** [3] - 71:17, 73:9, 73:10
**customer** [1] - 112:23
**CV** [1] - 1:6

**D**

**D-O-W-L-I-N-G** [1] - 11:6
**D000039** [1] - 91:3
**D000040** [1] - 91:3
**D000043** [1] - 94:11
**D000044** [1] - 94:11
**D000045** [1] - 94:18
**DATE** [1] - 1:12
**date** [15] - 11:18, 15:22, 23:12, 54:18, 60:6, 79:17, 83:13, 89:18, 91:7, 91:22, 92:12, 92:15, 93:2, 94:15, 104:11
**day** [8] - 23:4, 46:22, 111:23, 126:19, 137:9, 137:11, 139:13, 142:20
**days** [1] - 3:16
**dealing** [1] - 80:18
**dealt** [1] - 126:23
**Deborah** [1] - 1:23
**DEBORAH** [1] - 142:7
**dEBORAH** [1] - 142:23
**December** [1] - 10:24
**decision** [14] - 30:16, 34:16, 36:14, 36:18, 36:21, 37:10, 37:13, 37:20, 38:11, 40:23, 41:3, 49:19, 50:21, 115:9
**decision-making** [5] - 36:21, 37:20, 40:23, 41:3, 50:21
**declaring** [1] - 17:2
**declined** [1] - 34:13
**deem** [1] - 138:9
**Defendant** [16] - 1:16, 6:21, 12:21, 12:25, 76:23, 77:11, 90:6, 96:20, 96:23, 107:12, 108:12, 114:15, 124:6, 124:22, 125:13, 125:17
**Defendant's** [22] - 12:18, 57:6, 61:2, 62:4, 63:25, 64:3, 64:14, 87:24, 88:13, 88:15, 88:17, 88:21, 100:14, 122:13, 123:4, 123:11, 123:16, 125:9, 130:16, 138:3, 140:10, 140:13
**Defendants** [14] - 2:8, 13:3, 55:21, 61:5, 62:7, 62:19, 67:8, 85:4, 88:2, 90:16, 91:2, 123:21,

125:19, 130:24
**DEFENDANTS** [1] - 1:10
**defense** [7] - 61:14, 67:3, 76:12, 77:10, 126:12, 131:10, 134:11
**Defense** [11] - 65:2, 65:10, 65:16, 65:22, 65:25, 66:3, 66:6, 66:9, 66:12, 66:24, 124:16
**defenses** [31] - 13:3, 55:21, 57:6, 58:17, 61:4, 62:7, 62:15, 62:18, 63:7, 66:15, 66:19, 66:21, 88:2, 88:16, 117:4, 123:20, 125:19, 126:9, 129:20, 130:23, 131:4, 131:14, 132:2, 132:13, 132:24, 133:3, 133:24, 134:24, 135:5, 135:8, 135:11
**Defenses** [7] - 64:4, 64:15, 88:14, 123:12, 130:17, 130:20, 140:11
**defined** [1] - 40:16
**Delgenio** [6] - 4:10, 4:22, 4:23, 6:15, 58:18, 89:19
**DELGENIO** [2] - 1:18, 139:10
**department** [3] - 8:8, 97:9, 97:12
**dependant** [1] - 115:6
**deponent** [2] - 122:25, 137:22
**deposed** [1] - 4:24
**Deposition** [19] - 55:14, 56:5, 60:22, 63:5, 63:24, 64:9, 67:10, 76:18, 87:20, 88:10, 96:11, 106:18, 107:8, 107:9, 108:9, 123:8, 123:13, 137:23, 140:8
**deposition** [31] - 3:8, 3:9, 3:14, 4:18, 13:18, 13:25, 14:6, 14:14, 15:3, 15:7, 15:13, 15:16, 43:25, 59:18, 88:6, 89:6, 89:7, 90:19, 107:5, 108:5, 114:11, 114:18, 122:13, 122:25, 124:5, 132:9, 136:16, 136:18, 136:20, 138:3, 138:12
**DEPOSITION** [1] - 1:16
**depositions** [1] - 5:3
**describe** [7] - 27:4, 31:15, 32:2, 45:18, 70:25, 103:12, 111:25
**described** [3] - 30:7, 47:14, 127:7

**DESCRIPTION** [1] - 140:7
**designated** [3] - 67:9, 88:7, 117:11
**detail** [1] - 104:22
**determination** [1] - 105:7
**determine** [7] - 37:8, 40:25, 50:17, 80:9, 80:23, 81:5, 81:19
**determined** [1] - 37:18
**developed** [2] - 97:25, 100:22
**developing** [1] - 101:4
**develops** [1] - 100:20
**device** [1] - 86:23
**devices** [1] - 86:6
**dialogue** [1] - 113:3
**dictated** [1] - 45:13
**did she** [2] - 34:6, 133:24
**did you** [21] - 8:25, 9:21, 10:9, 11:2, 14:4, 14:25, 15:11, 19:16, 21:8, 21:12, 22:8, 22:16, 28:13, 29:18, 29:21, 35:7, 37:12, 44:23, 46:22, 84:21, 90:19
**difference** [2] - 30:9, 105:18
**direct** [13] - 12:7, 25:10, 38:10, 38:18, 42:21, 56:15, 56:20, 60:23, 60:24, 64:12, 64:22, 96:13, 105:24
**directed** [1] - 130:22
**directing** [3] - 53:21, 107:22, 118:12
**direction** [1] - 96:10
**director** [14] - 7:22, 8:16, 10:10, 20:9, 20:18, 38:13, 39:4, 39:15, 40:8, 40:14, 40:21, 41:13, 120:3, 120:6
**disabilities** [18] - 12:23, 12:24, 55:18, 55:19, 108:10, 108:11, 108:16, 108:17, 108:21, 108:22, 109:2, 109:6, 109:10, 114:13, 114:14, 117:3, 125:15, 125:16
**disability** [16] - 57:4, 57:24, 71:12, 78:11, 79:5, 102:7, 109:19, 110:9, 110:16, 110:21, 112:6, 115:2, 116:3, 118:17, 126:7, 129:17
**disability-based** [1] - 110:9
**disability-related** [2] - 115:2, 116:3

P. DELGENIO

disabled [2] - 80:17, 80:19
disagree [5] - 56:2, 92:14, 107:6, 117:9, 135:2
discerning [1] - 129:7
disciplinary [1] - 106:8
discipline [2] - 107:19, 107:20
disclosing [2] - 84:12, 132:7
discovery [1] - 106:15
discretion [1] - 34:18
discriminated [1] - 68:14
discrimination [37] - 12:21, 55:17, 56:12, 57:4, 57:23, 57:24, 71:10, 72:13, 76:22, 96:19, 96:24, 97:13, 97:16, 97:20, 97:25, 98:12, 98:16, 99:8, 99:19, 102:3, 102:13, 103:6, 104:23, 106:10, 107:11, 107:18, 108:25, 117:2, 117:23, 118:4, 118:8, 118:10, 121:24, 125:12, 126:5, 127:2, 141:15
discriminatory [2] - 57:10, 126:14
discuss [5] - 27:12, 56:18, 58:23, 84:2, 90:19
discussed [2] - 14:21, 47:16
discussing [2] - 44:7, 44:13
discussion [6] - 61:18, 78:8, 84:7, 84:17, 122:6, 138:18
discussions [8] - 13:23, 14:3, 24:3, 24:5, 24:13, 24:15, 25:3, 33:13
dispute [3] - 106:25, 110:14, 110:19
disputes [2] - 106:15, 136:18
disseminate [1] - 100:3
disseminated [4] - 97:11, 97:22, 98:11, 101:12
DISTRICT [2] - 1:2, 1:2
diversity [1] - 70:12
do they [1] - 121:10
Do you [103] - 6:22, 8:11, 10:14, 12:2, 13:6, 13:8, 14:8, 14:12, 15:5, 15:17, 15:22, 16:12, 16:20, 17:15, 17:20, 17:24, 18:8, 18:14, 19:4, 19:18, 19:21,

23:2, 25:12, 26:24, 29:11, 30:15, 31:2, 32:14, 32:22, 33:16, 34:20, 35:25, 38:16, 38:17, 38:22, 39:19, 40:6, 41:24, 42:5, 42:11, 42:16, 42:20, 44:6, 44:9, 44:12, 48:7, 48:12, 48:15, 48:18, 48:21, 51:2, 51:22, 51:25, 54:3, 61:8, 62:10, 64:15, 65:4, 68:7, 69:5, 69:13, 75:8, 76:3, 78:2, 78:13, 78:18, 84:6, 84:13, 85:6, 85:14, 86:2, 89:24, 90:8, 91:12, 92:24, 93:14, 94:20, 94:25, 95:12, 95:17, 97:15, 99:21, 100:6, 101:3, 101:18, 101:21, 102:15, 104:18, 106:6, 110:13, 110:23, 113:21, 115:8, 115:25, 116:16, 117:21, 119:16, 120:16, 120:19, 120:24, 121:8, 124:10
document [60] - 11:16, 11:23, 12:3, 12:8, 54:13, 54:16, 54:20, 55:8, 58:2, 58:11, 59:23, 60:4, 60:9, 60:12, 60:17, 60:19, 62:15, 64:6, 64:13, 64:15, 64:19, 64:23, 66:21, 67:21, 83:9, 83:11, 83:20, 83:24, 83:25, 87:6, 87:10, 88:23, 89:16, 90:3, 91:2, 91:5, 91:9, 91:13, 91:16, 93:15, 93:18, 93:20, 93:23, 93:24, 94:4, 94:6, 94:7, 94:8, 94:11, 94:13, 94:18, 94:20, 95:2, 95:4, 128:16, 130:21, 131:12, 131:24, 133:18, 134:12
Document [4] - 67:22, 68:5, 88:19, 140:14
documentation [7] - 41:25, 42:6, 42:9, 50:15, 82:6, 82:8, 82:11
documented [1] - 73:8
documents [11] - 15:2, 15:5, 15:12, 84:3, 84:14, 84:25, 93:22, 100:12, 106:22, 134:6,

141:10
DOCUMENTS [2] - 141:8, 141:9
does he [2] - 80:2, 80:6
does that [1] - 55:9
doesn't [5] - 64:8, 76:9, 112:25, 116:24, 131:16
door [2] - 46:16, 47:13
doors [1] - 113:2
dowling [2] - 11:3, 11:5
drive [1] - 100:9
driven [1] - 27:7
due [1] - 77:6
duly [2] - 4:3, 142:11
duties [1] - 95:6
duty [1] - 75:16
dynamic [1] - 105:23

**E**

e-mail [5] - 40:15, 48:4, 86:11, 86:25, 115:6
e-mails [5] - 84:16, 85:9, 86:13, 86:15, 86:18
earliest [2] - 85:3, 100:14
early [1] - 43:24
east [2] - 25:16, 25:18
EASTERN [1] - 1:2
edition [1] - 17:13
Edward [2] - 2:13, 6:7
EEOC [1] - 128:17
effect [5] - 3:12, 3:15, 52:22, 112:9, 112:20
effective [1] - 70:10
effort [1] - 73:6
eight [11] - 24:16, 31:8, 31:14, 42:22, 43:5, 44:19, 46:12, 49:5, 66:14, 93:11, 93:12
Eighth [1] - 66:11
elaborate [2] - 30:3, 113:13
Eleventh [1] - 66:16
eligible [1] - 80:25
employed [5] - 7:18, 9:8, 72:21, 74:9, 75:12
employee [29] - 43:21, 50:6, 54:24, 72:12, 74:25, 75:2, 75:25, 78:10, 80:16, 81:8, 82:15, 97:10, 97:21, 98:10, 99:9, 99:10, 99:11, 102:11, 103:5, 108:21, 109:18, 110:4, 110:15, 111:5, 116:2, 116:12, 117:22, 118:15, 126:2
employees [22] - 51:2, 56:14, 68:25, 75:15, 75:16, 76:3, 77:3,

97:12, 97:22, 98:11, 100:19, 100:20, 101:13, 101:14, 115:15, 113:20, 117:13, 118:5, 118:7, 120:19, 120:24, 120:25
Employment [1] - 2:14
employment [17] - 22:23, 23:22, 24:6, 31:17, 31:20, 35:8, 35:10, 38:4, 42:23, 43:6, 44:21, 46:7, 46:12, 72:20, 73:3, 84:4, 141:11
encompass [2] - 25:19, 109:3
end [2] - 72:2, 133:17
endeavor [1] - 106:3
engage [1] - 113:3
engaged [1] - 105:3
entailed [1] - 20:19
entitled [3] - 64:13, 80:25, 81:6
environment [2] - 37:5, 71:16
ESQ [2] - 2:6, 2:10
estimate [3] - 75:14, 102:25, 111:19
ethnicity [1] - 102:5
evaluating [3] - 21:13, 22:3, 121:21
event [1] - 133:15
events [1] - 107:18
evidence [1] - 133:15
exact [4] - 19:14, 23:3, 23:4, 124:12
exactly [5] - 7:5, 17:2, 38:20, 40:11, 85:12
EXAMINATION [2] - 4:6, 141:4
Examination [2] - 139:5, 140:8
examination [5] - 117:15, 134:4, 135:17, 142:10, 142:12
examined [1] - 4:5
example [4] - 126:11, 126:22, 128:2, 128:15
examples [3] - 36:23, 45:19, 45:25
exceeds [1] - 76:8
except [1] - 3:21
excerpts [2] - 136:25, 137:2
exchanges [1] - 63:20
excited [1] - 32:20
excused [1] - 123:2
EXHIBIT [2] - 140:6
exhibit [8] - 59:24, 83:18,

P. DELGENIO

87:15, 96:3, 124:5, 130:15, 135:9
**Exhibit** [3] - 64:3, 96:11, 96:13
**Exhibit 1** [5] - 11:11, 11:17, 60:21, 61:25, 87:21
**Exhibit 2** [2] - 54:12, 54:17
**Exhibit 3** [5] - 59:23, 60:5, 60:10, 64:13, 64:24
**Exhibit 4** [3] - 83:8, 83:12, 83:19
**Exhibit 5** [3] - 87:6, 89:14, 89:17
**Exhibit 6** [2] - 90:25, 91:6
**Exhibit 7** [2] - 94:10, 94:14
**Exhibit A** [5] - 12:9, 12:16, 62:2, 96:14, 108:9
**Exhibits** [1] - 96:5
**EXHIBITS** [1] - 140:4
**exist** [1] - 97:6
**existence** [2] - 46:5, 83:4
**exists** [1] - 37:9
**expectation** [8] - 27:11, 27:12, 27:14, 27:15, 27:17, 27:20, 30:9, 49:22
**expectations** [1] - 52:21
**expected** [1] - 27:24
**experience** [5] - 37:24, 43:17, 79:15, 79:16, 103:24
**explain** [1] - 8:6
**explore** [2] - 134:16, 136:3
**extent** [2] - 27:21, 84:24

**F**

**face** [4] - 47:2, 103:25
**face-to-face** [2] - 47:2, 103:25
**facilitate** [2] - 69:11, 69:21
**facilitated** [2] - 69:19, 70:22
**facilitates** [1] - 70:14
**fact** [9] - 25:2, 25:9, 31:9, 44:17, 53:23, 54:25, 55:4, 127:10, 132:13
**failed** [3] - 118:16, 132:18, 133:7
**fair** [10] - 28:16, 35:17, 43:2, 43:9, 45:6, 45:10, 46:4, 46:9, 82:24, 83:6
**fall** [4] - 55:23, 77:4,

116:24, 118:8
**falling** [1] - 114:2
**falls** [3] - 106:14, 118:2, 129:25
**familiar** [2] - 78:9, 131:3
**family** [4] - 20:3, 71:12, 81:2, 102:6
**Farmingdale** [4] - 4:13, 7:10, 9:15, 9:19
**fashion** [1] - 80:14
**fax** [1] - 48:4
**February** [2] - 1:12, 142:20
**Federal** [4] - 1:19, 4:19, 12:10, 96:16
**feel** [12] - 53:2, 53:6, 56:9, 72:5, 72:9, 76:25, 81:25, 89:2, 89:3, 108:4, 114:10, 117:14
**feels** [2] - 24:21, 82:9
**feet** [1] - 112:14
**felt** [4] - 41:4, 45:11, 50:23, 103:5
**field** [21] - 6:18, 8:3, 8:9, 10:6, 25:16, 25:25, 26:8, 38:14, 40:21, 41:7, 46:18, 47:21, 50:7, 50:12, 79:15, 97:8, 104:5, 104:15, 119:7, 121:6, 121:7
**Fifteenth** [1] - 66:18
**Fifth** [1] - 66:2
**file** [5] - 85:14, 85:21, 85:23, 85:25, 99:23
**filed** [5] - 53:24, 56:8, 106:23, 126:25, 127:4
**files** [4] - 73:8, 85:19, 115:10
**filing** [2] - 3:7, 95:16
**financial** [1] - 10:11
**find** [2] - 33:3, 73:15
**fine** [1] - 124:14
**Firm** [3] - 1:21, 6:14, 140:12
**firm** [1] - 10:11
**FIRM** [1] - 2:4
**first** [12] - 4:3, 9:25, 23:18, 48:8, 49:7, 54:13, 93:7, 103:18, 108:14, 109:13, 124:24, 127:22
**First** [3] - 64:25, 88:18, 140:14
**firstly** [2] - 4:21, 56:3
**five** [8] - 9:3, 26:5, 51:11, 51:14, 75:21, 98:24, 121:9, 127:13
**five-minute** [1] - 51:11
**Flanigan** [22] - 2:14, 6:9,

6:20, 7:7, 7:18, 9:8, 10:2, 10:9, 10:13, 16:3, 18:4, 18:24, 20:20, 46:17, 48:9, 68:8, 68:11, 68:13, 68:25, 106:24, 116:13, 119:11
**focus** [1] - 128:17
**follow** [3] - 74:16, 84:21, 104:10
**follow-up** [2] - 74:16, 104:10
**followed** [2] - 74:14, 109:8
**following** [6] - 12:19, 26:14, 61:3, 62:5, 79:20, 80:13, 123:17, 125:10
**follows** [1] - 4:5
**force** [1] - 3:15
**Form** [2] - 91:18, 91:21
**form** [25] - 3:21, 7:2, 16:7, 16:23, 18:18, 22:12, 28:22, 38:8, 43:8, 46:15, 71:2, 72:13, 85:7, 85:17, 86:9, 89:22, 92:17, 92:20, 93:6, 95:25, 99:14, 110:18, 113:17, 115:12, 133:20
**formal** [1] - 134:12
**format** [1] - 5:5
**former** [1] - 54:24
**forms** [1] - 102:8
**formulates** [1] - 78:18
**formulating** [1] - 78:14
**formulation** [1] - 78:17
**forth** [1] - 142:11
**forwarded** [2] - 95:5, 95:15
**found** [1] - 84:11
**four** [8] - 9:24, 75:19, 75:20, 75:21, 75:23, 93:13, 93:14, 101:24
**Fourteenth** [1] - 66:17
**Fourth** [2] - 65:22, 65:24
**frame** [5] - 23:4, 27:24, 40:11, 49:18, 51:6
**frankly** [3] - 79:14, 128:24, 129:25
**free** [1] - 72:9
**freely** [1] - 72:5
**Friedmann** [65] - 4:17, 19:4, 19:8, 19:11, 19:24, 21:10, 22:2, 24:2, 24:5, 24:13, 25:3, 29:17, 30:17, 31:4, 31:24, 32:6, 32:10, 32:18, 32:22, 33:5, 34:3, 34:9, 34:13, 34:24, 36:7, 37:14,

38:2, 38:17, 41:23, 42:18, 42:22, 43:4, 43:11, 44:2, 44:6, 44:13, 44:17, 45:8, 46:10, 48:7, 49:13, 50:3, 51:8, 51:21, 52:19, 53:8, 53:14, 53:24, 54:8, 57:8, 68:7, 72:18, 73:2, 74:9, 82:25, 86:21, 90:7, 91:19, 91:21, 92:2, 92:10, 92:23, 93:8, 94:23, 122:22
**FRIEDMANN** [1] - 1:3
**Friedmann's** [34] - 21:13, 21:17, 22:3, 22:10, 22:14, 22:17, 22:20, 22:23, 23:22, 29:12, 30:12, 31:8, 31:17, 35:8, 42:17, 44:21, 44:24, 46:6, 47:7, 48:16, 48:19, 48:25, 49:9, 50:23, 51:3, 53:11, 57:20, 58:8, 58:14, 74:6, 74:10, 84:4, 85:14, 141:11
**fulfilled** [1] - 74:11
**function** [5] - 50:12, 69:4, 74:12, 98:6, 112:12
**functions** [1] - 18:21
**Furniture** [14] - 2:14, 6:19, 6:22, 12:22, 12:25, 76:24, 90:8, 96:20, 96:23, 107:12, 108:12, 114:15, 125:13, 125:17
**FURNITURE** [2] - 1:8, 1:17
**FURTHER** [1] - 3:20

**G**

**Garden** [4] - 32:10, 34:25, 39:6, 39:21
**Garzaniti** [1] - 1:23
**GARZANITI** [2] - 142:7, 142:23
**gather** [2] - 46:3, 73:21
**gathered** [1] - 105:4
**gave** [2] - 57:11, 122:8
**generalist** [1] - 10:7
**generate** [1] - 95:21
**geographic** [3] - 8:11, 8:21, 121:11
**give** [9] - 5:21, 17:18, 19:14, 23:5, 36:23, 37:12, 75:14, 115:16, 131:8
**given** [4] - 32:6, 56:21, 127:15, 142:13

P. DELGENIO

giving [1] - 37:9
goal [1] - 133:17
goals [2] - 27:23, 27:25
goes [3] - 47:22, 74:15, 109:11
Goldstein [18] - 31:6, 33:19, 33:20, 37:24, 39:25, 40:7, 70:17, 70:20, 72:18, 72:24, 74:18, 74:23, 75:4, 75:15, 75:24, 83:2, 96:7, 101:18
GOLDSTEIN [1] - 1:9
Goldstein's [3] - 35:4, 38:18, 76:4
gosh [1] - 19:12, 33:21
gotten [1] - 99:17
graduate [2] - 10:21, 10:23
grant [1] - 110:8
granted [1] - 133:8
greater [2] - 120:11, 120:13
greet [1] - 112:24
greeting [1] - 20:5
Groh [2] - 2:13, 6:7
grounds [1] - 76:7
GRUN [1] - 6:7
guess [11] - 31:13, 33:22, 33:23, 36:6, 40:9, 48:11, 52:3, 54:5, 85:9, 101:23
guessing [1] - 20:13
guesstimate [1] - 23:12
guest [3] - 112:17, 112:24
guidance [5] - 104:19, 111:7, 112:3, 115:18, 115:23

**H**

half [1] - 87:3
hand [1] - 142:20
Handbook [13] - 15:8, 15:9, 15:15, 15:18, 15:19, 15:21, 16:5, 16:9, 16:13, 16:18, 47:18, 78:22, 97:6
handbook [11] - 16:19, 16:20, 16:21, 17:3, 17:7, 17:14, 17:16, 17:19, 17:21, 99:12
handbooks [2] - 97:11, 97:21
handed [1] - 131:12
handled [1] - 81:10
handles [1] - 128:22
handling [1] - 56:12
happening [1] - 31:23

happens [1] - 117:20
harassment [14] - 70:8, 70:23, 71:5, 71:14, 71:15, 71:19, 98:17, 98:19, 98:22, 99:16, 99:19, 102:9, 103:8, 141:14
hard [1] - 84:16
hardship [1] - 111:9
Harman [4] - 1:21, 6:14, 56:18, 140:12
HARMAN [1] - 2:4
have you [31] - 4:23, 7:12, 11:23, 16:4, 19:7, 19:10, 45:15, 54:20, 60:8, 60:12, 65:6, 65:12, 65:16, 66:2, 66:5, 66:8, 66:11, 66:18, 67:2, 70:16, 83:23, 85:22, 89:19, 90:12, 102:10, 109:16, 115:21, 116:11, 118:14, 119:2, 121:23
haven't [5] - 65:24, 67:20, 134:2, 134:18, 134:20
head [1] - 79:24
health [2] - 81:3, 112:7
hear [1] - 35:7
heard [6] - 53:10, 129:23, 130:4, 134:18, 134:19, 134:20
heavily [1] - 27:6
held [10] - 1:20, 7:12, 16:3, 20:6, 20:12, 38:23, 61:18, 78:8, 122:6, 138:18
help [5] - 21:18, 21:21, 33:3, 80:9, 81:18
helpful [1] - 137:3
HEREBY [1] - 3:5
hereby [1] - 142:9
herein [1] - 3:7
hereinbefore [1] - 142:11
hereunto [1] - 142:19
hey [5] - 19:25, 26:14, 104:9, 104:12, 112:15
hi [2] - 4:14, 46:21
Highway [1] - 2:15
hire [1] - 70:6
hiring [1] - 121:15
history [2] - 44:24, 105:22
hit [2] - 27:23, 27:24
hold [6] - 8:25, 9:22, 10:9, 119:11, 119:25, 120:7
holds [1] - 119:21
Honor [8] - 122:20,

130:5, 130:9, 130:11, 134:25, 135:23, 136:8, 137:6
hope [1] - 33:6
hoped [1] - 135:13
hopefully [2] - 59:6, 97:18
hostile [1] - 71:16
hotline [1] - 47:19
hour [2] - 5:21, 14:19
hours [1] - 127:14
how are [8] - 4:14, 19:25, 20:2, 46:21, 47:12, 71:24, 79:10, 97:3
how did [5] - 13:12, 13:17, 13:24, 25:8, 68:17
how do [3] - 69:7, 86:13, 115:2
how is [6] - 20:3, 46:21, 46:22, 81:10, 120:5, 120:9
how many [13] - 14:4, 19:10, 25:25, 26:7, 101:21, 102:15, 111:16, 116:16, 119:10, 120:16, 120:19, 120:25, 121:7
Howe [2] - 2:16, 6:13
HR [64] - 8:9, 10:6, 10:10, 21:20, 22:7, 25:16, 25:25, 26:8, 38:14, 40:18, 40:21, 40:25, 41:7, 43:3, 43:20, 44:7, 44:10, 44:14, 46:11, 46:18, 46:25, 47:6, 47:16, 48:2, 50:5, 50:7, 50:12, 69:16, 69:17, 69:18, 69:23, 69:24, 70:3, 70:4, 70:6, 70:7, 70:9, 70:13, 70:14, 72:2, 72:25, 73:10, 73:18, 74:3, 74:4, 74:20, 75:25, 76:5, 79:15, 97:12, 100:9, 100:19, 100:23, 100:24, 104:4, 104:15, 117:10, 120:3, 120:5, 121:6, 121:7, 126:2, 127:23
HR's [2] - 55:22, 73:8
human [1] - 79:24
Human [27] - 6:18, 7:22, 8:16, 9:11, 9:12, 18:4, 18:21, 19:19, 20:9, 20:18, 42:12, 69:2, 71:21, 72:14, 77:4, 81:17, 82:16, 82:20, 83:3, 85:15, 85:18, 97:9, 98:5, 110:5,

119:7, 123:3

**I**

idea [1] - 16:24
identification [8] - 11:11, 11:17, 54:17, 60:5, 83:12, 89:17, 91:6, 94:14
immediately [2] - 20:7, 49:15
imminently [1] - 49:16
impeded [1] - 107:4
impedes [1] - 114:10
impressed [1] - 34:12
improperly [1] - 89:4
Improvement [11] - 25:7, 28:4, 28:8, 29:10, 29:12, 29:18, 31:10, 36:8, 42:4, 51:4, 52:22
IN [1] - 142:19
inability [1] - 57:25
inaccurate [1] - 132:5
INC [2] - 1:8, 1:17
Inc [8] - 6:22, 12:22, 13:2, 76:24, 107:13, 114:16, 125:14, 125:18
inclined [1] - 40:6
include [3] - 88:20, 138:15, 138:20
included [1] - 71:18
Incorporated [2] - 96:21, 96:24
incorrect [2] - 52:7, 52:9
indicated [1] - 49:12
indicates [1] - 134:21
individually [1] - 1:9
infer [1] - 113:18
influence [1] - 70:11
informally [1] - 128:14
information [27] - 12:20, 12:23, 13:15, 13:20, 14:16, 46:3, 48:2, 48:24, 53:19, 55:16, 55:18, 68:22, 73:15, 73:22, 76:21, 96:18, 104:21, 105:5, 107:10, 108:10, 114:12, 118:9, 125:11, 125:14, 126:17, 127:11, 131:17
INFORMATION [2] - 141:8, 141:9
initial [2] - 103:22, 130:12
initially [1] - 124:2
input [8] - 17:17, 37:10, 37:12, 80:3, 111:14, 115:4, 115:21, 115:23
inquire [1] - 41:2
inquired [2] - 73:14,

P. DELGENIO

114:19
inquiries [2] - 41:5, 50:20
inquiry [1] - 133:23
ins [1] - 136:17
insert [5] - 36:20, 37:19, 45:11, 45:25, 49:23
inserted [2] - 45:15, 45:19
inserting [1] - 36:24
insight [1] - 104:19
instances [6] - 103:4, 106:6, 107:15, 113:21, 115:17, 115:25
instruct [3] - 55:12, 87:8, 106:20
instructed [4] - 88:22, 117:16, 118:19, 127:18
instructing [4] - 68:19, 114:6, 116:9, 117:5
instruction [3] - 77:25, 78:3, 87:17
instructions [2] - 84:22, 138:4
intend [3] - 104:18, 138:6, 138:11
intent [4] - 37:7, 38:11, 38:15, 40:23
interactions [1] - 44:6
interest [2] - 32:9, 32:13
interested [2] - 34:10, 142:17
interfered [1] - 89:4
internal [2] - 128:4, 128:18
internally [2] - 106:24, 128:15
Internet [1] - 10:19
interposed [1] - 130:24
interpretation [1] - 58:25
interrupt [2] - 35:20, 131:7
intervening [2] - 31:23, 110:13
interview [5] - 32:7, 32:19, 32:23, 34:7, 34:12
interviewed [1] - 34:3
introduce [3] - 11:10, 87:5, 90:25
introduced [3] - 88:17, 124:4, 130:14
investigate [1] - 29:21
investigated [1] - 22:19
investigation [4] - 22:17, 73:11, 73:13, 128:4
involve [1] - 41:2
involved [12] - 42:17, 49:20, 53:3, 102:11, 102:17, 102:20,

103:10, 106:7, 107:16, 109:17, 110:3, 113:22
iPhone [2] - 86:3, 87:2
irrelevant [1] - 58:11
IS [2] - 3:5, 3:20
is it your [1] - 75:22
is that [24] - 5:18, 6:2, 12:13, 17:7, 18:22, 22:4, 29:25, 31:13, 32:5, 32:15, 32:18, 33:5, 36:6, 36:16, 40:9, 43:14, 43:17, 69:25, 89:24, 91:23, 92:5, 92:18, 98:8, 118:24
is there [1] - 136:9
is this [2] - 93:19, 95:4
Island [4] - 8:19, 9:5, 9:14, 9:17
issue [4] - 49:8, 74:19, 82:25, 106:19
issues [11] - 19:19, 43:5, 44:20, 46:6, 72:19, 83:5, 114:3, 115:19, 116:6, 122:24, 123:5
IT [2] - 3:5, 3:20
item [2] - 65:15, 123:19

**J**

James [1] - 39:23
January [1] - 7:16
Jericho [2] - 2:9, 2:9
Jersey [2] - 8:14, 119:24
Jessica [2] - 89:12, 124:21
JESSICA [1] - 2:10
job [5] - 9:13, 20:19, 37:17, 37:21, 129:21
Judge [2] - 3:13, 59:13
judge [1] - 87:13
July [1] - 92:5
June [5] - 52:4, 52:5, 92:8, 92:13, 92:24
jurat [2] - 138:15, 138:20

**K**

keep [3] - 76:17, 87:18, 107:3
Kevin [1] - 33:23
kinds [1] - 46:19
knowing [1] - 28:17
knowledge [20] - 5:7, 26:20, 28:8, 28:25, 34:15, 40:17, 55:22, 57:2, 58:7, 58:14, 58:16, 72:17, 72:22, 72:23, 73:4, 95:19, 96:22, 109:7, 119:12, 126:16

**L**

labeled [1] - 62:2
Labor [1] - 2:14
laid [1] - 49:22
language [2] - 5:13, 133:6
larger [1] - 8:21
Larry [9] - 19:24, 36:7, 43:11, 52:14, 52:19, 86:21, 91:21, 94:22, 122:21
last [8] - 42:22, 43:5, 43:22, 46:12, 75:10, 77:19, 99:2, 105:4
law [1] - 98:23
Lawrence [2] - 4:17, 19:4
LAWRENCE [1] - 1:3
laws [2] - 71:10, 121:24
lawsuit [2] - 53:24, 58:9
lawsuits [2] - 55:22, 126:24
LDW)(AKT [1] - 1:7
leader [19] - 22:14, 27:8, 27:18, 38:10, 40:6, 45:22, 104:9, 106:11, 109:12, 109:17, 110:7, 110:14, 110:19, 110:24, 112:3, 112:8, 112:14, 115:24
leaders [10] - 25:2, 30:24, 70:15, 98:15, 99:3, 100:3, 106:12, 111:3, 111:13, 115:3
leadership [18] - 21:5, 24:3, 24:12, 30:21, 30:22, 33:2, 33:14, 33:17, 37:4, 50:14, 50:20, 73:17, 97:7, 97:8, 98:2, 99:3, 101:13
leads [1] - 94:7
learn [1] - 68:17
leave [6] - 75:6, 75:9, 75:13, 81:5, 135:16, 136:5
leaves [3] - 81:2, 81:4
leeway [3] - 56:21, 57:12, 127:16
legal [3] - 6:13, 17:10, 133:6
legitimate [3] - 57:9, 126:14, 132:22
let's [4] - 61:25, 80:21, 103:18, 106:12
Letter [1] - 140:12
letting [1] - 105:20
light [3] - 56:9, 57:25, 138:11
limit [1] - 63:20

limited [3] - 62:17, 116:25, 118:4
line [5] - 30:13, 56:10, 58:3, 122:15, 127:6
listed [3] - 47:17, 56:24, 123:18
listening [1] - 70:10
litigation [8] - 90:6, 90:7, 100:13, 118:24, 119:4, 128:22, 129:2, 130:2
liverpool [1] - 18:13
Liverpool [3] - 85:20, 95:16, 95:18
LLP [1] - 2:8
located [6] - 7:9, 8:17, 9:13, 18:12, 39:6, 119:17
location [25] - 9:17, 21:3, 21:4, 21:5, 26:12, 31:3, 32:8, 32:9, 32:11, 33:3, 33:6, 33:8, 33:17, 34:4, 35:2, 37:6, 39:22, 45:24, 46:19, 47:7, 48:5, 50:14, 51:3, 72:8, 98:25
locations [7] - 8:10, 21:6, 21:7, 26:13, 120:11, 120:14, 121:11
looks [1] - 94:23
loop [2] - 41:4, 109:14
loosely [1] - 112:6
lot [3] - 23:7, 56:21, 127:16
Lucy [10] - 31:6, 33:19, 33:20, 35:4, 38:18, 38:24, 70:16, 70:20, 71:7, 101:18
LUCY [1] - 1:9
lunch [3] - 83:14, 83:16, 90:20

**M**

Madame [1] - 137:13
MAGISTRATE [14] - 122:10, 124:13, 124:24, 125:23, 127:20, 130:6, 131:6, 133:12, 135:15, 136:4, 136:9, 136:14, 137:7, 137:12
Magistrate [4] - 106:16, 114:4, 116:8, 122:7
mail [5] - 40:15, 48:4, 86:11, 86:25, 115:6
mails [5] - 84:16, 85:9, 86:13, 86:15, 86:18
maintain [12] - 85:21, 96:24, 97:13, 97:15, 99:21, 100:6, 100:10,

108:15, 108:20, 115:8, 115:14, 115:15
**maintained** [8] - 85:19, 86:16, 97:4, 97:5, 97:7, 98:4, 98:13, 100:8
**maintains** [3] - 108:24, 132:16, 132:17
**major** [1] - 11:8
**maitreating** [1] - 45:23
**maltreatment** [1] - 37:5
**management** [5] - 24:12, 50:15, 70:9, 98:4, 120:25
**manager** [18] - 9:11, 9:12, 30:25, 31:3, 34:11, 34:17, 37:23, 38:9, 40:13, 72:11, 73:19, 81:11, 81:15, 81:21, 82:9, 82:14, 82:21, 95:21
**managers** [9] - 21:20, 30:25, 33:22, 69:5, 69:8, 71:6, 71:20, 77:3, 82:7
**managing** [2] - 81:14, 112:7
**Manhattan** [1] - 10:19
**manuals** [1] - 98:10
**marital** [2] - 71:12, 102:6
**mark** [7] - 54:12, 54:13, 59:17, 59:23, 83:8, 94:10, 124:9
**marked** [13] - 11:16, 54:16, 60:4, 60:9, 64:24, 83:11, 83:18, 87:21, 89:13, 89:16, 91:5, 94:13, 124:11
**market** [1] - 48:3
**marriage** [1] - 142:16
**materials** [14] - 85:7, 85:13, 98:18, 99:11, 99:18, 99:22, 100:3, 100:7, 100:17, 100:21, 101:4, 101:6, 102:2, 141:13
**matter** [9] - 4:18, 56:18, 59:15, 62:6, 71:13, 77:11, 95:8, 123:10, 142:18
**matters** [12] - 12:19, 61:3, 62:5, 103:10, 114:19, 123:17, 123:18, 125:4, 125:8, 125:10, 132:5, 137:23
**McPeak** [5] - 17:25, 18:2, 18:11, 79:25, 80:2
**McPeak's** [1] - 18:12
**mean** [9] - 19:10, 30:4, 32:14, 35:20, 69:24, 70:2, 97:15, 113:18,

131:7
**meaning** [1] - 80:19
**measure** [2] - 27:9, 30:8
**measured** [1] - 50:16
**medical** [1] - 81:2
**medium** [1] - 85:8
**meet** [11] - 14:4, 21:2, 46:11, 52:20, 73:23, 104:11, 104:20, 104:24, 104:25, 105:2, 113:5
**meeting** [4] - 14:13, 38:2, 104:2, 104:20
**meetings** [2] - 21:6, 21:7
**member** [3] - 72:6, 100:24, 104:5
**members** [2] - 24:11, 97:12
**mentioned** [1] - 8:3
**messages** [2] - 86:11, 86:14
**metric** [1] - 27:6
**metrics** [1] - 27:10
**Metro** [2] - 25:16, 25:18
**Metropolitan** [3] - 8:13, 8:19, 119:22
**midst** [1] - 122:12
**mind** [1] - 121:3
**minimum** [1] - 27:11
**minute** [2] - 51:11, 114:20
**minutes** [5] - 11:12, 51:14, 59:6, 77:8, 112:22
**mischaracterization** [2] - 24:18, 24:22
**misstate** [1] - 78:25
**mistaken** [1] - 20:8
**modification** [1] - 81:9
**moment** [3] - 96:10, 105:14, 136:3
**month** [1] - 23:6
**months** [1] - 23:15
**morale** [1] - 45:24
**morning** [1] - 130:13
**mostly** [1] - 85:9
**motion** [1] - 116:7
**move** [7] - 38:3, 59:21, 63:19, 77:16, 85:5, 108:3, 108:8
**MR** [50] - 4:7, 6:4, 6:7, 6:12, 51:12, 53:20, 54:11, 55:25, 57:18, 58:22, 59:10, 61:15, 61:19, 62:25, 63:18, 64:10, 67:6, 76:16, 77:18, 77:24, 78:5, 83:7, 84:24, 87:4, 87:16, 89:11, 90:23,

94:9, 94:16, 100:11, 107:2, 107:25, 114:5, 114:9, 117:8, 118:6, 122:3, 122:19, 124:15, 125:7, 130:4, 130:8, 134:25, 135:23, 136:6, 136:11, 137:5, 137:10, 137:16, 141:5
**Mr** [102] - 18:2, 18:10, 19:4, 19:7, 19:10, 21:9, 21:13, 21:16, 21:25, 22:3, 22:9, 22:14, 22:17, 22:19, 22:23, 23:21, 24:2, 24:5, 24:13, 25:3, 26:7, 29:12, 29:16, 30:12, 30:17, 31:3, 31:8, 32:10, 32:18, 32:22, 33:5, 34:3, 34:9, 34:12, 34:24, 35:7, 37:13, 37:25, 38:17, 39:25, 41:12, 41:23, 42:17, 42:18, 42:21, 43:4, 43:25, 44:6, 44:13, 44:17, 44:21, 44:24, 45:8, 46:6, 46:9, 47:7, 48:7, 48:15, 48:18, 48:25, 49:9, 49:13, 50:2, 50:22, 51:3, 51:7, 51:20, 53:8, 53:10, 53:14, 53:24, 54:8, 56:18, 57:8, 57:20, 58:5, 58:14, 68:7, 72:17, 73:2, 74:6, 74:8, 74:9, 79:24, 82:24, 84:3, 85:14, 91:19, 92:2, 92:10, 92:23, 93:8, 125:4, 127:23, 131:23, 132:11, 133:2, 136:14, 141:10
**MS** [58] - 6:10, 6:25, 13:14, 13:19, 14:15, 16:6, 16:22, 18:17, 22:11, 24:17, 28:21, 38:7, 43:7, 46:14, 51:6, 51:10, 52:15, 53:16, 53:22, 55:11, 56:19, 58:5, 59:7, 63:13, 64:7, 68:18, 76:6, 77:17, 78:4, 85:16, 86:8, 87:7, 89:10, 89:21, 92:16, 92:19, 93:5, 95:24, 99:13, 100:15, 106:13, 107:24, 110:17, 113:16, 113:25, 114:8, 114:21, 115:11, 116:5, 116:22, 117:25, 118:18, 124:21, 125:25, 131:21, 136:7,

138:16, 139:2
**Ms** [50] - 4:23, 6:2, 6:15, 26:21, 30:15, 33:11, 34:20, 35:4, 37:24, 38:18, 39:25, 40:7, 41:9, 41:12, 42:5, 42:16, 42:20, 44:12, 47:5, 49:12, 49:25, 52:12, 52:13, 58:18, 70:16, 70:20, 72:18, 72:24, 74:11, 74:17, 74:18, 74:23, 74:24, 75:4, 75:15, 75:24, 76:4, 77:7, 82:25, 86:7, 86:10, 89:19, 96:7, 107:21, 117:16, 121:4, 125:24, 131:8, 134:20, 135:3
**mutually** [1] - 104:3
**myself** [11] - 29:5, 36:20, 37:4, 37:19, 45:11, 46:2, 49:23, 69:12, 69:22, 74:22, 105:23

**N**

**name** [6] - 4:8, 4:21, 4:22, 6:5, 10:14, 39:9
**narrow** [1] - 58:25
**Nassau** [1] - 25:20
**national** [1] - 18:22
**nature** [2] - 32:2, 46:23
**needs** [1] - 113:5
**NEW** [2] - 1:2, 142:4
**nice** [1] - 137:11
**nine** [1] - 66:23
**Ninth** [1] - 66:16
**NIXON** [1] - 2:8
**NJ** [1] - 2:15
**nods** [1] - 5:13
**non** [5] - 57:10, 57:11, 98:17, 126:14, 126:15
**non-discriminatory** [2] - 57:10, 126:14
**non-harassment** [1] - 98:17
**non-retaliatory** [2] - 57:11, 126:15
**normal** [3] - 20:3, 86:17, 136:16
**NOTARY** [1] - 139:15
**Notary** [3] - 1:23, 4:4, 142:7
**note** [8] - 63:13, 63:21, 67:6, 88:6, 107:3, 130:12, 133:13, 137:24
**noted** [3] - 6:11, 64:11, 77:15
**notice** [2] - 127:12, 131:11

**Notice** [35] - 55:15, 56:4, 56:24, 57:16, 58:12, 60:21, 63:5, 63:17, 63:23, 64:9, 67:11, 76:9, 76:19, 87:12, 87:20, 88:9, 96:11, 106:18, 107:8, 107:9, 108:9, 116:25, 117:12, 118:3, 118:21, 123:8, 123:13, 125:5, 126:3, 129:7, 129:10, 129:13, 137:23, 140:8
**number** [11] - 19:15, 40:16, 47:19, 48:4, 62:6, 66:15, 120:13, 121:2, 122:23, 123:19, 126:20
**NUMBER** [1] - 140:7
**Number** [3] - 64:3, 96:11, 96:13
**numbers** [4] - 48:3, 52:14, 72:6, 96:3
**numerous** [2] - 22:7, 57:22

## O

**Oakdale** [1] - 11:4
**oath** [1] - 3:12
**object** [10] - 14:24, 53:17, 55:12, 62:25, 76:7, 87:8, 106:14, 114:2, 116:23, 127:18
**objected** [2] - 124:6, 127:8
**objection** [33] - 6:25, 13:14, 13:19, 14:15, 16:6, 16:22, 18:17, 22:11, 24:17, 28:21, 38:7, 43:7, 46:14, 52:15, 63:10, 64:7, 64:10, 68:18, 77:14, 85:16, 86:8, 89:21, 92:16, 92:19, 93:5, 95:24, 99:13, 110:17, 113:16, 115:11, 116:5, 117:25, 118:18
**objections** [2] - 3:21, 88:20
**Objections** [2] - 88:18, 140:14
**objectives** [1] - 38:3
**obligation** [1] - 131:14
**obstructed** [1] - 138:2
**obtain** [1] - 135:9
**occasions** [2] - 44:2, 115:22
**October** [1] - 83:19
**OF** [3] - 1:2, 142:4, 142:5
**off-the-record** [4] -

61:17, 78:7, 122:5, 138:17
**offer** [1] - 27:22
**offered** [4] - 32:19, 46:10, 47:3, 137:21
**office** [14] - 6:14, 7:9, 7:10, 8:17, 8:18, 9:16, 9:18, 18:10, 18:12, 47:25, 59:11, 99:22, 100:7, 112:22
**offices** [2] - 1:21, 97:14
**oh** [2] - 19:12, 33:21
**okay** [15] - 11:22, 24:8, 35:21, 54:19, 59:7, 60:7, 67:17, 77:17, 79:10, 91:11, 93:19, 94:19, 103:19, 112:20, 139:2
**one-minute** [1] - 114:20
**ones** [1] - 128:6
**open** [2] - 46:16, 47:13
**opinion** [4] - 17:18, 37:10, 37:13, 114:24
**opportunity** [9] - 32:7, 32:19, 34:10, 46:10, 46:24, 47:2, 47:4, 60:8, 131:9
**Opus** [1] - 10:20
**Oral** [1] - 140:8
**ordinarily** [3] - 41:18, 41:22, 54:25
**organization** [3] - 22:24, 27:6, 123:4
**organizationally** [2] - 38:25, 39:14
**orientation** [4] - 47:15, 70:7, 71:13, 102:6
**origin** [1] - 102:5
**original** [2] - 3:9, 3:17
**ourselves** [1] - 24:9
**outcome** [1] - 142:17
**outside** [3] - 118:2, 118:20, 129:23
**overall** [2] - 45:24, 79:24
**overlapped** [1] - 75:15
**overly** [1] - 58:25
**oversee** [4] - 8:9, 8:12, 79:20, 120:17
**oversees** [2] - 17:20, 18:20
**oversight** [3] - 28:3, 28:7, 79:7
**owners** [1] - 17:11

## P

**P.M** [1] - 139:4
**p.m** [1] - 83:15
**page** [16] - 12:8, 12:13, 12:16, 60:22, 62:2,

64:23, 65:9, 66:14, 66:23, 83:8, 91:2, 94:10, 94:17, 96:14, 138:14, 138:19
**PAGE** [3] - 140:6, 141:4, 141:9
**paperwork** [2] - 41:25, 81:3
**par** [1] - 27:14
**part** [8] - 37:16, 37:21, 47:9, 58:9, 70:14, 97:19, 98:21, 112:18
**participate** [12] - 16:8, 17:15, 21:12, 22:16, 26:17, 26:21, 60:16, 60:18, 78:13, 78:15, 79:2, 101:3
**participated** [6] - 16:4, 22:2, 30:16, 116:19, 118:14, 119:2
**participating** [1] - 117:21
**parties** [3] - 3:7, 136:19, 142:15
**partner** [2] - 38:14, 40:21
**party** [1] - 71:14
**PATRICIA** [1] - 1:18, 139:10
**Patricia** [2] - 4:10, 4:22
**payroll** [1] - 50:9
**PC** [2] - 1:21, 2:4
**PEABODY** [1] - 2:8
**peak's** [1] - 18:10
**peer** [1] - 71:15
**pending** [5] - 5:20, 67:15, 116:7
**people** [7] - 16:20, 26:15, 26:22, 26:25, 104:25, 105:2, 119:10
**performance** [28] - 21:13, 21:17, 22:3, 22:10, 22:15, 22:18, 22:20, 24:3, 24:4, 24:14, 25:4, 27:10, 27:13, 30:8, 38:2, 38:13, 43:5, 43:12, 44:20, 44:24, 48:16, 48:19, 48:22, 49:2, 49:9, 50:15, 84:18, 95:21
**Performance** [30] - 25:6, 26:12, 26:15, 26:18, 26:22, 26:25, 28:4, 28:7, 28:14, 28:18, 28:20, 28:24, 29:7, 29:10, 29:12, 29:17, 30:12, 30:14, 30:17, 31:5, 31:10, 36:8, 42:4, 44:18, 49:3, 49:23, 51:4, 52:21, 140:17
**performance-related** [1] - 24:4

**performing** [1] - 27:20
**performs** [1] - 27:17
**period** [10] - 9:21, 20:11, 20:17, 27:16, 31:23, 33:25, 109:2, 112:10, 112:11, 112:14
**periodically** [1] - 101:7
**person** [29] - 18:5, 27:19, 38:23, 39:25, 41:7, 46:18, 46:25, 47:17, 48:2, 74:16, 74:17, 103:15, 103:16, 103:19, 104:2, 104:6, 104:11, 104:13, 104:17, 104:21, 105:3, 105:19, 105:20, 112:21, 113:8, 113:11, 119:14, 119:17, 119:20
**person's** [2] - 39:8, 103:24
**personally** [6] - 28:13, 69:14, 69:15, 74:2, 79:13, 107:16
**personnel** [4] - 85:19, 85:21, 85:23, 85:25
**persons** [2] - 98:5, 109:5
**pertain** [1] - 76:10
**Peter** [3] - 4:16, 100:16, 122:20
**PETER** [1] - 2:6
**Philadelphia** [1] - 119:18
**Phillipsburg** [1] - 2:15
**phone** [5] - 40:15, 48:3, 86:19, 87:2, 115:5
**phonetic** [1] - 33:23
**PHR** [1] - 122:2
**phrase** [1] - 113:10
**physically** [1] - 69:11
**place** [5] - 30:16, 84:7, 103:6, 107:18, 116:17
**Place** [6] - 32:20, 32:23, 33:6, 33:7, 34:4, 34:11
**placed** [6] - 26:25, 28:17, 28:19, 29:17, 31:5, 44:17
**placing** [2] - 26:17, 26:21
**PLAINTIFF** [1] - 1:4
**Plaintiff** [14] - 1:18, 2:4, 4:17, 12:9, 19:3, 56:8, 58:8, 90:5, 96:15, 122:21, 126:13, 132:18, 137:18, 138:13
**Plaintiff's** [22] - 11:11, 11:16, 54:12, 54:16, 60:4, 60:9, 63:24, 83:11, 83:18, 87:6, 88:11, 88:18, 89:16, 90:25, 91:5, 91:25, 92:22, 94:13, 126:19, 127:15, 137:25, 140:14

P. DELGENIO

**PLAINTIFF'S** [1] - 140:4
**Plaintiffs** [10] - 12:17, 60:25, 62:3, 76:25, 88:6, 88:25, 90:17, 96:17, 123:15, 125:8
**Plan** [29] - 25:7, 26:12, 26:15, 26:18, 26:22, 28:18, 28:20, 29:18, 29:21, 29:22, 30:2, 30:4, 30:12, 30:14, 30:17, 31:5, 31:10, 36:9, 42:4, 44:18, 49:3, 49:23, 52:22, 93:9, 94:22, 95:10, 95:13, 140:17
**Plans** [13] - 27:2, 28:4, 28:5, 28:8, 28:14, 28:24, 29:7, 29:10, 29:13, 30:7, 51:4, 95:22
**play** [2] - 36:14, 36:17
**pleading** [12] - 13:4, 61:6, 62:8, 62:20, 88:3, 89:24, 90:3, 90:9, 118:23, 119:3, 123:22, 125:20
**pleadings** [3] - 89:20, 90:12, 90:15
**Please** [1] - 4:8
**please** [8] - 5:8, 5:15, 5:17, 24:20, 39:11, 51:11, 77:20, 125:5
**point** [18] - 35:9, 44:5, 44:23, 49:20, 53:9, 58:21, 59:3, 60:23, 76:11, 76:21, 87:8, 87:15, 88:5, 96:18, 108:8, 124:3, 124:12, 132:10
**points** [1] - 127:17
**polices** [1] - 132:18
**policies** [46] - 12:21, 17:9, 55:17, 56:12, 57:4, 57:5, 58:17, 69:2, 76:23, 78:10, 78:14, 78:16, 78:19, 78:21, 79:3, 79:5, 79:12, 79:14, 80:4, 96:19, 96:25, 97:3, 97:5, 97:13, 97:20, 97:25, 98:13, 99:8, 99:20, 102:13, 107:11, 108:15, 108:21, 108:24, 108:25, 109:3, 109:4, 117:2, 118:11, 125:12, 126:5, 126:8, 127:2, 127:25, 132:19, 141:15
**policy** [19] - 46:16, 47:13, 72:15, 76:10, 79:19,

79:21, 80:10, 81:23, 97:16, 98:16, 98:17, 98:23, 103:6, 104:23, 106:10, 117:24, 118:5, 128:3, 129:16
**poor** [1] - 45:24
**position** [37] - 6:16, 7:13, 7:14, 7:17, 7:20, 8:15, 8:20, 8:23, 9:2, 9:4, 9:7, 9:10, 9:22, 10:4, 10:9, 20:6, 20:7, 20:12, 20:18, 28:11, 36:17, 38:22, 54:23, 57:8, 57:19, 68:24, 69:21, 119:6, 119:11, 119:21, 119:25, 120:5, 120:6, 121:5, 127:5, 131:5
**positions** [1] - 16:2
**positive** [1] - 134:8
**posted** [2] - 46:17, 72:7
**poster** [1] - 47:18
**posters** [2] - 98:24, 98:25
**postings** [1] - 98:21
**Powers** [1] - 39:23
**powers** [1] - 40:2
**practice** [2] - 36:16, 136:16
**practices** [1] - 117:13
**precisely** [1] - 36:11
**prefer** [1] - 67:15
**preparation** [4] - 14:25, 60:16, 60:19, 119:3
**prepare** [9] - 13:17, 13:24, 14:5, 15:2, 15:6, 15:12, 15:16, 42:6, 42:9
**prepared** [18] - 16:13, 16:21, 16:25, 17:3, 17:5, 17:7, 61:11, 61:13, 62:12, 62:22, 90:4, 90:16, 132:9, 134:14, 134:15, 134:22, 135:18, 136:21
**prepares** [1] - 16:20
**prepped** [1] - 129:10
**PRESENT** [1] - 2:13
**present** [5] - 6:6, 42:12, 71:8, 111:23, 112:19
**presented** [3] - 25:6, 48:25, 67:22
**preservation** [1] - 84:3
**preserved** [1] - 85:8
**president** [7] - 6:17, 18:3, 39:16, 39:17, 39:19, 39:20, 119:7
**previous** [3] - 8:23, 9:2, 59:24
**previously** [42] - 4:24, 11:24, 12:13, 16:3, 30:6, 34:9, 43:24,

54:21, 55:8, 56:4, 56:7, 57:21, 60:13, 63:23, 64:6, 64:18, 65:6, 65:12, 65:17, 66:19, 66:22, 67:3, 67:19, 68:5, 72:7, 76:20, 77:9, 83:24, 87:23, 88:10, 88:12, 88:14, 90:12, 90:14, 93:16, 95:2, 100:16, 109:11, 123:7, 123:9, 123:10, 124:10
**prior** [17] - 9:10, 10:12, 15:18, 15:20, 15:23, 16:18, 20:7, 24:16, 28:10, 31:8, 31:14, 37:6, 43:22, 44:16, 44:19, 49:5, 93:10
**privilege** [4] - 13:16, 13:22, 53:19, 68:21
**privileged** [1] - 132:7
**pro** [1] - 71:15
**Procedure** [4] - 1:20, 4:20, 12:11, 96:17
**procedure** [1] - 132:17
**procedures** [6] - 69:2, 109:4, 117:12, 127:25, 128:13, 128:18
**proceed** [3] - 64:2, 104:20, 122:18
**process** [21] - 17:21, 27:4, 36:21, 36:25, 37:20, 38:6, 40:4, 40:13, 40:17, 40:19, 41:18, 41:21, 45:12, 45:16, 45:20, 47:16, 55:9, 55:10, 78:23, 80:18, 105:15
**processes** [1] - 109:8
**produced** [3] - 85:2, 100:16, 126:2
**production** [4] - 53:18, 68:20, 85:3, 100:12
**professional** [7] - 70:7, 70:22, 71:5, 98:18, 99:16, 117:10, 123:3
**professionals** [1] - 69:25
**prohibited** [1] - 72:13
**proper** [2] - 89:2, 117:14
**properly** [1] - 135:18
**proposed** [2] - 45:16, 110:15
**protected** [4] - 13:15, 13:21, 71:11, 130:3
**proven** [1] - 58:19
**provide** [6] - 69:19, 70:5, 70:15, 80:2, 135:20, 136:21
**provided** [1] - 70:20
**provides** [4] - 70:3, 70:6, 70:7, 70:9

**Public** [3] - 1:23, 4:4, 142:7
**PUBLIC** [1] - 139:15
**pull** [2] - 72:9, 131:22
**pursuant** [4] - 1:19, 4:19, 12:10, 96:16
**pursue** [1] - 138:11

## Q

**Quadrangle** [1] - 2:9
**question** [34] - 5:5, 5:19, 16:11, 16:14, 24:23, 53:12, 53:17, 61:23, 63:15, 65:16, 65:23, 67:14, 77:19, 77:22, 78:2, 85:12, 92:21, 97:18, 99:25, 108:14, 108:18, 109:21, 109:24, 109:25, 110:2, 114:7, 118:20, 125:2, 129:5, 129:22, 132:11, 133:2, 133:22, 135:20
**questioned** [1] - 58:6
**questioning** [6] - 56:10, 58:3, 63:12, 63:19, 122:15, 127:6
**questions** [44] - 5:6, 5:8, 11:14, 11:20, 14:23, 29:3, 30:21, 41:6, 46:2, 50:19, 56:22, 60:2, 64:2, 67:12, 67:16, 71:22, 72:3, 77:2, 77:14, 79:18, 81:15, 83:21, 91:10, 104:17, 105:21, 107:7, 107:23, 117:19, 124:7, 126:21, 128:9, 129:16, 129:19, 131:15, 131:18, 131:25, 133:10, 133:19, 133:25, 134:10, 134:23, 135:10, 138:5, 138:10
**quid** [1] - 71:15
**quiet** [1] - 124:16
**quo** [1] - 71:15

## R

**race** [2] - 71:11, 102:4
**raised** [1] - 44:14
**raising** [1] - 44:9
**RAYMOUR** [2] - 1:8, 1:17
**Raymour** [35] - 2:14, 6:8, 6:19, 6:20, 6:22, 7:6, 7:18, 9:8, 10:2, 10:8, 10:13, 12:22, 12:25, 16:3, 18:4, 18:24, 20:20, 46:17, 48:8, 68:8, 68:11, 68:13,

P. DELGENIO

68:25, 76:23, 90:7, 96:20, 96:23, 106:24, 107:12, 108:12, 114:15, 116:13, 119:11, 125:13, 125:17
**reach** [16] - 71:21, 72:5, 72:14, 72:24, 73:6, 73:20, 80:11, 81:17, 81:21, 81:24, 81:25, 82:15, 104:4, 104:8, 104:12, 105:25
**read** [9] - 12:4, 29:6, 29:9, 61:23, 77:19, 77:22, 124:19, 126:22
**reading** [2] - 29:11, 123:14
**reask** [1] - 135:10
**reason** [6] - 36:20, 52:6, 52:8, 53:5, 80:23, 92:25
**reasons** [4] - 57:11, 88:24, 126:15, 132:22
**recall** [67] - 5:10, 10:14, 14:8, 14:12, 14:17, 15:5, 15:17, 15:22, 19:18, 19:21, 23:2, 23:3, 25:12, 29:11, 29:14, 31:2, 31:19, 33:15, 33:16, 33:24, 34:20, 35:25, 36:3, 37:15, 38:16, 38:18, 38:20, 38:22, 39:8, 39:20, 41:24, 42:5, 42:11, 43:16, 44:7, 44:9, 44:12, 44:15, 51:22, 51:25, 54:3, 70:19, 70:21, 76:2, 76:3, 84:6, 85:24, 92:11, 93:15, 93:17, 93:19, 93:23, 94:25, 101:18, 101:21, 102:15, 102:24, 106:6, 110:12, 110:13, 110:22, 110:23, 111:13, 113:21, 115:25, 116:16, 117:21
**recap** [2] - 31:7, 33:10
**receipt** [3] - 57:14, 101:14
**receive** [3] - 86:6, 95:12, 112:2
**received** [3] - 22:13, 72:11, 115:21
**recently** [1] - 127:3
**recess** [5] - 51:15, 59:8, 83:14, 114:22, 137:14
**recognize** [3] - 58:2, 88:15, 91:12
**recollection** [17] - 19:23, 23:17, 29:23, 29:25,

30:11, 32:5, 32:15, 32:16, 32:18, 35:11, 36:6, 49:7, 49:10, 50:4, 73:5, 75:3, 92:7
**recommendation** [10] - 22:22, 23:21, 24:6, 45:7, 105:7, 105:9, 107:20, 114:25, 115:9, 115:16
**recommended** [1] - 106:8
**recommending** [1] - 40:5
**reconsider** [1] - 76:14
**reconvene** [1] - 105:6
**record** [30] - 4:9, 6:5, 45:4, 49:5, 51:17, 59:5, 59:11, 61:16, 61:17, 63:2, 63:11, 63:21, 67:7, 68:2, 77:15, 78:6, 78:7, 83:16, 89:9, 108:2, 114:10, 115:8, 115:15, 122:4, 122:5, 137:17, 137:19, 138:16, 138:17, 142:12
**referenced** [1] - 102:9
**referred** [3] - 61:22, 77:21, 124:18
**referring** [3] - 30:23, 99:4, 106:21
**refresh** [2] - 71:4, 92:7
**refresher** [1] - 70:23
**refused** [1] - 82:14
**regard** [6] - 129:16, 129:17, 129:19, 133:18, 134:8, 134:23
**regarding** [33] - 13:9, 14:13, 19:19, 21:16, 22:9, 22:23, 23:21, 24:13, 25:3, 41:25, 43:4, 56:11, 56:13, 61:11, 62:13, 62:14, 68:25, 72:19, 72:25, 73:3, 74:24, 75:25, 77:2, 77:3, 78:10, 87:25, 107:15, 108:15, 110:15, 111:6, 133:23, 136:17, 141:13
**region** [7] - 8:19, 25:17, 25:19, 39:5, 47:9, 119:19, 119:22
**regional** [8] - 9:12, 38:13, 39:3, 39:15, 40:8, 40:14, 40:20, 41:13
**regular** [3] - 20:21, 20:24, 21:2
**reiterate** [3] - 88:25, 99:18, 137:19
**related** [33] - 12:20, 12:23, 24:4, 29:3, 35:12, 36:21, 38:12,

55:15, 55:16, 55:18, 56:13, 56:25, 57:3, 71:10, 76:22, 84:17, 84:19, 96:19, 104:19, 107:10, 108:10, 108:21, 108:25, 109:9, 114:12, 115:2, 116:3, 118:10, 125:11, 125:14, 126:25, 142:15
**relates** [1] - 76:13
**relating** [2] - 84:3, 141:10
**relation** [1] - 7:4
**relationship** [2] - 6:23, 53:11
**relayed** [1] - 33:11
**release** [4] - 23:13, 24:16, 31:9, 36:10
**released** [3] - 36:9, 52:20, 52:23
**relied** [7] - 13:4, 61:5, 62:8, 62:19, 88:3, 123:21, 125:20
**relief** [3] - 133:8, 135:22, 138:6
**remained** [1] - 32:10
**remember** [1] - 39:11
**remembered** [1] - 92:10
**renew** [1] - 122:2
**reopened** [1] - 114:18
**repeat** [1] - 108:18
**rephrase** [2] - 16:11, 92:21
**replied** [1] - 130:20
**report** [7] - 18:6, 18:8, 26:2, 26:6, 39:15, 81:8, 121:13
**reported** [7] - 25:22, 26:8, 26:10, 38:24, 43:10, 105:17, 105:19
**Reporter** [16] - 5:11, 5:14, 11:18, 54:18, 59:17, 60:6, 61:24, 77:23, 83:13, 89:18, 91:7, 94:15, 124:9, 124:20, 131:22, 137:13
**Reporter's** [1] - 123:25
**reporting** [2] - 99:6, 121:8
**reports** [2] - 25:10, 121:5
**representation** [1] - 134:13
**representative** [6] - 43:20, 46:11, 47:6, 122:14, 127:23, 128:11
**represented** [2] - 5:23, 17:13
**representing** [1] - 122:21
**request** [12] - 5:18, 82:17, 109:12, 110:20, 111:5, 111:8, 111:9,

112:3, 113:24, 114:16, 115:2, 116:3
**requested** [3] - 110:6, 110:15
**REQUESTED** [1] - 141:8
**requesting** [1] - 81:9
**Requests** [2] - 88:19, 140:15
**required** [7] - 40:17, 82:7, 82:12, 98:21, 98:24, 129:11, 129:24
**requirement** [1] - 41:21
**requires** [2] - 112:12, 112:13
**reserve** [1] - 114:16
**reserved** [1] - 3:22
**resolve** [2] - 59:6, 111:5
**Resource** [1] - 81:18
**Resources** [26] - 6:18, 7:23, 8:16, 9:11, 9:12, 18:4, 18:21, 19:19, 20:9, 20:19, 42:12, 69:2, 71:21, 72:14, 77:4, 82:16, 82:20, 83:3, 85:15, 85:18, 97:9, 98:5, 110:5, 119:7, 123:3
**resources** [2] - 79:24, 80:9
**respect** [9] - 28:3, 31:16, 46:6, 62:24, 63:2, 77:6, 115:19, 130:10, 137:22
**respectfully** [3] - 55:25, 117:9, 135:2
**respective** [1] - 3:6
**respond** [5] - 76:16, 107:23, 112:4, 126:2, 131:9
**responding** [1] - 103:13
**response** [4] - 63:14, 67:10, 117:11, 126:24
**Responses** [2] - 88:17, 140:13
**responses** [3] - 5:12, 5:15, 88:20
**responsibilities** [2] - 18:15, 18:20
**responsibility** [3] - 21:9, 21:25, 99:7
**responsible** [7] - 50:11, 68:24, 69:3, 69:10, 99:9, 121:15, 121:18
**rest** [1] - 137:8
**resulted** [1] - 107:19
**retain** [2] - 84:15, 86:13
**retained** [1] - 86:5
**retaliatory** [2] - 57:11, 126:15
**return** [1] - 103:21

P. DELGENIO

returning [1] - 33:7
review [15] - 14:25,
   15:11, 17:16, 27:7,
   28:13, 40:4, 44:23,
   57:22, 59:25, 60:9,
   83:20, 91:8, 95:8, 95:9,
   125:5
reviewed [10] - 15:6,
   15:16, 16:16, 17:8,
   89:19, 90:12, 90:15,
   95:22, 96:6, 101:10
reviewing [2] - 29:14,
   93:23
reviews [1] - 95:17
revision [1] - 17:21
RICHMOND [1] - 142:5
right [7] - 49:14, 51:19,
   61:20, 114:16, 136:5,
   136:13, 137:4
Road [1] - 4:12
Roland [38] - 25:13,
   25:14, 25:15, 26:7,
   26:21, 29:24, 30:15,
   32:5, 32:17, 33:11,
   34:2, 34:20, 35:16,
   35:23, 35:25, 36:4,
   36:7, 37:3, 41:9, 41:12,
   42:5, 42:16, 42:20,
   43:10, 44:12, 47:5,
   49:12, 49:25, 52:12,
   52:13, 74:11, 74:17,
   74:21, 74:24, 86:7,
   86:10, 94:2, 121:4
role [13] - 15:25, 16:2,
   28:2, 28:6, 36:14,
   36:17, 40:18, 45:7,
   45:13, 70:11, 120:12,
   120:13
roles [2] - 22:6, 22:7
room [4] - 47:25, 98:22,
   123:2, 137:18
roughly [2] - 93:11,
   120:20
Rule [3] - 4:20, 12:10,
   96:16
rule [2] - 59:14, 122:12
Rules [1] - 1:20
ruling [4] - 106:19, 117:7,
   122:8, 137:3

S

Sagendorf [1] - 33:23
sales [12] - 27:5, 37:25,
   39:4, 39:18, 39:19,
   39:20, 42:13, 47:12,
   47:25, 80:17, 112:12,
   112:22
sat [1] - 25:5
saved [1] - 78:22

scan [1] - 102:22
schedule [3] - 81:10,
   81:13, 103:25
sciatica [1] - 68:15
scope [22] - 55:14, 56:23,
   58:21, 76:8, 76:15,
   77:5, 87:11, 102:22,
   106:15, 106:17, 107:7,
   114:2, 116:24, 118:2,
   118:9, 118:21, 120:8,
   120:9, 122:15, 126:21,
   127:9, 129:23
sealing [1] - 3:7
second [2] - 71:8, 89:23
Second [1] - 65:9
secondly [1] - 77:6
section [3] - 59:17,
   60:24, 124:11
seek [4] - 73:15, 104:21,
   123:15, 138:6
seeking [3] - 103:2,
   106:23
seeks [7] - 12:17, 60:25,
   62:3, 76:21, 96:17,
   123:14, 125:8
sees [1] - 54:14
semantics [1] - 73:12
senior [1] - 6:8
Senior [1] - 2:14
sense [4] - 103:22,
   103:23, 106:5, 112:2
served [2] - 123:14,
   128:16
server [1] - 86:16
service [8] - 3:16, 23:13,
   36:9, 36:10, 47:22,
   52:20, 52:24, 70:14
services [10] - 6:18, 8:4,
   8:8, 8:9, 10:11, 47:23,
   50:8, 85:20, 95:16,
   119:8
session [1] - 71:2
sessions [3] - 100:4,
   101:19, 101:21
seven [2] - 65:9, 102:21
Seventh [1] - 66:8
severity [1] - 103:23
sexual [5] - 71:13, 71:18,
   71:19, 102:5, 102:8
share [1] - 100:9
sheet [1] - 47:24
showing [2] - 87:10,
   133:18
showroom [3] - 30:25,
   33:22, 113:2
sign [2] - 101:14, 101:15
signatures [1] - 94:6
signed [3] - 3:10, 3:12,
   3:15

significantly [1] - 120:10
single [1] - 29:9
sit [4] - 27:8, 112:10,
   112:16, 112:21
sitting [1] - 112:25
situation [10] - 33:14,
   45:14, 53:4, 73:21,
   80:10, 81:7, 102:11,
   109:17, 110:4, 112:4
situations [2] - 82:7,
   111:3
six [11] - 10:12, 23:14,
   24:15, 31:8, 31:13,
   44:18, 49:5, 64:23,
   93:12, 93:13, 93:14
Sixteenth [1] - 66:24
Sixth [1] - 66:5
slow [1] - 124:25
somebody [1] - 128:13
someone [11] - 16:19,
   23:20, 42:11, 47:21,
   74:2, 74:4, 103:17,
   105:17, 106:3, 112:6,
   119:25
sorry [7] - 35:18, 45:3,
   61:15, 92:6, 94:16,
   113:9, 122:3
Sought [2] - 12:9, 96:15
sought [4] - 73:14, 87:23,
   115:3, 115:18
speak [6] - 19:16, 19:22,
   22:21, 46:25, 73:17,
   124:17
speaking [2] - 19:18,
   47:21
specialist [7] - 10:6,
   25:16, 38:14, 40:22,
   40:25, 41:8, 121:6
specialists [3] - 25:25,
   26:8, 121:7
specific [17] - 11:14,
   11:19, 31:20, 48:24,
   60:2, 79:21, 82:8,
   83:25, 91:9, 92:12,
   92:25, 102:2, 107:15,
   109:8, 123:5, 131:25,
   132:25
specifically [9] - 27:21,
   32:25, 47:10, 48:23,
   80:11, 85:11, 106:21,
   133:5, 133:9
spent [1] - 14:13
spoke [2] - 43:4, 46:20
squarely [1] - 116:6
SS [1] - 142:4
stand [3] - 78:2, 94:17,
   112:9
standard [7] - 27:11,
   30:2, 30:5, 30:13,
   36:16, 48:5, 99:11

standpoint [1] - 133:16
stands [1] - 50:18
start [3] - 80:21, 103:18,
   106:12
started [2] - 33:5, 48:14
state [2] - 4:8, 133:7
STATE [1] - 142:4
State [4] - 1:24, 4:4,
   98:24, 142:8
stated [7] - 6:6, 40:20,
   49:11, 72:7, 79:2,
   109:10, 132:14
statement [4] - 62:10,
   65:17, 128:3, 132:3
states [2] - 12:16, 107:9
STATES [1] - 1:2
status [4] - 35:12, 71:12,
   102:6
Steve [1] - 17:25, 80:12
STIPULATED [2] - 3:5,
   3:20
store [30] - 8:9, 21:6,
   21:7, 22:14, 24:11,
   25:2, 27:8, 27:18, 29:2,
   30:24, 31:2, 32:24,
   33:2, 33:14, 33:16,
   34:11, 34:17, 37:6,
   37:23, 38:9, 39:6, 40:6,
   40:13, 69:5, 69:7,
   71:20, 72:11, 73:18,
   81:15
stores [7] - 9:4, 18:25,
   20:20, 20:24, 20:25,
   44:3, 120:16
strategy [2] - 129:2,
   130:2
Street [1] - 1:22, 2:5
stretch [1] - 5:22
strike [1] - 16:10, 109:25
strongly [1] - 107:6
structure [1] - 5:4
subject [2] - 61:12, 62:13
subjects [1] - 13:10
Subscribed [1] - 139:12
substance [1] - 133:21
substantive [1] - 133:10
success [1] - 27:9
Success [4] - 91:17,
   91:21, 93:9, 140:16
successful [2] - 33:4,
   33:9
successfully [1] - 113:23
sued [1] - 116:2
sues [1] - 54:24
sufficiently [2] - 129:12,
   135:19
Suffolk [1] - 25:20
suggest [1] - 51:13
suggestion [1] - 107:6

P. DELGENIO

suing [3] - 68:8, 68:11, 68:13
Suite [1] - 2:9
suite [3] - 69:16, 69:17, 69:23
summarize [1] - 27:18
summary [2] - 34:8, 70:25
supervising [3] - 21:9, 21:25, 99:10
supervision [2] - 35:5, 76:4
supervisor [4] - 38:19, 70:11, 79:23, 100:19
supervisors [1] - 115:19
support [1] - 80:8
supposed [1] - 84:15
surrounding [1] - 126:18
switch [1] - 96:9
sworn [4] - 3:10, 4:3, 139:12, 142:11
Syosett [1] - 10:11
Syracuse [2] - 8:8, 47:24

**T**

take-away [1] - 98:18
talk [7] - 71:9, 71:14, 71:15, 71:16, 83:17, 102:4, 102:7
talked [1] - 126:15
talking [2] - 103:9, 111:3
team [18] - 24:4, 30:21, 30:23, 47:23, 50:14, 70:13, 72:6, 73:17, 74:3, 81:18, 81:22, 100:23, 100:25, 103:17, 104:5, 104:15, 106:3, 116:18
technically [1] - 112:13
telling [1] - 34:21
temporarily [2] - 80:17, 80:19
ten [4] - 51:14, 102:23, 103:3, 112:21
Tenth [1] - 66:16
tenure [1] - 102:23
term [2] - 21:20, 73:13
terminate [3] - 37:7, 37:13, 116:12
terminated [21] - 35:11, 35:14, 38:17, 41:24, 43:22, 45:9, 49:13, 49:17, 50:6, 51:8, 51:21, 51:22, 52:11, 52:12, 53:9, 57:9, 92:3, 92:11, 92:24, 93:3, 126:13
terminating [1] - 117:13
termination [16] - 38:4,

40:5, 42:2, 42:14, 42:18, 44:19, 49:6, 53:13, 53:15, 93:10, 116:19, 117:22, 118:5, 118:7, 118:15, 132:23
terminations [1] - 45:16
terms [1] - 56:22
testified [40] - 4:5, 16:16, 21:24, 24:10, 25:22, 35:22, 40:7, 43:24, 49:11, 50:22, 50:25, 52:13, 55:7, 56:3, 56:6, 61:10, 63:4, 63:22, 68:4, 74:7, 76:20, 77:9, 87:22, 88:8, 93:7, 93:11, 97:19, 97:24, 100:2, 118:22, 121:4, 123:6, 126:4, 126:6, 126:8, 127:11, 131:2, 132:14, 132:20, 132:21
testify [10] - 13:9, 61:11, 61:13, 62:12, 62:22, 107:15, 128:12, 132:4, 132:8, 134:9
Testimony [1] - 96:15
testimony [18] - 12:9, 12:17, 24:19, 43:14, 52:25, 60:25, 62:4, 64:5, 64:17, 75:22, 87:25, 95:20, 96:18, 98:8, 123:15, 124:19, 125:9, 142:13
text [2] - 86:11, 86:14
thank [17] - 4:15, 8:24, 11:7, 12:6, 64:21, 67:5, 67:25, 68:3, 90:22, 122:19, 130:8, 136:6, 136:7, 137:7, 137:10, 137:12, 139:2
THE [1] - 2:4
thereafter [1] - 130:17
thinking [2] - 39:10, 71:7
third [8] - 12:8, 60:22, 62:2, 62:15, 71:9, 71:14, 96:14, 130:15
Third [1] - 65:15
third-party [1] - 71:14
Thirteenth [1] - 66:17
three [13] - 23:10, 55:20, 55:23, 60:23, 62:6, 70:13, 94:17, 101:23, 123:18, 123:19, 125:4, 125:8, 125:18
Three [1] - 13:2
three-page [1] - 94:17
TIME [1] - 1:13
times [7] - 14:4, 19:10, 19:12, 19:13, 102:15, 111:16, 116:16
today's [7] - 13:17,

13:25, 14:5, 15:2, 15:6, 15:12, 15:16
TOMLINSON [14] - 122:10, 124:13, 124:24, 125:23, 127:20, 130:6, 131:6, 133:12, 135:15, 136:4, 136:9, 136:14, 137:7, 137:12
Tomlinson [5] - 59:13, 106:16, 114:4, 116:8, 122:8
Tony [1] - 40:10
topics [1] - 63:17
towards [1] - 38:3
train [3] - 69:5, 69:7, 100:19
trained [3] - 70:16, 79:11, 79:13
training [8] - 68:24, 69:14, 69:16, 69:24, 70:2, 70:8, 70:9, 70:19, 70:24, 71:6, 71:7, 79:16, 79:21, 98:19, 99:17, 100:4, 101:17, 121:19
trainings [5] - 69:10, 69:12, 69:18, 70:3, 70:4
transcript [3] - 6:11, 135:21, 136:20
tremendous [2] - 32:8, 32:13
trial [8] - 3:22, 13:5, 61:7, 62:9, 62:21, 88:4, 123:23, 125:21
Tristate [2] - 119:21, 119:23
true [2] - 28:10, 142:12
Tuesday [1] - 14:11
Twelfth [1] - 66:17
two-page [3] - 83:8, 91:2, 94:10
type [9] - 30:13, 71:2, 82:6, 86:22, 93:20, 95:4, 103:7, 112:4, 129:5
types [3] - 14:23, 70:4, 85:13

**U**

ultimately [1] - 69:10
unable [6] - 63:16, 82:10, 109:18, 109:21, 111:4, 132:3
uncomfortable [1] - 109:21
underlined [1] - 128:7
understand [23] - 5:7,

12:4, 19:4, 21:18, 64:5, 69:24, 73:16, 73:20, 74:7, 85:12, 87:16, 89:11, 90:8, 103:21, 104:22, 105:22, 105:23, 107:21, 117:15, 118:11, 122:11, 127:24, 130:10
understanding [21] - 6:23, 7:4, 12:2, 13:8, 13:13, 17:5, 17:6, 18:14, 18:19, 26:24, 33:5, 34:23, 38:5, 40:12, 49:21, 68:10, 68:12, 84:14, 85:6, 90:11, 104:14
undue [1] - 111:9
unfamiliar [1] - 135:6
unfortunately [2] - 116:22, 127:17
unit [1] - 7:24
UNITED [1] - 1:2
unlawful [1] - 105:4
unsigned [1] - 3:14
unsure [1] - 72:5
unusual [3] - 43:18, 43:19, 43:23
updated [2] - 31:22, 101:7, 101:9, 101:11
updates [3] - 17:9, 32:3, 32:4
uphold [1] - 99:7
upshot [2] - 34:7, 134:7
urgency [1] - 103:23
US [1] - 2:15

**V**

validity [1] - 37:9
variety [1] - 69:9
verbal [2] - 5:13, 5:14
versed [1] - 58:18
version [5] - 15:18, 15:21, 15:23, 16:17, 16:18
versus [1] - 90:7
via [1] - 103:20, 122:8
vice [7] - 6:17, 18:3, 39:16, 39:17, 39:19, 39:20, 119:7
violation [6] - 72:15, 81:22, 102:12, 103:5, 106:9, 117:23
vis-à-vis [1] - 104:17
visit [1] - 20:25
visited [1] - 47:8
visiting [4] - 20:20, 20:23, 44:3, 47:7
voicemail [1] - 103:20
volume [1] - 120:10

P. DELGENIO

| **W** | 138:17, 139:4 | **workshops** [1] - 70:13 |
|---|---|---|
| | **who are** [2] - 30:23, 99:4 | **wouldn't** [4] - 52:8, 82:21, 82:23, 113:19 |
| **wait** [2] - 87:13, 117:6 | **who is** [5] - 18:2, 25:14, 104:13, 105:3, 136:19 | **writing** [4] - 16:4, 16:8, 41:19, 105:10 |
| **waiting** [1] - 112:17 | **who was** [1] - 26:11 | **written** [1] - 98:12 |
| **waived** [1] - 3:9 | **whoever** [3] - 41:13, 74:15, 122:17 | **wrong** [1] - 36:13 |
| **wall** [1] - 72:7 | **wished** [1] - 22:22 | |
| **walls** [1] - 46:18 | **wishes** [1] - 38:3 | **Y** |
| **wanted** [3] - 12:12, 89:8, 111:7 | **witness** [21] - 3:10, 3:16, 3:18, 4:3, 58:13, 58:16, | |
| **warehouse** [1] - 8:10 | 63:3, 63:9, 67:10, | **year** [12] - 7:14, 7:15, 7:16, 10:20, 23:6, |
| **was it** [2] - 23:13, 34:23 | 87:24, 88:7, 88:8, 89:3, 127:10, 129:11, | 31:13, 51:7, 51:25, 71:4, 75:10, 87:3, |
| **was that** [2] - 7:24, 28:10 | 131:20, 137:21, 138:8, | 98:20 |
| **was there** [3] - 10:19, 47:11, 48:13 | 142:10, 142:13 | **years** [13] - 9:3, 9:24, 10:12, 19:13, 23:7, |
| **waste** [2] - 59:20, 108:3 | **WITNESS** [1] - 142:19 | 23:10, 32:17, 75:19, |
| **wasting** [1] - 59:4 | **Witness** [45] - 1:17, 53:21, 54:14, 55:12, | 75:20, 75:21, 75:23, 79:15, 102:22 |
| **ways** [2] - 40:16, 107:5 | 56:2, 56:16, 57:21, | **YORK** [2] - 1:2, 142:4 |
| **week** [2] - 14:11, 46:19 | 58:6, 63:15, 63:22, 76:19, 77:7, 83:20, | **York** [16] - 1:22, 1:24, |
| **weekend** [2] - 20:2, 46:23 | 87:9, 87:17, 87:22, | 2:5, 2:9, 4:4, 4:13, 7:11, 8:13, 10:12, 11:4, |
| **weekly** [2] - 27:7, 46:24 | 88:22, 89:2, 89:13, 106:20, 107:14, | 18:13, 119:22, 119:24, 142:8 |
| **weeks** [16] - 23:14, 24:16, 31:8, 31:14, | 107:22, 114:6, 116:9, 117:5, 117:9, 117:17, | **yourself** [9] - 16:4, 28:19, 36:25, 45:15, 45:19, |
| 42:22, 43:5, 43:22, | 118:12, 118:19, 123:6, | 102:10, 109:16, |
| 44:19, 46:12, 47:11, 49:5, 93:9, 93:12, | 124:7, 127:19, 128:8, 128:10, 129:4, 130:18, | 116:11, 121:23 |
| 93:14 | 132:8, 133:3, 134:22, | |
| **weigh** [1] - 104:22 | 135:4, 135:18, 137:17, 138:4, 139:5 | |
| **welcome** [1] - 17:18 | **Witness'** [1] - 57:25 | |
| **were you** [7] - 7:18, 9:7, | **witnessed** [1] - 104:25 | |
| 31:22, 35:13, 44:19, 53:13, 110:3 | **Witnesses** [2] - 12:10, 96:16 | |
| **West** [2] - 1:21, 2:5 | **witnesses** [5] - 12:18, | |
| **what are** [1] - 96:3 | 61:2, 62:5, 123:16, 125:10 | |
| **What is** [7] - 4:11, 6:15, 28:2, 38:5, 40:12, | **won't** [1] - 5:13 | |
| 68:10, 80:18 | **word** [5] - 78:24, 79:9, 109:22, 112:6 | |
| **what was** [6] - 7:20, 9:10, 10:4, 11:8, 26:10, | **work** [13] - 5:3, 5:13, 7:6, 34:25, 38:10, 40:7, | |
| 31:23 | 49:9, 75:4, 80:20, | |
| **when did** [3] - 9:25, 10:23, 24:25 | 80:22, 80:24, 81:8, 86:3 | |
| **when you** [15] - 8:16, | **worked** [4] - 10:18, | |
| 30:4, 30:22, 32:12, 36:24, 45:19, 53:10, | 19:13, 29:24, 31:4 | |
| 54:3, 69:17, 69:23, | **Workers** [2] - 47:18, 47:19 | |
| 80:15, 99:2, 99:3, 112:2, 114:24 | **working** [6] - 10:2, 10:12, | |
| **whenever** [2] - 23:12, 84:11 | 40:13, 48:8, 71:16, 80:11 | |
| **where is** [2] - 7:9, 18:10 | **workplace** [6] - 12:25, | |
| **where was** [2] - 8:17, 9:13 | 55:20, 108:12, 108:23, 114:14, 125:16 | |
| **WHEREOF** [1] - 142:19 | **workshop** [3] - 71:19, | |
| **Whereupon** [21] - 11:15, | 72:2, 101:16 | |
| 51:15, 54:15, 59:8, 60:3, 61:17, 61:22, | | |
| 77:21, 78:7, 83:10, 83:14, 89:15, 91:4, | | |
| 94:12, 114:22, 122:5, 122:7, 124:18, 137:14, | | |

### Diamond Errata Sheet

Plaintiff(s): _____

_____

_____

Defendant(s): _____

_____

_____

| Page | Line | Correction | Reason for Correction |
|------|------|------------|----------------------|
|      |      |            |                      |
|      |      |            |                      |
|      |      |            |                      |
|      |      |            |                      |
|      |      |            |                      |
|      |      |            |                      |
|      |      |            |                      |
|      |      |            |                      |
|      |      |            |                      |
|      |      |            |                      |
|      |      |            |                      |
|      |      |            |                      |
|      |      |            |                      |
|      |      |            |                      |
|      |      |            |                      |
|      |      |            |                      |
|      |      |            |                      |
|      |      |            |                      |
|      |      |            |                      |
|      |      |            |                      |
|      |      |            |                      |
|      |      |            |                      |
|      |      |            |                      |

Date: _____

Name of Witness: _____

Signature: _____

Subscribed and sworn to before me

This _____ of _____ 20___

_____
Notary Public

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
LAWRENCE I. FRIEDMANN,                                          **12 CV 1307 (LDW)(AKT)**

              *Plaintiff,*                          **NOTICE TO TAKE**
**DEPOSITION UPON ORAL**
    -against-                                             **EXAMINATION**

RAYMOUR FURNITURE CO., INC.,
*and* LUCY GOLDSTEIN, *individually,*

              *Defendants.*
-------------------------------------------------------------X

      **PLEASE TAKE NOTICE** that, Plaintiff LAWRENCE I. FRIEDMANN, by his attorneys, The Harman Firm, PC, hereby serves notice, pursuant to Federal Rule of Civil Procedure 30(b)(6), that the testimony upon oral examination of a representative of Defendant RAYMOUR FURNITURE CO., INC., specifically as they relate to matters detailed in *Exhibit A*, attached hereto, will be taken before a notary public who is not an attorney, or an employee of any attorney, for any party or prospective party herein and is not a person who would be disqualified to act as a juror because of interest or because of consanguinity or affinity to any party herein, at The Harman Firm, PC, located at 200 West 57th Street, Suite 900, New York, New York 10019, beginning on the 17th day of January 2013, at 10:00 a.m., with respect to evidence material and necessary in the prosecution of this action.

      **PLEASE TAKE FURTHER NOTICE** that the said oral examination will continue from day to day until completed.  Plaintiffs reserve the right to use electronic, audio and visual means to record said examination in conjunction with or instead of stenographic recordings, pursuant to applicable Court rules.

1



Dated: New York, New York
         December 19, 2012

                              By:    _____s/_____
                                     Kimberly S. Thomsen
                                     Walker G. Harman, Jr.
                                     THE HARMAN FIRM, P.C.
                                     *Attorneys for Plaintiff*
                                     200 West 57th Street, Suite 900
                                     New York, New York 10019
                                     (212) 425-2600
                                     kthomsen@theharmanfirm.com
                                     wharman@theharmanfirm.com

To:    Tara L. Eyer Daub, Esq.
       Jessica Chiclacos, Esq.
       NIXON PEABODY LLP
       *Attorneys for Defendants*
       50 Jericho Quadrangle, Suite 300
       Jericho, New York 11753
       (516) 832-7613
       tdaub@nixonpeabody.com
       jchiclacos@nixonpeabody.com

2

# EXHIBIT A

**Testimony Sought by Plaintiff from Witnesses pursuant to
Fed. R. Civ. P. 30(b)(6)**

Plaintiffs seeks testimony from Defendants' 30(b)(6) witnesses on the following matters:

1. All information related to anti-discrimination policies at Defendant RAYMOUR FURNITURE CO., INC.;
2. All information related to disabilities and accommodation of disabilities in the workplace at Defendant RAYMOUR FURNITURE CO., INC.;
3. All affirmative defenses asserted by Defendants and or to be relied upon in any pleading up to and including trial.

**FILED
CLERK**

**SUMMONS ISSUED**

Walker G. Harman, Jr. [WH-8044]
THE HARMAN FIRM, P.C.
*Attorneys for Plaintiff*
200 West 57th Street, Suite 900
New York, New York 10019
212-425-2600

2012 MAR 15  PM 4:48

U.S. DISTRICT COURT
EASTERN DISTRICT
OF NEW YORK

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------X
LAWRENCE I. FRIEDMANN,

                            *Plaintiff,*

      -against-

RAYMOUR FURNITURE CO., INC.,
and LUCY GOLDSTEIN, individually.

                        *Defendant.*
-------------------------------------------------------------------------X

Index No.:

**COMPLAINT**

**PLAINTIFF HEREBY
DEMANDS A TRIAL
BY JURY**

**CV 12 - 1307**

WEXLER, J

      Plaintiff, LAWRENCE I. FRIEDMANN, by his attorneys, THE HARMAN FIRM, P.C.,

as and for his Complaint of disability and age discrimination against Defendants alleges as

follows:

### JURISDICTION AND VENUE

      1.     Jurisdiction of this Court is proper under 28 USC § 1331 (a) in that claims arise

under federal law, specifically the Age Discrimination in Employment Act of 1967, 29 U.S.C.

623, *et. seq.*, and the Americans with Disabilities Act of 1990, 42 U.S.C. 12112, *et. seq.* The

supplemental Jurisdiction of the Court is invoked over the local law cause of action pursuant to

28 U.S.C. § 1367.

      2.     Venue is properly laid in the Eastern District of New York under U.S.C. §

1391(c), in that the Defendant corporation shall be deemed to reside in any judicial district in



which it is subject to personal jurisdiction at the time the action is commenced.  The corporate
Defendant owns and operates a retail store in which Plaintiff worked, located at 895 East Gate
Blvd, Garden City, NY 11530.

     3.     Plaintiff has filed a charge with the Equal Employment Opportunity Commission,
which issued to the Plaintiff a right to sue letter on December 19, 2011.

## PARTIES

     4.     Plaintiff, LAWRENCE I. FRIEDMANN (hereinafter "FRIEDMANN"), is a
resident of Bellerose, State of New York.

     5.     At all times relevant and hereinafter mentioned, Defendant RAYMOURS
FURNITURE CO., INC. (hereinafter "RFCI"), was and is a domestic business corporation, duly
existing pursuant to and by virtue of the laws of the State of New York.

     6.     At all times relevant and hereinafter mentioned, Defendant LUCY GOLDSTEIN
(hereinafter "GOLDSTEIN"), was Plaintiff FRIEDMANN's direct supervisor while he was
employed by Defendant RFCI.

     7.     At all times relevant and hereinafter mentioned, Defendant RFCI has offices
located at 7248 Morgan Road, Liverpool, NY 13088.

     8.     At all times relevant and hereinafter mentioned, Plaintiff FRIEDMANN was an
employee of Defendant RFCI.

     9.     At all times relevant and hereinafter mentioned Plaintiff was employed by
Defendant RFCI in the role of "Sales Associate."

2

## DEMAND FOR TRIAL BY JURY

10.    Plaintiff demands a trial by jury.


## FACTUAL BACKGROUND

11.    In or about October 2005, Plaintiff FRIEDMANN began working for Defendant RFCI as a "Sales Associate."

12.    From January 2006 until late 2010, before Plaintiff FRIEDMANN became ill, Plaintiff FRIEDMANN met all sales quotas imposed by Defendant RFCI and even excelled in his sales numbers as compared to his fellow associates.


## DISABILITY DISCRIMINATION

13.    Plaintiff FRIEDMANN had his first surgery relating to his Sciatica on or around May 31, 2002.

14.    However, before a flare up of his Sciatica on or about May 1, 2008, Plaintiff FRIEDMANN was not hindered by his Sciatica in any way in his employment for Defendant RFCI.

15.    Despite this flare up in May 2008, Plaintiff FRIEDMANN continued to meet all of the sales quotas imposed on all sales associates employed by Defendant RFCI.

16.    Plaintiff FRIEDMANN did not experience any significant flare ups in his Sciatica from May 1, 2008 until March of 2010.

17.    In or around March 2010, Plaintiff FRIEDMANN experienced another flare up of Sciatica.

18.    This time, the flare up affected Plaintiff FRIEDMANN's ability to stand for long periods of time, which thereby inhibited his ability to meet the requisite sales numbers.

3

19.    Plaintiff FRIEDMANN sought medical treatment as follows:

    a.  On March 3, 2010, Plaintiff FRIEDMANN met with Dr. Jeffrey Shapiro, an Orthopedic Surgeon, with complaints about his Sciatica pain;

    b.  On March 17, 2010, Plaintiff FRIEDMANN returned to Dr. Jeffrey Shapiro's office for further consultation and treatment;

    c.  On April 13, 2010, Plaintiff FRIEDMANN again met with Dr. Jeffrey Shapiro regarding his pain;

    d.  On April 30, 2010, Plaintiff FRIEDMANN met with Dr. Daniel Brietstein, who is a pain management doctor;

    e.  On May 7, 2010, Plaintiff FRIEDMANN received an MRI at Next Generation Radiology office;

    f.  On May 13, 2010, Plaintiff FRIEDMANN received epidurals injections at an Ambulatory Center which were administered by Dr. Daniel Brietstein, the pain management doctor;

    g.  On June 1, 2010, Plaintiff FRIEDMANN received more epidural injections by Dr. Daniel Brietstein;

    h.  On July 8, 2010, Plaintiff FRIEDMANN returned to Dr. Daniel Brietstein's office for a follow-up appointment after treatment and surgery;

    i.  On July 10, 2010, Plaintiff FRIEDMANN began physical therapy sessions at Long Island Physical Therapy;

    j.  On July 12, 2010, Plaintiff FRIEDMANN had another physical therapy session at Long Island Physical Therapy;

    k.  On July 20, 2010, Plaintiff FRIEDMANN had another physical therapy session at

4

Long Island Physical Therapy;

l.   On August 9, 2010, Plaintiff FRIEDMANN met with the supervisor of physical therapy, Dr. Jay Weiss for a consultation regarding further pain management treatment.

20.   Throughout Plaintiff FRIEDMANN's medical treatment, Plaintiff FRIEDMANN did not seek disability leave from Defendant RFCI, but simply made a request for reasonable accommodation that he be allowed to rest for short periods of time while on the sales floor so as not to exacerbate his condition and that some consideration be given to the impact this request would have on his sales quotas.

21.   Plaintiff FRIEDMANN's sales numbers suffered as a direct result of his Sciatica and resulting treatment.   However, Defendants, including Defendant GOLDSTEIN, did not adequately grant Plaintiff FRIEDMANN his accommodation request.   Plaintiff FRIEDMANN was chastised for taking breaks and no consideration was given to the impact the breaks would have on his sales quotas.

22.   Plaintiff FRIEDMANN was put on a performance review plan in or about April 2011.

23.   Plaintiff FRIEDMANN was the only individual put on a performance plan because disability alone, with one other man who used a cane.

24.   Despite the fact that Plaintiff FRIEDMANN had sciatica, which directly affected his ability to meet his sales quotas – sales quotas that should have been adjusted as a reasonable accommodation, and had never had difficulty with meeting any sales quotas before his sciatica flared up, Plaintiff FRIEDMANN was summarily terminated.

25.   Upon information and belief, no sales associates on the performance plan with

5

numbers lower than Plaintiff FRIEDMANN were terminated due to performance-related issues.

## AGE DISCRIMINATION

26.     In or about 2005, Plaintiff FRIEDMANN began his employment by RFCI as a sales associate. From January 2006 to December 2009, the Plaintiff's job and sales performance far exceeded RFCI's minimum volume requirements.

27.     In or about February 2011, Defendant GOLDSTEIN asked Plaintiff FRIEDMANN his age and when he planned to retire.  Plaintiff did not divulge his age at that time, but stated that he planned to retire approximately five (5) years in the future.  After this conversation, Defendant GOLDSTEIN began to refer to Plaintiff FRIEDMANN as "old man" when speaking to him.  It was at this time that Plaintiff FRIEDMANN began to believe his age was a problem for his employer.

28.     Thereafter, Plaintiff FRIEDMANN's other colleagues and managers began to address him as "old man" when speaking to him.

29.     Any time Plaintiff FRIEDMANN's performance was addressed by Defendant GOLDSTEIN, she would say, "that old excuse again."

30.     Although other employees were allowed to sit down at work without repercussion and without having to request reasonable accommodation, Plaintiff FRIEDMANN was not allowed these rights, even upon requesting them of his superiors.

31.     Upon Plaintiff FRIEDMANN complaining to his superiors about age and disability discrimination, nothing changed; moreover, Plaintiff FRIEDMANN was terminated because of his age and disability in retaliation for his complaints of discrimination.

32.     In or about May 2011, Plaintiff FRIEDMANN, along with eight other employees of Defendant RFCI were placed on a coaching plan because these employees were alleged to

6

have low figures in sales.

33.     Plaintiff FREIDMANN was the only one (1) of the eight (8) employees of Defendant RFCI placed on the coaching plan who was thereafter terminated from employment, while many other younger employees had been kept on the coaching plan for a number of years without being terminated.

34.     After Plaintiff FRIEDMANN was placed on the coaching plan, the regional manager, Tony Bender, informed Plaintiff FRIEDMANN that his figures "were going to slip again," despite Plaintiff FRIEDMANN informing Mr. Bender that he believed this was not the case.

35.     On or about May 18, 2011, Plaintiff FRIEDMANN was asked by Defendant GOLDSTEIN to interview with the Store Manager at the Carle Place branch owned by Defendant RFCI for consideration for a transfer.  Plaintiff met with Laura, a store manager of the Carle Place branch, who stated she "was not looking for anyone for her store who had a few bucks in the bank," meaning that she did not want an employee who was older and she felt like was about to retire.

36.     To Plaintiff FRIEDMANN, this was a derogatory comment aimed at Plaintiff FRIEDMANN's age.  Plaintiff FRIEDMANN was visibly offended by this comment.

37.     On or about May 18, 2011, upon Plaintiff FRIEDMANN's return to his work location, Defendant GOLDSTEIN informed Plaintiff FRIEDMANN that he was not being transferred to the Carle Place branch owned by Defendant RFCI.

38.     On or about June 18, 2011, Defendant GOLDSTEIN terminated Plaintiff FRIEDMANN and stated "enjoy your summer in the Hamptons," a direct reference to Plaintiff FRIEDMANN's age and Defendant GOLDSTEIN's opinion, which she had stated before on

7

many occasions, that Plaintiff FRIEDMANN should retire.

39.    On the same day, Iman Kosmi, the showroom manager employed by Defendant RFCI, also stated to Plaintiff FRIEDMANN that his father had resisted retiring but once he did, "he was very happy."

40.    Iman Kosmi further informed Plaintiff FRIEDMANN that he could collect unemployment in addition to any retirement income and that it was "not bad", implying Plaintiff FRIEDMANN was better off having been terminated by Defendant RFCI.

41.    Plaintiff FRIEDMANN was aged 70 upon his termination.[1]

## FIRST CAUSE OF ACTION

42.    Plaintiff FRIEDMANN repeats and realleges each and every allegation contained in paragraphs "1" through "41" with the same force and effect as if separately alleged and reiterated herein.

43.    Defendants RFCI and GOLDSTEIN subjected Plaintiff FRIEDMANN to age discrimination, in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. 623, *et. seq.*

44.    As a result, Plaintiff FRIEDMANN suffered damages for past and future earnings, other employment benefits, attorney's fees, and emotional injuries in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

45.    Plaintiff FRIEDMANN repeats and realleges each and every allegation contained in paragraphs "1" through "41" with the same force and effect as if separately alleged and

---

[1] Plaintiff FRIEDMANN was born June 17, 1941.

8

reiterated herein.

46.    Defendants RFCI and GOLDSTEIN subjected Plaintiff FRIEDMANN to disability discrimination, in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. 12112, *et. seq.*

47.   As a result, Plaintiff FRIEDMANN suffered damages for past and future earnings, other employment benefits, attorney's fees, and emotional injuries in an amount to be determined at trial.

### THIRD CAUSE OF ACTION

48.    Plaintiff FRIEDMANN repeats and realleges each and every allegation contained in paragraphs "1" through "41" with the same force and effect as if separately alleged and reiterated herein.

49.    Defendants RFCI and GOLDSTEIN subjected Plaintiff FRIEDMANN to disability and age discrimination in violation of the New York Executive Law § 296, *et. seq.*

50.    As a result, Plaintiff FRIEDMANN suffered damages for past and future earnings, other employment benefits, and emotional injuries in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION

51.    Plaintiff FRIEDMANN repeats and realleges each and every allegation contained in paragraphs "1" through "41" with the same force and effect as if separately alleged and reiterated herein.

52.    Defendant GOLDSTEIN willfully and consciously aided and abetted the pervasive disability and age discrimination Plaintiff FRIEDMANN suffered and refused to

9

rectify the work environment, despite being responsible for doing so.

      53.    As a result, Plaintiff FRIEDMANN suffered damages for past and future earnings, other employment benefits, and emotional injuries in an amount to be determined at trial.

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

(i)    On the First Cause of Action, actual damages to be determined at trial, but in no event less than $1,000,000;

(ii)    On the Second Cause of Action, actual damages to be determined at trial, but in no event less than $1,000,000;

(iii)    On the Third Cause of Action, actual damages to be determined at trial, but in no event less than $1,000,000;

(iv)    On the Fourth Cause of Action, actual damages to be determined at trial, but in no event less than $1,000,000;

(iv)    Punitive damages;

(v)    Attorneys' fees, disbursements and other costs; and

(vi)    Such other and further relief which the Court deems just and proper.

Dated:    New York, New York
          March 12, 2012

                            Walker G. Harman, Jr.
                            THE HARMAN FIRM, PC
                            *Attorneys for Plaintiff*
                            200 West 57th Street, Suite 900
                            New York, New York 10019
                            (212) 425-2600

Tara Eyer Daub, Esq. (TE-7943)
Jessica Chiclacos, Esq. (JG-2534)
Nixon Peabody LLP
50 Jericho Quadrangle, Suite 300
Jericho, New York 11753
(516) 832-7500
tdaub@nixonpeabody.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

LAWRENCE I. FRIEDMANN,

                                        Plaintiff,

            - against -                                    12 CV 1307
                                                           (LDW) (AKT)
RAYMOUR FURNITURE CO., INC., and LUCY
GOLDSTEIN, individually.

                                        Defendants.

## DEFENDANT'S ANSWER WITH AFFIRMATIVE DEFENSES

Defendant Raymour Furniture Company, Inc., d/b/a Raymour & Flanigan Furniture

("Defendant" or "Raymour & Flanigan"), by its attorneys Nixon Peabody LLP, hereby answers

the Complaint of Plaintiff Lawrence Friedmann ("Plaintiff" or "Mr. Friedmann") in accordance

with the numbered paragraphs thereof as follows:

### JURISDICTION AND VENUE

1.      Admits that Plaintiff purports to base the jurisdiction of this Court on the statutes

cited in Paragraph 1 of the Complaint but, except as so admitted, denies the allegations set forth

in Paragraph 1 of the Complaint.

2.      Admits that Plaintiff purports to base proper venue of this action within this Court

on the statute cited in Paragraph 2 of the Complaint and that at the time of his termination from

14207489



employment, Plaintiff worked at Raymour & Flanigan's Garden City, New York location but, except as so admitted, denies the allegations set forth in Paragraph 2 of the Complaint.

      3.      Admits the allegations set forth in Paragraph 3 of the Complaint.

## PARTIES

      4.      Admits, upon information and belief, the allegations set forth in Paragraph 4 of the Complaint.

      5.      Admits the allegations set forth in Paragraph 5 of the Complaint.

      6.      Admits that at certain points during Plaintiff's employment with Raymour & Flanigan his work was supervised by Lucy Goldstein but, except as so admitted, denies the allegations set forth in Paragraph 6 of the Complaint and refers all questions of law to the Court.

      7.      Admits the allegations set forth in Paragraph 7 of the Complaint.

      8.      Admits and avers that Plaintiff was employed by Raymour & Flanigan from on or about October 18, 2005 until the termination of his employment on or about June 18, 2011.

      9.      Admits the allegations set forth in Paragraph 9 of the Complaint.

## DEMAND FOR TRIAL BY JURY

      10.      Admits that Plaintiff demands a trial by jury.

## FACTUAL BACKGROUND

      11.      Admits the allegations set forth in Paragraph 11 of the Complaint.

      12.      Denies the allegations set forth in Paragraph 12 of the Complaint.

## DISABILITY DISCRIMINATION ALLEGATIONS

      13.      Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 13 of the Complaint.

14207489.3

14.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 14 of the Complaint.

15.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations regarding Plaintiff's "flare up" in May 2008, and denies the remainder of the allegations set forth in Paragraph 15 of the Complaint.

16.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 16 of the Complaint.

17.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 17 of the Complaint.

18.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations concerning Plaintiff's "flare up," and denies the remainder of the allegations set forth in Paragraph 18 of the Complaint.

19.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 19 of the Complaint, including all sub-parts thereof.

20.     Denies the allegations set forth in Paragraph 20 of the Complaint.

21.     Denies the allegations set forth in Paragraph 21 of the Complaint.

22.     Avers that Plaintiff was placed on a coaching for success plan but, except as so averred, denies the allegations set forth in Paragraph 22 of the Complaint.

23.     Denies the allegations set forth in Paragraph 23 of the Complaint.

24.     Denies the allegations set forth in Paragraph 24 of the Complaint.

25.     Denies the allegations set forth in Paragraph 25 of the Complaint.

## AGE DISCRIMINATION ALLEGATIONS

26.     Admits that Plaintiff began working for Raymour & Flanigan as a Sales Associate in October 2005 but, except as so admitted, denies the allegations set forth in Paragraph 26 of the Complaint.

27.     Denies the allegations set forth in Paragraph 27 of the Complaint.

28.     Denies the allegations set forth in Paragraph 28 of the Complaint.

29.     Denies the allegations set forth in Paragraph 29 of the Complaint.

30.     Denies the allegations set forth in Paragraph 30 of the Complaint.

31.     Denies the allegations set forth in Paragraph 31 of the Complaint.

32.     Avers that Plaintiff and other employees of Defendant were placed on coaching for success plans in May 2011 due to low sales figures but, except as so averred, denies the allegations set forth in Paragraph 32 of the Complaint.

33.     Denies the allegations set forth in Paragraph 33 of the Complaint.

34.     Denies the allegations set forth in Paragraph 34 of the Complaint.

35.     Avers that in or about May 2011, Plaintiff spoke with Ms. Goldstein and thereafter met with the Carle Place Store Manager Laura D'Ambrosio about a possible transfer to Defendant's Carle Place, New York showroom but, except as so averred, denies the allegations set forth in Paragraph 35 of the Complaint.

36.     Denies the allegations set forth in Paragraph 36 of the Complaint.

37.     Avers that Plaintiff was informed that he would not be transferred to the Carle Place showroom but, except as so averred, denies the allegations set forth in Paragraph 37 of the Complaint.

14207489.3

4

38.     Admits that Plaintiff's employment with Raymour & Flanigan was terminated on or about June 18, 2011, but, except as so admitted, denies the allegations set forth in Paragraph 38 of the Complaint.

39.     Denies the allegations set forth in Paragraph 39 of the Complaint.

40.     Denies the allegations set forth in Paragraph 40 of the Complaint.

41.     Admits the allegations set forth in Paragraph 41 of the Complaint.

## FIRST CAUSE OF ACTION

42.     Defendant repeats and restates each and every response to paragraphs 1 through 41 as if fully set forth herein.

43.     Denies the allegations set forth in Paragraph 43 of the Complaint.

44.     Denies the allegations set forth in Paragraph 44 of the Complaint.

## SECOND CAUSE OF ACTION

45.     Defendant repeats and restates each and every response to paragraphs 1 through 44 of the Complaint as if fully set forth herein.

46.     Denies the allegations set forth in Paragraph 46 of the Complaint.

47.     Denies the allegations set forth in Paragraph 47 of the Complaint.

## THIRD CAUSE OF ACTION

48.     Defendant repeats and restates each and every response to paragraphs 1 through 47 of the Complaint as if fully set forth herein.

49.     Pursuant to United States District Court Judge Wexler's October 16, 2012 Memorandum and Order, Plaintiff's claims under the New York Executive Law have been dismissed from this action and, therefore, no responsive pleading is required.

14207489.3                                              5

50.     Pursuant to United States District Court Judge Wexler's October 16, 2012 Memorandum and Order, Plaintiff's claims under the New York Executive Law have been dismissed from this action and, therefore, no responsive pleading is required.

## FOURTH CAUSE OF ACTION

51.     Defendant repeats and restates each and every response to paragraphs 1 through 50 of the Complaint as if fully set forth herein.

52.     Pursuant to United States District Court Judge Wexler's October 16, 2012 Memorandum and Order, Plaintiff's claims under the New York Executive Law have been dismissed from this action and, therefore, no responsive pleading is required.

53.     Pursuant to United States District Court Judge Wexler's October 16, 2012 Memorandum and Order, Plaintiff's claims under the New York Executive Law have been dismissed from this action and, therefore, no responsive pleading is required.

## PRAYER FOR RELIEF

The Paragraph in the "Wherefore" clause immediately following Paragraph 53 of the Complaint states requests for relief to which no responsive pleading is required.  To the extent a responsive pleading is required, Defendant denies that Plaintiff is entitled to any relief whatsoever.

## GENERAL DENIAL

Denies each and every allegation not specifically admitted herein.

## FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a claim, in whole or in part, upon which relief can be granted.

14207489.3

6

### SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, to the extent that they were not interposed within the applicable statute(s) of limitations or contractual limitations period.

### THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, to the extent that he failed to properly and timely exhaust all necessary administrative, statutory and/or jurisdictional prerequisites for the commencement of this action.

### FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred to the extent that they were not alleged or encompassed within the administrative charge filed by Plaintiff or the administrative investigation thereof.

### FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the principles/doctrines of estoppel, laches, waiver and/or unclean hands.

### SIXTH AFFIRMATIVE DEFENSE

The relief sought herein is barred, in whole or in part, to the extent that Plaintiff has failed to take reasonable steps to mitigate his damages.

### SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because Defendant exercised reasonable care to prevent and promptly correct any allegedly discriminatory behavior.

### EIGHTH AFFIRMATIVE DEFENSE

Plaintiff unreasonably failed to take advantage of the preventive and corrective opportunities provided by Defendant or to otherwise avoid his alleged harm.

### NINTH AFFIRMATIVE DEFENSE

Plaintiff is not a "qualified individual" with a "disability" under the applicable laws.

### TENTH AFFIRMATIVE DEFENSE

To the extent that Plaintiff may be considered to have a "disability," Defendant took appropriate steps to reasonably accommodate such "disability." To the extent that any accommodation was requested but not granted, Plaintiff sought accommodations which are not required and/or are excused by law because they would impose undue hardship on Defendant.

### ELEVENTH AFFIRMATIVE DEFENSE

Plaintiff failed to timely engage in an "interactive process" with Defendant respecting some or all of his requested accommodations.

### TWELFTH AFFIRMATIVE DEFENSE

Defendant did not aid, abet, ratify, condone, encourage or acquiesce in any alleged discriminatory conduct.

### THIRTEENTH AFFIRMATIVE DEFENSE

The decisions and actions, or failure to act, if any, respecting Plaintiff and his employment were not discriminatory, but were justified by legitimate, non-discriminatory reasons and based on factors other than Plaintiff's age or alleged disability.

### FOURTEENTH AFFIRMATIVE DEFENSE

The claims must be dismissed because Defendants would have made the same employment decisions regardless of Plaintiff's age and alleged disability.

### FIFTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims for emotional distress are barred, in whole or in part, by the exclusivity provisions of Sections 10 and 11 of the New York State Workers' Compensation Law.

14207489.3

8

Case 2:12-cv-01307-LDW-AKT   Document 71-3   Filed 06/28/13   Page 180 of 197 PageID #:
2634
Case 2:12-cv-01307-LDW-AKT   Document 26   Filed 11/14/12   Page 9 of 9 PageID #: 149

## SIXTEENTH AFFIRMATIVE DEFENSE

The claims for punitive damages are barred because Defendant at no time engaged in discriminatory practices or actions with malice or with reckless disregard for Plaintiff's rights. To the contrary, Defendant made a good-faith effort to comply with obligations under the various discrimination statutes.

**WHEREFORE,** having fully answered Plaintiff's allegations, Defendant respectfully requests that this Court dismiss the Complaint in its entirety, award it the costs and disbursements of this action, including reasonable attorney's fees, and award such other relief as the Court deems just and proper.

Dated: November 14, 2012
Jericho, New York

NIXON PEABODY LLP

/s/

By:_____
Tara Eyer Daub

50 Jericho Quadrangle, Suite 300
Jericho, NY  11753-2728
(516) 832-7613

*Attorneys for Defendant*
*Raymour Furniture Company, Inc.*

# THE HARMAN FIRM, PC

### ATTORNEYS & COUNSELORS AT LAW

200 WEST 57ᵗʰ STREET, SUITE 900, NEW YORK, NEW YORK 10019

TELEPHONE 212 425 2600  FAX 212 202 3926

WWW.THEHARMANFIRM.COM

October 11, 2011

**VIA CERTIFIED US MAIL**
Raymours Furniture Co., Inc.
7248 Morgan Road
Liverpool, NY 13088-0200

Re:    Lawrence I. Friedmann and Raymours Furnitures Co., Inc.

To Whom It May Concern:

This firm has been retained by Lawrence I. Friedmann to represent him with respect to employment-related claims against Raymours Furniture Co., Inc. Based on our preliminary investigation, we have concluded that Raymours Furniture Co., Inc. subjected Mr. Friedmann to age and disability discrimination, and ultimately unlawfully terminated Mr. Friedmann's employment, in violation of Federal and New York State anti-discrimination laws.

Accordingly, we hereby put you on notice that litigation could be imminent and demand that all electronically stored information that relates to Mr. Friedmann's employment at Raymours Furniture Co., Inc. be retained. Because a lawsuit could be imminent, all information from Raymours Furniture Co., Inc.'s computer systems, removable electronic media, and other locations must be retained. This includes, but is not limited to, email and other electronic communication, word processing documents, spreadsheets, databases, calendars, telephone logs, contact manager information, Internet usage files, and network access information.

Raymours Furniture Co., Inc. should also preserve the following platforms in their possession or the possession of a third party under the control of Raymours Furniture Co., Inc. (such as an employee or outside vendor under contract): databases, networks, computer systems, including legacy systems (hardware and software), servers, archives, backup or disaster recovery systems, tapes, discs, drives, cartridges and other storage media, laptops, personal computers, internet data, personal digital assistants, handheld wireless devices, mobile telephones, paging devices, and audio systems (including voicemail). The laws and rules prohibiting destruction of evidence apply to electronically stored information in the same manner that they apply to other evidence.

PLAINTIFF'S
EXHIBIT NO.
FOR IDENTIFICATION
DATE

October 11, 2011
Page 2 of 2

    Should you have any questions, please do not hesitate to contact our office. Thank you for your attention in this matter.

Very truly yours,
THE HARMAN FIRM, PC

Walker G. Harman, Jr.

CC:   Lawrence I. Friedmann

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| LAWRENCE I. FRIEDMANN,<br><br>Plaintiff,<br><br>- against -<br><br>RAYMOUR FURNITURE CO., INC., and LUCY GOLDSTEIN, individually.<br><br>Defendants. | **DEFENDANT'S RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST SET OF DOCUMENT REQUESTS**<br><br>12 CV 1307 (LDW) (AKT) |

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, defendant Raymour Furniture Company, Inc., d/b/a Raymour & Flanigan Furniture ("Defendant" or "Raymour & Flanigan"), by and through its attorneys Nixon Peabody LLP, hereby responds and objects to Plaintiff Lawrence Friedmann's ("Plaintiff") First Set of Document Requests. Defendant's responses are based on the best information currently available and it reserves the right to amend or supplement its responses to the extent required pursuant to the Federal Rules of Civil Procedure. Subject to both the general and specific objections and the reservations and responses set forth below, documents will be produced, to the extent they exist. The production of any document or information shall not operate as an admission that it is relevant to the subject matter of this action or as a waiver of any objection to its admission into evidence.

## GENERAL OBJECTIONS

1.      Defendant objects to the requests to the extent that they request information or seek the production of documents that are subject to attorney-client privilege, that were prepared in anticipation of litigation, that constitute attorney work product, that are protected from disclosure under the self-critical analysis doctrine or by any other privilege or immunity or that

14216272.1



are otherwise immune from discovery.  Inadvertent identification or production of such information or documents shall not constitute a waiver of any privilege with respect to the subject matter thereof or the information contained therein, and shall not waive Defendant's right to object to the use of any such document or the information contained therein during any subsequent proceeding.

2.      Defendant objects to Plaintiff's requests to the extent that they are overly broad, unreasonable and unduly burdensome.

3.      Defendant objects to Plaintiff's requests to the extent that they seek documents, information, or materials that are not relevant to the claims or defenses of any party herein, and are not reasonably calculated to lead to the discovery of relevant, admissible evidence, including, without limitation, documents relating to matters that are not raised in the Complaint.

4.      Defendant objects to the requests the extent that they seek documents, information, or materials from entities or persons who are not parties to this litigation and which documents, information, or materials were not within the Defendant's knowledge, possession, and/or control at any time during the relevant period alleged in the Complaint.

5.      Defendant objects to Plaintiff's requests to the extent that they are not reasonably limited in time and/or call for documents outside the periods of limitation applicable to Plaintiff's claims under the Age Discrimination in Employment Act and the Americans with Disabilities Act.

14216272.1

6.      Defendant objects to Plaintiff's requests to the extent that they are vague, ambiguous, not subject to reasoned interpretation, lack sufficient particularity, and/or fail to put Defendant on reasonable notice of the information being requested.

7.      Defendant objects to Plaintiff's requests to the extent that they seek documents which are already in Plaintiff's custody or control and/or are readily accessible to him.

8.      Defendant objects to Plaintiff's requests to the extent that they seek personal and confidential information that concern individuals, including employees, clients or others having a relationship with Raymour & Flanigan, who are not parties to this action and/or individuals who did not participate in any employment decision affecting Plaintiff, the disclosure of which might violate the privacy rights of, or prejudice, those individuals.

9.      Defendant objects to Plaintiff's requests on the ground and to the extent that they attempt or purport to impose obligations beyond those authorized by the Federal Rules of Civil Procedure and/or the Local Civil Rules.  Defendant specifically objects to, rejects and repudiates, the "Definitions & Instructions" in Plaintiff's requests and shall provide objections and responses in accordance with the Federal Rules of Civil Procedure and the Local Civil Rules.

10.     Defendant's responses are based on the best information presently available, and Defendant reserves the right to amend or to supplement its responses if it obtains other or additional information, but states that it is not obligated to produce documents created after the date of this response.

11.     Defendant's obligations to respond to Plaintiff's requests are defined by the objections and limitations contained herein.

- 3 -

14216272.1

## DEFINITIONS APPLICABLE TO THIS RESPONSE

The following definitions shall apply to this response:

A.      The term "overly broad" shall mean that Defendant objects to a request on the ground that it calls for information that is neither relevant to the subject matter involved in the pending action nor reasonably calculated to lead to the discovery of admissible evidence.

B.      The term "vague" shall mean that Defendant objects to a request on the grounds that it does not identify the information sought with requisite particularity and is ambiguous, and improperly requires Defendant to speculate as to what information is sought.  Where a vagueness objection is asserted, however, Defendant will in good faith attempt to construe the request and respond to the request as construed.

## SPECIFIC OBJECTIONS AND RESPONSES

**REQUEST NO. 1:**

The complete personnel file of Plaintiff.

**RESPONSE TO REQUEST NO. 1:**

See General Objections Nos. 2, 3, 5, 6 and 7.

Subject to and without waiving the foregoing objections, Defendant will produce non-privileged documents that may be deemed responsive to this request, if any, at Exhibit A.

**REQUEST NO. 2:**

The complete personnel file of any former direct supervisor or manager of Plaintiff and any employee of Defendants' in the greater New York area who has been disciplined for failing to meet sales quotas.

**RESPONSE TO REQUEST NO. 2:**

See General Objections Nos. 2, 3, 4, 5, 6 and 8.  Defendant further objects to this request on the ground that the terms "greater New York area" and "disciplined for failing to meet sales

- 4 -

quotas" are vague.

**REQUEST NO. 3:**

All communications, all documents, and all electronically memorialized information, concerning Plaintiff's work performance.

**RESPONSE TO REQUEST NO. 3:**

<u>See</u> General Objections Nos. 2, 3, 5, 6 and 7.

Subject to and without waiving the foregoing objections, Defendant will produce non-privileged documents that may be deemed responsive to this request, if any, at Exhibit B.

Defendant also refers Plaintiff to documents produced at Exhibit A.

**REQUEST NO. 4:**

All communications, all documents, and all electronically memorialized information, concerning any complaints ever received by Defendants about Plaintiff, including, but not limited to, complaints about job performance.

**RESPONSE TO REQUEST NO. 4:**

<u>See</u> General Objections Nos. 2, 3, 5, 6 and 7.

Subject to and without waiving the foregoing objections, Defendant refers Plaintiff to documents produced at Exhibit A.

**REQUEST NO. 5:**

All communications, all documents, and all electronically memorialized information written by or sent to Defendants concerning employees hired by Defendants to replace Plaintiff, including but not limited to their age.

**RESPONSE TO REQUEST NO. 5:**

<u>See</u> General Objections Nos. 2, 3, 4, 5, 6 and 8.  Defendant further objects to this request on the ground that the word "replace" is vague.

**REQUEST NO. 6:**

All communications, all documents, and all electronically memorialized information

- 5 -

14216272.1

relating, reflecting or referring to any and/or all witnesses identified in Defendant's responses to Plaintiffs' First Set of Document Requests and Interrogatories.  This request includes but is not limited to any and all personal files held or maintained by Defendants.

**RESPONSE TO REQUEST NO. 6:**

    See General Objections Nos. 1, 2, 3, 4, 5, 6, 7 and 8.

**REQUEST NO. 7:**

    All communications, all documents, and all electronically memorialized information, concerning any performance evaluations given to Plaintiff, including the actual performance evaluations, and any emails or memoranda related to the generation of any of Plaintiff's performance evaluations.

**RESPONSE TO REQUEST NO. 7:**

    See General Objections Nos. 2, 3, 5, 6 and 7.

    Subject to and without waiving the foregoing objections, Defendant refers Plaintiff to

documents produced at Exhibit A.

**REQUEST NO. 8:**

    All communications, all documents, and all electronically memorialized information, concerning any and all complaints filed with and/or pending before the Equal Employment Opportunity Commission, the New York State Division of Human Rights, the New York City Human Rights Commission, the New York State Unemployment Insurance Appeal Board, or any other Court, tribunal or administrative agency against Defendants concerning alleged discrimination or retaliation by Defendants and/or its agents in the last five (5) years leading up to the filing of the Complaint in this action.  This request includes any and all documents submitted to and/or obtained from any of the above listed entities concerning Plaintiff.

**RESPONSE TO REQUEST NO. 8:**

    See General Objections Nos. 1, 2, 3, 4, 5, 6, 7 and 8.  Defendant further objects to

Document Request No. 8 as documents related to all complaints of discrimination and retaliation

bear no relation to the complaint's allegations.

    Subject to and without waiving the foregoing objections, Defendant will produce non-

privileged documents that may be deemed responsive to this request, if any, at Exhibit C.

- 6 -

**REQUEST NO. 9:**

All communications, all documents, and all electronically memorialized information, concerning any lawsuit filed against Defendants alleging retaliation or age discrimination in the last five (5) years leading up to the filing of the Complaint in this action, including but not limited to, Complaints, Answers, Settlement Agreements or Judgments entered in all such suits.

**RESPONSE TO REQUEST NO. 9:**

See General Objections Nos. 1, 2, 3, 4, 5, 6, 7 and 8.

**REQUEST NO. 10:**

All communications, all documents, and all electronically memorialized information, concerning any internal grievances filed against Defendants alleging age, race, national origin discrimination or retaliation.

**RESPONSE TO REQUEST NO. 10:**

See General Objections Nos. 1, 2, 3, 4, 5, 6, 7 and 8. Defendant further objects to

Document Request No. 10 as the request for any documents related to grievances concerning

race and national origin discrimination would bear no relation to the complaint's allegations.

**REQUEST NO. 11:**

All training materials (including, but not limited to, training manuals, instructions, pamphlets, videotapes, bulletins and memoranda) used by Defendants, from 2005 through the present, on the topic of discrimination, including but not limited to age discrimination and retaliation as well as policy guidelines regarding severance packages, termination procedures, employee pension information, employment 401(k) and stock options.

**RESPONSE TO REQUEST NO. 11:**

See General Objections Nos. 1, 2, 3, 4, 5, 6, 7, and 8.

Subject to and without waiving the foregoing objections, Defendant will produce non-

privileged documents from 2010 and 2011 that may be deemed responsive to this request, if any,

at Exhibit D.

**REQUEST NO. 12:**

All communications, all documents, and all electronically memorialized information,

- 7 -

concerning any and all procedures and/or policies of Defendants regarding employment discrimination.

**RESPONSE TO REQUEST NO. 12:**

See General Objections Nos. 1, 2, 3, 5, 6, and 7.

Subject to and without waiving the foregoing objections, Defendant will produce non-privileged documents from 2010 and 2011 that may be deemed responsive to this request, if any, at Exhibit E.  Defendant also refers Plaintiff to documents produced at Exhibit D.

**REQUEST NO. 13:**

All communications, all documents, and all electronically memorialized information concerning training offered by Defendants on the subject of employment discrimination and/or retaliation.

**RESPONSE TO REQUEST NO. 13:**

See General Objections Nos. 1, 2, 3, 4, 5, 6, 7, and 8.

Subject to and without waiving the foregoing objections, Defendant refers Plaintiff to documents produced at Exhibit D.

**REQUEST NO. 14:**

All communications, all documents and all electronically memorialized information concerning such communications, between Defendants concerning Plaintiff.

**RESPONSE TO REQUEST NO. 14:**

See General Objections Nos. 1, 2, 5, 6 and 7.  Defendant further objects to the phrase "between Defendants" as vague.

Subject to and without waiving the foregoing objections, Defendant will produce non-privileged documents that may be deemed responsive to this request, if any, at Exhibit F. Defendant also refers Plaintiff to documents produced at Exhibit A.

- 8 -

**REQUEST NO. 15:**

All communications, all documents, and all electronically memorialized information, concerning any and all investigations into employment discrimination with Defendants in the past five (5) years.

**RESPONSE TO REQUEST NO. 15:**

See General Objections Nos. 1, 2, 3, 4, 5, 6 and 8.  Defendant further objects to the term

"investigations into employment discrimination with Defendants" as vague.

**REQUEST NO. 16:**

All employee handbooks and/or personnel manuals and/or written directives distributed and/or posted for employees of Defendants within the last five (5) years.

**RESPONSE TO REQUEST NO. 16:**

See General Objections Nos. 1, 2, 3, 5, 6 and 7.

Subject to and without waiving the foregoing objections, Defendant refers Plaintiff to

documents produced at Exhibit E.

**REQUEST NO. 17:**

All statements taken and/or obtained by Defendants of any and all persons in connection with this matter.

**RESPONSE TO REQUEST NO. 17:**

See General Objections Nos. 1, 2, 4 and 6.  Defendant further objects to the term

"statements" as vague.

Subject to and without waiving the foregoing objections, Defendant states that, at this

time, it is not in possession of any statements regarding Plaintiff's claims in this matter.

**REQUEST NO. 18:**

All communications, all documents, and all electronically memorialized information identified in the answers to Plaintiff's First Set of Document Requests and Interrogatories.

- 9 -

14216272.1

**RESPONSE TO REQUEST NO. 18:**

See General Objections Nos. 1, 2, 3, 4, 5, 6, 7, 8 and 9.

Subject to and without waiving the foregoing objections, Defendant refers Plaintiff to documents produced at Exhibits A through F.

**REQUEST NO. 19:**

All communications, all documents, and all electronically memorialized information upon which Defendants will rely to defend against liability in this matter.

**RESPONSE TO REQUEST NO. 19:**

See General Objections Nos. 1, 2, 3, 4, 5, 6, 7, 8 and 9.

Subject to and without waiving the foregoing objections, Defendant states that it has not yet determined which documents it intends to rely upon to defend against liability in this matter.

Defendant refers Plaintiff to document produced at Exhibits A through F.

Dated: November 30, 2012
       Jericho, New York

                              NIXON PEABODY LLP

                              By: _____
                                  Tara Eyer Daub (TE-7943)
                                  Jessica Chiclacos (JG-2534)

                              50 Jericho Quadrangle, Suite 300
                              Jericho, NY  11753-2728
                              (516) 832-7613

                              *Attorneys for Defendant*
                              *Raymour Furniture Company, Inc.*



# Coaching for Success

Associate Name: Larry Friedmann
Location: Garden City _____
Manager: Lucy Goldstein _____

Date of Review: 05/07/11 _____
Next Review Date: 5/21/11 _____

**Opportunity for Improvement—Below are the standards set by Raymour & Flanigan that you have not yet met.**

I want to review with you your underperformance for delivered sales . The date range is 01/01/11 – 05/05/11 . You underperformed for this YTD  to the minimum expectation of $252,750 in delivered sales by $53,537. This dollar amount is based on your $750,000 Business Planner for 2011 that we will review. You are also underperforming to the minimum expectation for delivered sales for the year and are currently projected to finish the year at $617,435..

Below will be your specific goals by category for the next 2 weeks and will include an additional $ in written and delivered expectations per week to help catch up to the amount you are short.

**Goals of Coaching for Success—Use specific, quantitative measures whenever possible.** Clearly describe all behavioral issues as they relate to and affect team, morale, departmental/individual performance, customer impact, etc.)

| | Written Expectation | Delivered Expectation | AGP Expectation | Platinum Expectation | Bddg Expectation |
|---|---|---|---|---|---|
| Week 1 | $ 24,000 → | $ 20,000 | 2.5% | 50% | 18% |
| | Actual | Actual | Actual | Actual | Actual |
| | Written | Delivered | AGP | Platinum | Bddg |
| Week 1 | | | | | |
| | Written Expectation | Delivered Expectation | AGP Expectation | Platinum Expectation | Bddg Expectation |
| Week 2 | $ 24,000 | $ 20,000 | 2.5% | 50% | 18% |
| | Actual | Actual | Actual | Actual | Actual |
| | Written | Delivered | AGP | Platinum | Bddg |
| Week 2 | | | | | |
| | Written Expectation | Delivered Expectation | AGP Expectation | Platinum Expectation | Bddg Expectation |
| Week 3 | $ 24,000 | $ 20,000 | 2.5% | 50% | 18% |
| | | | | | |
| | | | | | |
| | | | | | |

**Support from Management Team: (List any tools, training, etc.)**



D 000039

The managers will review  with you daily your Ups/Closes, GEBS and Appointments to review your missed opportunities and give you any assistance they can. Please be specific on any areas you would like  additional training on so that we can help you to achieve the minimum expectations.

**Next Follow Up/Review Date & Expectations:**

| Week 1 | Written | Delivered | AGP | Platinum | Bddg |
|--------|---------|-----------|-----|----------|------|
|        | Expectation | Expectation | Expectation | Expectation | Expectation |
|        | $ | $ | 2.5% | 50% | Dollars |
| Week 1 | Actual | Actual | Actual | Actual | Actual |
|        | Written | Delivered | AGP | Platinum | Bddg |
|        |        |           |     |          |      |
| Week 2 | Written | Delivered | AGP | Platinum | Bddg |
|        | Expectation | Expectation | Expectation | Expectation | Expectation |
|        | $ | $ | 2.5% | 50% | Dollars |
| Week 2 | Actual | Actual | Actual | Actual | Actual |
|        | Written | Delivered | AGP | Platinum | Bddg |
|        |        |           |     |          |      |
|        |        |           |     |          |      |
|        |        |           |     |          |      |
|        |        |           |     |          |      |
|        |        |           |     |          |      |

**Additional  Comments:** At anytime during this coaching for success plan, if your performance does not meet with the minimum expectations set forth in this plan , we will move you to a formal action plan.

Associates Signature _Warrene Lipman_     Date_____

_Manager Signature_     Date  5/7/11_____

Manager Signature                              Date

D 000040



# Action Plan & Performance Agreement

Associate Name: Larry Friedmann _____
Location: Garden City Store _____
Lead Manager: Lucy Goldstein

Date of Review: June 13,2011 _____
Period Reviewed: _____
Next Review Date: June 20,2011

**Opportunity/Performance Issue—**Below are standards of performance set by Raymour & Flanigan that you have not met.

I want to review with you your underperformance for YTD for 2011. The date range is 01/01/2011-06/10/2011. You underperformed for this YTD period to the minimum expectation of $322,875 in delivered sales by $48,190. This dollar amount is based on your $750,000 Business Planner for 2011 that we will review. You are also underperforming to the minimum expectation in Written Sales, AGP %, Platinum %, Bedding % of Sales. Attached is a SAFR showing your actual numbers for YTD vs. the minimum expectation in each category.

Below will be your specific goals by category for the next 3 weeks.

**Goals of the Performance Agreement—**Use specific, quantitative measures whenever possible. Clearly describe all behavioral issues as they relate to and affect team, morale, departmental/individual performance, customer impact, etc.)

|  | Written Expectation | Delivered Expectation | AGP Expectation | Platinum Expectation | Bddg Expectation |
|---|---|---|---|---|---|
| Week 1 | $18,019 | $29,938 | 2.0% | 50% | $12,925 |
|  | Actual | Actual | Actual | Actual | Actual |
|  | Written | Delivered | AGP | Platinum | Bddg |
| Week 1 | $ | $ |  |  |  |
|  | Written Expectation | Delivered Expectation | AGP Expectation | Platinum Expectation | Bddg Expectation |
| Week 2 | $ 18,019 | $29,938 | 2.0% | 50% | $12,925 |
|  | Actual | Actual | Actual | Actual | Actual |
|  | Written | Delivered | AGP | Platinum | Bddg |
| Week 2 | $ | $ |  |  |  |
|  | Written Expectation | Delivered Expectation | AGP Expectation | Platinum Expectation | Bddg Expectation |
| Week 3 | $18,019 | $29,938 | 2.0% | 50% | $12,925 |
|  | Actual | Actual | Actual | Actual | Actual |
|  | Written | Delivered | AGP | Platinum | Bddg |
| Week 3 | $ | $ |  |  |  |



PLAINTIFF'S
EXHIBIT NO.
FOR IDENTIFICATION
DATE

D 000043

**Actions for the Associate**

Larry needs to consistently turn any of his ups over to a Manager if he cannot close them.

He should be going through all of his 10/10's , 12/12's and 6/6's to try and get as much delivered from this past business.

**Actions for the Management Team**

The managers will review  with you daily your Ups/Closes, GEBS and Appointments to review your missed opportunities and give you any assistance they can. Please be specific on any areas you would like  additional training on so that we can help you to achieve the minimum expectations.

**Associate Comments:**

**Next Follow Up/Review Date & Expectations:**

Failure to meet these minimum expectations at anytime during this Action Plan will result in further disciplinary action up to and Including termination.

_____        _____
Associate Signature                                    Date

_____        _____
Manager Signature                                     Date

D 000044

*Sales Projection 623,000*

**RAYMOUR & FLANIGAN FURNITURE**

PERFORMANCE EVALUATION AND DEVELOPMENT FORM: Sales Associate

Associate: *LARRY FRIEDMANN*

Year to Date Review - January 1st, 2011 through June 3rd 2011

### PART I: SALES PERFORMANCE

| Accountability | Budget | Actual | Variance (+/-) | Last YTD |
|---|---|---|---|---|
| Volume Written | $386,250.00 | 374,311 - | -11,879 - | 322,105 - |
| Volume Delivered | $309,000.00 | 256,676 - | -52,324 - | 245,925 - |
| Discounts | 7% | 12 % | -5% | |
| AGP $$$ | $7,725.00 | - 4,811 | | + 1,521 |
| Platinum Protection | 50% | 46.4 | -3.6 | .49 |
| Average $ per Sale | $1,500.00 | 1,671 - | + 171 | 1,830 |
| Store Bedding Sales | $51,697.00 | 32,918 - | -18,779 - | 33,329 |
| Prospecting-Minimum 5 Appts/$5000 written weekly average  6 WKS | $5,000/week | 524 - | ~4,476 | |
| Ups  555 | Closes  186 | %  33% | TO's  126 | Prospects  91 |
| Exception Updates | Lateness  5 | Absenteeism  0 | | |

### GOALS AND DEVELOPMENT

**GOALS: (Define goals and objectives including a date to review to determine if goals were attained.)**

1.) WRITTEN + DELIVERED BUSINESS NEEDS TO INCREASE TO REACH THE MINIMUM GOALS.

2.) BEDDING - BELOW REQUIREMENTS NEEDS TO FOCUS WITH EACH CUSTOMER TO TRY + SELL BEDDING

3.) PROSPECTING - EXTREMELY BAD - AVG'D #524 OVER A 6 WK PERIOD

4.) DISCOUNTS + AGP - NEED TO RAISE THE LEVEL IN BOTH OF THESE AREAS

MANAGER'S COMMENTS: LARRY IS BELOW AVERAGE IN ALL AREAS - He NEED TO DO AN IMMEDIATE TURN AROUND.

ASSOCIATE'S COMMENTS:

SIGNATURES: *Clarence Jackson*

Associate Signature                                      Date

Managers Signature                                      Date

Additional Comments

*E-BOB OVERVIEW*
*6/6      10/10      12/12      11/1*

D 000045